UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA 

Before The Honorable Phyllis J. Hamilton, Judge

United States of America,    )    **Jury Trial**
                             )
            Plaintiff,       )    **Volume 8**
                             )
   VS.                       )    NO. CR 14-00590 PJH
                             )
RICHARD THOMAS GRANT,        )    **Pages 1368 through 1610**
                             )
            Defendant.       )    Oakland, California
_____)    Friday, June 17, 2016


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:          Brian J. Stretch, Esq.
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  COLIN C. SAMPSON,
                        Assistant United States Attorney

                        U.S. Department of Justice
                        Tax Division
                        Western Criminal Enforcement Section
                        601 D Street NW
                        WASHINGTON, D.C.  20004
                   BY:  MATTHEW KLUGE, Trial Attorney

For Defendant:          WILLIAM A. COHAN, ATTORNEY AT LAW
                        P.O. Box 3448
                        Rancho Santa Fe, California  92067


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# I N D E X

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| MOTTAHEDEH, PEYMON | | |
| DIRECT EXAM (RESUMED) BY MR. COHAN | 1370 | 8 |
| CROSS-EXAMINATION BY MR. SAMPSON | 1423 | 8 |
| REDIRECT EXAMINATION BY MR. COHAN | 1433 | 8 |
| | | |
| GRANT, JR., RICHART T. | | |
| DIRECT EXAMINATION BY MR. COHAN | 1435 | 8 |
| CROSS-EXAMINATION BY MR. SAMPSON | 1519 | 8 |

| DEFENDANT'S EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 504 | | | 1449 | 8 |
| 506A | | | 1481 | 8 |
| 507 | | | 1487 | 8 |
| 508 | | | 1489 | 8 |
| 509 | | | 1493 | 8 |
| 510 | | | 1495 | 8 |
| 512 | | | 1498 | 8 |
| 513 | | | 1499 | 8 |
| 522, 523 | | | 1511 | 8 |
| 613 | | | 1405 | 8 |
| 627 | | | 1409 | 8 |
| 637 | | | 1413 | 8 |

1    Friday, June 17, 2016                              8:32 a.m.

2                        P R O C E E D I N G S

3         (The following proceedings were heard in the presence of

4    the jury:)

5              **THE CLERK:**  Please be seated and come to order.

6              **THE COURT:**  All right.  Good morning, counsel.

7              **MR. COHAN:**  Good morning.

8              **THE COURT:**  Ladies and gentlemen of the jury.

9         All right.  Now, we were in the middle or toward the end

10   of your examination of Mr. Mottahedeh.  And you were examining

11   him with respect to which exhibit, counsel?

12             **MR. COHAN:**  129, Your Honor.  So this is in evidence

13   already.

14             **THE COURT:**  All right.

15             **MR. COHAN:**  And consequently, if I may, I'd like to

16   display Exhibit 129.

17        Before I go farther, I want to make sure that the court

18   reporter is picking this up, and I'm remembering to talk into

19   the mic.

20             **THE REPORTER:**  Yes, thank you.

21             **MR. COHAN:**  You're welcome.

22        All right.

23                      <u>**DIRECT EXAMINATION**</u>

24   BY MR. COHAN:

25   **Q.**  Mr. Mottahedeh, good morning.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **A.**   Good morning, sir.

2    **Q.**   So do you see Exhibit 129 before you?

3    **A.**   Yes.

4    **Q.**   Okay.

5                    (Exhibit published.)

6    **BY MR. COHAN:**

7    **Q.**   Inviting your attention to this exhibit, do you recognize

8    it?

9    **A.**   Yes.

10   **Q.**   And how do you recognize this exhibit?

11        I take it the jury is able to see this?  Maybe I should

12   zoom it a little bit.

13        No.  That's the wrong way.

14                    (Exhibit published.)

15        **MR. COHAN:**  Okay.

16   **Q.**   So how is it, sir, that you recognize this Exhibit 129,

17   this -- there's obviously a typo.  It says, "Robert T. Grant."

18   You received it from Richard T. Grant, Junior, didn't you?

19   **A.**   Yes.

20   **Q.**   And was that sometime shortly after September the 2nd of

21   2009?

22   **A.**   Yes.

23   **Q.**   Did you have occasion to discuss any of the content of

24   this exhibit?  In particular, I want to invite your attention

25   to the paragraph that says, quote, you have the right to

1    representation as stated in Publication 1 that was previously

2    sent to you and on Form 4564, No. 1, information document

3    request.

4        Do you see that?

5    **A.**  Yes.

6    **Q.**  And then below that, we have enclosed Publication 2105,

7    quote, why do I have to pay taxes, end quote, for you to read.

8        And in addition, we have enclosed Notice 609, quote

9    Privacy Act, end quote, and Publication 1, quote, Your Rights

10   As a Taxpayer.  See all that?

11   **A.**  Yes.

12   **Q.**  And if I might invite your attention to the second page,

13   you can see that this was sent by or at least signed by --

14   excuse me -- Patricia Young-Lau.

15   **A.**  Yes.

16   **Q.**  Okay.  And did you see the second page as well when you

17   received this from Mr. Grant?

18   **A.**  Yes.

19   **Q.**  Inviting your attention, if I might, to the third page in

20   particular.  I think where we were was under the description

21   of documents requested by Ms. Young-Lau, paragraph numbered 2.

22       So do you have that before you?

23   **A.**  Yes.

24   **Q.**  I think where we were was I was asking you about whether

25   you had had a discussion with Mr. Grant concerning the

1  following language:  Quote, please be aware that

2  Internal Revenue Code Section 6000 and 6011 require that each

3  person who owes income files a return.  If the person doesn't

4  file, Internal Revenue Code Section 6020(b) allows the

5  Internal Revenue to prepare a return from income sources

6  available.

7      Did you can you discuss that language with Mr. Grant

8  sometime in September or October of 2009?

9  **A.**  Yes.

10  **Q.**  And what was the nature of the discussion concerning

11  whether you told Mr. Grant or did not tell Mr. Grant if

12  Section 6000 and 6011 applied to him?

13          **THE COURT:**  Excuse me.

14          **MR. SAMPSON:**  Leading, Your Honor.

15          **THE COURT:**  Overruled.

16          **THE WITNESS:**  I explained to him that this sentence,

17  to me it did not make any sense, that if somebody owes income

18  or money to somebody else, that does not require the person to

19  file a return.  So I expressed to him that maybe this is a

20  typo, this part of it, or misunderstanding by the IRS agent.

21  But I told him that I don't understand why that sentence says

22  that.

23  **BY MR. COHAN:**

24  **Q.**  What about the question of whether you discussed with

25  Mr. Grant the applicability or non-applicability of Section

1  6000 and 6011 to Mr. Grant?

2  **A.** I discussed with him that Section 6000 and -11, if the

3  person is required to file a return, then he is required to

4  file under those sections. But if he's not required to file

5  in the first place, he's not required to file, period, under

6  any sections.

7  **Q.** Did you mention to him that the Internal Revenue,

8  according to this document, can prepare returns for you if you

9  don't file your own under Section 6020(b)?

10  **A.** Yes, I did tell him that that part is correct, that if the

11  IRS believes that the person is required to file a return, and

12  they have not done so, the IRS does have the authority to go

13  under Section 6020(b) and file a return for that person.

14      **THE COURT:** Excuse me. Counsel, I think I should

15  give the limiting instruction that we talked about yesterday.

16      Ladies and gentlemen, you're listening to testimony from

17  this witness about things that he said to the defendant

18  outside of the courtroom. And I instruct you that this

19  evidence is being admitted for a limited purpose. That

20  purpose is demonstrating the defendant's state of mind,

21  knowledge, or the effect of the statement on the defendant.

22  It is admitted only for that limited purpose and for no other

23  purpose.

24      **MR. COHAN:** May I proceed?

25      **THE COURT:** Yeah.

1    MR. COHAN:  Thank you.

2    Q.  Now, inviting your attention to the next page of the

3    exhibit, Mr. Mottahedeh, do you have that before you?

4    A.  Yes.

5                    (Exhibit published.)

6    BY MR. COHAN:

7    Q.  Did you -- Do you recall having any discussion with

8    Mr. Grant about any of what's on this page?

9    A.  The last page.

10   Q.  Okay.  The last page.  Let me turn to that page, then.

11                   (Exhibit published.)

12   BY MR. COHAN:

13   Q.  Is this the last page to which you're referring?

14   A.  Yes.

15   Q.  And let me shrink this a little bit.  Oh, you have the

16   entire thing in front of you, don't you?

17   A.  Yes, I do.

18   Q.  All right.  So what portions of this page do you recall

19   discussing with Mr. Grant?

20   A.  I discussed the part, paragraph -- it's not numbered, but

21   if you count it after the first paragraph, the fourth

22   paragraph that says "Truth."  It's a rather big paragraph that

23   starts with "Truth."

24   Q.  Okay.  Just a moment if I may.  Let's make sure I'm --

25                   (Exhibit published.)

**BY MR. COHAN:**

**Q.** Okay. Now, according to the government publication, this is the truth. Can I ask you a preliminary question?

Do you have an understanding of difference between truth and propaganda?

**A.** Yes.

**MR. SAMPSON:** Objection.

**BY MR. COHAN:**

**Q.** What's the difference?

**MR. SAMPSON:** It's argumentative.

**THE COURT:** Sustained.

**BY MR. COHAN:**

**Q.** Do you know who is responsible for making this statement of what is the truth? Is there an individual who says something under penalty of perjury, or do you know where this comes from?

**A.** This just come from some IRS employee who put their opinion of the law in writing and mailed it out.

**Q.** That's just an assumption on your part, right? You don't really know who sent it, do you?

**A.** I really don't know who put this thing together.

**Q.** Okay. So --

**THE COURT:** All right. And then the witness's last answer is stricken, and the jury is instructed to disregard it.

**BY MR. COHAN:**

**Q.** If I may, are we talking about the term voluntary compliance means that each of us is responsible for filing a tax return when required?

**A.** Yes.

**Q.** And what, if anything, did you discuss with Mr. Grant about the meaning of that statement, quote, the term voluntary compliance means that each of us is responsible for forming a tax return when required?

**A.** Well, I read with him the very first sentence of that paragraph slowly so that, you know, he understands what the sentence actually means. And it says the term voluntary compliance means that each of us is responsible for filing a tax return when required and for determining and paying the correct amount of tax.

And I explained to him that I don't understand how something that is required can be voluntary at the same time.

**Q.** Was this part of a discussion that you had with him on more than one occasion, about whether most working people in the United States are required to file income taxes by law or they aren't?

        **MR. SAMPSON:** Objection, Your Honor. This is leading the witness.

        **THE COURT:** Sustained.

        **MR. SAMPSON:** Coaching the witness.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **THE COURT:**  Sustained.

2    **BY MR. COHAN:**

3    **Q.**  Did you have a discussion with Mr. Grant or more than one

4    about whether income tax filings are voluntary or mandatory

5    under law?

6    **A.**  Yes.

7    **Q.**  And can you summarize that discussion or those discussions

8    for the ladies and gentlemen of the jury?

9    **A.**  Yes.  I explained to him that in my opinion, my research,

10   and that of my student, the former gun-carrying IRS Special

11   Agent with the IRS's own Criminal Investigation Division, the

12   average American is not required to file and pay the federal

13   income tax.

14   **Q.**  Okay.

15            **MR. COHAN:**  May I have a moment, Your Honor?

16            **THE COURT:**  Yes.

17            **MR. COHAN:**  Thanks for that.

18                (Off-the-record discussion.)

19            **A JUROR:**  -- when exhibits are not being displayed

20   these monitors are turned off?  They're very bright.

21            **THE COURT:**  All right.

22            **THE CLERK:**  I can't turn them off.

23            **THE COURT:**  It's up to him.

24            **THE CLERK:**  No, when -- It's -- I mean, I'm in

25   control of their monitors, and I can't physically turn them

1  off.

2        **A JUROR:**  Just black them out somehow?

3        **THE COURT:**  Hold on.  Hold on.  Hold on.

4     Nichole, when you say you can't turn them off, you mean

5  you have to blacken the whole system?

6        **THE CLERK:**  Well, I can -- I guess I can switch out.

7        **THE COURT:**  Yeah, but then --

8        **THE CLERK:**  Yeah.

9        **THE COURT:**  You can't do it -- He can't use it unless

10  you switch the whole system on.

11        **THE CLERK:**  Right.

12        **MR. COHAN:**  I have --

13        **THE CLERK:**  I can do it.  It just will take time.

14              (Simultaneous colloquy.)

15        **THE COURT:**  Hold on.

16     Do all the jury members find that these lights are too

17  glaring to leave on during the course of a witness's

18  testimony?  Because we -- it's a cumbersome procedure to turn

19  the whole thing off.  Anybody besides juror No. 10?

20     Okay.  All right.

21        **THE CLERK:**  We could use that.

22        **THE COURT:**  All right.

23        **THE CLERK:**  They could use the government --

24        **THE COURT:**  To the extent that the exhibits are

25  already in.

1    **MR. SAMPSON:**  If they're in.

2    **THE COURT:**  All right.  If they're in, then the

3    government will use their system.

4                    (Off-the-record discussion.)

5    **THE COURT:**  All right.  It's just when we use -- when

6    the ELMO's being used that it's a problem.

7    Okay.  Go ahead.

8    **MR. COHAN:**  This technology is above my pay grade,

9    Your Honor.  I don't know how to do it.

10    **THE COURT:**  Okay.

11    **MR. COHAN:**  Apologies.

12   **Q.**  Okay.  This next exhibit that I want to use and invite

13   this witness attention to is Exhibit 130, and it is in

14   evidence.

15   So, Mr. Garland, can you --

16                    (Exhibit published.)

17    **MR. COHAN:**  Thank you very kindly.

18   **Q.**  So now the individual monitors are off, and everybody can

19   see that one?

20   All right.  So, Mr. Mottahedeh, do you recognize Exhibit

21   130?

22   **A.**  Yes.

23   **Q.**  And what is Exhibit 130?

24   **A.**  It's a response I wrote for Mr. Grant to send to IRS

25   Revenue Agent Patricia Young-Lau.

1  **Q.**  And it appears that it's nothing more than rescheduling an

2  appointment.  Is that your understanding what you were doing?

3  **A.**  Yes.

4  **Q.**  So no matter what Mr. Grant received from the IRS or

5  Franchise Tax Board or any court in which he had an action

6  going on related to his income tax, is it your understanding

7  that everything would be sent to you for your deciding what

8  type of response and preparing whatever response was going to

9  be provided by Mr. Grant?

10  **A.**  Yes.

11  **Q.**  Okay.  And so that's what this was?

12  **A.**  Yes.

13  **Q.**  All right.  Thank you.

14      So the next exhibit is Exhibit 359.  Exhibit 359 is also

15  in evidence.

16      So, Mr. —— if you would ——

17                      (Exhibit published.)

18          **MR. COHAN:**  Thank you.

19  **Q.**  Now, Mr. Mottahedeh, inviting your attention to Exhibit

20  359, do you have that before you?

21  **A.**  Yes.

22  **Q.**  Do you recognize it?

23  **A.**  Yes.

24  **Q.**  And can you tell the ladies and gentlemen of the jury what

25  this is that you ——

1    Well, first of all, did you write this?

2  **A.**  Yes.

3  **Q.**  Okay.  And what was your purpose in preparing this

4  document?

5  **A.**  Mr. Grant's brother and partner, Mr. Randall Grant, had

6  received a summons from the IRS requesting documents from

7  Grant Engineering, the business that Mr. Richard and Robert

8  (sic) Grant owned together.

9  **Q.**  You mean Richard and Randall, don't you?

10  **A.**  Yes.  I'm sorry.  Richard and Randall, yes.

11    And so I prepared this response for Mr. Randall Grant as

12  the general partner of Grant Engineering -- to send to the IRS

13  because it was in relation to Mr. Richard Grants (sic).

14  **Q.**  Okay.  And inviting your attention to the second page --

15    (Exhibit published.)

16  **BY MR. COHAN:**

17  **Q.**  Did you write every bit of this?

18  **A.**  Yes.

19  **Q.**  And it says, quote, Due to the fact that your response is

20  not timely and due to other personal considerations, I'm

21  unable to appear at this time.

22  **A.**  Yes.  And the paragraphs above it explain that in more

23  detail why the IRS's summons wasn't timely.

24  **Q.**  Okay.  Now, do you know who actually affixed the signature

25  below, respectfully submitted, and it appears to be Randall L.

1  Grant, right?

2  **A.**  That's what I believe also.

3  **Q.**  Okay.  Do you know who signed it?

4  **A.**  I believe Mr. Randall Grant signed it, brother of

5  Mr. Richard Grant.

6  **Q.**  Right.

7       **MR. SAMPSON:**  Objection, asked and answered.  He --

8  lack of foundation.

9       **THE COURT:**  Yeah, that's the problem.  How does --

10  What's that based upon?  Please --

11       **MR. COHAN:**  I'll clear this up.

12       **THE COURT:**  Please establish.

13  **BY MR. COHAN:**

14  **Q.**  In fact, sir, you don't know who actually signed this

15  because you weren't present when it was signed, correct?

16  **A.**  That is correct.

17  **Q.**  Thank you.

18       **THE COURT:**  Then the jury is instructed to disregard

19  his last answer indicating that he did know.

20  **BY MR. COHAN:**

21  **Q.**  Did you ever speak with Randall Grant about this

22  particular document?

23  **A.**  No.

24  **Q.**  Okay.

25       The next exhibit is also in evidence.  It's Exhibit 134.

1    Do you have that before you?

2    **A.**   (Reviewing document.)

3         Yes.

4                    (Off-the-record discussion.)

5              **MR. COHAN:**   If you would, sir.

6                        (Exhibit published.)

7    **BY MR. COHAN:**

8    **Q.**   Do you recognize this document?

9    **A.**   Yes.

10   **Q.**   What is this document, sir?

11   **A.**   It's the petition of Grant Engineering to the United

12   States District Court to quash the IRS's summons of –– the

13   summons that IRS had issued to Grant Engineering about

14   Mr. Richard Grant.

15   **Q.**   Actually, if I might invite your attention to page 2.

16                       (Exhibit published.)

17             **MR. COHAN:**   No, I'm sorry.  That shows the receipt

18   for payment.  The third page of the exhibit, page 2 of the

19   petition.  It's the next page.

20                       (Exhibit published.)

21             **MR. COHAN:**   There we go.

22   **Q.**   All right.  Inviting your attention to this page, do you

23   see that this was actually an IRS summons not to Grant

24   Engineering but it was to Washington Mutual bank concerning

25   records that pertained to Grant Engineering?

1    **MR. SAMPSON:**  Objection, the document speaks for

2    itself.  He's describing the document to the witness.

3    **THE COURT:**  Yes.  It's a very leading question,

4    counsel.  Rephrase, please.

5    **BY MR. COHAN:**

6    **Q.**  Did you testify mistakenly a moment ago when you said that

7    the summons was a summons to Grant Engineering instead of

8    third-party summons that appears to be the subject of this

9    petition to quash?

10   **A.**  Yes, because I didn't have a chance to really look at it

11   closely and refresh myself.  It looked like -- It is from

12   Grant Engineering.  And -- But now that I see that page 2, it

13   does say in page 2 that it is to quash the records of

14   Washington Mutual Bank.

15   **Q.**  Okay.

16      So what was your purpose in preparing -- First of all, did

17   you prepare the entirety of this petition to quash the

18   summons, and it's got --

19      (Reviewing document.)

20      The exhibit has actually a number of pages, but let's go

21   to the eighth page of the exhibit if we could.

22                    (Exhibit published.)

23   **BY MR. COHAN:**

24   **Q.**  All right.  Do you recognize this document?

25   **A.**  (Reviewing document.)

1    Yes.  This was the IRS summons that was issued to

2    Washington Mutual Bank about the records of Grant

3    Engineering & Manufacturing.

4    **Q.**  Okay.  So this was the summons as to which you were

5    preparing the petition to quash; is that right?

6    **A.**  Yes.

7    **Q.**  And why did you provide this petition to quash --

8        **MR. SAMPSON:**  Objection.

9    **BY MR. COHAN:**

10   **Q.**  -- to Mr. Grant?

11       **MR. SAMPSON:**  Your Honor, relevance as to why this

12   witness did something.  What matters is what the defendant

13   understood.

14       **THE COURT:**  Sustained.

15   **BY MR. COHAN:**

16   **Q.**  What did you tell Mr. Grant about your reasons for

17   preparing this petition to quash?

18   **A.**  Those reasons are actually listed in the -- the summons.

19   They're the cause of action --

20   **Q.**  You mean, in the -- in your petition to quash the summons?

21   **A.**  Yes, the reasons are listed.  To protect his rights.  IRS

22   has not been following the proper procedures to do this.  And

23   violating his rights at the same time.  And it's all listed in

24   there.

25   **Q.**  So inviting your attention to page 3 of the exhibit.

1    (Exhibit published.)

2    **BY MR. COHAN:**

3    **Q.**  You referred to reasons, and you have before you this page

4    3.  And is it fair to say you wrote all of the -- the verbiage

5    here?

6    **A.**  Yes.

7    **Q.**  Okay.  And so it's your contention that you wrote this and

8    provided it to Mr. Grant so that he would be protecting his

9    rights?

10    **MR. SAMPSON:**  Objection, Your Honor.  He's asking the

11    contention.

12    **THE COURT:**  Yes.  Improper.  What -- It's not his

13    contention.  Rephrase.

14    **BY MR. COHAN:**

15    **Q.**  Can you tell the ladies and gentlemen of the jury what you

16    told Mr. Grant as to the reasons for him to submit this

17    petition to the United States District Court to quash the IRS

18    summons that's attached it to?

19    **A.**  Yes, I told him, first of all, that the IRS had not

20    followed the proper procedures stated in the IRS Code sections

21    which are listed here.

22    The first one is that it was not timely.  There is a

23    certain amount of time which things must take place under the

24    law and the IRS Code.  And the IRS didn't meet those proper

25    timely requirements.

1    No. 2, the IRS is required to provide record of persons

2    who IRS has contacted about Grant Engineering.  And the IRS

3    had not done so.

4    Third, I stated that I believe that although they make it

5    look like it was just a civil case about money, they're --

6    actually the IRS was pursuing him criminally and referred him

7    to the U.S. Department of Justice for criminal prosecution,

8    exactly like this case that ended up being.

9    **Q.**  And on page 4?

10   **MR. SAMPSON:**  Your Honor, I need to object.  The --

11   the witness is reading while he's talking about the things,

12   and he's saying that he told Mr. Grant these things.  It's a

13   little confusing what he told Mr. Grant or what was in this

14   document.

15   **THE COURT:**  Yes.  And --

16   **MR. COHAN:**  A false dichotomy, Your Honor.  Obviously

17   I'm eliciting this witness recollection looking at the

18   document explaining the document to Mr. Grant.

19   **THE COURT:**  You can ask him --

20   **MR. COHAN:**  So we can go refresh recollection --

21   **THE COURT:**  Well, that is -- that is the procedure.

22   **MR. COHAN:**  Very well.

23   **THE COURT:**  That is required.

24   BY MR. COHAN:

25   **Q.**  Mr. Mottahedeh, can you recall what you wrote in 2010 in a

1  petition that you filed -- strike that -- that you provided to

2  Mr. Grant that he filed after you prepared it?

3  **A.**  I could recall it after I take a look at the document,

4  refresh myself, yes.

5  **Q.**  All right.  Without refreshing your recollection by

6  looking at the document, can you recall every one of these

7  things that you allege here?

8  **A.**  No, I could not.

9  **Q.**  Okay.

10  Well, take a moment, then, look at the fourth cause of

11  action and see if it refreshes your recollection.

12  **A.**  (Reviewing document.)

13  Okay.

14  **Q.**  So what was it that you were writing here for Mr. Grant to

15  allege to protect his rights as you saw it?

16  **A.**  (Reviewing document.)

17  What I was saying here is, I told him that Washington

18  Mutual is not a specified third-party recordkeeper which IRS

19  can get the records of Grant Engineering about.  That's what

20  No. 4 is.

21  **Q.**  And the -- without reading from this, can you remember the

22  fifth, sixth, and seventh cause of action that you allege here

23  as grounds for a court to quash the summons by the IRS to

24  Washington Mutual?

25  **MR. SAMPSON:**  I object.  The witness is obviously

1  reading.  He should put the document away.  Mr. Cohan said

2  without reading the document.

3         **THE COURT:**  Yes.  Sustained.

4         **MR. COHAN:**  Can I get an answer to that question?

5         **THE COURT:**  No.  Rephrase it.

6  **BY MR. COHAN:**

7  **Q.**  Is it fair to say that without reading this document, you

8  really can't recall the details of what you were thinking six

9  years ago?

10  **A.**  That is correct.

11  **Q.**  Okay.

12     I'll move on from this exhibit.

13     Inviting your attention to Exhibit 136.

14                (Exhibit published.)

15         **MR. COHAN:**  Again, it's in evidence.

16  **Q.**  Do you recognize Exhibit 136, Mr. Mottahedeh?

17  **A.**  (Reviewing document.)

18     Yes.

19  **Q.**  And what is Exhibit 136?

20  **A.**  This is a petition to quash that Mr. Richard Grant filed

21  to quash an IRS summons to some –– and let me see ––

22  apparently some third parties.  I have to look at page 2 to

23  refresh myself as to what it was –– what summons it was

24  quashing.

25  **Q.**  Well, let's look at the ––

1   **MR. SAMPSON:** Memory is not exhausted, Your Honor.  I

2   object.

3   **THE COURT:** Yes.

4   **MR. SAMPSON:** We haven't established that.

5   **THE COURT:** Yes.  We -- Counsel, we do have to follow

6   the proper procedure.

7   **MR. COHAN:** All right.

8   **Q.** Do you recall without looking at this document what you

9   were thinking when you drafted this document and sent it to

10  Mr. Grant on or about, I guess, early July or late June of

11  2011?

12  **A.** Without look at the document, refreshing myself, I could

13  not tell you exactly what -- what it was about.

14  **Q.** Okay.

15  **THE COURT:** If you want him to refresh his

16  recollection, then he can look at --

17  (Simultaneous colloquy.)

18  **MR. COHAN:** Yes.

19  **Q.** Please take your time.  Take all the time you want and

20  review the entire document, and we'll just wait.

21  **THE COURT:** Well, we're not going to wait for an

22  indefinite amount of time.

23  **MR. COHAN:** No.  Just a reasonable time for him to

24  review an eight-page document, Your Honor.  If your rulings

25  are your rulings, I'll follow them.

1    **THE COURT:**  All right.

2    **MR. COHAN:**  Of course.  But that's what we're going

3    to have to do.

4    **THE COURT:**  All right.  But don't argue with me about

5    it.

6    **MR. COHAN:**  I'm not arguing.

7    **THE WITNESS:**  (Reviewing document.)

8    Okay.  I'm prepared to respond your questions about this

9    exhibit.

10   **BY MR. COHAN:**

11   **Q.**  Okay.

12   Don't look down at the document while you're responding,

13   please.  Okay?

14   **A.**  Okay.

15   **Q.**  Thank you.

16   Now, do you recall what the subject was of the information

17   that this petition to quash was seeking to quash, meaning

18   prevent the person who got the summons from providing the

19   information to the IRS, what information and from whom was the

20   subject of this petition to quash?

21   **A.**  The IRS Special Agent wanted to get information about

22   Mr. Grant from several different persons around the United

23   States.  And this was a proper method to challenge that.

24   **Q.**  Do you recall the -- the particular source of information

25   in this Exhibit 136 without looking at Exhibit 136?

1    **A.**   No.

2    **Q.**   Okay.  Do you need to look at it longer to know the

3    persons to whom it was directed?

4    **A.**   Yes.

5    **Q.**   Take another moment, if you would, sir.  And I'd invite

6    your attention to the bottom of page 1 that identifies the

7    recipients of the -- of the summons.

8    **A.**   (Reviewing document.)

9         Carol Zineck (phonetic) & Associates in Petaluma,

10   California; and Moore (phonetic) & Company in Novato,

11   California.

12        **MR. SAMPSON:**  I do object.  He's just reading from

13   the document.

14        **THE COURT:**  Overruled on this one.

15   BY MR. COHAN:

16   **Q.**   So do you know who Carol Zinck & Associates and Morre

17   C.P.A & Company are?

18   **A.**   No.

19   **Q.**   Do you -- Did you have a conversation with Mr. Grant about

20   this summons and the petition to quash that you prepared for

21   him prior to actually your drafting up this petition?

22   **A.**   Restate that question, please.

23   **Q.**   Sure.  Do you recall having a conversation -- Well, let's

24   back up.

25        Did you receive the summons -- if you would, look at the

1  page 8 -- excuse me -- page 8 and page 11 of this Exhibit 136.

2  And you'll see there are actually two summonses, one to Carol

3  Zinck & Associates --

4                        (Exhibit published.)

5  BY MR. COHAN:

6  **Q.**  -- and one to more -- Morre & Company.

7       Do you see that?

8  **A.**  Yes.

9  **Q.**  And did Mr. Grant send those summonses to you for you to

10  deal with them?

11  **A.**  Yes.

12  **Q.**  And did you prepare this petition that constitutes Exhibit

13  136?

14  **A.**  Yes.

15  **Q.**  And do you recall any of the details of your discussions

16  with Mr. Grant about preparing this petition and -- and

17  instructing him to file it without looking at the document?

18  **A.**  Not very specifically because it happened so many years

19  ago.  But basically, I just discussed the contents of it to

20  make sure he understood them.

21           **MR. COHAN:**  Okay.

22           **MR. SAMPSON:**  Objection.  He said he didn't recall

23  it.

24           **THE COURT:**  Overruled.

25           **MR. COHAN:**  We'll move on.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  **Q.**  If I may, let's take a look at Exhibit 358.

2  **A.**  (Reviewing document.)

3      **MR. SAMPSON:**  I don't have a copy.

4      **MR. COHAN:**  Of Exhibit 358?

5      **MR. SAMPSON:**  Oh, okay.  There's not one in the

6  binders.

7      **MR. COHAN:**  Oh, it's 'cause it's your exhibit.  I'm

8  sorry.

9      Do you need a copy of it?

10      **THE COURT:**  I think one of you gave me the copy.  I

11  have an extra.

12      **MR. COHAN:**  Counsel?

13      **MR. SAMPSON:**  It's fine.

14      **THE COURT:**  I think you gave me -- One of you gave me

15  that copy.

16      **MR. COHAN:**  Thank you.

17              (Exhibit published.)

18  **BY MR. COHAN:**

19  **Q.**  Please take a moment, if you would, Mr. Mottahedeh, and

20  look at Exhibit 358.  That's a two-page exhibit.

21  **A.**  Yes.

22  **Q.**  Okay.

23      Do you recognize that handwriting?

24  **A.**  No.

25  **Q.**  Okay.  Inviting your attention to the second page, I want

1  you to please review that second page of the handwritten

2  script, the second page.

3                    (Exhibit published.)

4          **MR. COHAN:**  There we go.  There's the second page.

5                    (Exhibit published.)

6  **BY MR. COHAN:**

7  **A.**  Yes.

8  **Q.**  Have you read the entire thing?

9  **A.**  Yes.

10  **Q.**  Do you recall having a conversation with Richard Grant

11  about a summons that Randall Grant had received from Special

12  Agent Moran?

13  **A.**  Yes.

14  **Q.**  And what was that conversation that you had about this

15  subject with Richard Grant?

16  **A.**  (Reviewing document.)

17      I don't specifically recall because I did not -- I don't

18  think I prepared this letter.

19  **Q.**  Do you recall discussing the contents of this letter with

20  Mr. Grant so he could draft the letter?

21  **A.**  I think what I did in this case because it was his brother

22  and his brother was nervous about things and did not want to

23  talk to me, so I told Mr. Grant some of the legal aspects of

24  this case and the factual aspect of the case.  And then

25  Mr. Grant told me that he'll talk to his brother about doing

1  something or writing a letter.  And this was the result of

2  that.  So I did not dictate the contents of this letter.

3  **Q.**  Okay.

4       **MR. SAMPSON:**  Objection, Your Honor.  The answer

5  contained hearsay.  It's not a party opponent.

6       **THE COURT:**  It's a little difficult to parse it all

7  out.  First of all, it's not clear to me from the witness's

8  answer that he knows anything about this letter, and you need

9  to clarify exactly what his knowledge is about this letter.

10 **BY MR. COHAN:**

11 **Q.**  Well, that's the purpose of my questions.

12      Mr. Mottahedeh, do you have any further recollection about

13 any conversation you had with Richard Grant about this Exhibit

14 358 concerning preparing it?

15 **A.**  Like I said, the only thing I can think of that I said to

16 Mr. Grant that may have related to this document is that I

17 spoke with Mr. Richard Grant about the summons to his brother

18 and what are the legal and factual issues related to it.

19      And based upon that, apparently they may have had a

20 conversation.  I don't know.  But that's as far as I can tell

21 you about my relation to this letter.

22      **THE COURT:**  All right.  I'd like to clarify this.

23 Have you seen this letter before?

24      **THE WITNESS:**  No.

25      **THE COURT:**  Did you prepare this letter?

1    **THE WITNESS:**  No.

2    **THE COURT:**  Do you know anything about this letter?

3    **THE WITNESS:**  No.

4    **MR. COHAN:**  Okay.

5    **Q.**  Inviting your attention to Exhibit 138.

6    **A.**  (Reviewing document.)

7    (Exhibit published.)

8    **THE WITNESS:**  Yes.

9    **BY MR. COHAN:**

10   **Q.**  Do you recognize Exhibit 138?

11   **A.**  Yes.

12   **Q.**  What is it?

13   **A.**  It's a petition by Mr. Richard Grant to quash an IRS

14   summons issued to some third parties.

15   **Q.**  And do you have any independent recollection of what you

16   were thinking when you drafted what has been admitted as

17   Exhibit 138?

18   **MR. SAMPSON:**  Objection, Your Honor, what –– what the

19   witness was thinking.

20   **THE COURT:**  Sustained.

21   **BY MR. COHAN:**

22   **Q.**  Do you recall having a conversation with Richard Grant

23   about –– Well, strike that.  We'll back up.

24   Did you receive a summons from Rick Grant as to which this

25   was a petition to quash that summons that you drafted?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1   **A.**   Yes.

2   **Q.**   And do you recall the details of your discussion with Rick

3   Grant about the summons that you were seeking to quash or

4   seeking to assist Mr. Grant in quashing by drafting up this

5   petition?

6   **A.**   Not without looking at the document, refreshing myself.

7   **Q.**   Are you satisfied that you're the person who drafted this

8   document up?

9   **A.**   Yes.

10  **Q.**   And did you tell Rick Grant that it was to protect his

11  rights?

12  **A.**   Yes.

13  **Q.**   Okay.  I'll move on.

14       Let's go to Exhibit 140, please.

15                    (Exhibit published.)

16  **BY MR. COHAN:**

17  **Q.**   Do you recognize Exhibit 140?

18  **A.**   (Reviewing document.)

19       Yes.

20  **Q.**   And what is Exhibit 140?

21  **A.**   It's another petition to quash IRS summons that was issued

22  against Mr. Richard Grant.

23  **Q.**   And did you receive the summons as to which this is a

24  petition to quash from Richard Grant prior to the time you

25  prepared this petition to quash for Mr. Grant?

1  **A.**  Yes.

2  **Q.**  And you drafted up the petition?

3  **A.**  Yes.

4  **Q.**  As you sit here today, do you recall the details of your

5  discussion with Mr. Grant?

6  **A.**  Again, not without looking at the document in more detail

7  to refresh myself.

8  **Q.**  Okay.  Do you want to take a moment, please, to look at

9  the document.  It's about five pages long.

10  **A.**  (Reviewing document.)

11     Okay.

12  **Q.**  What do you recall about this document now that you've

13  taken a moment to refresh your recollection about it?

14  **A.**  This was a -- This is a summons to -- that IRS had issued

15  to Macy's department store.

16       **MR. SAMPSON:**  Your Honor, as the witness is

17  answering, he's reading, he's looking at the document.

18       **THE COURT:**  Okay.

19       **MR. SAMPSON:**  I'm not sure this is proper

20  refreshment.

21       **THE COURT:**  Sustained.

22  **BY MR. COHAN:**

23  **Q.**  Without looking at the document, can you recall these

24  details, Mr. Mottahedeh?

25  **A.**  No.

1  **Q.**  Okay.

2      Now, you -- as -- you've just testified this morning you

3  prepared a number of petition (sic) to quash for Mr. Grant

4  back in 2009, -10, and -11, correct?

5  **A.**  Correct.

6  **Q.**  Have you prepared petitions to quash for any other people

7  who have purchased the Royal Freedom Package from Freedom Law

8  School?

9  **A.**  Yes.

10 **Q.**  Would it be fair to say that you've prepared dozens of

11 such petitions at least over the last five or six years?

12 **A.**  Over the last 15 years?

13 **Q.**  All right.  Over the last 15 years, would you say you

14 prepared dozens of them?

15 **A.**  Yes.

16 **Q.**  Okay.  Can you recall the details of each one of these

17 petitions to quash without spending a lot of time reading

18 through the documents?

19 **A.**  No.

20 **Q.**  All right.

21     We'll move on.

22     Inviting your attention to Exhibit 611.

23 **A.**  (Reviewing document.)

24 **Q.**  611 is not in evidence.  But -- And so it's not going to

25 be shown to the jury until you can authenticate it, and it's

1    really just to refresh your recollection.

2        I'm going to ask you some questions about documents you

3    provided to the Franchise Tax Board of California after

4    receiving documents from Mr. Grant, which he had received from

5    the Franchise Tax Board.

6            **MR. SAMPSON:**  Your Honor, that's a leading question.

7    I object.  Also he has not established that the witness's

8    recollection is -- that he doesn't have a recollection of

9    these things.

10           **THE COURT:**  Sustained.  There's no question pending.

11   **BY MR. COHAN:**

12   **Q.**  Inviting your attention to Exhibit 612 --

13   **A.**  (Reviewing document.)

14       Yes?

15   **Q.**  Do you recognize Exhibit 612?

16   **A.**  I had not seen this document before.

17   **Q.**  Okay.

18       It refers to the Franchise Tax Board power of attorney?

19           **MR. SAMPSON:**  Your Honor, the witness has just

20   testified that he doesn't -- has never seen it.

21           **THE COURT:**  Exactly.  It's not, then, appropriate for

22   you to read it into the record if he doesn't recognize it.

23   **BY MR. COHAN:**

24   **Q.**  Sir, did you have a power of attorney with the Franchise

25   Tax Board in effect to represent Rick Grant in front of the

1    Franchise Tax Board for 2005 and additional years?

2    **A.**   Yes.

3    **Q.**   Are you sure you didn't receive this document which shows

4    that you had a power of attorney for Mr. Grant?

5         **MR. SAMPSON:**   That's asked and answered, Your Honor.

6         **THE COURT:**   Sustained.

7    **BY MR. COHAN:**

8    **Q.**   Inviting your attention to Exhibit 613.

9    **A.**   (Reviewing document.)

10        What exhibit number, I'm sorry?

11   **Q.**   613?

12   **A.**   613.

13        (Reviewing document.)

14   **Q.**   Do you recognize Exhibit 613?

15   **A.**   Yes.

16   **Q.**   And is this a document you received from the Franchise Tax

17   Board?

18   **A.**   Yes.

19   **Q.**   And why did you receive this document from the Franchise

20   Tax Board, sir?  Can you tell from the face of it?

21        **MR. SAMPSON:**   Objection, asking why he received it.

22        **THE COURT:**   Sustained.

23   **BY MR. COHAN:**

24   **Q.**   Did you receive this document from Mr. Grant because you

25   had a power of attorney and you were being given notice of an

1    oral hearing where you were supposed to represent Mr. Grant?

2              MR. SAMPSON:  Objection, leading.

3              THE COURT:  Sustained.

4    BY MR. COHAN:

5    Q.  Did you receive this document and maintain it yourself in

6    the ordinary course of Freedom Law School's business?

7    A.  Yes.

8    Q.  And did you respond to it?

9    A.  At this moment, something that old, I cannot tell you for

10   sure if I did or did not.  I don't know.  I don't remember.

11   Q.  Okay.  But you received this document because it was

12   addressed to you, correct?

13   A.  Yes.

14   Q.  And it was from the Franchise Tax Board, right?

15   A.  Yes.

16   Q.  And it gave it -- gave you notice of an oral hearing where

17   you were supposed to be representing Richard T. Grant, Junior

18   for the taxable year 2003, correct?

19   A.  Yes.

20             MR. COHAN:  I move its admission, Your Honor.

21             THE COURT:  Any objection?

22             MR. SAMPSON:  Yes, Your Honor.  It's not prepared by

23   the witness so I'm not sure that it satisfies the business

24   records exception to hearsay.

25             THE COURT:  It's from the State Franchise Tax Board.

1    **MR. SAMPSON:**  I also object because it's irrelevant.

2    **THE COURT:**  Overruled.  I'll allow it.

3    You may publish.

4    **MR. COHAN:**  Thank you.

5    (Defendant's Exhibit 613

6    received in evidence)

7    (Pause in the proceedings.)

8    (Exhibit published.)

9    **MR. SAMPSON:**  Your Honor, this is interlineated on

10   Mr. Cohan's copy.

11   **MR. COHAN:**  Yes, it is.  It has a circle around

12   Mr. Mottahedeh's name, and his address is underlined, Your

13   Honor.

14   **THE COURT:**  Is that the only thing --

15   **MR. COHAN:**  That's --

16   **THE COURT:**  -- annotated?

17   All right.  But, Mr. Cohan, you're aware from prior days

18   of this trial that you're supposed to use clean copies to show

19   the jury.

20   **MR. COHAN:**  I am, Your Honor.

21   **THE COURT:**  All right.  So I'll -- I'll let this one

22   slide, but please make sure that you unredact or unedit any

23   future exhibits.

24   **MR. COHAN:**  We have done our best, Your Honor.  And I

25   apologize.

1  **THE COURT:** All right. Go ahead.

2  **BY MR. COHAN:**

3  **Q.** Now, we –– excuse me. This is 613.

4  So you received this document from Mr. Grant –– No, strike

5  that.

6  Did you receive this document directly from the Franchise

7  Tax Board?

8  **A.** Yes.

9  **Q.** And was 9582 Buttemere –– is it Buttermere? Spelled

10  Buttermere here?

11  **A.** It's pronounced Buttemere.

12  **Q.** Actually it's a misspelling, isn't it? It was Buttemere

13  is the address where you lived, correct?

14  **A.** Yes, it is misspelled.

15  **Q.** Okay. That's why I underlined it.

16  In any event, that was your address notwithstanding the

17  extra "R" in there, correct?

18  **A.** Yes.

19  **Q.** Okay. And do you recall that as of this point in time ––

20  that is to say, as it shows, July 20th, 2005, you were

21  representing Rick Grant before the Franchise Tax Board,

22  correct?

23  **A.** Yes.

24  **Q.** Okay. Do you recall any of the details about the oral

25  hearing as to which you were given notice concerning Rick

1  Grant's tax for the taxable year 2003?

2  **A.**  Not without looking at some documents.  This is, you know,

3  over ten years old.

4  **Q.**  Okay.  That's right.  All right.  We'll move on.

5       **THE COURT:**  Did you want this exhibit admitted?

6       **MR. COHAN:**  I thought I moved its admission.

7       **THE COURT:**  Okay.  I just noticed there's a Social

8  Security number on it.  That should be redacted.

9       **MR. COHAN:**  Ah.  There is indeed, Your Honor.

10      So my apologies.  We'll have to redact it before we

11  actually move it into evidence.

12      **THE COURT:**  Right.

13      **MR. COHAN:**  So one line that shouldn't be there.

14      **THE COURT:**  Well, it's admitted, but it's subject to

15  that redaction.

16      **MR. COHAN:**  Very well.

17      I think my assistant and partner has made a note of that.

18  Thank you.

19  **Q.**  Now, this shows that you were representing Mr. Grant with

20  respect to the Franchise Tax Board.  Was this having to do

21  with a claim by the Franchise Tax Board that Mr. Grant owed

22  income taxes to the State of California for 2003?

23      **MR. SAMPSON:**  Objection, leading.

24      **THE COURT:**  Sustained.

25

**BY MR. COHAN:**

**Q.** Do you know the year for which you were representing Rick Grant before the Franchise Tax Board referred to in Exhibit 613 without looking at it?

**A.** Without looking at the document, no, but the document says the year.

**Q.** Okay.

     Of your own recollection, have you continued to represent Rick Grant before the Franchise Tax Board since at least as far back as his 2003 tax year and continuing up for the next at least 10 or 11 years?

**A.** I'm not sure exactly how long.  I can say through 2009, -10.

**Q.** Okay.  We'll look at some more documents and see if they refresh your recollection.

**A.** Um-hmm.

**Q.** Okay.  Let's take a look at Exhibit 627.

**A.** (Reviewing document.)

**Q.** Do you have Exhibit 627 before you, sir?

**A.** Yes.

**Q.** And do you recognize Exhibit 627?

**A.** Yes.

**Q.** And is this a document that you actually prepared?

**A.** Yes.

**Q.** And does it represent that you are in fact appearing on

1   behalf of Richard Grant?  And, again, it's got his Social

2   Security number on it.  It needs to be redacted before we

3   admit it.

4        But you do recognize this document as one you prepared on

5   behalf of Richard Grant and filed with the Franchise Tax

6   Board, correct?

7   **A.**  Yes.

8             **MR. COHAN:**  Move its admission, Your Honor.

9             **THE COURT:**  All right.  Any objection?

10            **MR. SAMPSON:**  No, Your Honor.

11            **THE COURT:**  Admitted.

12       (Defendant's Exhibit 627 received in evidence)

13            **MR. COHAN:**  May I publish, Your Honor?

14            **THE CLERK:**  So you're not going to show the Social

15  Security number?

16            **MR. COHAN:**  I can redact it right now.

17       It's barely legible anyway.

18                      (Exhibit published.)

19  **BY MR. COHAN:**

20  **Q.**  Okay.  So I had just asked you whether you had any

21  independent recollection of the years for which you were

22  representing Mr. Grant before the Franchise Tax Board.  And I

23  invite your attention to my underlining there on the third

24  line.

25       Again, I didn't have time to correct this, Your Honor.

1  And I didn't think that it did anything other than assist me

2  in finding the portion of this document.

3       **THE COURT:**  I'll allow it, but this is the last one.

4       **MR. COHAN:**  Okay.

5       **MR. SAMPSON:**  Your Honor, I just note that this

6  highlights for the witness what his testimony should be.

7       **THE COURT:**  Exactly.

8       I will allow it, but this is the last document that's been

9  annotated that I will permit.

10  **BY MR. COHAN:**

11  **Q.**  Mr. Mottahedeh, as you sit here, do you remember without

12  looking at this document what you couldn't remember 30 seconds

13  ago, namely the years to which you were representing Mr. Grant

14  before the Franchise Tax Board?

15  **A.**  Would you rephrase that question, please.

16  **Q.**  No.  I'll just ask another one.

17       Based on looking at this document, are you clear that you

18  were representing Rick Grant from 2000 at least through the

19  year 2010, as you can see by this Exhibit 627 that's now in

20  evidence?

21  **A.**  Yes.

22  **Q.**  All right.  Now, there are some other people identified on

23  this document.

24                    (Exhibit published.)

25

**BY MR. COHAN:**

Q. And, again, it says 9582 Buttemere Road, right?

A. Yes.

Q. -- Phelan, California. Was that the office where Freedom Law School conducted its business and educational activities?

A. Yes.

Q. And when did you move to Florida from this address?

A. About two years ago.

Q. Okay. So as of April 20th, 2010, you were still at this address?

A. Yes.

Q. And I see the names Tina James, Marci Kline, Adishian Brooks -- I don't know if I'm pronouncing that right.

Who are these people?

A. These other individuals that were given power of attorney by Mr. Grant.

Q. And were they working with you and under your direction, Freedom Law School?

A. They were people from time to time would be perhaps if needed assist me.

Q. So like contract assistants, not regular employees or --

A. In just rare occasions, if I'm not able to do something myself, then I would need maybe somebody else to do something quickly for me, then I would have these people do it.

Q. Okay.

1    All right.  Inviting your attention if I may to Exhibit

2    637.

3    **A.**  (Reviewing document.)

4    **Q.**  Do you recognize Exhibit 637, sir?

5    **A.**  Yes.

6    **Q.**  What is Exhibit 637?

7    **A.**  It's a request for a hearing prepared for --

8    **Q.**  637?

9    **A.**  I'm sorry.  I'm looking at 636.  My mistake.

10   637.  Oh, okay.

11   (Reviewing document.)

12   **Q.**  Do you recognize it, first of all -- and I realize it's --

13   let's see.  How many pages long is it?

14   Thirty-two pages.

15   **A.**  Yes, I do recognize it.

16   **Q.**  And how do you recognize it, sir?

17   **A.**  Because it was the Board of Equalization decision in the

18   case of these individuals that I represented before the Board

19   of Equalization.

20   **Q.**  And among those individuals, do you see the names Carol

21   Grant and Richard T. Grant, Junior?

22   **A.**  Yes.

23   **Q.**  And was this the decision in cases of people who are

24   listed on here, all of whom were your clients at the time?

25       **MR. SAMPSON:**  Objection, Your Honor, leading.

1    **THE COURT:** Sustained.

2    **BY MR. COHAN:**

3    **Q.** Do you know who these other people are who are listed on

4    the first page of Exhibit 637, sir, along with Mr. Grant and

5    Carol Grant?

6    **A.** They're other individuals who I represented before the

7    Board of Equalization.

8        **MR. COHAN:** Move the admission of Exhibit -- of

9    Exhibit 637, Your Honor.

10       **THE COURT:** What's the relevance?

11       **MR. COHAN:** That Mr. Grant continued to -- Excuse me.

12    That Mr. Mottahedeh continued to represent Mr. Grant

13    before the Franchise Tax Board in this appellate tribunal, the

14    Board of Equalization, as late as July 17th, 2014. That's the

15    relevance of it.

16       **THE COURT:** Okay. Any objection?

17       **MR. SAMPSON:** No, Your Honor.

18       **THE COURT:** All right. Admitted.

19    (Defendant's Exhibit 637 received in evidence)

20            (Exhibit published.)

21    **BY MR. COHAN:**

22    **Q.** So, Mr. Mottahedeh, does this refresh your recollection

23    that at least as late as July 17th of 2014, which is the date

24    of this decision, you were still representing Richard Grant

25    and actually Carol Grant as well before the State Board of

1  Equalization?

2  **A.**  Yes.

3  **Q.**  And what, if anything, is the relationship between the

4  State Board of Equalization and the Franchise Tax Board?

5  **A.**  If the Franchise Tax Board makes a ruling against

6  somebody, you can appeal that decision to the Board of

7  Equalization, and that's what this was about.

8  **Q.**  And so as to all of these different clients of yours,

9  including the Grants, you lost in front of the Board of

10  Equalization, didn't you?

11  **A.**  Yes.

12  **Q.**  Did Mr. Grant ever accuse you of misleading him or failing

13  to honor your promise to him in any way?

14  **A.**  No.

15  **MR. COHAN:**  Bear with me, if you would, please, Your

16  Honor, just a moment.  I'm almost done with this witness.

17  (Pause in the proceedings.)

18  **BY MR. COHAN:**

19  **Q.**  Mr. Mottahedeh, do you recall whether you wrote a letter

20  for Mr. Grant to sign and send to Senator Barbara Boxer from

21  the State of California, United States Senator?

22  **A.**  Yes.

23  **Q.**  And -- And another copy from Richard and Carol Grant to

24  Congressman George Miller?

25  **A.**  Yes.

1  **Q.**  And another letter to Senator Dianne Feinstein?

2  **A.**  Yes.

3  **Q.**  And can you -- Well, first of all, did you send the letter

4  to Mr. Grant for him the sign and send to his representatives

5  in Congress of the United States?

6  **A.**  I send the letters to him to sign and mail back to me, and

7  I mailed it out for him.

8  **Q.**  Okay.  And can you summarize without even looking at this

9  letter -- it's the same letter to both senators and

10  Congressman Miller, correct?

11  **A.**  Which exhibit are you speaking of?

12  **Q.**  534.  I don't believe you have it before you.  Do you need

13  it to refresh your recollection?

14  **A.**  It would be nice, but I'm very familiar with the letter.

15  **Q.**  Okay.  Let's see how you do without even having your

16  recollection refreshed.  This was sent sometime in 2005,

17  wasn't it?

18  **A.**  Yes.

19  **Q.**  Okay.  So you still recall generally the contents?

20  **A.**  I don't remember -- Yeah, I think it could have been 2003

21  if I remember right.

22  **Q.**  Well --

23  **A.**  But it could have been little bit later also.

24  **Q.**  Have you prepared letters to senators and congressmen for

25  other of your students of Freedom Law School for them to send

1   that basically contain the same contentions and argument and

2   evidence for their senators and congressmen in other states?

3   **A.**   Yes.

4   **Q.**   Okay.

5        So can you summarize basically the contents of the letter?

6   **A.**   Yes, I can.

7   **Q.**   Please do.

8        **MR. SAMPSON:**  Your Honor, he's summarizing -- I

9   object to the relevance of this.

10       **THE COURT:**  Well, it's not entirely clear why it's

11  relevant.  Can you perhaps elicit the information from him to

12  establish that before he reads it?

13       **MR. COHAN:**  Sure.

14  **Q.**   Is it fair to say that the contents of this letter

15  summarize all of the arguments and exhibits in evidence that

16  you discussed with Mr. Grant supporting the claim that there

17  is no law that requires filing of income tax returns?

18       **MR. SAMPSON:**  Objection, Your Honor, leading.

19       **THE COURT:**  It is leading, but I'm going to permit

20  it.  We'd like an explanation.

21       **THE WITNESS:**  Would you restate the question, please.

22       **MR. COHAN:**  Your Honor, could I ask the court

23  reporter to read that back?

24       **THE COURT:**  I'll read it.

25       **MR. COHAN:**  Thank you.

1        **THE COURT:**  "Is it fair to say that the contents of

2   this letter summarize all of the arguments and exhibits in

3   evidence that you discussed with Mr. Grant supporting the

4   claim that there is no law that requires filing of income tax

5   returns?"

6        **THE WITNESS:**  No.

7   **BY MR. COHAN:**

8   **Q.**  It's not?

9   **A.**  No.

10  **Q.**  Well, can you do a better job of summarizing the contents

11  of this claim (sic)?

12  **A.**  Yes.

13  **Q.**  Please do.

14  **A.**  What I had Mr. Grant do, and I urge all individuals to do

15  so, is to ask their representatives in government about the

16  question of the income tax, that people that we've -- they are

17  supposed to represent to us in a legislative branch of

18  government, send them the written report and speech of the

19  former IRS Special Agent Joseph Bannister who in his report

20  conclude that there is no law requiring the average American

21  to file and pay their federal income tax.

22       And the government never responded or -- show him that he

23  was wrong when he was with them or afterwards.

24       **MR. SAMPSON:**  Your Honor, I object to this narrative.

25  It's far beyond the question.

1    **THE COURT:** Sustained.

2    **MR. COHAN:** Well --

3  **Q.** Are these the contents of this letter that you wrote and

4  had Mr. Grant send back to you with his signature and that you

5  forwarded to the senators and the congressmen?

6  **A.** Yes.

7  **Q.** So you're not going to let --

8    **THE COURT:** Are you going to move the exhibit into

9  evidence?

10    **MR. COHAN:** Well, I will through this witness if the

11  court permits it. I was saving it for Mr. Grant, but he's

12  going to testify about it, so I'll move it into evidence now.

13    **THE COURT:** And where is it?

14    **MR. COHAN:** It is Exhibit 534, Your Honor.

15        (Pause in the proceedings.)

16    **MR. COHAN:** Yes, it's in the other binder, Your

17  Honor, that we gave you for Mr. Grant's testimony.

18        (Pause in the proceedings.)

19    **MR. COHAN:** It's actually the same letter addressed

20  to both -- Well, I should say each senator and Congressman

21  Miller, constituting exhibits --

22    **THE COURT:** And it's 534?

23    **MR. COHAN:** 534, 535, and 536.

24    **THE COURT:** Okay. Let me take a look.

25        (Pause in the proceedings.)

1    **THE COURT:** Okay. I've looked at it. Is there an

2    objection?

3    **MR. SAMPSON:** Your Honor, what's relevant in this

4    case is Mr. Grant's state of mind. These documents should not

5    be admitted for the truth.

6    **THE COURT:** I've already instructed the jury that all

7    of this witness's testimony with regard to their out-of-court

8    conversations are for the limited purposes of establishing the

9    defendant's knowledge and state of mind.

10   So with that, yes. I'll allow this document.

11   **MR. COHAN:** Thank you, Your Honor.

12   (Document published.)

13   BY MR. COHAN:

14   **Q.** All right. Mr. Mottahedeh, do you have Exhibit 534 before

15   you, sir? On the screen?

16   **A.** Yes.

17   **Q.** Do you recognize this document?

18   **A.** Yes.

19   **Q.** How do you recognize this document?

20   **A.** I wrote it for Mr. Grant.

21   **Q.** How many years ago did you write this for Mr. Grant?

22   **A.** Eleven years ago.

23   **Q.** Okay.

24   You testified you thought it was in 2003. You see the

25   date on it is 2005?

1  **A.**  Yes.

2  **Q.**  Are you sure it was 2003?  You think it was 2005?

3  **A.**  At this point, I'm not sure because that could be a typo

4  that -- maybe it was 2003.  I think it was 2003, quite

5  frankly, because that's when he joined Freedom Law School, if

6  I remember right.  And that's one of the first things I have

7  everybody do is to write to their congressmen, senators.

8  **Q.**  Well, when you say you have them do it, is it mandatory or

9  voluntary that they sent these letters to their senators or

10 congressmen?

11 **A.**  Well, it's -- when the person volunteer -- joins the

12 Freedom Law School and what we're doing, we trying to effect

13 change by informing our public servants of what's going on

14 with the U S. Constitution and income tax.  And so it is a

15 standard part of the process.

16     **MR. SAMPSON:**  Objection, Your Honor.  The witness is

17 making an argument to the jury about the law.

18     **THE COURT:**  The jury will be instructed by the court

19 as to what law applies to this case.

20     I'll allow the answer to stand as it provides context.

21     **MR. COHAN:**  Thank you.

22 **Q.**  Well, Mr. Grant and Mrs. Grant should have said, well,

23 we're not going to sign the letter, right?  Refused, couldn't

24 they?

25 **A.**  If they would have refused, I would have had a discussion

1   with them as to why it is very important and they do so.

2   Q.   Okay.  But you wouldn't force them to do so by any means,

3   would you?

4   A.   No, I have no way of forcing anybody to do anything.

5          MR. SAMPSON:  Objection, Your Honor.  I believe it

6   misstates the testimony.  I believe witness said that he

7   mailed them.

8          THE COURT:  Why don't you clarify that for us.

9          MR. COHAN:  Yes.

10  Q.   You sent them, I believe you testified a few moments ago,

11  to Mr. and Mrs. grant for their signatures, correct?

12  A.   Yes.

13  Q.   Now, inviting your attention to the last page of Exhibit

14  534, there is what's called a Bates number in the lower

15  right-hand corner that identifies this as --

16      Excuse me.  I want the signature page.  I apologize.

17                      (Exhibit published.)

18  BY MR. COHAN:

19  Q.   Do you have RG triple zero 456 before you, sir?

20      (Reviewing document.)

21      I have before me what's on the screen.

22  Q.   That's right.  Look in the lower right-hand corner.  Do

23  you see the RG triple zero 456?

24          THE COURT:  No.  It's not --

25          MR. COHAN:  It's not on the screen.  My bad.

1  (Exhibit published.)

2  **BY MR. COHAN:**

3  **Q.**  Now do you see it?

4  **A.**  Yes.

5  **Q.**  Okay.  Do you also see the signatures that appear above

6  the names Richard T. Grant and Carol Grant?

7  **A.**  Yes.

8  **Q.**  Okay.  So is it your recollection that Mr. Grant and

9  Mrs. Grant signed this letter and sent it back to you?

10  **A.**  Yes.

11  **Q.**  Okay.  And so you then, after having it returned to you,

12  you mailed it to the addressees, the senators and Congressman

13  Miller?

14  **A.**  Yes.

15  **Q.**  To your knowledge, have you ever received a response to

16  this letter?

17  **A.**  No.

18  **Q.**  Did Mr. Grant and you ever discuss a response to this

19  letter?  Or the fact that there was no response to this

20  letter?

21  **A.**  Yes.

22  **Q.**  And can you summarize those discussions about that for

23  this jury?

24  **A.**  I told him that until they could refute what's in the

25  letter, then the contents of what the letter says must be

1  true.

2          **MR. COHAN:**  Nothing further.  Thank you.

3          **THE COURT:**  Cross-examination?

4                  (Pause in the proceedings.)

5                  **CROSS-EXAMINATION**

6  BY MR. SAMPSON:

7  **Q.**  Good morning, Mr. Mottahedeh.

8  **A.**  Good morning.

9  **Q.**  What medication are you taking?

10  **A.**  I don't recall the exact name of it, but it's antibiotic

11  and a pain medication.

12  **Q.**  And you took that today as well?

13  **A.**  Yes.

14  **Q.**  You took it yesterday?

15  **A.**  Yes.

16  **Q.**  Does it affect your memory?

17  **A.**  No.

18  **Q.**  Does it affect your ability to tell the truth?

19  **A.**  No.

20  **Q.**  Did you meet with Mr. Cohan on Wednesday?

21  **A.**  Yes.

22  **Q.**  For how long?

23  **A.**  For about maybe a couple hours.

24  **Q.**  Did you meet with him yesterday after court?

25  **A.**  No.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  **Q.**  Did you meet with Mr. Grant?

2  **A.**  No.

3  **Q.**  Did you meet with Mrs. Grant?

4  **A.**  After court?

5  **Q.**  Yes.

6  **A.**  No.

7  **Q.**  Did a process server come and serve you with a subpoena in

8  this case?

9  **A.**  No.

10 **Q.**  So you just agreed to come and testify?

11 **A.**  The letter was mailed to me by Mr. Cohan, and I agreed to

12 testify -- come and testify.

13 **Q.**  And you came from Florida?

14 **A.**  Yes.

15 **Q.**  How did you get here?

16 **A.**  I flew to Southern California and after being there for a

17 few days, I drove up here.

18 **Q.**  Has anyone other than you agreed to pay for the flights?

19 **A.**  No.

20 **Q.**  So this trial is free advertising for you, isn't it?

21 **A.**  What do you mean?

22 **Q.**  Is it free advertising for Freedom Law School?

23 **A.**  How would it be free advertising for Freedom Law School?

24 **Q.**  I'm asking a question.

25      **THE COURT:**  Excuse me, Mr. Mottahedeh.  Just answer

1  his questions.

2  **THE WITNESS:**  I'm not sure if I'm understanding your

3  question about -- what do you mean by a trial is advertising

4  for Freedom Law School?

5  **BY MR. SAMPSON:**

6  **Q.**  Are you publicizing your appearance here today?

7  **A.**  Yes, I am.

8  **Q.**  It's on your website?

9  **A.**  Yes.

10  **Q.**  And that website says that the government will be on trial

11  in this case; is that right?

12  **A.**  Yes.

13  **Q.**  And you have a financial interest in the outcome of this

14  case; isn't that right?

15  **A.**  No.

16  **Q.**  If Mr. Grant is in -- is acquitted, will you tout this as

17  a success of Freedom Law School?

18  **A.**  Yes.

19  **Q.**  Now, Exhibit 515, do you recall the representation

20  agreements, the representation letters that were -- were sent

21  to Mr. Grant over the years that we had discussed yesterday in

22  court?

23  **A.**  You mean the exhibit here?

24  **Q.**  Yes, sir.

25  **A.**  Yes.

1    **MR. SAMPSON:**  Your Honor, I'm showing 515.

2    **THE COURT:**  Is it in evidence?

3    **MR. SAMPSON:**  Yes, I believe it is.

4    **THE CLERK:**  Yes.

5    **MR. SAMPSON:**  515.

6         (Pause in the proceedings.)

7    **MR. SAMPSON:**  I believe it was --

8    **THE CLERK:**  It's in.  I just told the judge.

9    **MR. SAMPSON:**  Thank you.

10        (Exhibit published.)

11   BY MR. SAMPSON:

12   Q.  Now, the agreement between Freedom Law School and

13   Mr. Grant includes some representation, paragraph 2.  Do you

14   recall that?

15   A.  Yes.

16   Q.  Is your appearance here today part of that representation?

17   A.  No.

18   Q.  So you manage a church; is that right?

19   A.  Yes.

20   Q.  Are you the rabbi or the pastor of that church?

21   A.  I'm the founder/liberator of the church.

22   Q.  Liberator?

23   A.  Yes.

24   Q.  And that's called the Freedom Church?

25   A.  Yes.

1 **Q.** And Freedom Law School is under the umbrella of that

2 church; is that right?

3 **A.** Yes.

4 **Q.** You're not a lawyer, Mr. Mottahedeh?

5 **A.** I'm not a bar member lawyer; that's correct.

6 **Q.** You're not a member of any bar anywhere?

7 **A.** No, I'm just self-taught.

8 **Q.** You're not a C.P.A., are you?

9 **A.** No, I'm not.

10 **Q.** Your law school is not accredited, is it?

11 **A.** It's not accredited by any government agency; that's

12 correct.

13 **Q.** Or any association of lawyers.

14 **A.** That's correct.

15 **Q.** And it doesn't confer degrees, does it?

16 **A.** No, it does not.

17 **Q.** And there's no campus, is there?

18 **A.** No, there is not.

19 **Q.** Other than May of 2003, have you ever met -- have you met

20 Mr. Grant in person before this trial?

21 **A.** Yes.

22 **Q.** How many times?

23 **A.** Just a few.  Maybe about three times, perhaps,

24 approximately.

25 **Q.** And in May 2003, what was the event at which you met

1  Mr. Grant?

2  **A.** I think it was 2002 Tax Freedom Rally of the Free

3  Enterprise Society in San Jose, California.

4  **Q.** You testified yesterday that you weren't sure whether you

5  met him in 2003; that is correct?

6  **A.** 2003? Whether he came in person to see me or it was by --

7  everything is done by telephone, I don't recall that at this

8  moment, no.

9  **Q.** Did Mr. Grant ever send you K1's from his business?

10  **A.** I don't recall. I don't think so.

11  **Q.** Did he send you documentations of his income and expense?

12  **A.** No.

13  **Q.** You testified that you filed a power of attorney for

14  Mr. Grant with the Franchise Tax Board; is that right?

15  **A.** Yes.

16  **Q.** And you represented him for numerous years?

17  **A.** Yes.

18  **Q.** And you knew that Mr. Grant was not paying state income

19  taxes; is that right?

20  **A.** Yes.

21  **Q.** You never had a power of attorney with Mr. Grant with the

22  IRS, did you?

23  **A.** That's correct.

24  **Q.** You tell clients that you're not an attorney, don't you?

25  **A.** I let everybody know that I'm not an attorney.

1  Q.  And you tell them that you're providing them information

2  but not legal advice; is that right?

3  A.  Yes.

4  Q.  Now, the Board of Equalization exhibit that we discussed,

5  I won't show it, but that was a decision that assessed

6  frivolous appeal penalties against Mr. Grant and his wife; is

7  that correct?

8  A.  Without looking at the document, I cannot tell you for

9  sure.

10  Q.  Do you recall whether in 2014, the Board of Equalization

11  assessed frivolous appeal penalties against Mr. Cohan and his

12  wife?

13  A.  Without looking at the paper, no, I could not tell.

14  Q.  You couldn't testify from your own memory to that?

15  A.  I believe they probably did, but I could not tell you for

16  sure.

17  Q.  The letters to the Congress people that we just -- that

18  you just discussed with Mr. Cohan, is that part of a package

19  that Freedom Law School sells?

20  A.  It's part of the Royal Freedom Package.

21  Q.  What is the Freedom Preparation Package?

22  A.  It's educating people about the law and their rights.  In

23  other words, the average American like myself, I being -- had

24  a four-year degree from university, I was never taught about

25  the law and my rights.

1    **MR. SAMPSON:**  Objection, Your Honor.  Move to strike.

2    It's not responsive.

3        **THE COURT:**  Sustained.  Jury should disregard the

4    last answer.

5    **BY MR. SAMPSON:**

6    **Q.**  Is –- Are the letters that were discussed to the Congress

7    people, are those part of the Freedom Preparation Package?

8    **A.**  They're part of the –- No, they're not.  They're part of

9    the redress of grievance part of the program.

10   **Q.**  It's part of -– is that a different package?

11   **A.**  Part of the same package.

12   **Q.**  You warn clients that they could end up in jail, correct?

13   **A.**  I warn everybody they could end up –- that everybody could

14   end up in jail.

15   **Q.**  For tax crimes?

16   **A.**  Yes.

17   **Q.**  And you tell clients to make up their minds on their own,

18   correct?

19   **A.**  No.

20   **Q.**  About the tax laws?

21   **A.**  I think you're trying to box me in a way that does not let

22   me explain my position.

23   **Q.**  I'm asking you yes or no questions.

24   **A.**  Yes.

25       **THE COURT:**  Yes, you have to answer –-

1    **THE WITNESS:**  Sure.

2    **THE COURT:**  -- the questions as he -- Excuse me.

3    **THE WITNESS:**  I'm sorry.

4    **THE COURT:**  -- as he poses, not as you wish they were

5    given.

6    **THE WITNESS:**  Sure.

7    **THE COURT:**  Okay.

8    **THE WITNESS:**  Say it again, please.

9    BY MR. SAMPSON:

10   **Q.**  You tell clients to make up their own mind about the tax

11   laws; is that correct?

12   **A.**  Yes.

13   **Q.**  You tell them to go to a law library.

14   **A.**  Yes.

15   **Q.**  And you tell people that they could be convicted for

16   failure to file and failure to pay, correct?

17   **A.**  Yes.

18   **Q.**  And class 8 on your set of DVD's is a mock federal

19   criminal trial, correct?

20   **A.**  Yes.

21   **Q.**  For federal criminal tax charges?

22   **A.**  Yes.

23   **Q.**  And you go through what a defendant does in that kind of a

24   trial?

25   **A.**  Yes.

1    Q.  And that's part of the package that you sent to Mr. Grant?

2    A.  Yes.

3    Q.  Your package actually discusses how many people are

4    convicted of tax crimes in this country, doesn't it?

5    A.  Yes.

6    Q.  The letters to Congress that you write, they don't say --

7    they don't say that the person sending the letter isn't going

8    to pay their taxes until the Congress person answers, do they?

9    A.  No, they don't.

10            MR. SAMPSON:  Court's brief indulgence.

11                 (Pause in the proceedings.)

12   BY MR. SAMPSON:

13   Q.  When you testified that you told Mr. Grant certain things

14   earlier on direct with Mr. Cohan, what did you mean by "told

15   Mr. Grant"?

16       Does that mean that you told him in the documents you

17   prepared?

18   A.  Means I talked to him probably -- most likely on

19   telephone.

20                 (Off-the-record discussion.)

21   BY MR. SAMPSON:

22   Q.  Did you have difficulty communicating with Mr. Grant?

23   A.  No.

24   Q.  Did you -- Did he ramble on and on when you talked to him

25   on the phone?

1    **A.**   No.

2                      (Off-the-record discussion.)

3    **BY MR. SAMPSON:**

4    **Q.**   And you tell your clients that your best advice if they're

5    not going to file their tax returns is to pay the tax,

6    correct?

7    **A.**   Restate the question, please.

8    **Q.**   You tell clients that your best advice to them if they're

9    not going to file tax returns is to pay the tax and not file,

10   correct?

11   **A.**   No.

12   **Q.**   You tell them that if they hide their money while IRS is

13   disputing taxes with them, they could be convicted of tax

14   evasion, correct?

15   **A.**   Yes.

16            **MR. SAMPSON:**  No further questions.

17            **THE COURT:**  Any redirect?

18            **MR. COHAN:**  Just briefly, Your Honor.

19                      <u>**REDIRECT EXAMINATION**</u>

20   **BY MR. COHAN:**

21   **Q.**   I believe you testified yesterday -- excuse me -- that you

22   have been operating Freedom Law School since 1996; is that

23   right?

24   **A.**   Yes.

25   **Q.**   Have you been contacted by the Internal Revenue Service or

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    the Department of Justice basically threatening to close you

2    down if you don't stop?

3              **MR. SAMPSON:**  Your Honor, that's beyond the scope.

4              **THE COURT:**  Sustained.

5    **BY MR. COHAN:**

6    **Q.**  Have you had communications with the IRS about being

7    required to stop disseminating your materials and responding

8    with that?

9              **MR. SAMPSON:**  Same --

10   **BY MR. COHAN:**

11   **Q.**  Those communications?

12             **MR. SAMPSON:**  Same objection, Your Honor.

13             **THE COURT:**  Sustained.

14             **MR. COHAN:**  You're not allowing me to go into this

15   area?

16             **THE COURT:**  Yes, I'm not allowing you to go in that

17   area.

18             **MR. COHAN:**  Very well, Your Honor.  Nothing further.

19             **THE COURT:**  Anything else, counsel?

20             **MR. SAMPSON:**  No, Your Honor.

21             **THE COURT:**  All right.  Mr. Mottahedeh, you may step

22   down.  Thank you.

23        Next witness, please.

24             **MR. COHAN:**  Defense calls Richard T. Grant, Junior to

25   the witness stand.

1   (Pause in the proceedings.)

2   **THE CLERK:** Please raise your right hand.

3   **RICHARD T. GRANT, JR.,**

4   called as a witness for the DEFENDANT, having been duly sworn,

5   testified as follows:

6   **THE CLERK:** Please be seated. Please state your full

7   name and spell your last name for the record and speak clearly

8   into the microphone.

9   **THE WITNESS:** Richard T. or Thomas Grant, Junior,

10  G-r-a-n-t.

11  **DIRECT EXAMINATION**

12  BY MR. COHAN:

13  **Q.** Good morning, Mr. Grant.

14  **A.** Good morning. Excuse my throat.

15  **Q.** Do you have some water there?

16  **A.** Ah.

17  **MR. COHAN:** May I approach with a (sic) exhibit

18  binder, Your Honor?

19  **THE COURT:** Yes.

20  (Pause in the proceedings.)

21  (Off-the-record discussion.)

22  **MR. COHAN:** Excuse me.

23  (Pause in the proceedings.)

24  BY MR. COHAN:

25  **Q.** Good morning, Mr. Grant.

1  **A.**  Morning.

2  **Q.**  So you've heard a lot of testimony.  I want to briefly ask

3  you to summarize where you were born and grew up and educated

4  up until the time you attended college.

5          **MR. SAMPSON:**  I object to the extent it calls for a

6  long narrative about the defendant's life.

7          **THE COURT:**  Yeah.  I -- We don't need --

8          **MR. COHAN:**  I haven't --

9          **THE COURT:**  -- narrative.

10         **MR. COHAN:**  -- asked a question yet, Your Honor, at

11  this time.

12         **THE COURT:**  You didn't?

13         **MR. COHAN:**  I'm just getting --

14         **THE COURT:**  "I want you to briefly summarize," and

15  there's a question mark.  Our mistake.

16         **MR. COHAN:**  My mistake.

17         **THE COURT:**  Ask the full question.

18         **MR. COHAN:**  Very well.

19  **Q.**  Where were you born, sir?

20  **A.**  Portsmouth Naval Hospital, Virginia.

21  **Q.**  And how do you know that?

22  **A.**  It's on my birth certificate.

23  **Q.**  Okay.  But you don't really remember it, do you?

24  **A.**  No.

25  **Q.**  Okay.

1    What's your earliest memory growing up?

2    **A.**  I have some memories of growing up and living in

3    Brunswick, Maine.

4    **Q.**  And how old were you when you were living in Brunswick,

5    Maine?

6    **A.**  Between about three and four.

7    **Q.**  Okay.  What do you remember?

8    **A.**  Nature primarily.  The deep snows and the buttercups and

9    wandering in the -- in the woods right behind my house.  These

10   days, I don't think they'd let a little kid stray too far, but

11   I'm sure I was being supervised.

12   **Q.**  Okay.  So where did you move after Maine?

13   **A.**  From there, I moved to Monterey, California.

14   **Q.**  Okay.  And when you say you moved, you moved with your mom

15   and dad?

16   **A.**  Yes.

17   **Q.**  And your brothers are Randy and Ron, correct?

18   **A.**  Yeah.  Ron wasn't born at the time, though.

19   **Q.**  Okay.  Ron's nine years younger than you?

20   **A.**  Correct.

21   **Q.**  Okay.  So how old were you when you were in Monterey,

22   California?

23   **A.**  Between four and up to maybe close to five.

24   **Q.**  Okay.  And do you recall what you were doing there when

25   you were four and five years old?

1  **A.**  Mostly nature.  I was an outdoor kid who liked to roam

2  eucalyptus groves and look for wildlife.

3  **Q.**  Okay.  And where did you move next after you were roughly

4  five years old?

5  **A.**  Silver Springs, Maryland.

6  **Q.**  Is that where the triplets lived across the street?

7  **A.**  Yes, there were seven boys, and I, once again, made some

8  bonds with them.  And it was an -- kind of an outdoor explore

9  the world kind of thing.

10  **Q.**  Okay.  And how long did you live in Silver Springs,

11  Maryland before you moved again?

12  **A.**  Approximately a year or so.  Maybe two.

13  **Q.**  Where to next?

14  **A.**  From there I moved to Key West, Florida, as I recall.

15  **Q.**  And how old were you when you lived in Key West, Florida?

16  **A.**  Five to six to -- maybe seven or so.

17  **Q.**  Okay.  And where did you move next?

18  **A.**  To San Diego, California.

19  **Q.**  And how old were you when you lived in San Diego,

20  California?

21  **A.**  I was there third grade, fourth -- part of third, fourth,

22  and fifth grade.  I'd have to do the calculations.  But --

23  **Q.**  Okay.  You don't need to now.

24  So to the best of your recollection, where did you move

25  next?

1    **A.**   Virginia Beach, Virginia.

2    **Q.**   And how old were you when you lived in Virginia Beach,

3    Virginia?

4    **A.**   Fifth -- well, sixth, seventh, eighth, ninth -- I actually

5    lived there for almost six years.

6    **Q.**   Okay.

7          And you heard your brother testify your father was in the

8    Navy?

9    **A.**   Yes.

10   **Q.**   Is that correct?

11   **A.**   Quite a few moves.

12   **Q.**   Okay.  So -- Okay.  Where did you go after Virginia Beach?

13   **A.**   I had -- I was uprooted in my senior year of high school.

14   I didn't get to attend senior year, so I went to Evanston,

15   Illinois on the Great Lakes on the -- Lake Michigan.

16   **Q.**   Okay.  And that's where you graduated --

17   **A.**   Yes.

18   **Q.**   -- from high school?

19   **A.**   Yes.

20   **Q.**   What year?

21   **A.**   1971.

22   **Q.**   Okay.  And then did you continue your education?

23   **A.**   Yes, I went to Old Dominion University in 1971, starting

24   in 1971.

25   **Q.**   And did you graduate?

1  **A.**  Yes.

2  **Q.**  What did you -- Strike that.

3      Did you get a degree in something?

4  **A.**  I got a degree in biology with a kind of a minor although

5  it wasn't official in Marine Science and also Education.

6  **Q.**  Okay.  And did you meet anyone there who became important

7  to you?

8  **A.**  Yes, the first day of orientation, I met my wife in June

9  of -- of 1971.

10  **Q.**  And did you get married eventually?

11  **A.**  Eventually.  Number of years later in 1977.

12  **Q.**  Okay.  So during the time that you were in college, did

13  you date the lady who became your wife Carol?

14      **MR. SAMPSON:**  Objection just based on relevance, Your

15  Honor.

16      **THE COURT:**  Overruled.

17      **THE WITNESS:**  Yes.  I dated her.

18  **BY MR. COHAN:**

19  **Q.**  Okay.  And did you and your brother Randy discuss

20  purchasing an airplane that we've heard some testimony about

21  before it was actually purchased?

22  **A.**  Yes.  I had located a -- a little advertising bit in a --

23  in a trade -- trade publication, and he seemed to share the --

24  the vision of what I would propose soon.

25  **Q.**  Well, what was it that the two of you were doing -- Strike

1   that.

2      What was the purpose of purchasing the airplane?

3   **A.** Well, I had studied marine science, marine biology and had

4   participated in a high school biology group special summer

5   program and then subsequently was a lab assistant, and -- and

6   that's where I initially found the aircraft in 1975, '76. I

7   mean, located the -- the "for sale" sign.

8   **Q.** Okay. And who saw the airplane first between you and your

9   brother Randy?

10   **A.** My brother came out. He got a -- I think he gave extra

11   blood and flew out from his -- wherever duty point was and

12   evaluated the airplane.

13   **Q.** Okay. This is while Randall was still in the Navy?

14   **A.** Correct.

15   **Q.** Okay. So when did you and Randall agree and actually buy

16   the airplane?

17   **A.** I believe it was about 1976.

18   **Q.** Okay. And did you -- Strike that.

19      When was the first time that you actually saw the

20   airplane?

21   **A.** I came out ten days before my wedding. We -- I think we

22   converged. We flew to where my parents lived in Dallas,

23   Texas -- Irving, Texas. And then my dad provided a car, gave

24   us a car, and we drove pretty much non-stop to see it in 1977.

25   **Q.** Okay. And when you say "we," who was with you?

1  **A.**  Oh, that was brother Randy and brother Ron.

2  **Q.**  Okay.  And when you arrived, was the -- the flying boat in

3  Richmond?

4  **A.**  Yes.  It was on the waterfront.

5  **Q.**  Okay.  And the jury's already seen pictures of it and

6  knows what it looked like.

7      So you -- you got to work along with your brothers on that

8  airplane, right?

9  **A.**  Well, actually we came out for just a brief period.  I

10  drove back non-stop -- you know, 56 hours nonstop to get

11  married 'cause I -- that was -- my wife really was indulgent.

12  You know, I had this passion, and she, you know, didn't

13  complain.  She was trying to prepare for the wedding.

14      But anyway, so we drove back non-stop 56 hours, my three

15  brothers -- I mean, myself and my two brothers, the three

16  brothers, and drove back non-stop.

17  **Q.**  Okay.  And so you got married when?

18  **A.**  October 13th -- I better remember this -- of 1977.

19  **Q.**  Okay.  And then did you and your brother buy a -- an old

20  school bus?

21  **A.**  Yeah, well, it wasn't very expensive.  They were usually

22  used up pretty well by the school systems, and then sometimes

23  churches used them for another few years.  And by that time,

24  they were kind of on their last legs, but for $500, you could

25  buy a school bus.

1  **Q.**  So did you buy a school bus for $500?

2  **A.**  Yes.

3  **Q.**  And what was the purpose for which you and your brother

4  spend $500 for an old school bus?

5  **A.**  Well, we outfitted it, painted it, stripped out seats and

6  tried to make it in kind of a little RV with some little tiny

7  galley, maybe a little desk for an office, and bunk beds, and

8  a little shower that was fed from a 50-gallon blue water tank

9  that was mounted on top.

10  **Q.**  Now, did you and your brother drive across country in that

11  refurbished school bus that you just described?

12  **A.**  Actually not.  My wife and myself and my youngest brother,

13  who we would swing through Texas to visit my parents, of

14  course, and then we would go from there.  But Randy was in the

15  Navy at the time and didn't really join us until 1980,

16  primarily.

17      I don't know if he made it out any of those summers from

18  1978, '79, and then we came out full-time in 1980.

19  **Q.**  Okay.  Did you make cross-country trips in that bus with

20  some other people?

21  **A.**  Oh, yes.

22  **Q.**  In the summers?

23  **A.**  Yes.

24  **Q.**  And --

25  **A.**  There were students who were very enthusiastic about the

1  concept of a flying laboratory, is what the aircraft was for,

2  an oceanographic program that we initially called PREFLITE

3  Oceanographic and then later Sea Flight Oceanographic 'cause

4  people, you know, didn't understand what PREFLITing always

5  meant, but sea flight kind of implied a flying oceanographic

6  laboratory.

7  **Q.**  Was "PREFLITE" some sort of acronym that you created to --

8  to sort of make it sound really good?

9  **A.**  Yeah.  It was -- at this -- bear with me.  I hope I can

10  get it right.  Program for research and education through

11  flying long-range investigations and transocean exploration.

12  **Q.**  I won't ask you to repeat that.

13     So that was your initial name for the -- the idea behind

14  buying the flying boat?

15  **A.**  Yes.

16  **Q.**  Okay.

17  **A.**  May have a brochure somewhere that shows something I wrote

18  up about the concept.

19  **Q.**  Okay.

20     We'll just move past that --

21  **A.**  Okay.

22  **Q.**  -- brochure, 'cause it's too late for that now.

23  **A.**  Okay.

24  **Q.**  That was -- Well, strike that.

25     So you mentioned students.  What students or -- to whom

1    are you referring when you say "students"?

2    **A.** Ex-students because after I graduated in '75, I did a

3    brief stint for -- with student teaching, and then for the

4    years in between during the -- during the year, I was a

5    teacher at -- at the -- at the very Virginia Beach public high

6    school in what's called First Colonial High School, but I did

7    also some substitute teaching elsewhere.

8    **Q.** Was that in 1976?

9    **A.** That was -- Well, substitute teaching in '76, and then I

10   started teaching I believe in '77, '78, and '79, and then I

11   resigned before the summer of '80.

12   **Q.** Okay. So in the summers of '77, '78, and '79, did you

13   travel across the United States in that refurbished old school

14   bus with some of your biology students from the high school?

15   **A.** Yeah, they -- some of them actually chipped in, you know,

16   because we couldn't afford all the food and whatnot, and we

17   kind of made it a little adventure cross-country, stopping in

18   a few national parks and so on.

19        But, yeah, it was also an adventure in fixing things on

20   the way. Generator. Alternator brackets would break.

21   Windshield wipers would fall off. Engine parts would break.

22   Batteries would -- anyway it was -- you know, it was, like, a

23   Stanley Steamer. It kind of was a struggle to get across

24   country.

25   **Q.** But you made it all three summers, correct?

1    **A.**   All three summers.

2    **Q.**   And you worked -- you and your brother and the students

3    all worked on that airplane, the flying boat?

4    **A.**   Well, once we arrived full-time and Randy joined us, yes,

5    but we worked around the clock for the -- when we arrived

6    here, we would just rotate shifts, and we were trying to clean

7    the corrosion off the hull and -- and repaint -- prime and

8    paint it.  We wet-sanded some areas, which we basically -- our

9    fingertips were bleeding.  And we -- it was -- it was a lean

10   times.  We ate a lot of macaroni and cheese and Hamburger

11   Helper.

12   **Q.**   Okay.  And are you talking about the summers --

13   **A.**   Yes.

14   **Q.**   -- of '77, '78, and '79?

15   **A.**   (Nods head.)

16   **Q.**   So then during the school years in '77, '78, and '79, you

17   were a biology teacher in high school; is that right?

18   **A.**   Yes.

19   **Q.**   Okay.  And then did you say that you resigned in -- at the

20   end of --

21   **A.**   Well, it was during the -- the year -- one of the

22   semesters just before 1980 when we came out full-time.

23   **Q.**   Okay.  And who came out full-time?

24   **A.**   My wife, myself, and a few students -- actually they

25   weren't students.  Some of them just -- people would like to

1  come to California, has had a certain caché, coming to

2  California.  People, you know, really idolized the ideas back

3  on the East Coast.  I mean, it was an easy sell as far as, you

4  know, can we, you know, get a few people could come with us.

5  We couldn't take that many, so the first ones who expressed

6  interest and we knew and were compatible with, we brought

7  along.

8  **Q.**  Okay.  So in 1980, was it the same bus or had you gotten a

9  replacement --

10  **A.**  Yeah, we -- we started out with a 1955 International

11  Harvester, and then we got a 1965 International --

12  International Harvester because the other one just -- the

13  engine just blew, and we couldn't, you know, fix it ourselves.

14  **Q.**  Okay.  So you and Carol and a few students or other folks

15  who wanted to make the trip to California came out in 1980.

16      And where did you stop and -- Well, you stopped where

17  the -- where the flying boat was that you were still --

18  **A.**  Yeah, I think we showed some photos of it right alongside.

19  **Q.**  Okay.  Well, I don't think we need look at the photos

20  again.  Everybody saw them.

21      So for five and a half years you lived there in the bus?

22  **A.**  Yes.

23  **Q.**  And --

24  **A.**  Right alongside the project.  Again, we were kind of poor

25  as church mice maybe, but we -- my brother joined us in

1  that -- in that summer full-time as I recall.

2  **Q.**  Okay.

3  **A.**  And we worked -- like I said, we were continuing to work

4  each summer, and that was the beginning of the full-time

5  effort.

6  **Q.**  okay.  Now, I want to show you what's been marked for

7  purposes of --

8       Do you have your binder up there?

9  **A.**  Yes, I do.

10  **Q.**  Would you take a look at Exhibit 504, please.

11  **A.**  (Reviewing document.)

12       Oh, yeah.  There's our description of the beginning effort

13  out there.  That was sort of the seed of -- even of our

14  company eventually.

15  **Q.**  And this was something that you wrote yourself or you had

16  somebody else write?

17  **A.**  I recall writing this myself.

18  **Q.**  Okay.  And it's a two-page document?

19  **A.**  Yep.  It's really expressing our interest and concern for

20  the ocean.

21  **Q.**  Okay.

22  **A.**  It was sort of ahead of its time a little bit because

23  about nine months after we got the aircraft, Jacques Cousteau

24  or Philippe Cousteau, a famous ocean explorer, had acquired a

25  PBY, which was a similar but much smaller, relatively

1  speaking, airplane.

2          **MR. COHAN:**  Your Honor, I'd move the admission of

3  Exhibit 504.

4          **THE COURT:**  Any objection?

5          **MR. SAMPSON:**  Well, Your Honor, relevance.  It makes

6  no fact of consequence in this case more or less likely.

7          **THE COURT:**  Yes.  I -- What's the relevance?

8          **MR. COHAN:**  It was and still is Mr. Grant's dream,

9  and I think it's relevant to his intent.

10          **THE COURT:**  His intent on not paying --

11          **MR. COHAN:**  Yes.

12          **THE COURT:**  -- taxes?  I don't understand.

13          **MR. COHAN:**  His mental condition.

14          **THE COURT:**  Okay.  All right.  I'll allow it.

15      (Defendant's Exhibit 504 received in evidence)

16                  (Exhibit published.)

17  **BY MR. COHAN:**

18  **Q.**  Sir, is this a copy of your summary that you wrote

19  yourself?

20  **A.**  Yes, a part of it.  I think it continues on another page.

21  **Q.**  Right.  I will turn the page.

22                  (Exhibit published.)

23  **BY MR. COHAN:**

24  **Q.**  Who's in the picture?

25  **A.**  That's Mr. -- actually became Dr. Nick Savage.  He's my

1    mentor and was an exceptional instructor, one of those that

2    maybe if you're lucky to have once.  He could entertain and

3    educate at the same time.  And he was funny and -- anyway

4    special to me and hundreds and hundreds of other students.

5    Q.  Okay.  So this dream that you had that is reflected in the

6    exhibit that we just admitted, have you -- well, you continued

7    to pursue that dream and worked on that airplane.  We heard

8    your brother testify about it.  But I want to ask you a few

9    more questions about it.

10       You worked on it beginning in 1977 and when did you

11   basically finish everything but the engines?  Do you recall

12   what year?

13   A.  I was still attempting to locate engines anywhere around

14   the world and the last known place for these Bristol Hercules

15   sleeve-operating engines was in New Zealand, the South Island.

16   And I actually made two trips trying to get parts.  It was

17   each a month.  And, you know, it was a -- it was a tough trip.

18       I had to leave my family behind and -- and go out into the

19   brush.  They call them the prickles down there, the blue --

20   the blackberries and such, and try to get these -- extract

21   these engines.

22       Unfortunately, they ended up being the wrong series.  And

23   with the FAA, everything has to be exactly -- exactly as

24   specified for that aircraft.

25   Q.  So --

1    THE COURT:  Excuse me, counsel.  It's time for our

2    break.

3    MR. COHAN:  Thank you.

4    THE COURT:  Ladies and gentlemen, you're excused for

5    15 minutes.

6    (The following proceedings were heard out of the presence

7    of the jury:)

8    THE COURT:  All right, Mr. Grant.  You may step down.

9    Counsel, I wanted to bring to your attention --

10   MR. SAMPSON:  I just note -- Well, Mr. Mottahedeh is

11   still in the room, but I guess he's not testifying so I

12   just --

13   MR. COHAN:  He's done.

14   THE COURT:  All right.

15   MR. SAMPSON:  Okay.  Anyway --

16   THE COURT:  He may not be re-called, obviously --

17   MR. COHAN:  No, no intention --

18   THE COURT:  -- in the courtroom.

19   I received a note from Juror No. 5, Mr. Allen Smith.  And

20   he says just letting you know I have a medical appointment on

21   Monday, June 20th at 2:45 p.m. in Berkeley.  I need to leave

22   for this by 2:15 at the latest.  I don't expect this is a

23   problem if we are released by 1:30 as usual.

24   Although Monday is supposed to be a full day, and I told

25   them the last day would be a full day.  Anyway he says, I

1 cannot reschedule this. It is a referral from an ENT doctor

2 six weeks ago before the jury summons and from my primary care

3 physician two months ago. I have chronic sinusitis which will

4 require surgery to remove polyps and correct a deviated septum

5 but first I must see an allergist on Monday. Appointments are

6 six weeks plus out, and I have travel commitments after that.

7 So at some point before he's excused, we'll explore this

8 with him. But this does present a problem. Does -- It does

9 present a problem. We cannot conclude by 1:30 on Monday. Or

10 even by 2:00. That would be about the latest.

11 **MR. COHAN:** Well --

12 **THE COURT:** Unless we are able to conclude the

13 evidence today. And then the jury could come back -- we can't

14 conclude the trial including all of the arguments and

15 instructions, is what I'm talking about.

16 Jury deliberations is within the jury -- is within the

17 jury's control. I'm a little concerned about losing another

18 juror before they commence deliberations because who knows

19 what will happen during that period of time, so that's an

20 issue. You all need to give it some consideration.

21 If we adjourned at 1:30 or 2:00 on Monday, I'm just afraid

22 we would not have everything in, and I'm a little concerned

23 because several of the jurors have expressed to Nichole their

24 surprise that we're going over to Monday in any event.

25 All right. I just share that with you all.

1    **MR. SAMPSON:**  Thank you, Your Honor.

2    **THE COURT:**  Okay.

3    (Recess taken at 10:19 A.M.; proceedings resumed at 10:34

4    A.M.)

5    (The following proceedings were heard in the presence of

6    the jury:)

7    **THE CLERK:**  Please be seated and come to order.

8    **THE COURT:**  All right.  Please continue.

9    **MR. COHAN:**  Thank you.

10   **Q.**  Okay, Mr. Grant.  Back to the airplane for a minute.

11   Airplane No. 1.  Why didn't somebody check to make sure you're

12   going to be able to get engines for this thing before you

13   spend ten years and thousands of hours and piles of money

14   getting it ready to fly?

15   **A.**  I think we were young.  I don't want to say anything about

16   any -- you know, I mean, it was just we -- we had a vision, a

17   dream.  And, you know, we could make anything happen.

18   When you're young, you think anything can happen.  I mean,

19   you believe that -- if it's money, maybe money should show up.

20   If it's parts -- but I pretty much discovered that there were

21   no such parts in sufficient quantity to -- to make that fly as

22   it sits.

23   I mean, you can do anything with money.  You can -- you

24   can retool and build engines.  You can put turbines on there

25   but it costs a lot of money.  That's all.

1  **Q.**  Okay.  Do you know what magical thinking is?

2  **A.**  No.  Not really.

3  **Q.**  Well, like imagining that money and engines will show up

4  when there's no objective basis for believing that's going

5  happen?

6         **MR. SAMPSON:**  Objection, Your Honor.  He's describing

7  what the witness said.  He doesn't really know about --

8         **THE COURT:**  Yes.  Sustained.

9  **BY MR. COHAN:**

10  **Q.**  Well, after about ten years, you realized that you were

11  never going to be able to get the flying boat off the ground

12  or the water, correct?

13         **MR. SAMPSON:**  Objection, Your Honor, leading.

14         **THE COURT:**  I'm going to permit it.  It is leading.

15  But --

16         **THE WITNESS:**  I actually didn't necessarily.

17         **MR. COHAN:**  Wait.

18         **THE COURT:**  It's fine.  Overruled.

19         **THE WITNESS:**  I -- I didn't necessarily give up on

20  the dream.  And it -- as it sits even at the Oakland Airport,

21  many years later, I think there's a plaque on the -- on the

22  boarding thing that says owned by Rick and Randy Grant and

23  something referencing wishing to make it fly or doing

24  something -- I -- it's been a long time since I've gone and

25  looked at that.  But I wanted it to be represented that way

1  even though it was on display at a museum.  Somebody might see

2  it in a museum.

3  **BY MR. COHAN:**

4  **Q.**  Okay.

5  **A.**  And say, let's make this fly.

6  **Q.**  Okay.  And you didn't abandon the dream because you and

7  your brother bought another airplane, right?

8  **A.**  Yes.  And they've seen the Grumman Albatross.  It's a

9  twin-engine ex-military amphibian that can land on land or

10  water.

11  **Q.**  So was the purpose for purchasing that Albatross to do the

12  same thing that you'd intended to do with the Solent III when

13  you bought it?

14  **A.**  Certainly, yes.  It's -- an -- it's a (sic) ocean-going

15  capable aircraft.  It can -- It can land on the water.  And it

16  easily transferred the -- the concept to that particular

17  aircraft.

18  **Q.**  Okay.  And by 1987, you and your wife had moved to 1306

19  Sanderling Island, right?

20  **A.**  Yes.  That's -- That's so.

21  **Q.**  And your daughter Lindsay was born in 1984 while you were

22  living in the bus, right?

23  **A.**  Yes.  We were living in a dirt field with no real

24  substantial electricity.  We had a single 1500-watt heater

25  that would dim all the rest of the lights or blow a circuit

1  breaker, and so we had to turn things off and turn things on

2  in order to live, you know, with a little electricity.

3  Q.  So -- But in 1986, after Lindsay was born but before

4  Brittany came along, you had an opportunity to move into 1306

5  Sanderling, right?

6  A.  Yeah, I think it was December of '85, so that pretty much

7  correlates the five and a half years in the dirt field.

8  Q.  And how were you able to afford to move into the house

9  where you've apparently lived for the last 30 years?

10  A.  Well, some very kind people probably saw a couple living

11  out in a dirt field and so they kindly extended an invitation

12  for us to stay in their home, ostensibly because you'd have

13  lower insurance rates.  But they were just being nice to us, I

14  think.

15     If somebody inhabits a home, the insurance rates aren't so

16  high if you have a -- a vacant home, it costs a lot.  So, you

17  know, you can buy it, but they were really nice.  They saw a

18  little toddler playing next to a school bus in a dirt field

19  and probably took a little pity on us.

20  Q.  Anyway, you -- you were able to move in there for not very

21  much money, and I -- from what you just said, is it correct

22  that the owners didn't live in that house; they lived

23  somewhere else?

24  A.  They lived up the street, yes.

25  Q.  Okay.  So you moved in I think you said in December of

1  '85.  Your daughter Brittany was born in '86.  And in 1987,

2  you bought the second airplane, right?

3  **A.**  1987, yes.

4  **Q.**  Okay.  But by then, you and your brother were already

5  working with the McDonald brothers?

6  **A.**  Yes.  That's so.  There was some kind of a -- a connection

7  with the McDonald brothers working on a -- on a product.  And

8  my brother was introduced to them and taken under their wing.

9  And eventually, I too helped work with the McDonald brothers

10  and developing our own little -- little operation, which

11  actually it started at about '82, '83, using some of the

12  aircraft-related techniques, bead blasting, sheet metal work

13  which Randy had done in the Navy, and we started a little

14  company.

15  **Q.**  Okay.  And so Grant Engineering, can you pinpoint when the

16  partnership actually got formed?

17  **A.**  You know, we probably started doing stuff in '82, and we

18  probably got a -- a sales permit or whatever they call it

19  in -- in '83.  So I kind of give it a -- official '83, but it

20  could have been -- you know, you could call it '82 when you --

21      When you start up lifting yourself up by the bootstraps,

22  it doesn't -- it doesn't -- you know, you don't really know

23  when you've started precisely.  You kind of have an idea, but

24  sometimes it --

25  **Q.**  Okay.

1  **A.**  -- odd jobs.

2  **Q.**  -- was Carol actually supporting you and Randy during the

3  entire period of time period '80 to '85 basically?

4  **A.**  I mean, she certainly contributed.  You know, because we

5  had to pay rent where we were staying.  Not a huge rent, but

6  it was a lot for us, 150 a month seemed like a lot.  Nowadays,

7  it's nothing.

8      So she helped keep us -- she cooked our food.  She

9  shopped.  And she was working at Children's -- Oakland

10  Children's Hospital as a physical therapist.

11  **Q.**  And is it correct that she continued to do that work until

12  1994?

13      **MR. SAMPSON:**  Objection, Your Honor.  We're back into

14  leading quite a bit now.

15      **THE COURT:**  Yeah.  I've given you a lot of leeway on

16  background information, but at some point you've got to take

17  control and stop with the narrative answers.

18  **BY MR. COHAN:**

19  **Q.**  So do you recall seeing the partnership agreement that was

20  at Mechanic's Bank that came into evidence here?

21  **A.**  Yes.  That was a basic partnership agreement from Nolo

22  Press out of Berkeley, and that's -- I went down to Berkeley

23  and got a partnership agreement.

24  **Q.**  So you didn't hire a lawyer to draw up a partnership

25  agreement?

1  **A.**  No, we probably didn't -- couldn't afford one.

2  **Q.**  Okay.  So do you recall what year that was?

3  **A.**  1983.

4  **Q.**  Okay.

5      And were you -- when did you first assume responsibility,

6  if you did, for handling the financial affairs of the

7  partnership?

8  **A.**  Probably pretty quickly.  My brother definitely was a

9  hands-on guy, technical guy, and he did not want to have

10  anything to do with anything that had to do with pushing paper

11  or -- mean, I wouldn't say buying things.  He certainly could

12  buy stuff.  But he pretty much didn't want to deal with too

13  much in the way of administrative things.

14  **Q.**  Okay.

15      So had the issue -- Well, strike that.

16      When did you first start filing your personal income tax

17  returns, if you can recall?

18  **A.**  I'm sure as soon as we had an official little company set

19  up and we were earning -- I mean, some earnings of some kind.

20  Companies would pay us, you know.  I mean, our biggest --

21  only -- really only -- well, we had actually more than just

22  BioRad who had moved in right next to us.  We did some work

23  probably with the McDonald's.  I don't know if they wrote us a

24  little check for something we might have done or the Lindberg

25  Combustion Control System, which was a water injection system

1  that was -- was being, in part, manufactured with the McDonald

2  brothers.  That was sort of the nexus, the connection.

3  **Q.**  Well, let me ask question again.

4      And I'm going to have to lead you a little bit.  What

5  about when you were a teaching high school in Virginia?

6  **A.**  Oh, certainly.  Of course.  Yes.  My wages there and --

7  **Q.**  So did you file individual income tax returns then?

8  **A.**  Certainly.

9  **Q.**  And was your wife Carol working also at that time?

10 **A.**  She was a physical therapist in the same school system,

11 and we -- of course.

12 **Q.**  So you say "of course."  Did you consult with an attorney

13 or a C.P.A. or H&R Block to get your returns done, or did you

14 do them?

15 **A.**  I might have done some myself.  As I recall.  You know,

16 the simple 1040 E-Z.  And, you know, you do what everybody

17 else does.

18 **Q.**  Okay.  So did you see a law that provided criteria from

19 which you concluded that you were a person required to file?

20 **A.**  There's no law?

21           **MR. SAMPSON:**  Objection, Your Honor.

22           **THE WITNESS:**  You just do what everybody else does.

23           **THE COURT:**  Excuse me.  When there's an objection,

24 you have to wait.

25           **MR. SAMPSON:**  Vague as to time.

1    **THE COURT:**  Sustained.

2    **BY MR. COHAN:**

3    **Q.**  As far as you know, from the time you began filing income

4    tax returns until testifying today, have you ever seen any law

5    that requires you to file an income tax return?

6    **A.**  No.

7    **Q.**  Okay.  But you were filing, according to your testimony,

8    beginning certainly as early as 1977, correct?

9    **A.**  Correct.

10   **Q.**  Okay.  And then you began filing partnership returns,

11   didn't you?

12   **A.**  Yes.

13   **Q.**  And do you recall when you did that?

14   **A.**  Same time.

15   **Q.**  When you started doing that -- Excuse me.

16   **A.**  1983 or '4, thereabouts, when we --

17   **Q.**  Okay.  Well, you've seen testimony from -- Well, I -- I

18   guess you engaged Morre & Company before you engaged Carol

19   Zinck & Associates; is that right?

20   **A.**  That's correct.

21   **Q.**  Okay.  How did you come to retain the services of Morre &

22   Company, if you recall?

23   **A.**  I'm not absolutely -- I can't absolutely say how.

24   **Q.**  Okay.

25       So I guess you should say "I don't remember."

1  **A.** I don't remember.

2  **Q.** All right.

3  Now, but you do remember that from, what, the late '80's

4  on through the '90's, Morre & Company C.P.A.'s were preparing

5  income tax returns for you and for Grant Engineering &

6  Manufacturing?

7  **A.** Yes, as I recall.

8  **Q.** Okay.

9  You just don't remember how you got connected with Morre &

10  Company.

11  **A.** Yes.  Yes.

12  **Q.** Okay.  Did you turn the microphone off?

13  **A.** I didn't -- There it is.  Okay.  It's on.

14  **Q.** All right.

15  So is it fair that you and Randy were the only two people

16  employed by Grant Engineering & Manufacturing until the

17  1990's?

18  **A.** In some way I considered my wife a part of it, but that

19  was unofficial.  So, you know, she is kind of sustaining us a

20  bit, but that dropped by the wayside.  It was Randy and I.

21  **Q.** Well, she wasn't getting paid, was she?

22  **A.** No.

23  **Q.** Okay.  You split whatever there was between you and your

24  brother ongoing, what, every month or every two weeks?  Do you

25  recall?

1  **A.**  Wow, when you start up, you kind of say, hey, do we have

2  some money.  We didn't draw the -- the company down.

3  **Q.**  The question was do you recall.

4  **A.**  Oh.  No.

5  **Q.**  Okay.

6  Sorry to interrupt, but --

7  **THE COURT:**  Thank you.

8  **BY MR. COHAN:**

9  **Q.**  Anyway, do you recall the -- Let me put it another way.

10  What's your earliest recollection of doing bookkeeping for

11  the partnership and forwarding the information retaining --

12  relating to the bookkeeping to Morre and associates.

13  Do you remember whether you were doing that by 1990?

14  **A.**  I believe so.  Once we started operating within the

15  McDonald Custom Molding little shop, I remember -- I

16  believe -- process -- you know, putting -- assembling

17  materials, but I don't have an exact date.

18  **Q.**  Okay.  You heard Linda Panichelli and saw Linda Panichelli

19  in here testifying?

20  **A.**  Yes.

21  **Q.**  Okay.  Do you recall her making statements about doing the

22  bookkeeping for the partnership actually in -- as well as

23  preparing returns?

24  **A.**  Yes.

25  **Q.**  Was Morre & Company actually doing Grant Engineering's

1  bookkeeping from, like, roughly 1990 onward?

2  **A.**  They did some bookkeeping, as I recall, and -- and they

3  did the returns.  And then it seemed that either it was

4  expensive or somehow we might have been referred to the Carol

5  Zinck Associates -- and Associates.

6  **Q.**  Okay.  Did you ever perform yourself the calculations to

7  determine what should be withheld from the employees'

8  paychecks?

9  Let me withdraw that question.

10  Let's go back to -- When did you start, as far as you can

11  recall, hiring people, paying them?  And when I say "you," I

12  mean the partnership -- withholding from employee's wages.  Do

13  you recall that at all?

14  **A.**  I believe it was the '90's.

15  **Q.**  Okay.  So you can't be any more specific than that?

16  **A.**  It's really hard.

17  **Q.**  So do you know whether you actually performed the

18  calculations that determined what had to be withheld from each

19  paycheck and then sent the paycheck to whoever was receiving

20  those funds for the State and for the federal government?

21  **A.**  I don't remember.

22  **Q.**  Do you recall that certainly sometime in the '90's you

23  were no longer -- if you ever had been involved in that

24  process, you were not involved in it any longer?

25          **MR. SAMPSON:**  Objection, it's leading.

1    **THE COURT:**  Overruled.  I'll allow it.

2    **THE WITNESS:**  Yes.  I would package stuff up and send

3    it off so that it can be done.

4    **BY MR. COHAN:**

5    **Q.**  Okay.  So you don't recall -- if I understand your

6    testimony -- Let me ask a question.

7    As far as you know, did either Morre & Company or Carol

8    Zinck & Associates do all the withholding and just tell you --

9    and provide you with the forms to file and how much money to

10   pay?

11   **A.**  Yeah, I -- you know, 1040's and 1041's and L's and this

12   and that kind of baffled me and overwhelmed me because I was

13   really trying to do a lot -- we wore all the hats.  I

14   described us -- instead of white color workers and blue collar

15   workers, I like to say we were no collar workers.  We wore

16   T-shirts and -- and so I was -- we did everything.

17   **Q.**  Okay.

18   **A.**  And -- And the numbers and everything were kind of beyond

19   me.  You could -- You could pay -- You could keep a checkbook

20   balanced, but then it was a much -- bit much.

21   **Q.**  Okay.

22   **MR. SAMPSON:**  Objection, Your Honor.  It was not

23   responsive to the question.

24   **THE COURT:**  Yeah.  I -- I'll make you a deal.  I'll

25   allow you to ask somewhat leading questions if you can control

1     the narratives that Mr. Grant is giving.  The narrative

2     answers are not responsive.

3          **MR. COHAN:**  I understand.  That's why --

4          **THE COURT:**  So I will give you leeway in asking

5     leading questions.

6          **MR. COHAN:**  Thank you.  I will try not to lead other

7     than to just focus the witness's attention.

8          **THE COURT:**  That's -- I appreciate that.

9          **MR. COHAN:**  Thank you.

10    **Q.**  So did you start listening to talk radio sometime in the

11    '90's?

12    **A.**  Yes.  Manufacturing -- Oh, yes.

13    **Q.**  Okay.  What talk radio station did you listen to, if you

14    recall?

15    **A.**  Well, it was 560AM, talk radio show.  Actually many

16    different hosts.

17    **Q.**  Do you remember the call letters of the station at AM560?

18    **A.**  KSFO.

19    **Q.**  Okay.  And who -- do you recall the name of any particular

20    host or disc jockey -- I guess host.  We're talking talk

21    radio.  Excuse me -- radio hosts to whom you were listening in

22    the '90's?

23    **A.**  Jeff Metcalf.

24    **Q.**  And what was your understanding of who Jeff Metcalf was

25    and is?

1  **A.**  Well, he was a well-spoken talk show host, ex- -- he's a

2  retired lieutenant colonel, Army Special Forces.

3  **Q.**  And was there a particularly memorable topic that's

4  pertinent to this trial that you recall listening to in

5  December of 1996?

6  **A.**  Yes.

7  **Q.**  Okay.  You answered yes.

8     Next question:  What was the subject matter that you were

9  listening to that was of interest to you in December of 1996

10 on Lieutenant Colonel Jeff Metcalf's radio show on KSFO?

11        **MR. SAMPSON:**  Objection.  The foundation, of interest

12 to the witness.

13        **THE COURT:**  Overruled.

14        **THE WITNESS:**  He had a host by the name of D.V. Kidd,

15 a lady from -- I don't know where she was from actually now.

16    Should I stop there?

17 **BY MR. COHAN:**

18 **Q.**  No, you can continue.  What was the subject matter of the

19 show?  She wasn't the host, but she was --

20             (Simultaneous colloquy.)

21        **THE WITNESS:**  She was a guest.

22 **BY MR. COHAN:**

23 **Q.**  My turn.

24    Was the subject of the show, Jeff Metcalf with his guest

25 D.V. Kidd, anything to do with income taxes?

1 **A.** Yes.

2 **Q.** And what was it about the discussion of income taxes that

3 you recall that was of interest to you?

4 **A.** She specifically talked about the voluntary nature of the

5 income tax, federal income tax.

6 **Q.** And what was your reaction to hearing that the income tax

7 was voluntary?

8 **A.** Obviously, it's jaw dropping. You just can't really

9 accept it on the face because everybody knows that there's an

10 income tax.

11 **Q.** Um-hmm.

12 And had you ever seen anything prior to listening to that

13 radio show that used the word "voluntary" in connection with

14 filing income tax returns and paying income taxes?

15 **A.** Yes.

16 **Q.** What?

17 **A.** My own -- yes.

18 **Q.** What was that?

19 **A.** That was the 1040 instruction booklet.

20 **Q.** And what on the 1040 instruction booklet do you recall

21 used the word "voluntary"? What was the context?

22 **A.** Well, I -- as I recall, it was something to do with the

23 voluntary -- voluntary compliance with the tax system. It was

24 like words -- or the largest voluntary system or something

25 along those lines. I'm having a hard time right now.

1          MR. SAMPSON:  Objection.  The answer contained

2   hearsay.

3          THE COURT:  Overruled.

4          MR. COHAN:  It's effect of the hearer.

5          THE COURT:  I overruled the objection.

6          MR. COHAN:  I know.  I was sort of --

7          THE COURT:  Okay.

8          MR. COHAN:  Forgive me.

9          THE WITNESS:  That -- Yeah.

10  BY MR. COHAN:

11  Q.  So anyway, you -- you were listening to this radio show,

12  and this lady heard -- identify herself as D.V. Kidd was

13  suggesting that there was no law that required filing of an

14  incomes tax return; it was voluntary.

15      Was that what you heard?

16          MR. SAMPSON:  Objection, misstates the testimony

17  about law requiring.

18          THE COURT:  Sustained.

19  BY MR. COHAN:

20  Q.  Did you equate the idea that filing income tax returns is

21  voluntary with the idea that there was no law, or was that

22  actually stated during the course of the radio show?

23  A.  They actually stated that.

24  Q.  And you've already said that your jaw dropped.  Beyond

25  recovering the use of your jaw, did you do anything else in

1    response to receiving this information that obviously had some

2    impact on you?

3    **A.**    It makes you -- It just starts making you question -- just

4    start looking around a little more.

5    **Q.**    What did you do by way of looking around a little more, if

6    anything?

7    **A.**    Well, just wondered.  I almost laughed out loud because I

8    had recalled the voluntary notification in the 1040 booklet.

9    It was just, like, I went -- I mean, you just can't believe

10   it.  I mean, it was -- it was the same thing, but if you look

11   at the 1040 booklet, at least at the time, there's this exact

12   verbiage.

13   **Q.**    Okay.

14       Do you recall listening to the -- Strike that.

15       Do you recall watching C-Span the Fourth of July weekend

16   in 1999?

17           **MR. SAMPSON:**  Objection, Your Honor.  That's

18   completely leading.

19           **THE COURT:**  Overruled.

20           **THE WITNESS:**  Wow.  Yeah, the -- the C-Span 2.

21   BY MR. COHAN:

22   **Q.**    "Yes " --

23   **A.**    Yes.

24   **Q.**    -- was the answer.

25           **THE COURT:**  Okay.

1  **BY MR. COHAN:**

2  **Q.** What did you see on C-Span 2 on the Fourth of July weekend

3  of 1999 that had some impact on you with respect to whether

4  you did or did not have a duty to file income tax returns?

5  **A.** There was a series of hosts -- I mean, guests and -- and

6  they actually -- it was a symposium put on at the National

7  Press Club. And the guests were very astute, well-spoken,

8  matter-of-fact, calm -- I don't know where the adjectives

9  stop -- highly credible individuals, dressed in suits, at the

10 National Press Club now and speaking on the legality of the

11 income tax.

12 **Q.** Where was the National Press Club located, what city?

13 **A.** It's in Washington, D.C. just practically within sight of

14 the capital and the White House. It's right there where our

15 leaders are supposed to be working.

16 **Q.** Okay. And what did you see on there -- you've described

17 the appearance of guests. What were they discussing that had

18 an impact on your views of whether you were or were not

19 required by law to file income tax returns and pay income

20 taxes?

21 **A.** There was a discussion about the voluntary nature, again,

22 the income tax, and they had different guests talking about

23 different experiences and knowledge bases.

24     And one particular guest was Mr. Joseph Bannister, who was

25 the former only recently resigned from the IRS Criminal

1  Investigation Division.

2  **Q.**  And where was Mr. Bannister an IRS Special Agent

3  geographically, if you know?

4  **A.**  San Jose area.

5  **Q.**  California?

6  **A.**  Yeah.  Northern California.

7  **Q.**  Do you recall where Mr. Bannister mentioned anything about

8  KSFO radio on video that you -- not video you watched but

9  C-Span that you were watching at that time?

10  **A.**  Could you say that again?

11  **Q.**  Yes.

12      Do you recall whether Special Agent Bannister mentioned

13  anything about listening to KSFO radio in December of 1996?

14  **A.**  As I recall, he recounts his experience, and that was by

15  coincidence, although there's probably tens of thousands, if

16  not more people listening to a radio station.  I believe I

17  heard the same exact radio broadcast.

18  **Q.**  And after you joined Freedom Law School, were you able to

19  get a video of that entire presentation of what you saw on

20  C-Span in July of 1999?

21  **A.**  I was.

22  **Q.**  And have you reviewed it -- Oh, strike that.

23      I have here, Your Honor, Exhibit 506.  This is the

24  original container of video that I'm about to seek to

25  introduce some excerpts from in accordance with the court's

1  ruling, just excerpts from it.

2      Is it fair to say that the entirety of the video was more

3  than three hours long?

4  **A.**  Is that the C-Span --

5          **MR. COHAN:**  May I show it to the witness, Your Honor?

6          **THE COURT:**  Yes.

7  BY MR. COHAN:

8  **Q.**  (Handing exhibit.)

9  **A.**  Yes.

10 **Q.**  Okay.  Do you recall receiving this container that had a

11 DVD in it -- that had a copy of that C-Span broadcast in 1999

12 in this actual container in my hand --

13                  (Simultaneous colloquy.)

14         **THE WITNESS:**  Yes.

15 BY MR. COHAN:

16 **Q.**  Did you provide this to me?

17 **A.**  Yes.

18 **Q.**  Okay.  So you -- when did you first receive this DVD?

19 **A.**  I received videotapes initially of the C-Span in 2003.

20 **Q.**  Okay.  And then at some later time, you got this DVD that

21 had the same program just recorded in this different format?

22 **A.**  Yeah, VHF tapes, you know, they don't last forever.

23 **Q.**  Okay.  But you have the DVD that reflected the same C-Span

24 presentation from July of 1999 on this DVD that you got from

25 Mr. Mottahedeh?

1    **A.**  Yes.

2           **MR. COHAN:**  Okay.  Now, I'm not going to move the

3    entirety of the video in, Your Honor, based on the court's

4    ruling, just the excerpts.

5    **Q.**  But I want to ask you, Mr. Grant, after you retained any

6    services to represent you in matter, did I ask you based on

7    the court's ruling to pick out the most important portions of

8    this video so that we could create some excerpts that we could

9    show to the jury during this trial?

10   **A.**  Yes.

11          **THE COURT:**  Yes, counsel.

12          **MR. SAMPSON:**  Your Honor, I raise a concern.  The

13   government doesn't have a copy of those excerpts.

14          **THE COURT:**  You have not previewed them?

15          **MR. SAMPSON:**  What's that?

16          **THE COURT:**  You have not previewed them?

17          **MR. SAMPSON:**  We were given the entire DVD.

18   Additionally, I was told at the break there are materials in

19   front of the defendant that were not produced to the

20   government relating to the C-Span video.

21          **THE COURT:**  Okay.  What materials are those?

22          **MR. SAMPSON:**  Apparently a written transcript, and it

23   says "attorney work product" on it.

24          **MR. COHAN:**  No, he does have a copy of the -- he was

25   just given that.

1    **MR. SAMPSON:**  I asked for it at the break and was

2    just given it.

3            **THE COURT:**  Okay.  All right.

4        All right.  Fine.  I ruled before trial that we're not

5    going to play a three-hour video for the jury.  We will play

6    excerpts so that we can see what Mr. Grant was looking at.

7    And since you've had the entirety of it, I see no reason why

8    we shouldn't play any snippets of it.

9            **MR. COHAN:**  Fine.  We understand.

10            **THE COURT:**  How long is the excerpt?

11            **MR. COHAN:**  There are multiple excerpts, Your Honor.

12    And I have the -- the first one I think is about 3 minutes and

13    4 seconds.  The second one is about 39 seconds.  The next

14    one's 2 minutes and 20 seconds.  The next one's 2 minutes and

15    20 seconds.

16            **THE COURT:**  Did you edit them together?

17            **MR. COHAN:**  Oh, they're all -- we're going to play

18    them consecutively.

19            **THE COURT:**  Okay.  And what's the entire period of

20    time you're seeking to view.

21            **MR. COHAN:**  I'm just totaling it up.  I think it's

22    around 20 minutes, give or take.

23            **THE COURT:**  Okay.  Yes.

24            **MR. SAMPSON:**  Your Honor, I'm also not sure there's a

25    foundation.  I also think this evidence is cumulative about

1  the defendant's testimony about what he heard and understood.

2          THE COURT:  I understand that, but I already ruled on

3  the cumulative objection.  And I indicated that we would allow

4  a small sampling of the materials Mr. Grant relied upon.  This

5  is one of them.  Let's play it.

6          MR. COHAN:  Thank you, Your Honor.

7                  (Off-the-record discussion.)

8          THE COURT:  It will be not reported.

9          MR. COHAN:  We'll have a transcript if there's any

10  need for it that my office prepared of the -- and we provided.

11          THE COURT:  It's not an official transcript.

12          MR. COHAN:  No, no.  I understand.

13          THE COURT:  It's an exhibit.  It's being played.  We

14  don't need a transcript.  It's being played for the jury.

15                  (Video playing.)

16          MR. SAMPSON:  Your Honor, this --

17          THE COURT:  Excuse me.

18          MR. SAMPSON:  This is not part of the clip.

19          THE COURT:  Pause it.  Pause it.  Pause it.

20          MR. SAMPSON:  This is playing from zero, and the clip

21  starts at one minute eight and goes on.

22          MR. COHAN:  That is false, Your Honor.

23          THE COURT:  What part is false, that the clip starts

24  where?

25          MR. COHAN:  The clip starts exactly where I said it

1   did.   108 into the -- the intro.  And the words that are on

2   there, the same words that this person on the screen was

3   speaking, and he has it in his left hand, Your Honor.

4          **THE COURT:**  Okay.  So that number down at the bottom

5   isn't the same.

6          **MR. COHAN:**  The time coding discounts the clip, Your

7   Honor.

8          **THE COURT:**  Okay.  All right.  Thank you.

9          **MR. COHAN:**  This -- This tells him where it is in the

10  originals that we gave him.

11         **THE COURT:**  Okay.  Go ahead.

12         **MR. COHAN:**  Please continue.

13                  (Video playing.)

14         **MR. COHAN:**  Next segment, please.

15                  (Video playing.)

16         **MR. COHAN:**  Next clip, please.

17                  (Video playing.)

18         **MR. COHAN:**  Next clip?

19                  (Video playing.)

20         **MR. SAMPSON:**  Your Honor, I'm just going to interpose

21  a relevance objection to these last two clips.

22         **THE COURT:**  All right.  Overruled.

23     Go ahead.

24         **MR. COHAN:**  Go ahead.

25                  (Video playing.)

 1           **MR. COHAN:**  Next clip.

 2                     (Video playing.)

 3           **MR. SAMPSON:**  Your Honor, after almost a half hour of

 4    videos, I would ask the court instruct the jury on the law.

 5           **THE COURT:**  Well, I'm not going to instruct them on

 6    the law --

 7           **MR. SAMPSON:**  On legal material.

 8           **THE COURT:**  -- until we get to the jury charge.  But

 9    I will read the limiting instruction again.

10           **MR. SAMPSON:**  Thank you.

11           **THE COURT:**  I believe that I instructed you all

12    yesterday that evidence of legal matters -- legal materials

13    that are going to be introduced here today, that Mr. Grant

14    relied upon are admitted only as to Mr. Grant's state of mind.

15    They do not represent the requirements of the law.

16        I will tell you what the law actually is that applies to

17    this case.

18        All right.  Continue.

19           **MR. COHAN:**  Thank you.

20    **Q.**  So after you saw that -- of course, you saw a lot more

21    than that, correct, on --

22    **A.**  Oh, yes.

23                     (Simultaneous colloquy.)

24    **BY MR. COHAN:**

25    **Q.**  -- weekend.

1    Let me finish the question.

2  **A.**  Oh.

3  **Q.**  I'm drawing your attention back to the July 4th weekend

4  1999.  And I'm asking you whether you saw a much longer

5  presentation on C-Span than just those excerpts that we just

6  went through.

7  **A.**  Yes.

8  **Q.**  Okay.  And those excerpts that the jury just saw were

9  excerpts that you selected off of the video that we introduced

10 as exhibit -- or I identified as Exhibit 506.  And -- that --

11 that you thought were most important to influencing your

12 decision to top filing income tax returns?

13 **A.**  Yes.

14 **Q.**  Okay.

15     So I'm moving the admission of that exhibit, Your Honor.

16        **THE COURT:**  All right.  The -- We need an exhibit

17 that contains the excerpts --

18        **MR. COHAN:**  That's the exhibit we have.

19        **THE COURT:**  -- for the record.  That's it?

20        **MR. COHAN:**  Yeah, we just played it.

21        **THE WITNESS:**  The thing that you showed was just the

22 container of the original.

23        **MR. COHAN:**  Right.  We've served the government with

24 the DVD's, I believe, and the transcript of what's been played

25 on there.

1    **THE COURT:**  Excerpted.

2    **MR. COHAN:**  Yes.

3    **THE COURT:**  Okay.

4    **MR. SAMPSON:**  We don't have the excerpts, Your Honor.

5    We just have the full videos, so I'm not sure what's being

6    admitted.

7                        (Simultaneous colloquy.)

8    **THE COURT:**  All right.

9    **MR. COHAN:**  I'm sorry.

10   **THE COURT:**  Excuse me.

11       What I am admitting is the excerpts that have been played

12   here.  We need a DVD for the record.

13   **MR. COHAN:**  We -- I have it, Your Honor.

14   **THE COURT:**  Okay.  Then we'll take care of it.

15                        (Simultaneous colloquy.)

16   **THE CLERK:**  The number, which I think is 506A which

17   hasn't been noted.

18   **MR. COHAN:**  Okay.  Thank you.

19   **THE COURT:**  Is 506A, though, the --

20   **MR. COHAN:**  5-0 --

21   **THE COURT:**  -- entire exhibit or just the excerpt?

22       See, I think you've marked 506 as the original copy of the

23   disc in the packaging.

24   **MR. COHAN:**  Right.  But the only disc that we brought

25   is 506A, and that's a disc that only contains the excerpts.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    **THE COURT:**  Okay.  Then that's the only one.

2        **MR. COHAN:**  And that's in the binders.

3    **THE COURT:**  That will be admitted.

4        **MR. COHAN:**  Thank you.

5    (Defendant's Exhibit 506A received in evidence)

6  **BY MR. COHAN:**

7  **Q.**  Okay.  Now, for the rest of 1999, Mr. Grant, did you

8  continue with making quarterly payments?

9  **A.**  I believe so.

10  **Q.**  Okay.  So when April the 15th -- Well, strike that.

11     Did you happen to see some newspapers in which *We the*

12  *People* had published something about the income tax --

13  **A.**  Yes.

14  **Q.**  And was that before April the 15th of 2001?

15  **A.**  Yes.

16  **Q.**  And --

17     (Reviewing document.)

18        **MR. SAMPSON:**  Your Honor, I'm seeing an exhibit that

19  has not been given to the government.  The -- This whole *USA*

20  *Today* appears to be marked as an exhibit.

21        **THE COURT:**  Do you understand you are required to

22  give the government copies of every exhibit?

23     If you've done so --

24        **MR. COHAN:**  We have.

25        **THE COURT:**  -- point it out.

1    **MR. COHAN:** We have, Your Honor. We have copies, and

2  what we've done is just copied the -- the page out of this

3  original that Mr. Grant kept that he received in March of

4  2001, not whole paper, but just to show that this is where it

5  came from.

6         **THE COURT:** Is the excerpt marked as --

7         **MR. COHAN:** It is.

8         **THE COURT:** -- an exhibit? Then just identify it so

9  that counsel can see if he has a copy.

10         **MR. COHAN:** Bear with me. We have more than one

11  newspaper, and this one is --

12         **MR. SAMPSON:** Your Honor, we only have an insert that

13  says it's a reprint from Freedom Law School. We don't have

14  this original --

15         **MR. COHAN:** 511.

16         **THE COURT:** Hold on. Hold on. He's identifying it.

17    511. It's in the binder.

18         **MR. COHAN:** Yes, it is.

19         **THE COURT:** Do you have that, counsel?

20    **MR. SAMPSON:** 511?

21    **MR. COHAN:** Yes, sir.

22    **MR. SAMPSON:** Starts at 514, Your Honor.

23    **MR. COHAN:** It's 511.

24         (Pause in the proceedings.)

25    **MR. SAMPSON:** Yes. We received this this morning on

1    our table.

2            THE COURT:  Okay.  All right.

3    BY MR. COHAN:

4    Q.  Mr. Grant, do you have Exhibit 511?

5    A.  (Reviewing document.)

6        Yes.

7    Q.  Okay.  And what is Exhibit 511?

8    A.  It's from *USA Today*, a cover sheet there.

9    Q.  Well, it shows -- initially on the first page, it shows

10   the front page of this edition, doesn't it, with a date?

11   A.  Yes.

12   Q.  Of March the 2nd to 4th, 2001?

13   A.  Yes.

14   Q.  Okay.  Inviting your attention to the second page, if you

15   look in the upper right-hand corner --

16           THE COURT:  Hold on.  What is it?

17           MR. SAMPSON:  Your Honor, I just have a Rule 16

18   objection that this has been given to us in the middle of

19   trial.

20           THE COURT:  And why is it that it's something that

21   you believe should have been given to you in advance?

22                   (Off-the-record discussion.)

23           THE COURT:  What is your explanation, counsel?

24           MR. COHAN:  It was provided long ago to the

25   government.  It has a Bates number on it and was produced to

1  the government.  Of course, we didn't give them a -- our only

2  copy of this.  We gave them a copy of the front page, and we

3  gave them a copy of the page that has this full-page ad that

4  Mr. --

5          **THE COURT:**  Mine does not have a Bates number.  I

6  assume that the Bates number indicates that it was in

7  discovery?

8          **MR. COHAN:**  My understanding is that it was produced

9  to the government months ago.

10         **MR. SAMPSON:**  I can tell the court that this or the

11  handwritten 511 on it, that this is not something that the

12  government has had.

13         **THE COURT:**  All right.

14         **MR. SAMPSON:**  We've had these (indicating).

15         **THE COURT:**  All right.  We'll take this up outside

16  the presence of the jury.

17     Move on with some exhibits that you have indeed produced.

18  **BY MR. COHAN:**

19  **Q.**  So, Mr. Grant, did you see a newspaper article that --

20  Well, strike that.

21     Not a newspaper article.  Did you see the original

22  newspaper that I was holding in my hand a few moments ago that

23  was copied and turn to what's marked as Exhibit 511?

24         **THE COURT:**  I -- You're just getting around my

25  ruling.  For now, 511 we're putting aside.

1    MR. COHAN:  I understand that, but I --

2    THE COURT:  So you may not ask any questions about

3    511.

4    MR. COHAN:  Oh, okay.

5    THE COURT:  Move to another exhibit that you've given

6    to the government.

7    MR. COHAN:  Very well.

8     I thought all these newspaper excerpts were given to the

9    government.

10   Is it the government's position they didn't get them?

11   MR. SAMPSON:  No, that's not the government's

12   position, Your Honor.  Our position is that there's an insert

13   to this paper that indicates it was a reprint from Freedom Law

14   School.  That's what the government got.  We didn't get the --

15   the *USA Today* cover sections.

16   THE COURT:  Okay.

17   MR. SAMPSON:  And that's what we're objecting to.

18   THE COURT:  All right.  So you can't use it now.

19   MR. COHAN:  Okay.  Very well.

20   Q.  So inviting your attention to Exhibit 507, do you have

21   that before you?

22   A.  (Reviewing document.)

23   Yes.

24   Q.  Okay.  Do you recognize Exhibit 507, sir?

25   A.  I do.

1  **Q.**  And where do you believe you first saw what's been marked

2  for purposes of identification as Exhibit 507?

3  **A.**  I had one copy of an original *USA Today*, and then the

4  other ones I got from Freedom Law School in 2003.

5  **Q.**  Okay.

6      So is Exhibit 507 a copy of what you got from Freedom Law

7  School in 2003 that is a piece of -- or excerpt of a

8  newspaper?

9  **A.**  I believe so.

10 **Q.**  And it has multiple pages; is that right?

11 **A.**  (Reviewing document.)

12     One has two pages.

13 **Q.**  507 has two pages?

14 **A.**  Wait a minute.  Well --

15 **Q.**  One --

16 **A.**  In this -- this one --

17     (Reviewing document.)

18     There's several articles in here.

19 **Q.**  Okay.  Would it be fair to say that at the time you read

20 these articles and knew exactly what they contained?

21 **A.**  Yeah, I mean, it -- it's -- it's information supporting

22 these people's position about the income tax.

23 **Q.**  And can you state that these different newspaper article

24 copies all basically contain essentially identical

25 information?

1    **MR. SAMPSON:**  Objection.

2    **THE WITNESS:**  They're different.

3    **MR. SAMPSON:**  Objection, that's vague, Your Honor.

4    **THE COURT:**  Yeah.  Bad question.

5    **BY MR. COHAN:**

6    **Q.**  What, if any, difference have you determined between the

7    contents of these various publications other than the

8    photographs above the text?

9    **A.**  (Reviewing document.)

10      They're basically saying that the income tax is not

11   required.

12   **Q.**  Okay.

13       **THE COURT:**  And are you referring only to 507?

14       **MR. COHAN:**  I am right now only referring to 507,

15   which has, I think, three different copies of what is

16   essentially the same thing, Your Honor.

17       **THE COURT:**  Okay.

18       **MR. COHAN:**  So I'm moving the introduction of Exhibit

19   507.

20       **THE COURT:**  Any objection?

21       **MR. SAMPSON:**  Yes, Your Honor.  It's cumulative of

22   what the defendant's testified to.

23       **THE COURT:**  Overruled.  It's admitted.

24      (Defendant's Exhibit 507 received in evidence)

25

1  **BY MR. COHAN:**

2  **Q.** Okay. Now, inviting your attention the Exhibit 508, do

3  you recognize Exhibit 508?

4  **A.** (Reviewing document.)

5     I'm -- I'm -- Yeah, I'm familiar with it, little bit.

6  **Q.** Do you recall when you first saw it?

7  **A.** Boy, it's been a long time. I don't want to say with

8  absolute certainty.

9  **Q.** You don't have to be absolutely certain.

10    Do you believe that you received this from Freedom Law

11 School back near 2003?

12 **A.** Yes. They --

13 **Q.** Is there any doubt that you received this from Freedom Law

14 School?

15 **A.** No.

16 **Q.** Okay. Your only question is you're not sure you might

17 have received it later than 2003?

18 **A.** I got a lot of materials after we joined, so a lot came.

19 **Q.** Are you confident you received it more than ten years ago?

20 **A.** Yes.

21 **Q.** Okay.

22    So I move the admission of Exhibit 508, Your Honor.

23        **THE COURT:** Any objection?

24        **MR. SAMPSON:** Your Honor, it's cumulative. It's 403.

25 It's potentially confusing of the issues.

1  THE COURT:  All right.  Overruled.

2  (Defendant's Exhibit 508 received in evidence)

3  BY MR. COHAN:

4  Q.  Okay.  Now, is this Exhibit 508 that you had before you --

5  May I publish, Your Honor?

6  THE COURT:  Yes.

7  (Pause in the proceedings.)

8  MR. COHAN:  Okay.

9  (Exhibit published.)

10  BY MR. COHAN:

11  Q.  It's hard to read this.  Did you provide us with your

12  original copies after you retained my law firm and we made

13  copies from your originals?

14  A.  I believe so.

15  Q.  Okay.

16  So you recognize that this is something that you received

17  from *We the People* -- or strike that -- from Freedom Law

18  School more than ten years ago, correct?

19  A.  Correct.

20  Q.  And without going through all this, the jury can read as

21  much of it as they want.

22  THE COURT:  Well, it's fairly illegible.  I'm not

23  sure -- I can't read it.  I'm not sure what the jury's ability

24  to read this is.

25  MR. COHAN:  I respectfully disagree.  I can read

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  every word on this page, Your Honor.

2      **THE COURT:**  Well, perhaps your eyes are better than

3  mine.  I'm telling you that I can't read it.  If you want the

4  jury to be able to read it, you need to blow it up more than

5  this.

6      **MR. COHAN:**  Oh, okay.

7      **THE COURT:**  The font is tiny.  It's blurred.

8          (Exhibit published.)

9  **BY MR. COHAN:**

10 **Q.**  Oh okay.  I have the original here that will probably be

11 easier to read.

12          (Exhibit published.)

13     **THE COURT:**  Much clearer.

14     **MR. COHAN:**  Whoops.

15          (Exhibit published.)

16 **BY MR. COHAN:**

17 **Q.**  Okay.  Better?

18     **THE COURT:**  It is for me.  Thank you.

19     **MR. COHAN:**  Okay.  Thank you.  Okay.  And I just want

20 to be clear this is Exhibit 508.

21 **Q.**  Now, this -- you see the headline "Congress," comma,

22 "President, served with petitions with protest"?

23 **A.**  (Reviewing document.)

24 **Q.**  This is the first page of 508, sir.

25 **A.**  508, what -- what page?

1  **Q.** First page of 508, and it probably would be on your

2  monitor in color.

3  **A.** Oh, I can see the -- the color version here.

4       **MR. COHAN:** Thank you, Your Honor.

5  **Q.** Do you recall what the petitions were, whether they were

6  the same thing that was referred to by Mr. Bannister and by

7  Mr. Schultz on the video?

8  **A.** Similar.

9  **Q.** Okay. And were you interested mostly in the issues

10 pertaining to whether there was a law that required the filing

11 of federal income tax returns?

12 **A.** That's correct.

13 **Q.** Okay. I don't want to take court time to read now. The

14 jury can have the original.

15      **THE COURT:** Okay.

16      **MR. COHAN:** We only have obviously one copy of the

17 original.

18      **MR. SAMPSON:** I've got one.

19      **MR. COHAN:** I lied. We have two copies. The

20 government has one.

21 **Q.** Inviting your attention, if I may, sir, to Exhibit 509.

22 **A.** (Reviewing document.)

23 **Q.** Do you recognize 509?

24 **A.** Yes.

25 **Q.** Is this a copy of a newspaper, the original of which you

1   provided to me in connection with my representation of you?

2   **A.**   (Reviewing document.)

3       I -- This looks like one in 2003 that I got in that time

4   period and was -- and I forward to you 'cause I can tell that

5   there's the Freedom Law School phone number, et cetera, on the

6   upper right-hand corner, so it was 2003, well into 2003.

7   **Q.**   Okay.

8   **A.**   So it's a original copy.

9   **Q.**   Was this similar in terms of the content of making claims

10  basically that there was a real question whether there was any

11  law requiring the filing of an income tax return?

12          **MR. SAMPSON:**   Objection, Your Honor, argumentative

13  and leading.

14          **THE COURT:**   Overruled.

15          **THE WITNESS:**   Yes, as all of the other ones are --

16  **BY MR. COHAN:**

17  **Q.**   Okay.

18                  (Simultaneous colloquy.)

19          **MR. COHAN:**   I'm moving the admission of Exhibit 509,

20  Your Honor.

21          **THE COURT:**   All right.   Same objection?

22          **MR. SAMPSON:**   Yes, Your Honor.

23          **THE COURT:**   All right.   Overruled.

24          **MR. COHAN:**   May I publish?

25          **THE COURT:**   Yes.

1    (Defendant's Exhibit 509 received in evidence)

2        **MR. COHAN:**  This time, I'll use the color original.

3            (Exhibit published.)

4        **MR. COHAN:**  Okay.

5    **Q.**  So does this look like the original that you provided me

6    with?

7    **A.**  (Reviewing document.)

8        It's an original copy.

9    **Q.**  Okay.  And you got this from Freedom Law School way back

10   in 2003, you believe?

11   **A.**  Yes, I can quickly see the phone number in the upper

12   right-hand corner.

13   **Q.**  Okay.  So did this impact your belief that you did not

14   have any duty to file income tax return?

15   **A.**  Reaffirmed it.

16   **Q.**  Thank you.

17       **MR. COHAN:**  Did I move in 507, Your Honor?

18       **THE COURT:**  I don't think --

19       **THE CLERK:**  Yes.

20       **THE COURT:**  You did?  Okay.  507's in.

21       **MR. COHAN:**  Okay.  I'll just briefly review 507.

22   **Q.**  Mr. Grant, is this very similar to the previous exhibits

23   of newspaper articles?  Is the content of the articles

24   essentially the same material?

25   **A.**  (Reviewing document.)

1    Yes.  Different -- Different experts.  I'm just looking to

2  make sure there's no duplication here.

3  **Q.**  Okay.

4  **A.**  Can do it by the people and the faces.

5  **Q.**  Okay.  Okay.

6    Turn, if you would, to Exhibit 510.

7  **A.**  (Reviewing document.)

8  **Q.**  Not in evidence yet.

9  **A.**  (Reviewing document.)

10 **Q.**  Tell us when you have the exhibit.

11 **A.**  Oh, yes.

12 **Q.**  Okay.  Do you recognize Exhibit 510?

13 **A.**  I do.

14 **Q.**  And is it essentially the same material as we've seen in

15 Exhibits 507, 508, 509 and 511?  More newspaper publications

16 of the same essential material, only different photographs?

17 **A.**  Yes.

18 **Q.**  Okay.

19    I move the admission of Exhibit 510, Your Honor.

20    **THE COURT:**  Objection?

21    **MR. SAMPSON:**  The witness has testified it's the same

22 material, Your Honor.  That's cumulative.

23    **THE COURT:**  Yeah.  It is.  It's the very definition

24 of "cumulative."  I'll allow it.  This is the last one.

25    **MR. COHAN:**  It is the last one, Your Honor, and the

1  reason I --

2          **THE COURT:**  Okay.

3          **MR. COHAN:**  It's got a date on it.

4       (Defendant's Exhibit 510 received in evidence)

5  **BY MR. COHAN:**

6  **Q.**  Okay.

7                     (Exhibit published.)

8  **BY MR. COHAN:**

9  **Q.**  Just inviting your attention, if I may, Mr. Grant, to

10  Exhibit 510, do you see that this is page 11A from *USA Today*

11  Friday, February 16th, of 2001?

12  **A.**  Yes.

13  **Q.**  And this is the same -- Well, it's not exactly the same

14  prose, but is it fair to say the arguments and the evidence

15  that is cited in this is the same essential material

16  supporting your belief that you -- you didn't have a duty to

17  file an income tax return?

18  **A.**  Yes.

19  **Q.**  Okay.  Thank you.

20       Move the -- I guess it's in evidence.  Thank you.

21       Correct?

22          **THE COURT:**  Yes.

23          **MR. COHAN:**  Thank you.

24  **Q.**  Inviting your attention to Exhibit 512.

25  **A.**  (Reviewing document.)

1    **Q.** Did you receive Exhibit 512 on or about March 18, 2001,

2    which is the date on the first page of it?

3         **MR. SAMPSON:** Objection, Your Honor. The witness is

4    being led.

5         **THE COURT:** Yes, but we're trying to get through

6    this. I'm allowing some leeway in this regard, if we can keep

7    Mr. Grant's statements focused. Overruled.

8         **THE WITNESS:** Yes. I'll -- Obviously later.

9         **THE COURT:** Well, we can't have it both ways.

10   Either you can ask a fairly leading question and he can

11   give a direct answer, or I won't permit you to lead and I'll

12   give him more leeway.

13        **MR. COHAN:** Okay.

14        **THE COURT:** But you can't have it both ways.

15        **MR. COHAN:** As between us, I think and I hope I'm a

16   little more concise, but that's for others to judge.

17   **Q.** So I'd like to go ahead, try to just get you to answer

18   "yes" and "no" when they're "yes" and "no" questions. If I

19   ask you to explain, then it's your turn. Okay?

20   **A.** Yes.

21   **Q.** Thank you.

22        All right. Do you recognize Exhibit 512?

23   **A.** Yes.

24   **Q.** Do you recall approximately when you received Exhibit 512?

25   **A.** Sometime in -- probably later March, mid-March.

1  **Q.**  What's the date on this letter that seems to be addressed

2  to you at 1306 Sanderling?

3  **A.**  March 18, 2001.

4  **Q.**  And can you tell the ladies and gentlemen of the jury what

5  is this -- Let's see.  It's -- Looks like an 11-page letter to

6  you from Thomas L. Price, LLD.

7      What is it?

8  **A.**  It's an opinion letter from somebody who has had some

9  legal experience and supports the findings.

10         **MR. SAMPSON:**  Objection, based on foundation, Your

11  Honor.

12         **THE COURT:**  Sustained.  Sustained.

13  **BY MR. COHAN:**

14  **Q.**  Well, is this a letter that you obtained from someone who

15  you believed had expertise in determining whether there was a

16  law that required you to file income taxes?

17  **A.**  Yes.

18  **Q.**  And do you recall how you were able to locate the author

19  of this letter, Thomas L. Price, LLD?

20  **A.**  No.

21  **Q.**  Do you recall receiving it and reading it in late March of

22  2001?

23  **A.**  Yes.

24  **Q.**  Was this during the period of time when you were trying to

25  decide whether you were going to stop filing income tax

1   returns?

2   **A.**   In the midst of it, yes.

3   **Q.**   Okay.  Did you rely on this letter in any way, shape, or

4   form for your ultimate decision to decide to stop filing?

5   **A.**   Yes.

6          **MR. COHAN:**  Move its admission, Your Honor.

7          **THE COURT:**  All right.  Any objection?

8          **MR. SAMPSON:**  Not -- No, Your Honor.

9          **THE COURT:**  Admitted.

10      (Defendant's Exhibit 512 received in evidence)

11  **BY MR. COHAN:**

12  **Q.**   Inviting your attention to Exhibit 513, do you have that

13  before you?

14  **A.**   Yes.

15  **Q.**   Do you recognize it?

16  **A.**   Yes.

17  **Q.**   What is it?

18  **A.**   It's another opinion letters from another attorney or -- a

19  legal -- somebody in the legal profession.

20  **Q.**   Okay.  And do you recall how you contacted this attorney

21  whose name appears to be Gerald P. Aurillio in Metairie,

22  Louisiana?

23  **A.**   Not at this point in my life?

24  **Q.**   Okay.

25  **A.**   I don't recall.

1 **Q.** Do you recall receiving this letter in late March or early

2 April 2001?

3 **A.** Yes.

4 **Q.** Is -- Is it your understanding that this is the opinion of

5 somebody who is an attorney licensed to practice law in

6 Louisiana?

7 **A.** Yes.

8 **Q.** And did it address the issue of whether there was or was

9 not a law that required you to file an income tax return?

10 **A.** Yes.

11 **Q.** And can you summarize whether there was an opinion that

12 said you didn't have a requirement to file an income tax

13 return?

14 **MR. SAMPSON:** Objection, calls for hearsay. The

15 witness has testified that he relied on it.

16 **THE COURT:** Yes, that's all that's --

17 **MR. COHAN:** I'll move its admission at this time,

18 Exhibit 513.

19 **THE COURT:** Admitted. I assume, Mr. Sampson, you

20 have no objection to this one either.

21 **MR. SAMPSON:** No, Your Honor.

22 **THE COURT:** All right. Admitted.

23 (Defendant's Exhibit 513 received in evidence)

24 **MR. COHAN:** Okay. May I publish briefly, Your Honor?

25 **THE COURT:** Yes.

1    (Exhibit published.)

2    BY MR. COHAN:

3    **Q.**  Do you know whether you paid money for this attorney's

4    opinion letter that's before us now and has been admitted as

5    Exhibit 513?

6    **A.**  Yes.

7    **Q.**  Do you know how much?

8    **A.**  I think it was part of a package.  I don't know how much.

9    **Q.**  Okay.  Did you get this -- Well, strike that.

10    Was -- Did you receive this letter before you met Peymon

11    Mottahedeh?

12    **A.**  Yes.

13    **Q.**  Was it before you'd even heard of Freedom Law School?

14    **A.**  Yes.

15    **Q.**  So did this letter influence your beliefs about whether

16    there was a law that required you to file an income tax

17    return?

18    **A.**  Yes.

19    **Q.**  Okay.  Move on.

20    **THE COURT:**  All right.  Counsel, I think at this time

21    we're going to take a 15-minute break.

22    **MR. COHAN:**  Thank you.

23    (The following proceedings were heard out of the presence

24    of the jury:)

25    **THE COURT:**  All right.  As slow as this is going,

1  it's very clear it's not even likely we're going to finish

2  with this witness's testimony on direct today, much less

3  cross.

4          **MR. COHAN:**  Oh, we'll finish direct, Your Honor.

5          **THE COURT:**  You'll finish direct?

6          **MR. COHAN:**  Yes.

7          **THE COURT:**  But that still leaves cross for Monday,

8  so we have to decide what to do about juror -- Juror No. 5.

9      Have you all given it some consideration?

10         **MR. SAMPSON:**  We have, Your Honor.  Now, we know that

11  this may -- almost definitely will continue into Monday.  We

12  think that it would not be appropriate at this time to dismiss

13  that juror.  He indicated that he had a conflict that he would

14  have to leave for at 2:15 on Monday.

15         **THE COURT:**  And do any of you recall if he told us

16  that?

17         **MR. COHAN:**  He did not.

18         **THE COURT:**  There was -- the 22nd was the only date I

19  recall there being a conflict stated by a juror.

20      Do you remember, Nichole?

21         **THE CLERK:**  I don't recall.

22         **THE COURT:**  I don't.

23         **MR. COHAN:**  There was no conflict with Monday, Your

24  Honor.  That's my very clear recollection.  You told the jury

25  that we would likely go into Monday.

1        **THE COURT:**  Right.

2        **MR. SAMPSON:**  But the court did not tell the jury

3    that we would go all day on Monday.

4        **THE COURT:**  No, I told them the first and last day of

5    trial, we always go all day.

6        **MR. SAMPSON:**  I understand.

7        **THE COURT:**  I don't know.  Maybe he just forgot that.

8        **MR. SAMPSON:**  I don't know what we told the jury when

9    the last day would be.

10       **THE CLERK:**  Judge, he did -- he had to have known

11   because he did ask me about it about a week or so ago.  And I

12   had told him I would suggest that he reschedule the

13   appointment.  I said, otherwise, I don't know if an

14   accommodation can be made.

15       **THE COURT:**  Right.

16       **THE CLERK:**  So --

17       **THE COURT:**  Okay.

18    All right.  Would you all like -- I mean, I'd still

19   ideally like to conclude on Monday if we can.  And if we just

20   have the cross-examination, there certainly will be adequate

21   time to giving closing arguments, to instruct the jury, and

22   for them to commence their deliberations.  I mean, I'd still

23   like to be able to do that.

24    So would you like me to bring him out and indicate to him

25   that I'm not going to excuse him, even if we go all day?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1          **MR. SAMPSON:**  I -- I think that's appropriate, Your

2     Honor.

3          **MR. COHAN:**  I agree.

4          **THE COURT:**  Okay.

5          **MR. KLUGE:**  The only other option we discussed during

6     the break, Mr. Cohan and I --

7               (Off-the-record discussion.)

8          **MR. KLUGE:**  -- is that would it be appropriate

9     perhaps to -- while -- to work all day on Monday or continue

10     to have Monday to be a full day, but to take a late lunch

11     break at 1:30, like we've done in the past, and allow the

12     juror who has the doctor's appointment to go to his doctor's

13     appointment sort of over our lunch hour, then come back --

14          **THE COURT:**  His appointment's at 2:45, and he needs

15     to leave here at 2:30.  I'm sorry.  2:15, is what he says.  So

16     if he left here at 2:15, went to an appointment -- when is the

17     last time you went to a doctor's appointment and were called

18     as soon as you walked in the door.

19          **MR. KLUGE:**  It's been a while, Your Honor.  Yes.

20          **THE COURT:**  Exactly.  So I -- No, we can't -- We

21     can't do that.  We'd have to adjourn no later than 2:15, and

22     that would shorten our day by two and a half hours, which is

23     substantial if we're trying to conclude the case.

24          **MR. KLUGE:**  Yes, Your Honor.

25          **THE COURT:**  Okay.

1    All right.  Why don't you bring -- bring him out.  And

2    we'll indicate to him what our plan is.

3        Mr. Grant, why don't you step down, please.

4            **MR. COHAN:**  Thank you, Your Honor.

5        (Juror Smith is present in the courtroom.)

6            **THE COURT:**  Mr. Smith, if you could just have a seat.

7    I got your note about --

8            **A JUROR:**  Yes.

9            **THE COURT:**  -- your conflict on Monday.

10           **A JUROR:**  Yes.

11           **THE COURT:**  And none of us can recall you telling us

12   that you had a conflict on this Monday.

13           **A JUROR:**  I told her.

14           **THE COURT:**  A week or so ago, but not before you were

15   impaneled.  And I -- and I told everyone that the first and

16   last day of trial are full days so we cannot permit you to

17   leave at 2:15 on Monday, and it's a full day because that's

18   the last day of trial.

19           **A JUROR:**  Well --

20           **THE COURT:**  We are anticipating having the conclusion

21   of the evidence, the closing arguments, jury instructions, and

22   deliberations to commence.

23           **A JUROR:**  I have -- I had to wait six weeks for the

24   appointment.  I'll have to wait another six weeks to get it

25   re-appointed, and I can't really do that.  I need to have this

1   condition treated.

2          THE COURT:  Okay.  I can't excuse you for -- for

3   Monday.

4          A JUROR:  I also have to pay a penalty of $75 for

5   missing the appointment.

6          THE COURT:  Okay.  We'll see if there's any way that

7   court can reimburse you for that, but I cannot excuse you

8   given that you didn't tell me that before you were impaneled.

9       And I did indicate that the day was a full day for the

10  last day, and --

11         A JUROR:  I understood that the jury term was to last

12  through the 17th.  I didn't expect this to be a conflict.

13         THE COURT:  No.  The only dates that were given was

14  that we anticipated the trial would be approximately two

15  weeks.  The only date that was mentioned was the gentleman who

16  was catching a flight on the 24th.  One other person told us

17  they had an appointment on the 22nd.

18         A JUROR:  The summons was from the 6th through the

19  17th.

20         THE COURT:  The summons sated that?

21         A JUROR:  Yes, I can produce it if you would like.

22         THE COURT:  Yeah, I'll definitely need to see that.

23  But notwithstanding that, I cannot excuse you for Monday.  And

24  I'll see if the court can reimburse you for the fee, but you

25  will need to try to make another appointment.

1   **MR. COHAN:** Can you help him do that? Would the
2   court order --
3           **A JUROR:** Could I --
4           **THE COURT:** Perhaps I could, yes.
5           **MR. COHAN:** Could you --
6           **A JUROR:** Could I leave my appointment and come back.
7           **THE COURT:** But we were talking about that, but you
8   said your appointment --
9           **A JUROR:** My appointment is actually for 3:15. I
10  have to check in at -- at 2:45.
11          **THE COURT:** And -- And you think that you would be
12  back.
13          **A JUROR:** It's allergy testing. I don't know how
14  long it will take.
15          **THE COURT:** Yeah, I think it's probably not likely
16  you'd be back by -- if your appointment's at three something.
17          **A JUROR:** -- probably would not be back before 4:00
18  o'clock, yes.
19          **THE COURT:** Right. Right.
20          **A JUROR:** It's in Berkeley.
21          **THE COURT:** If you would like, I would indeed attempt
22  to assist you in procuring another appointment if you want to
23  give me that information.
24          **A JUROR:** Okay. I can't give it to you today. I can
25  give it to you Monday or tomorrow.

1    **THE COURT:**  Okay.  But --

2       **A JUROR:**  I think it's hard making --

3    **THE COURT:**  It's hard doing it on -- day before.

4       **A JUROR:**  -- scheduling it to the weekend.

5    **MR. COHAN:**  What about this afternoon.

6    **THE COURT:**  That's what I'm saying, this afternoon.

7  Even if you don't have it now, you're going to be excused at

8  1:30.  Can you call or text us with that number and your

9  doctor's name today so that I can make contact with the office

10 today?

11      **A JUROR:**  I can try.

12   **THE COURT:**  Okay.  All right.

13    Then that -- I would be willing to do that for you.  And

14 like I said, I'll see if the court can reimburse you for

15 the -- the penalty that you're going to have to pay.

16    All right.  Thank you.

17    All right.  Please continue with your break.  We have a

18 few minutes and -- and our court reporter needs a few, so

19 everybody take --

20    Raynee, is ten enough?

21            (Off-the-record discussion.)

22   **THE COURT:**  Okay.  Take a ten-minute break.

23    (Recess taken at 12:11 P.M.; proceedings resumed at 12:24

24 P.M.)

25    (The following proceedings were heard in the presence of

1  the jury:)

2          **THE CLERK:**  Please be seated and come to order.

3          **THE COURT:**  All right.  Mr. Cohan, please continue.

4      **MR. COHAN:**  Thank you.

5  **Q.**  Do you have Exhibit 522 in your book?

6  **A.**  (Reviewing document.)

7  **Q.**  May be in Mr. Mottahedeh's?

8                  (Pause in the proceedings.)

9          **MR. COHAN:**  Ah, it's in the other binder.  It's okay.

10  **Q.**  You heard Mr. -- don't look for it.  It's in the other

11  binder.  I have the original in my hands.  I just need to get

12  your attention and ask you a couple questions.

13      Did you hear Mr. Mottahedeh testify about Joe Bannister's

14  report, the 95-page report --

15  **A.**  Yes.

16  **Q.**  -- that he spoke about?

17  **A.**  Whoops.

18  **Q.**  Did you receive a copy of that report from Freedom Law

19  School sometime in 2003?

20  **A.**  Yes.

21          **MR. COHAN:**  May I approach, Your Honor?

22          **THE COURT:**  Yes.

23  BY MR. COHAN:

24  **Q.**  I'm handing you what's been marked for purposes of

25  identification as Exhibit 522.

1    Do you recognize 522?  Take a moment.

2  **A.**  (Reviewing document.)

3    Yes, this looks like a first edition.

4  **Q.**  Is that the one that you actually gave me that you

5  received from Freedom Law School in 2003?

6  **A.**  (Reviewing document.)

7    I feel like I had a second edition, but --

8  **Q.**  Well, did you get both editions?

9  **A.**  Yes, I did eventually.

10  **Q.**  Okay.  We're only offering this one right now.  Do you

11  recognize it?

12  **A.**  Oh.  Yes.

13  **Q.**  Did you rely on it for your determination to continue not

14  to file tax returns?

15  **A.**  Yes.

16    **MR. COHAN:**  Move its admission, Your Honor.

17    **THE COURT:**  All right.

18    **MR. SAMPSON:**  Your Honor, we have -- I guess we're

19  talking about this (indicating).  This is what we have.

20    **MR. COHAN:**  That's exactly what we're talking about.

21    **MR. SAMPSON:**  Okay.  It's not in a binder, but, Your

22  Honor, I object because it's both cumulative.  It's a 90-page

23  document with legal materials in it.  And it's also vague as

24  to when the defendant received this version.

25    **THE COURT:**  Can you establish when he received it?

1    **MR. COHAN:**  I can.

2  **Q.**  Do you recall receiving both this version that's marked as

3  Exhibit 522 and another version that's marked as Exhibit 523?

4  **A.**  Yes.

5  **Q.**  Do you recall whether you received those shortly after

6  joining Freedom Law School?

7  **A.**  I received one of them.

8  **Q.**  Do you know which one you received first?

9  **A.**  I don't know.

10  **Q.**  That's a "yes"?

11     Okay.  If you don't know you don't know.

12     Do you recall that you received them roughly at the same

13  time, or were they years apart?

14  **A.**  No, they were pretty concurrent.

15  **Q.**  Is there, other than the cover, any real difference in the

16  contents between Exhibits 522 and 523?

17  **A.**  Type font.  That's pretty much all's I noticed.

18  **Q.**  Okay.

19     I'll move them both into evidence then, Your Honor,

20  Exhibit 522 and 523.

21        **THE COURT:**  Objection.

22        **MR. SAMPSON:**  Yes, Your Honor.  So obviously one is

23  exactly cumulative of the other.

24        **THE COURT:**  Exactly.

25        **MR. COHAN:**  Fine.

1    **THE COURT:**  He's simply trying to make to point of

2    the volume of information that Mr. Grant had.  I ruled

3    pretrial that I would allow him to put on some of it.

4        These documents comprise "some of it."  Objection

5    overruled.  They can both come in.

6        (Defendant's Exhibits 522, 523 received in evidence)

7        **MR. COHAN:**  Okay.

8        Now, Mr. Garland, can you put up Exhibit 358?

9        My other book.

10                    (Exhibit published.)

11    **BY MR. COHAN:**

12    **Q.**  Okay.  Mr. Grant, take a look at Exhibit 358.

13        And, Mr. Garland, can you flip to the second page of this

14    exhibit, please.

15                    (Exhibit published.)

16        **THE WITNESS:**  3 -- What is it?

17    **BY MR. COHAN:**

18    **Q.**  It's Exhibit 358.  I don't believe you have the -- the

19    right volume up there.  I need to get you one, too.

20                    (Off-the-record discussion.)

21        **MR. COHAN:**  Thank you.

22    **Q.**  Mr. Sampson has just given me the one that -- Well,

23    anyway, I have another copy.

24        May I approach, Your Honor?

25        **THE COURT:**  Yes.

1                  **MR. COHAN:** All right.

2    **Q.** Handing you what's been marked and admitted as Exhibit

3    358, do you recognize this?

4    **A.** Yes, that's my handwriting.

5    **Q.** Okay. And --

6    **A.** Or.

7    **Q.** Do you recall the circumstances under which -- now, this

8    is in evidence so you can refer to it.

9        Do you recall the circumstances under which you actually

10   put pen to paper and wrote this response from Randall Grant to

11   Special Agent Moran?

12   **A.** Yes. My brother received -- Whoops, sorry.

13   **Q.** "Yes" was the answer?

14   **A.** Yes.

15   **Q.** What were the circumstances that lead you to write in your

16   own hand a letter for Randall Grant?

17   **A.** My brother received a request or summons for materials

18   that he didn't have in his possession. He contacted Freedom

19   Law School and talked to -- I believe it was an intern or

20   whatever they -- the people who work there.

21       I believe they then may have talked to Peymon and given me

22   the verbiage. I wrote it down, then transcribed it into this

23   letter.

24   **Q.** Okay. And the signature of Randall Grant at the bottom of

25   the page, did you write that, or did your brother Randall

1   write that?

2   **A.**   I put this letter on his desk.  And he -- I said if you

3   want to sign this, this will take -- this should take care of

4   it because he didn't have the item on his -- I mean, in his

5   possession.  And the last thing I recall him saying is that he

6   didn't necessarily want to turn it in.

7           **MR. SAMPSON:**  Objection.

8           **THE WITNESS:**  He wasn't going to use it.

9           **MR. SAMPSON:**  Your Honor, hearsay.

10          **THE COURT:**  Sustained.  The jury should disregard the

11  last statement.

12  **BY MR. COHAN:**

13  **Q.**   Did you sign this letter, or did your brother?

14  **A.**   I didn't sign it.

15  **Q.**   Okay.  Do you know what happened to it after you gave it

16  to your brother?

17  **A.**   No.

18  **Q.**   Okay.

19          Now, let's go to Exhibit 359, please, Mr. Garland.

20                    (Exhibit published.)

21  **BY MR. COHAN:**

22  **Q.**   And you can look on the screen, save time.

23  **A.**   (Reviewing document.)

24          Should I see it on this?  Should I be able to see it on

25  this screen?  Can -- I can't really read it too well.

1    **MR. COHAN:**  May I approach, Your Honor?

2    **THE COURT:**  Yes.

3    **BY MR. COHAN:**

4    **Q.**  I'll show you mine.

5    **A.**  (Reviewing document.)

6    **Q.**  Okay.  Mr. Grant, take a moment and review those two

7    pages.  I'll let you just keep my copy for the moment.

8    **A.**  (Reviewing document.)

9    **Q.**  Is there a second page?

10       Can you turn to that page, Mr. Garland, please.

11                      (Exhibit published.)

12            **MR. COHAN:**  Thank you.

13   **Q.**  Do you see the signature on the second page, sir?

14   **A.**  I do.

15   **Q.**  And did you see your brother sign his name to this?

16   **A.**  No.

17   **Q.**  Did you sign it for him?

18   **A.**  No.

19   **Q.**  So you don't know who signed his name.

20   **A.**  No.

21   **Q.**  Do you know the circumstances pursuant to which this

22   Exhibit 359 was prepared?

23   **A.**  (Reviewing document.)

24       It's a -- It's a response to a summons -- I'm reading it

25   here.

1    **Q.**  Okay.  Did you provide the summons that your brother

2    received?

3        Did he give it to you, first of all?

4    **A.**  No.

5    **Q.**  Do you know --

6    **A.**  I don't recall.  I mean, I -- don't know.

7    **Q.**  Okay.  You don't know.

8        So you don't know who prepared this Exhibit 359?

9    **A.**  I have no memory of it.

10   **Q.**  Okay.  So you don't recall sending the summons to

11   Mr. Mottahedeh?

12   **A.**  No.

13   **Q.**  Okay.

14       So your testimony is you don't know what happened with

15   respect to this?

16           **MR. SAMPSON:**  Asked and answered, Your Honor.

17           **THE COURT:**  Sustained.

18           **MR. COHAN:**  Okay.

19           **THE COURT:**  Is 359 already in evidence?

20           **MR. COHAN:**  It is.

21           **THE COURT:**  Okay.

22           **MR. COHAN:**  Okay.

23       We're almost done with the direct.  Just one more exhibit

24   we need to go through.

25           **THE COURT:**  Okay.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    BY MR. COHAN:

2    Q.   Now, Mr. Grant, you received correspondence from the

3    Internal Revenue Service and the Franchise Tax Board telling

4    you that you were supposed to be filing tax returns in 2004,

5    2005, correct?

6    A.   Yes.

7    Q.   Did you see something on the Internet called Freedom to

8    Fascism that was produced by Aaron Russo in September 2006?

9    A.   Yes.

10             MR. SAMPSON:  Objection, Your Honor.  It's leading.

11             THE COURT:  Overruled.

12             MR. COHAN:  And --

13             THE WITNESS:  Yes.

14   BY MR. COHAN:

15   Q.   Did you then download that -- Well, strike that.

16        First of all, you saw this video, Freedom to Fascism, back

17   in 2009 (sic).

18        How many times did you see it, do you know?

19   A.   Probably twice.  It's a feature-length -- Am I allowed to

20   keep talking?

21   Q.   You are.

22   A.   It's a feature-length documentary.

23   Q.   Okay.

24   A.   And it takes -- it takes, you know, time.

25   Q.   Couple hours?

1   **A.**  Yes.

2   **Q.**  Okay.  At my request, did we prepare a download of the

3   entire thing and ask that you go through it and find just the

4   smallest number of excerpts or excerpt that epitomized what

5   was important out of that video that you relied on for your

6   belief that there's no law requiring the filing of income tax

7   returns?

8   **A.**  Yes.

9   **Q.**  Okay.  And you've seen, then, what's been marked for

10  purposes of identification as 537 and 537A, which are the

11  excerpt that we prepared for you, right?

12  **A.**  I have the transcripts here.

13  **Q.**  Okay.

14          **MR. COHAN:**  Okay.  Move the admission and the playing

15  of Exhibit 537A.  And that's the last thing I have before I

16  tender the witness, Your Honor.

17          **THE COURT:**  And how long is it?

18          **MR. COHAN:**  It's ten minutes.  Ten minutes.

19          **THE COURT:**  All right.

20          **MR. SAMPSON:**  I object, Your Honor.  It's cumulative.

21  At the very last break, we were now given a transcript of --

22  of this document.  So the government will be reading it along

23  with the jury as it's -- as it's heard.

24          **THE COURT:**  Are you saying that you were not given

25  the CD before trial?

1    **MR. SAMPSON:**  We were given the CD a couple weeks

2  ago, Your Honor.

3    **THE COURT:**  Okay.

4    **MR. SAMPSON:**  But these excerpts, this transcript,

5  was just handed to us.

6    **THE COURT:**  Okay.

7    **MR. SAMPSON:**  And we're not sure --

8    **THE COURT:**  Objection --

9    **MR. SAMPSON:**  Okay.

10    **THE COURT:**  Objection overruled.

11    All right.  This is last excerpt.  You did mis -- and I

12  think you asked him twice about when he viewed this.  And the

13  first time you said September of 2006.  The second time --

14    **MR. COHAN:**  Did I say September?

15    **THE COURT:**  -- 2009.

16    **MR. COHAN:**  No.

17    **THE COURT:**  Well, that's -- that's what Raynee

18  recorded.  You asked him the question twice, and you used

19  different dates each time, so please clarify the date at which

20  he saw it.

21  **BY MR. COHAN:**

22  **Q.**  You saw it in -- in September of -- Excuse me.

23    Do you know what month in 2006 you saw it?

24  **A.**  It was the end of the -- end of the year.  I don't recall

25  exactly the month.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  **Q.** But was it 2006?

2  **A.** As I recall.

3  **Q.** Okay. Thank you.

4         **THE COURT:** All right. Go ahead. Play it.

5              (Pause in the proceedings.)

6                   (Video playing.)

7         **THE COURT:** All right. Anything else?

8         **MR. COHAN:** Nothing further, Your Honor.

9         **THE COURT:** All right. Cross?

10             (Pause in the proceedings.)

11                   **CROSS-EXAMINATION**

12  **BY MR. SAMPSON:**

13  **Q.** Hello, Mr. Grant.

14  **A.** Hello.

15  **Q.** You saw that video, the one we just watched, in September

16  2006?

17  **A.** Approximately.

18  **Q.** Six years after you stopped paying your taxes.

19  **A.** Well, that just was more --

20  **Q.** Please answer the question.

21  **A.** Yes.

22  **Q.** All of your income comes from Grant Engineering, does it

23  not?

24  **A.** As --

25         **MR. COHAN:** Object to the form of the question. It

1    assumes that income is the definer.  It's gross income.

2           **THE COURT:**  Overruled.

3           **MR. SAMPSON:**  The witness -- Can the witness answer?

4           **THE COURT:**  He may answer.

5           **THE WITNESS:**  For the most part.

6    **BY MR. SAMPSON:**

7    **Q.**  Grant Engineering was a full-time job for you, was it not?

8    **A.**  As far as revenue earning, yes.

9    **Q.**  Your wife wasn't working from 2000 to 2009, was she?

10   **A.**  No.

11   **Q.**  You worked at the 400 Ohio Avenue of -- facility of Grant

12   Engineering, correct?

13   **A.**  Yes.

14   **Q.**  You hired employees?

15   **A.**  Yes.

16   **Q.**  You dealt with HR issues, human resources issues?

17   **A.**  Yes.

18   **Q.**  Like giving them Forms (sic) W9 (sic) to change their

19   withholdings?

20   **A.**  If they requested.

21   **Q.**  You distributed paychecks?

22   **A.**  Yes.

23   **Q.**  You invoiced the clients?

24   **A.**  2006....

25           **MR. COHAN:**  Can we have a time period?

 1    **BY MR. SAMPSON:**

 2    **Q.**  Are you --

 3          **THE COURT:**  Is there a time period that you're

 4    seeking, or for this entire time?

 5    **BY MR. SAMPSON:**

 6    **Q.**  Was there ever a time when you didn't invoice the clients?

 7    **A.**  Once we got our bookkeeper Robin Anderson.

 8    **Q.**  And when was that?

 9    **A.**  I don't exactly recall.

10    **Q.**  From 2005 to 2009, did you send invoices to clients?

11    **A.**  There might have been a small portion of that where Robin

12    did, but -- I would say yes.

13    **Q.**  2005 to 2009, did you manage the shipping?

14    **A.**  I had help with the -- my -- all my people.

15    **Q.**  Did you manage the shipping?

16    **A.**  I don't understand "manage" it.

17    **Q.**  Did you -- Did you -- Did you oversee employees who

18    conducted the shipping at Grant Engineering?

19    **A.**  Yes.

20    **Q.**  You had employees working under you at Grant Engineering,

21    correct?

22    **A.**  Yes.

23    **Q.**  And you wrote checks on Grant Engineering check --

24    checkbooks, correct?

25    **A.**  Yes.

1    **Q.**  And from 2005 to 2009, did you keep the bank accounts

2    balanced?

3            **MR. COHAN:**  Is that personal or Grant Engineering?

4            **MR. SAMPSON:**  It's Grant Engineering.

5            **THE COURT:**  All right.

6            **THE WITNESS:**  I think it was confirmed by

7    bookkeeping, Carol Zinck.

8    **BY MR. SAMPSON:**

9    **Q.**  After you did it, correct?

10   **A.**  Yeah, they made sure everything was accurate.

11   **Q.**  You approved the payroll?

12   **A.**  Could you define all -- what -- the payroll is.

13   **Q.**  You signed checks for employee salaries, correct, wages?

14   **A.**  Yes.

15   **Q.**  You talked to clients?

16   **A.**  Yes.

17   **Q.**  You talked to officials at BioRad?

18   **A.**  Yes.

19   **Q.**  On behalf of Grant Engineering?

20   **A.**  "Officials."

21   **Q.**  Employees of BioRad Engineering, the client?

22   **A.**  Yeah.  Yes.

23   **Q.**  You did you take deposits to the bank to deposit for Grant

24   Engineering?

25   **A.**  Yes.

1  Q.  Did you make deliveries for Grant Engineering?

2  A.  Yes.

3  Q.  Did you purchase equipment for Grant Engineering?

4  A.  Some.

5  Q.  The business had over a million dollars in gross receipts

6  through the 2000's, did it not?

7  A.  I don't know in the early 2000's, but -- it had -- during

8  that 2005 to 2009, I would say I believe so.

9  Q.  And in 2009, it actually broke $2 million in gross

10  receipts, did it not?

11  A.  I don't recall.

12  Q.  The profits were split between you and your brother

13  Randall, correct?

14  A.  Yes.

15  Q.  And you were each 50 percent partners?

16  A.  Yes.

17  Q.  And in the 1990's and early 2000's -- Well, let me -- Let

18  me rephrase.  You were the tax matters partner for Grant

19  Engineering; is that right?

20  A.  What is tax matters?

21  Q.  I'm not -- I'm not answering questions.  Were you a tax

22  matters partner for Grant Engineering?

23  A.  I don't understand.

24  Q.  If tax returns were prepared listing your name as the tax

25  matters partner for Grant Engineering, would they be wrong?

1        **MR. COHAN:**  Object, lack of a explanation.  What does

2    "tax matters partner" mean?

3        **THE COURT:**  He's pursuing it.  Overruled.

4        **THE WITNESS:**  I don't know.

5    **BY MR. SAMPSON:**

6    **Q.**  Have you ever seen your --

7    **A.**  I'm sorry.  I just don't know what --

8    **Q.**  Have you ever seen your name listed as a tax matters

9    partner for Grant Engineering?

10   **A.**  No.  I mean, it's hard to believe.  Can't --

11   **Q.**  Payroll tax returns were filed by Carol Zinck & Associates

12   for Grant Engineering, correct?

13   **A.**  Repeat.

14   **Q.**  Grant Engineering payroll tax returns were filed by Carol

15   Zinck & Associates Bookkeeping; is that correct?

16   **A.**  I believe so.

17   **Q.**  And you wrote checks approving payments to Carol Zinck &

18   Associates for that service, correct?

19   **A.**  Correct.

20   **Q.**  You never told them to stop doing that?

21   **A.**  No.

22   **Q.**  Now, Morre & Company C.P.A. has prepared Grant

23   Engineering's partnership tax returns since the early 1990's;

24   is that right?

25   **A.**  I believe so.

1  **Q.** And you understand that Morre -- John Morre and Linda

2  Panichelli were C.P.A.'s correct?

3  **A.** Yes.

4  **Q.** And you paid them thousands of dollars a year to prepare

5  those returns, correct?

6  **A.** Thousands?  2,000.

7  **Q.** Per year?

8  **A.** Per year.

9  **Q.** And you spent time talking on the phone to Linda

10  Panichelli?

11  **A.** Yes.

12  **Q.** And to Doug Woodcox?

13  **A.** Yes.

14  **Q.** And they asked you questions?

15  **A.** If they had a question.

16  **Q.** And you would answer that, correct?

17  **A.** Of course.

18  **Q.** And you understood that -- that these discussions were to

19  help them prepare, correct, Grant Engineering partnership tax

20  returns, correct?

21  **A.** Yes.

22  **Q.** That's what you paid them to do?

23  **A.** To the best of their ability, yes.

24  **Q.** And Morre & Company did prepare those returns?

25  **A.** Yes.

1  **Q.**  And up through 2002, you filed the federal partnership tax

2  returns, didn't you?

3  **A.**  Yes.

4  **Q.**  And Morre C.P.A. prepared your personal income tax returns

5  up through 2000; isn't that right?

6  **A.**  I believe so.

7  **Q.**  And you knew that you could ask Morre & Company for tax

8  advice, correct?

9  **A.**  I didn't think of them as tax advisers, but they were tax

10  preparers.

11  **Q.**  You paid them to prepare your tax returns?

12          **MR. COHAN:**  Asked and answered.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  Yes.

15  **BY MR. SAMPSON:**

16  **Q.**  And before your 2000 income tax return was due, you

17  informed them you didn't need their services anymore; isn't

18  that right?

19  **A.**  That's right.

20  **Q.**  You had already decided that you were done filing taxes

21  and paying them, correct?

22  **A.**  I had serious questions.

23  **Q.**  Is that a "yes"?

24  **A.**  Yes.

25  **Q.**  And you didn't share that with Morre & Company C.P.A. when

1    you terminated their services for your income tax returns, did

2    you?

3    **A.**   I did not.

4    **Q.**   And you didn't ask Morre & Company to review your

5    questions about the tax laws, did you?

6    **A.**   No.

7    **Q.**   And even after you stopped paying Morre to prepare your

8    personal income tax returns, Grant Engineering kept paying

9    Morre to prepare the partnership tax returns; is that right?

10   **A.**   Yes.

11   **Q.**   And they been preparing them up through the present?

12   **A.**   Yes.

13   **Q.**   And you knew you could call them and ask their advice?

14   **A.**   I didn't wish to get their advice.

15   **Q.**   You knew they were C.P.A.'s.

16   **A.**   Doesn't mean a lot to me.

17   **Q.**   That's not responsive.

18   **A.**   Could you say it again.  I'm sorry.

19   **Q.**   You knew they were C.P.A.'s, correct?

20   **A.**   Yeah, they have "C.P.A." after their name, sure.

21   **Q.**   And you never once asked anyone at Morre if you were

22   required to file a tax return, did you?

23   **A.**   No.

24   **Q.**   And you never once asked them if you thought the income

25   tax was legal?

1  **A.**  No.

2  **Q.**  And you never shared with them any of the material that

3  you claim to have relied on, did you?

4  **A.**  Absolutely not.

5  **Q.**  You kept sending K1's to your brother so that he could

6  file his tax returns, didn't you?

7  **A.**  Yes.  He wanted a K1.

8  **Q.**  And you received your K1's from Morre, did you not?

9  **A.**  They were in the packet.

10  **Q.**  So you received them?

11  **A.**  Yes.  Yes.

12  **Q.**  And they stated on them what your income from the

13  partnership was, did they not?

14  **A.**  I believe so.

15  **Q.**  And at some point, in 2008, you worked with Doug Woodcox

16  on a California Enterprise Zone credit for the California

17  partnership tax return for Grant Engineering, did you not?

18  **A.**  I believe so, yes.

19  **Q.**  And you had not filed a California partnership tax return

20  for Grant Engineering since 2001, had you?

21  **A.**  No.

22  **Q.**  You would get instructions from Morre on how to file every

23  year, correct?

24  **A.**  Yes.

25  **Q.**  And in 2002, you filed a federal return for Grant

1  Engineering partnership, did you not?

2  **A.**  It's been a while, but I'll -- I'll agree.

3  **Q.**  But in that year, you did not file a California 2002

4  partnership return, did you?

5  **A.**  Can't remember.

6  **Q.**  You can't remember whether you stopped filing California

7  one year before you stopped filing federal?

8  **A.**  No.

9  **Q.**  Now, by the time the 2000 California partnership tax

10  return was due, you had already received a letter from the

11  California Franchise Tax Board, had you not?

12  **A.**  I don't remember.

13  **Q.**  Let me show you Exhibit 76.

14                    (Exhibit published.)

15  **BY MR. SAMPSON:**

16  **Q.**  Did you receive this letter sometime shortly after

17  September 16th, '02?

18  **A.**   I don't remember.

19  **Q.**  This was before you were a member of Freedom Law School?

20  **A.**  The date you mean?

21  **Q.**  Yes, 2000 -- Yes, September 2000 --

22  **A.**  Yes.  Yes.

23  **Q.**  You concealed from Randall Grant that you had stopped

24  filing the partnership tax returns, didn't you?

25          **MR. COHAN:**  Object to the form of the question.

1  **THE COURT:**  Overruled.

2  **THE WITNESS:**  He did not ask.  I didn't say anything.

3  BY MR. SAMPSON:

4  **Q.**  But you kept giving him the K1's?

5  **A.**  He wanted to file, yes.

6  **Q.**  Now, you continued to have Morre C.P.A. prepare the

7  partnership tax returns up through 2009, did you not?

8  **A.**  And beyond, yes.

9  **Q.**  And in 2009, you received a letter from Morre saying that

10  they wanted to switch you to e-filing those partnership tax

11  returns, did you not?

12  **A.**  I remember something about e-file, the new -- latest thing

13  or something.

14  **Q.**  Yes.  And you didn't want them to do that, did you?

15  **A.**  I don't like electronic filing.  I don't like things out

16  in the ethers, so I -- I was not for it.

17  **Q.**  Well, you didn't like paper filing either, did you?

18  **A.**  I don't -- I don't really follow.

19  **Q.**  You weren't filing, were you?

20  **A.**  That's correct.

21  **Q.**  You called and told Morre that you preferred to paper

22  file, did you not?

23  **A.**  Seems -- Seems accurate, yes.

24  **Q.**  But that was a lie, wasn't it?

25  **A.**  No.

1  **Q.**  It was a lie that you told them to --

2  **A.**  Oh.

3  **Q.**  -- paper file?

4  **A.**  Oh, no, no.  I said -- I said -- I mean, I -- I mean, I

5  did say continue to paper file.

6  **Q.**  And that was a lie, was it not?

7  **A.**  I didn't consider it a lie about anything.

8  **Q.**  You told Morre that you would continue to paper file the

9  partnership tax returns?

10  **A.**  I just said I didn't want to file paper -- I mean, file

11  e-file.

12  **Q.**  Prior to 2001, you made estimated tax payments to the IRS

13  quarterly, did you not?

14  **A.**  Repeat.

15  **Q.**  Prior to 2001, you made quarterly estimated federal tax

16  deposits for your personal income taxes, did you not?

17  **A.**  I don't recall, but for argument sake, yes.  Is that --

18       **THE COURT:**  No, that's not appropriate.  Either you

19  recall or you don't recall.

20       **THE WITNESS:**  I don't absolutely recall.

21  **BY MR. SAMPSON:**

22  **Q.**  You don't know whether you made the tax deposits before

23  2001?

24  **A.**  I could have, but I don't recall.

25  **Q.**  You know that you stopped by the end of 2000; isn't that

1  right?

2        **MR. COHAN:**  Object to the form of the question as --

3  presupposes that he knows the prior period.  He just said he

4  didn't.

5        **THE COURT:**  Overruled.

6     I'm going to give him as much as leeway as I gave you as

7  to the form of the question.

8        **THE WITNESS:**  Could you repeat that again?

9  **BY MR. SAMPSON:**

10  **Q.**  When did you stop paying income tax?

11  **A.**  I don't really fully recall.  I mean, once it becomes --

12  Oh, I'm sorry just running on.

13  **Q.**  In 2000, you were still earning money from the Grant

14  Engineering partnership, correct?

15  **A.**  I was getting income, yes.

16  **Q.**  And in 1998 -- going back, in 1998, you reported adjusted

17  gross income of $120,000 to the IRS.  Do you recall that?

18  **A.**  I don't recall.

19  **Q.**  Do you recall that in 1999, your income doubled?

20  **A.**  No.  We just worked hard.

21  **Q.**  Do you recall that in 1999, your income tax doubled?

22  **A.**  I don't recall.

23  **Q.**  Do you recall that you paid a penalty in 1999 and

24  interest?

25  **A.**  I don't remember.  It's a long time ago.

1  **Q.**  Do you recall that the last payment you ever made to the

2  IRS was that penalty and interest payment in late 2000?

3  **A.**  I don't.  And I seem to recall that they started having

4  payments to the treasury instead of IRS.  That's one of -- one

5  of the few things I might actually recall.

6  **Q.**  Okay.  So when I say "IRS," IRS is a department of -- part

7  of the Department of the Treasury, so does that change your

8  answer to any of my questions?

9  **A.**  I don't recall it.

10  **Q.**  In 2000, you were angry that your income tax doubled; is

11  that -- is that a fair characterization?

12  **A.**  No, I don't recall anything like that.  I had probably

13  ceased volunteering anymore.

14  **Q.**  And you had also ceased paying?

15  **A.**  I wrote no more checks.

16  **Q.**  Until when?

17  **A.**  I don't recall what -- what your -- what are you -- what

18  date you're trying to get?

19  **Q.**  When was the last time you had made a payment to the

20  Treasury for income taxes, Mr. Grant?

21  **A.**  I don't absolutely recall.

22  **Q.**  Now, sometime in 2001 -- Well, let me ask it this way.

23      You claim to rely on a letter from a lawyer in New Orleans

24  from 2001.  Do you recall that?

25  **A.**  Yes.

1    **Q.**   Testifying to that?

2    **A.**   Reviewed it here.

3    **Q.**   And you testified that you received that sometime in March

4    2001?

5    **A.**   Yes.

6    **Q.**   Did you go to New Orleans to meet this lawyer?

7    **A.**   No.

8            **MR. SAMPSON:**   Can we show that exhibit?  I think it's

9    512.

10           (Pause in the proceedings.)

11           **MR. SAMPSON:**   I think it's 512.  I'll show it on the

12   ELMO.

13           (Pause in the proceedings.)

14               (Exhibit published.)

15   **BY MR. SAMPSON:**

16   **Q.**   Do you recall looking at this exhibit earlier today?

17   **A.**   (Reviewing document.)

18           Yes.  Yes.

19   **Q.**   This is the letter from the lawyer in Louisiana?

20   **A.**   Yes.

21   **Q.**   And you testified that you don't recall how you found this

22   lawyer; is that right?

23   **A.**   It may have been part of a package of materials.

24   **Q.**   What package?

25   **A.**   There were numerous packages of -- of materials, not from

1  Freedom Law School.  I -- but from other organizations.

2  **Q.**  Why didn't you look for a more local attorney?

3  **A.**  They probably practice, sort of like the medical

4  profession, consensus medicine, consensus legal practice.

5  Most of these people are invested in the system, and even if

6  they were presented with this information in my opinion, they

7  would just shriek and turn away from it and -- because

8  they're -- they're getting -- you know, this is their

9  livelihood.

10  **Q.**  So you went and found a lawyer in Louisiana that you never

11  met because he would agree with your views; is that fair?

12  **A.**  These people didn't just agree.  They supported --

13  supported --

14  **Q.**  Is --

15  **A.**  -- their findings.

16  **Q.**  Please answer my question "yes" or "no."

17      Is that a fair characterization?

18  **A.**  I -- Could you repeat?

19  **Q.**  Did you go looking -- Did you find an attorney in

20  Louisiana to give you this opinion letter because you thought

21  he would agree with your views?

22  **A.**  No, this was supplied as part of a package.

23  **Q.**  And in a package was about income tax law?

24  **A.**  I believe so.

25  **Q.**  This is called on the first line -- it's called a reliance

1  letter.

2  **A.**  Uh-huh.

3  **Q.**  Do you have other reliance letters?

4  **A.**  There's another one I believe right in here.

5  **Q.**  You understand a reliance letter to be a defense to a

6  criminal charge; is that -- is that right?

7  **A.**  No.

8  **Q.**  What do you think a reliance letter is?

9  **A.**  Just something that supports your beliefs.

10  **Q.**  By the time you received this, you had already missed

11  estimated tax payments to the IRS; is that right?

12  **A.**  I would say probably so.

13  **Q.**  So you had already stopped paying income tax before you

14  got this letter?

15  **A.**  I had other reliance materials obviously that you have

16  witnessed here in the courtroom.

17  **Q.**  Now, did you do any research on Gerald Aurillo?

18  **A.**  No, I --

19  **Q.**  Yes or no, Mr. Grant?

20  **A.**  No.

21  **Q.**  This letter says to do your own research, does it not?

22  **A.**  And I -- yes.

23  **Q.**  What law library did you go to to do that research?

24  **A.**  I did not go to a law library.

25  **Q.**  Mr. Grant, I'm going to direct your attention to the last

1  page, 17.

2                    (Exhibit published.)

3  **BY MR. SAMPSON:**

4  **Q.**  It says on the second paragraph, I cannot advise you or

5  tell you not to file a Form 1040, does it not?

6  **A.**  (Reviewing document.)

7      Let's see.  I'm trying to find that.

8  **Q.**  It's the first sentence on the second paragraph.

9  **A.**  Oh, I -- I read that, yes.

10 **Q.**  This is a letter that you claim to rely on?

11 **A.**  In part.  Not in toto.

12 **Q.**  It also says in the fourth paragraph -- it's a little hard

13 to read, does it not say before you do anything or don't do

14 anything, I suggest that you seek and obtain professional

15 opinion letters on the subject from other lawyers.

16 **A.**  But as you said I had already committed -- yes.  Sorry.

17 **Q.**  And what other lawyers did you seek an opinion from?

18 **A.**  At that -- At that time, I don't think the -- the other

19 letter was from a lawyer, but they had some legal

20 understanding.

21 **Q.**  Are you talking about Thomas Price?

22 **A.**  Let me -- Could you refer me to that page.

23 **Q.**  Well, do you recall who it was from?

24 **A.**  Not at this moment.

25 **Q.**  Do you recall that it was a lawyer in Florida?

1  **A.**  Yes, Coral -- something Coral something.

2  **Q.**  Did you ever meet that person?

3  **A.**  I did not.

4  **Q.**  Okay.  That opinion letter cost $50, did it not?

5  **A.**  I think it was part of a package.  I didn't -- I didn't

6  directly pay for any given piece of the package.

7  **Q.**  If there was an advertisement in the back of the Joseph

8  Bannister book that said that Thomas Price would give opinion

9  letters for $50, would that be wrong?

10  **A.**  Perhaps it's -- it's -- no, I'm not saying it is.  I just

11  didn't get it through Freedom Law School or from the back of

12  that book 'cause I didn't have that book at this time.

13  **Q.**  Okay.

14  Now, let's go through this letter.  This is a letter that

15  you claimed to rely on, correct?

16  **A.**  In part.

17  **Q.**  And did you look to determine whether this person was a

18  lawyer?

19  **A.**  Reading the letter, it seemed that they had some

20  credentials and credibility.  Not everybody has to be a

21  lawyer.

22  **Q.**  That letter says to go to a law library, does it not?

23  **A.**  Where are you reading?  I can't see it.

24  **Q.**  I'm asking you from your recollection.

25  **A.**  I don't recall.  Many years.

1  **Q.** It's been many years since you've relied on this?

2  **A.** Since I first read it and confirmed what I was looking to

3  confirm.

4  **Q.** Mr. Grant, the first paragraph says, I cannot advise or

5  counsel you not to file a 1040 tax return. Do you see that?

6  **A.** I see that.

7  **Q.** That didn't cause you to question the -- the letter?

8  **A.** I see it as a disclaimer that they all -- must all do

9  because they could be if -- if they're a lawyer, they'll be

10  disbarred. It's consensus legal practice.

11  **Q.** Is that a "yes" or a "no"?

12  **A.** I see it. Didn't dissuade me.

13  **Q.** It also states, I urge you to do your own research on

14  these issues. Go to your local law library.

15  Do you see that?

16  **A.** That's pretty standard.

17  **Q.** Is that a "yes"?

18  **A.** I see it, yes.

19  **Q.** It also says, I -- it is also imperative that you seek out

20  the advice -- advise (sic) and counsel of other professionals

21  such as -- such as lawyers, Certified Public Accountants,

22  enrolled agents, and the like.

23  Do you see that? On the third --

24  **A.** I see -- Yeah, I see that.

25  **Q.** But you didn't talk to Morre C.P.A. about these claims?

1  **A.**  No.  No.

2  **Q.**  Do you recall that the Gerald Aurillo letter talks about

3  criminal prosecutions in tax cases?

4  **A.**  I think you mentioned that.

5  **Q.**  Do you recall it from the letter, sir?

6  **A.**  I think you read that, so I do now recall it, but I don't

7  recall it from the past.

8  **Q.**  He talks about a case called *Cheek*, does it not?

9  **A.**  I don't see it.

10  **Q.**  Do you recall it?

11  **A.**  I've heard that word.  It's hard to forget.

12  **Q.**  It doesn't say that you would not be prosecuted, does it,

13  Mr. Grant?

14  **A.**  I'm still trying to understand, you know, the *Cheek*

15  something case.  I don't remember it.

16  **Q.**  The letter, Mr. Grant -- the letter says, does not

17  guarantee that you won't be prosecuted, does it?

18  **A.**  I don't see anything in front of me.

19  **Q.**  In fact, Mr. Grant, it discusses the Assistant United

20  States' Attorney, does it not, on page 11?

21  **A.**  (Reviewing document.)

22      This -- I don't know how this comes together.  17,000

23  documents to me seems to have to do with --

24  **Q.**  I'm not asking you about 17,000 documents, Mr. Grant.  I'm

25  asking you if it refers to the Assistant United States'

1   Attorney?

2   **A.** I believe an assistant United States Attorney who would be

3   the one to bring the case to --

4   **Q.** I'm not asking you to read it out loud, Mr. Grant.

5   **A.** Oh. Hang on.

6   (Reviewing document.)

7   Are you talking at the very top?

8   **Q.** No, Mr. Grant. I'm talking about the bottom of the

9   letter.

10   **A.** The natural flow?

11   **Q.** All right. Mr. Grant, this talks about willfulness in a

12   criminal tax case, does it not? Do you see the word

13   "willfulness" at the bottom of page 11?

14   **A.** I do see it.

15   **Q.** And this is a letter that you claim to have relied on,

16   correct?

17   **A.** I read it, and it -- it added weight to my perception that

18   there was problem with the income tax.

19   **Q.** Is that a "yes" or a letter that you claim to have relied

20   on?

21   **A.** In part, yes.

22   **Q.** In addition to the letter from I-R -- FTB dated September

23   2002, you also got letters from the IRS, correct?

24   **A.** What time frame are we talking about?

25   **Q.** Did you receive letters from the IRS?

1  **A.**  Yes.  And I forward them -- yes.

2  **Q.**  Do you recall when you first started receiving letters

3  from the IRS about your personal income taxes?

4  **A.**  No.

5  **Q.**  Do you recall that they were about a Substitute for

6  Return?

7  **A.**  No.

8  **Q.**  Do you recall that they related to your failure to file

9  and pay income taxes for 2000 and 2001?

10  **A.**  I don't remember the letters.

11  **Q.**  But you recall receiving letters?

12  **A.**  I feel like I -- during some time period, I certainly have

13  received letters.

14  **Q.**  I didn't stop withholding the taxes of your employees

15  after you stopped paying your own, did you?

16  **A.**  No.

17  **Q.**  In 2000 to 2009, you were still receiving money from Grant

18  Engineering, were you not?

19  **A.**  Yes.

20  **Q.**  From 2005 to 2009, you were receiving almost 200,000 a

21  year, correct?

22  **A.**  I think we heard a lot about that.

23  **Q.**  Is that a "yes"?

24  **A.**  Yes.

25  **Q.**  You challenged a lien that IRS was proposing to file

1  against your house, correct?

2  **A.**  I believe -- yes.

3  **Q.**  And you appealed IRS's decision to the Tax Court?

4  **A.**  With my legal documentation that was provided to me by

5  Mr. Mottahedeh.

6  **Q.**  You know Mr. Mottahedeh was not a lawyer, correct?

7  **A.**  He's had greater legal knowledge, but he was not a lawyer.

8  **Q.**  And you appealed that case to the Ninth Circuit Court of

9  Appeals, did you not, when the Tax Court ruled against you?

10  **A.**  I believe so.  I believe so.

11  **Q.**  And you lost in the Ninth Circuit, too, correct?

12  **A.**  I don't know.  I guess it's been -- it's been a long time.

13  I don't remember.

14  **Q.**  Someone from the IRS showed up at your home in 2005; do

15  you recall that?

16  **A.**  I do recall somebody.

17  **Q.**  And you refused to identify yourself, didn't you?

18  **A.**  I think I was caught off guard, and I did not exactly

19  identify Myself.  It was in my house.  Oops, sorry.

20  **Q.**  Someone from the IRS called your business, didn't they?

21  **A.**  I don't remember.

22  **Q.**  You don't recall talking to somebody that dialed your

23  extension at your business?

24  **A.**  I don't remember.

25  **Q.**  Let me show you Exhibit 112.

1    (Exhibit published.)

2    (Off-the-record discussion.)

3  **BY MR. SAMPSON:**

4  **Q.**  This is a letter that you sent to the Tax Court, correct?

5  **A.**  I signed it.  I -- I must have sent it.  Yes.  Yes.

6  **Q.**  And in 2006, in this Tax Court case, you asked if you

7  could get an attorney provided for you, didn't you?

8  **A.**  (Reviewing document.)

9     Does it say that?  Could you draw my attention --

10  **Q.**  The last sentence.

11  **A.**  Oh.  Oh.  Thank you.

12     (Reviewing document.)

13     Thank you for reading my letter.  Now I have a whole --

14  **Q.**  You don't need to read it out loud, Mr. Grant.

15  **A.**  (Reviewing document.)

16     So, like, I would probably want to have an attorney that

17  would protect my interests like Mr. Mottahedeh.  I mean, a --

18  a person, so if I requested one, I must have agreed to this --

19  this letter from -- or via Mr. Mottahedeh.

20  **Q.**  You didn't actually want a public defender, did you?

21  **A.**  This was recommended to me, so if that's -- if it says

22  that, I -- I was confident that my -- my position was being

23  protected by somebody who cared.

24  **Q.**  And this is in a year when you received $201,000 from

25  Grant Engineering; isn't that right?

1  **A.**  I don't recall, but an attorney can cost a lot of money.

2  **Q.**  Yes or no, Mr. Grant?

3  **A.**  Oh, I don't recall the 201,000 precisely.  You have all

4  those figures at your command.

5  **Q.**  You were issued a summons in late 2005 by IRS, were you

6  not?

7  **A.**  I -- I have received a summons, yes.

8  **Q.**  And you didn't show up to meet the IRS agent in response

9  to that summons, did you?

10  **A.**  I don't know that particular instance.  I thought I did

11  come to a summons, but I don't know what date or what -- when

12  I was responding to.

13  **Q.**  Well, you showed up to one in 2009; isn't that right?

14  **A.**  Okay.

15  I'll agree.

16  **Q.**  Is that the first time you went to meet with someone at

17  IRS?

18  **A.**  Yes.

19  **Q.**  Your personal checking account at Mechanic's Bank was

20  leveed by the Franchise Tax Board in October 2005, was it not?

21  **A.**  I remember a levy.

22  **Q.**  Is that a "yes"?

23  **A.**  I don't have the date.  I don't carry all these dates

24  around.

25  **Q.**  And your joint account with your wife was also levied on

1  the same date.

2      Do you recall that?

3  **A.**  I know I think -- both of our accounts were levied.

4  **Q.**  And they were both levied again in 2007.  Do you recall

5  that?

6  **A.**  Not precisely, but let's just say for argument's sake,

7  yes.

8  **Q.**  You knew that IRS might levy your bank account as well,

9  didn't you?

10  **A.**  Not necessarily.  I don't know.

11  **Q.**  You filed lawsuits in three different district courts to

12  keep IRS from getting information about your income, didn't

13  you, Mr. Grant?

14  **A.**  Could you describe what those -- the term I think is

15  motion to quash.  Is that what you're saying?

16  **Q.**  Did you pay a filing feed in the District Court to file a

17  lawsuit against the government?

18  **A.**  Motion to quash I think is -- is that -- lawsuit.  I

19  don't -- I don't understand all those terms.  Motion to quash,

20  is that the --

21  **Q.**  Did you file something to get a judge to decide --

22  **A.**  I believe so.

23  **Q.**  -- regarding --

24  **A.**  Yes.

25  **Q.**  One such motion in this district?

1   **A.**   Yes.

2   **Q.**   Two in Los Angeles?

3   **A.**   I would say in Los Angeles, something.

4   **Q.**   One in Ohio?

5   **A.**   Ohio, it seems -- I have a recollection of that.

6   **Q.**   The Ohio one was for Macy's, was it not?

7   **A.**   Macy's sounds familiar.

8   **Q.**   Is that a "yes"?

9   **A.**   Yeah.

10   **Q.**   And you never once brought up your claimed views for a

11   court to decide them, did you, Mr. Grant?

12   **A.**   I don't understand that.

13   **Q.**   Is that a -- Please answer the question "yes" or "no."

14   **A.**   No.  I don't understand.

15   **Q.**   Do you need me to rephrase the question?

16   **A.**   Yes.

17   **Q.**   You never once told any of these courts these views that

18   you're claiming you have about tax.

19   **A.**   No.

20   **Q.**   And you didn't do that because you knew they would be

21   rejected, didn't you?

22   **A.**   I didn't put those motions together.  I kind of skimmed

23   over them and relied on somebody else.

24   **Q.**   You just outsourced those motions to Peymon Mottahedeh?

25   **A.**   He was the person I relied on.

1  **Q.**  Is that a "yes"?

2  **A.**  Yes.

3  **Q.**  You filed these motions to delay IRS from collecting the

4  taxes it thought you owed; isn't that right?

5          **MR. COHAN:**  Object to the form of the question, what

6  the IRS thought.  He wouldn't know what they thought.

7          **THE COURT:**  Yeah.  Correct.

8  **BY MR. SAMPSON:**

9  **Q.**  You filed these motions to delay IRS's collection of taxes

10  that they were attempting to collect from you.

11  **A.**  I don't know.

12  **Q.**  You don't know why you filed these lawsuits?

13  **A.**  I don't know what the objective was.  It was to protect my

14  rights as far as I understood.

15  **Q.**  I'm going to show you Exhibit 134.

16                  (Exhibit published.)

17          **MR. SAMPSON:**  Please zoom in on the top.

18                  (Exhibit published.)

19  **BY MR. SAMPSON:**

20  **Q.**  You put -- You -- Who prepared this document?

21  **A.**  Can I see more of it?

22          **MR. SAMPSON:**  Zoom out.

23          **THE WITNESS:**  Sure wasn't me.

24                  (Exhibit published.)

25          **THE WITNESS:**  I would say -- the Freedom Law School.

1            **MR. SAMPSON:**  All right.  Now zoom in on the top.

2   **Q.**  Is that your handwriting that says no phone, no email?

3   **A.**  Looks like my writing.  My printing, I mean.

4   **Q.**  So you added that to what Freedom Law School prepared?

5   **A.**  Apparently.

6   **Q.**  And that's because you didn't want anybody actually

7   contacting about your tax liabilities; isn't that right?

8   **A.**  I may have been told what to do.  I don't know.

9   **Q.**  It also says "pro se."

10     Do you know what "pro se" means?

11   **A.**  Is that where I do it --

12   **Q.**  I'm not answering the questions.

13   **A.**  Okay.  I don't fully recall the definition.

14   **Q.**  Do you know that you were telling this court that you

15   didn't have a lawyer?

16   **A.**  And I -- I guess I didn't based on what you said.  Yes.

17   **Q.**  Please show Exhibit 129.

18                (Exhibit published.)

19         **MR. SAMPSON:**  Could you zoom in on the top portion.

20                (Exhibit published.)

21   **BY MR. SAMPSON:**

22   **Q.**  Now, you stated -- testified that you did meet with IRS in

23   response to a summons; is that right?

24   **A.**  I did.

25   **Q.**  And you met with Patty Young-Lau?

1    **A.**   I believe so.

2    **Q.**   And was it 2009, sometime after this letter?

3    **A.**   Makes sense, yes.

4    **Q.**   So you received this letter.

5    **A.**   Yes.

6    **Q.**   There's an attachment on the fourth page called, why do

7    you have to pay taxes?

8         Do you see that?

9    **A.**   It's pretty blurry from here.  Well, I can read the

10   caption.

11   **Q.**   You received that with the letter, did you not?

12   **A.**   I believe so.

13   **Q.**   And it says, what does IRS do to address willful

14   noncompliance with the U.S. tax laws, doesn't it?

15   **A.**   (Reviewing document.)

16        Okay.

17        (Reviewing document.)

18        That's what it says.

19   **Q.**   And section two says that it -- IRS could include

20   prosecution and prison sentences, doesn't it?

21   **A.**   Throw the book at you.

22   **Q.**   Is that a "yes"?

23   **A.**   Yes, I read that.

24   **Q.**   And you discussed this pamphlet with Mr. Mottahedeh, did

25   you not?

1   **A.**   As I recall.

2   **Q.**   Is that a "yes"?

3   **A.**   Yes.

4   **Q.**   That -- Go back one page, please.

5                     (Exhibit published.)

6   **BY MR. SAMPSON:**

7   **Q.**   You received this request for documents from the IRS to

8   bring with you to this meeting in 2009, didn't you?

9   **A.**   I believe it was with it.

10  **Q.**   And you didn't bring those documents to the meeting, did

11  you, Mr. Grant?

12  **A.**   I just simply responded to that.

13  **Q.**   That is a "yes" or a "no," Mr. Grant?

14  **A.**   I did not.

15  **Q.**   But you did come to the meeting with your own court

16  reporter, didn't you?

17  **A.**   I did have a person with me.

18  **Q.**   Transcribing it as a court reporter?

19  **A.**   Tape-recorder.

20  **Q.**   And in that meeting, you never once brought up your

21  claimed beliefs about the legality of taxes, did you,

22  Mr. Grant?

23  **A.**   I did not.  I didn't provide any --

24  **Q.**   That's -- That's sufficient.

25        And, indeed, you never asked IRS if your views were

1  correct, did you?

2  **A.**  No.

3  **Q.**  And you never asked a court if your views were correct,

4  did you?

5  **A.**  I am here.

6  **Q.**  Before your prosecution?

7  **A.**  No.  No.

8  **Q.**  Thank you.

9      You didn't show up for trial in Tax Court, did you,

10  Mr. Grant?

11  **A.**  I did not go to a tax court.

12  **Q.**  And you didn't ask these questions of IRS and the courts

13  because you didn't know -- you didn't want to know what the

14  answer was; isn't that correct?

15  **A.**  No.

16      **THE COURT:**  All right.  Counsel, we've reached the

17  end of the day.

18      Ladies and gentlemen of the jury, it's Friday afternoon,

19  and I want to just advise you that we will conclude the trial

20  on Monday.  Monday will be a full day.  As I told you, the

21  first and last days of trial are full days.  Full day means

22  8:30 to 4:00 or 5:00, if you'd like to stay as late as 5:00.

23      We anticipate finishing the evidence first thing in the

24  morning and proceeding to closing arguments and instructions.

25      We will provide lunch for you, so you -- because you will

1    be here all day.

2        And keep in mind the instructions that I've given you

3    every day.  Do not talk to anyone or allow anyone to talk to

4    you about the case; and -- that includes talking among

5    yourselves.

6        Please do not do any independent research about the case,

7    and please do not use any electronic means to either do

8    research or to communicate about the case.

9        You're excused at this time till 8:30 on Monday morning.

10       Mr. Smith, if you would remain a moment.

11       (The following proceedings were heard out of the presence

12   of the jury:)

13            (Juror Smith was present in the courtroom.)

14       **THE COURT:**  Mr. Smith, I just want to give you an

15   opportunity to leave a number with me if you would like me to

16   make that effort for you this afternoon.

17       **A JUROR:**  I was unable to contact my wife.  She's not

18   answering the phone.

19       **THE COURT:**  Okay.

20       **A JUROR:**  So --

21       **THE COURT:**  Will you call in before the end of the

22   day if you can?

23       **A JUROR:**  I will call in this afternoon when I get

24   home.

25       **THE COURT:**  And you have Nichole's number?

1         **A JUROR:**  I do not.

2         **THE CLERK:**  Okay.

3         **THE COURT:**  Okay.  She'll give it to you.  And I'll

4  do what I can this afternoon.

5         **A JUROR:**  Okay.

6         **THE COURT:**  All right.  Thank you.  Have a good

7  weekend.

8     (The following proceedings were heard out of the presence

9  of the jury:)

10         **THE COURT:**  All right.  Mr. Grant, you may step down.

11     All right, counsel.  We're going to take a lunch break.

12         **MR. SAMPSON:**  Yes.

13     Your Honor, could we remind the defendant not to discuss

14  his testimony with counsel?

15         **THE COURT:**  Yes.  Mr. Grant, now that you've started

16  testifying, you may not talk about your testimony with counsel

17  until the matter's concluded.

18     All right.  So a lunch break, and then we'll come back and

19  talk about the jury instructions.  All right.  How much time

20  would you like?  Forty-five minutes?  Or an hour.

21         **MR. SAMPSON:**  Whatever the court prefers?

22         **MR. COHAN:**  We're just going to go -- if we get have

23  an hour --

24         **THE COURT:**  Okay.  An hour is fine.  We'll see you

25  back here at 2:30.

1       **MR. SAMPSON:**  Thank you.

2       **MR. COHAN:**  Thank you, Your Honor.

3       **THE COURT:**  Okay.

4       (Recess taken at 1:33 P.M.; proceedings resumed at 2:34

5   P.M.)

6       **THE CLERK:**  Please remain seated and come to order.

7       (The following proceedings were heard out of the presence

8   of the jury:)

9       **THE COURT:**  All right.  So I will report that I was

10  able to talk to someone in Juror Smith's doctor's office who

11  promised me on Monday morning, she would make contact with the

12  allergist and expedite a new appointment for him, so I think

13  that should make him feel better.

14      Okay.  All right.  So we have a couple of things to do.

15  We need to go over the jury instructions.  And we'll go

16  through them one at a time.

17      You all will -- You can remain seated.  Will you please

18  put your microphone down and talk -- Are those on?

19      **THE CLERK:**  They're not.  I have to turn them on.

20      **THE COURT:**  And talk directly into the microphones.

21      While we're working on that, I just want to enter my final

22  ruling on the Rule 29 motion.  I did have the opportunity to

23  read the *Spies* case that Mr. Cohan relied upon.

24      And my determination is as follows:  In the *Spies* case,

25  the trial court erred by not giving an appropriate lesser

1    included instruction and conflating the felony and the

2    misdemeanor charges.

3        And in our case, we are going to give the lesser included

4    instruction, and we're not going to conflate the felony and

5    misdemeanor charges.

6        And I thought that it was fairly instructive on the -- on

7    the description of the differences between the two types of

8    offenses.  And Mr. Cohan is absolutely correct that the real

9    differentiating element is the affirmative action that is

10   required.

11       The instructions that you all have submitted do

12   incorporate that language.  And I think that that fully takes

13   care of it.

14       But there is one thing that I wanted to explore when

15   looking at the jury instructions in combination with this need

16   for an affirmative act.

17       In the *Spies* decision, it's clear that the neglect of

18   statutory duty, the willful failure to pay or failure to file

19   are lesser includeds.  But it can be combined with some act --

20   some affirmative act to support an evasion charge.

21       And in the opinion, the court by way of illustration and

22   not by way of limitation, says we think affirmative willful

23   attempt may be inferred from conduct, and it gives a

24   non-exclusive list such as keeping a double set of books,

25   making false entries or alterations or false invoices or

documents, destruction of books or records, concealment of

assets, or covering up sources of income, handling one's

affairs to avoid making the records usual in transactions of

kind, and any conduct, the likely effect of which would be to

mislead or conceal.

So it -- there's certainly a laundry list, and it's a

non-exclusive list, and the court makes the point that the

inferences to draw from that conduct are for the injury to

draw, not for the court.  So the motion to the extent it rests

on the *Spies* case, the motion is denied.

But this also raises another issue.  And that has to do

with the injury instructions.  And there is this non-exclusive

list, and it's not clear to me what the government is relying

upon as the affirmative conduct from which an inference of

evasion can be drawn.

The jury instructions say you're limiting it to the -- the

check-writing habits, use -- the use of money orders and the

digital money orders, the warehouse bank and that kind of

thing.  We've heard other evidence, and it's not clear to me

what your intent is.

You've elicited testimony with regard to Mr. Grant not

identifying himself or not producing the list of records that

Ms. Young-Lau added.  Are those kinds of things you're relying

upon, or is it just going to the banking habits of Mr. Grant?

MR. KLUGE:  Your Honor, the only affirmative acts

1   listed in the indictment are what you just described, the --

2   the use of MyICIS through the money orders, the use of the

3   debit cards through MyICIS, the use of the cashier's checks to

4   pay personal expenses, and the use of the postal money orders

5   to pay personal expenses.

6           **THE COURT:**  Okay.  So those are the affirmative acts

7   that you're relying upon, and the other things go to the

8   question of willfulness or good faith.

9           **MR. KLUGE:**  That's correct, Your Honor.

10          **THE COURT:**  I just wanted to get clarity from you

11  all.

12          **MR. KLUGE:**  If the indictment said those things and

13  others, then they think we would rely on those, but the

14  indictment did not, so within the jury instructions, our

15  reliance and our closing, we will argue those four things I

16  just described, that those are the alleged affirmative acts.

17          **THE COURT:**  Okay.  All right.  Thank you for

18  clarifying that.

19      All right.  Let's turn to the instructions.

20          **MR. COHAN:**  May I be heard briefly.

21          **THE COURT:**  Well, I heard you all the other day, and

22  I ruled tentatively, and I simply wanted to confirm my ruling.

23      This is not an opportunity for you to argue further.

24          **MR. COHAN:**  I just wanted to point one thing out,

25  Your Honor.

1          **THE COURT:**  What?

2          **MR. COHAN:**  That is, that the affirmative acts that

3     are alleged here cannot as a matter of law apply to counts two

4     or three because they have nothing to do with the assessment.

5     And there has to be some logical nexus between these

6     affirmative acts and the charge.

7          **THE COURT:**  Okay.

8          **MR. COHAN:**  They could legitimately be considered

9     with respect to payment, but that's only charged in count one.

10    It's not charged in count two or count three.

11        And thank you for letting me make my record.

12         **THE COURT:**  Well, I believe you said that the other

13    day, and I was mindful of that.

14        Nonetheless, I think that the question's a jury question,

15    and the jury has been very, very patient.  They will get the

16    case on Monday and decide.

17        All right.  Now we're going to turn to the jury

18    instructions.  Want to go through each of them, though, to

19    make sure that we're all on same page, even the joint ones.

20        So we're -- I'll start first with the jointly filed

21    instructions, which are contained in document -- in Docket No.

22    77 filed on May the 11th.

23        Okay.  The first, one duty to find the facts and follow

24    the law, that's model instruction 3.1.  That will be given.

25         3.2, charge is not evidence.

1    3.3 or 3.4, the defendant's election to testify or not, I

2  assume that right not to testify is 3.3 and right -- and

3  defendant has testified is 3.4.

4    Do I have the numbers right?

5    **MR. KLUGE:**  I believe so, Your Honor.

6    **THE COURT:**  All right.  So I'll give the 3.4.  Both

7  instructions are currently included on the same page, so we

8  need to separate them out.  And just give me the 3.4.

9    **MR. KLUGE:**  Does Your Honor want that in a filed

10  pleading or just a blind courtesy copy delivered to chambers?

11    **THE COURT:**  Well, we need blind copies of all the

12  instructions.  And by "blind," it is to have no reference to

13  the submitting party and no reference to the authority.  But I

14  would like you to put the titles back in it.

15    It's impossible for the jury -- this will go back in to

16  the jury.  And it's -- there's no reason to make them have to

17  read every single one of them to find one that they might

18  particularly want to revisit in the jury room.

19    So you need to put the titles on them so that they can

20  find them.

21    **MR. COHAN:**  You mean just instruction number?

22    **THE COURT:**  Well, the title of the instruction.  The

23  caption.  You've removed the captions from --

24    **MR. COHAN:**  Oh, oh.  I'm just looking at what was

25  filed, and it's just stipulated proposed instruction No. 19.

1       **THE COURT:**  No, it should say, "Duty of jury" --

2       **MR. COHAN:**  Oh, okay.

3       **THE COURT:**  -- at the top.  It should say, "Ruling on

4   objections," "credibility of witnesses," the title that comes

5   from the model -- the manual.

6       **MR. COHAN:**  What's stated in the table of

7   instructions?

8       **THE COURT:**  Yes, exactly.

9       **MR. COHAN:**  Thank you.  Okay.

10      **THE COURT:**  All right.  3.5, which is reasonable

11  doubt.

12      3.6, which is what is evidence?

13      3.7, what is not evidence.

14      3.8, direct and circumstantial evidence.

15      3.9, credibility of witnesses.

16      3.10 -- Do you still want that one, activities not

17  charged?

18      **MR. KLUGE:**  Yes, Your Honor.

19      **THE COURT:**  Mr. Cohan?

20      **MR. COHAN:**  (Reviewing document.)

21          (Off-the-record discussion.)

22      **MR. COHAN:**  Kind of a close call for me, Your Honor.

23  I'm not sure --

24      **THE COURT:**  You stipulated to it previously for --

25  obviously, for some reason.

1    **MR. COHAN:** Well, it was because of our concern about

2    the 404(b) instruction that we ultimately -- well, the court

3    ruled, I believe, that it was not going to give such an

4    instruction.

5          **THE COURT:** Right.

6          **MR. COHAN:** And did not.

7          **THE COURT:** Do you want to withdraw this?

8          **MR. COHAN:** I think so, yes. I mean, just one less

9    instruction for the jury that they don't need, so --

10          **THE COURT:** No, I agree. I don't think it's

11   necessary. Why do you -- Do you all care? Usually, it's a

12   defendant's choice.

13          **MR. KLUGE:** The government doesn't -- will defer to

14   the court, Your Honor.

15          **THE COURT:** Okay. You want it withdrawn, Mr. Cohan?

16          **MR. COHAN:** I do, Your Honor.

17          **THE COURT:** All right. So we won't give that one.

18      3.11, multiple counts. I assume you still want that?

19          **MR. KLUGE:** Yes, Your Honor.

20          **THE COURT:** Mr. Cohan?

21          **MR. COHAN:** Yes, Your Honor.

22          **THE COURT:** 3.20, which is on or about defined. I

23   assume that you still want that?

24          **MR. KLUGE:** Yes, Your Honor.

25          **THE COURT:** Yes?

1          **MR. COHAN:**  I don't have an objection to it, Your

2   Honor.

3          **THE COURT:**  Okay.  Well, you all stipulate -- I'm

4   only giving these because you all submitted them as a

5   stipulation, so unless I hear an objection, I'm going to give

6   whatever it is you all have stipulated to.

7          **MR. COHAN:**  That's why I didn't object, Your Honor.

8          **THE COURT:**  Okay.

9      4.1, statements by defendant.  Okay.  I'll give that.

10     Okay.  We're not giving 4.3.  Oh, with regard to 4.14,

11  opinion evidence, I don't generally put in the names of the

12  witnesses who offered opinion testimony.  And that's one

13  thing.

14     And secondly, is the government going to call Dr. Chen?

15         **MR. KLUGE:**  We haven't conferred yet, Your Honor, and

16  determined that, so I think the government would agree it

17  would be best to remove the names of the individuals.

18         **THE COURT:**  Yeah.  The model instruction doesn't even

19  include a bracket for that.  I mean, the -- you've heard

20  testimony from witnesses who may -- who have given their

21  opinions because of whatever the reasons.

22     So --

23         **MR. COHAN:**  So --

24         **THE COURT:**  Whatever the language of the Ninth

25  Circuit manual 4.14 unmodified, is what I want.

1          **MR. KLUGE:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  So that's 4.14.  Oh, let's see,

3    4.15.  Oh, I did have questions about 4.15 and 4.16.

4        The first is summaries not received in evidence -- charts

5    and summaries not received in evidence.  Did we have any of

6    those?  I think the only ones -- charts and summaries we had

7    were received in evidence.  I don't think I allowed you all to

8    show any that were not received in evidence, but I could be

9    wrong.

10         **MR. KLUGE:**  That's my recollection as well, Your

11   Honor.  I --

12         **MR. COHAN:**  I think I objected to one of the summary

13   exhibits.  And I believe Your Honor sustained that objection.

14         **THE COURT:**  Right.  I --

15         **MR. COHAN:**  -- bank account balances, some chart.

16         **THE COURT:**  But that's not evidence.  So it

17   wouldn't -- and I didn't allow them to publish it.

18         **MR. COHAN:**  Yeah, the other one was -- I think Your

19   Honor agreed that it was confusing because it had --

20         **THE COURT:**  Right.  Right.  Right.  Right.

21       The witness was able to read the amount of whatever it

22   was.

23         **MR. SAMPSON:**  The amount of payments towards the 940.

24         **THE COURT:**  That's what it was, the amount of

25   payment, but it did not come in as evidence.

1     **MR. KLUGE:** That's correct, Your Honor.

2     **THE COURT:** So my view is that summaries received in

3  evidence, 4.16 is the appropriate one. And I don't -- I'm not

4  sure that 4.15 is necessary.

5     **MR. KLUGE:** Would 4.15 apply to the brain image that

6  Dr. Woods testified, Your Honor? It wasn't a chart or

7  summary, but --

8     **THE COURT:** That was a demonstrative exhibit, and

9  they don't come, and we don't give instructions about them.

10    **MR. KLUGE:** Okay.

11    **THE COURT:** It wasn't a chart or summary.

12    **MR. KLUGE:** Then the government has no objection if

13  the court removes from the proposed instructions 4.15?

14    **THE COURT:** Mr. Cohan.

15    **MR. COHAN:** I'm fine with removing it, Your Honor.

16  The fewer instructions I think the easier it is for the jury

17  to wade through them.

18    **THE COURT:** Thank you. All right. So 4.16 will be

19  given.

20    All right. And then at the end of the -- we're going to

21  skip the case-specific instructions until we get through the

22  stipulated instructions.

23    So the next one on the stipulation list is 7.1, duty to

24  deliberate; 7.2, consideration of evidence; 7.3, use of notes;

25  7.4, punishment, 7.5, verdict form; 7.6, communication with

1    the court.

2        I always give the limiting instructions that were given

3    throughout the trial again so I would give both of them.

4    There are two of them, one having to do with the reliance

5    materials, and one having to do with statements made to the

6    defendant and their limited purpose.  I would give those again

7    as well.

8            **MR. COHAN:**  I don't know that I have a printed copy

9    of them.

10            **THE COURT:**  No, you don't, because I wrote them out.

11    You all submitted --

12            **MR. COHAN:**  Understood.

13            **THE COURT:**  -- stipulation as to the effect on

14    listener one but not to the other one.  And I just pulled that

15    from the *Powell* case, so I will simply -- I've got them

16    written down, so I'll include those.

17            **MR. COHAN:**  Your Honor advised us think it was

18    yesterday but it might have been earlier that you were going

19    to modify the effect on hearer instruction to broaden it, and

20    it had initially been communications from IRS people to

21    Mr. Grant.

22            **THE COURT:**  Right.

23            **MR. COHAN:**  And you just removed that limitation.

24            **THE COURT:**  I did.  And I used it with your

25    witness --

1          **MR. COHAN:**  Yes.

2          **THE COURT:**  -- by inserting his name.  You're going

3    to hear testimony from him that this -- and then -- and -- and

4    then I used it again with regard to something else.  But in

5    any event --

6          **MR. COHAN:**  The stuff on the video, I think.

7          **THE COURT:**  On the videos, programs, yeah.  The

8    reliance materials.

9          **MR. COHAN:**  Okay.

10         **THE COURT:**  That's a little bit different.

11     But in any event, I'll just use the generic one.  There's

12   a generic limiting instruction in the manual, and only one of

13   them is modified by the *Powell* decision.  I forgot which one

14   that is.

15     Let's see.  I think I wrote that down.

16         **MR. COHAN:**  Well, there are two *Powell* decisions,

17   1955 F.2d. and 1936 F.2d. --

18         **THE COURT:**  Here.  Here they are.  I'll just tell you

19   what the instructions will be.

20         **MR. KLUGE:**  Does Your Honor want us to include them

21   in the blind copy --

22         **THE COURT:**  Well, I'm going to read this to you now

23   so yes, you can include it.

24         **MR. KLUGE:**  Okay.

25         **THE COURT:**  Oh, it was the reliance materials that I

1  took from the *Powell* decision.  And this is the instruction I

2  gave:  I instruct you that legal material admitted at trial is

3  relevant only to show the defendant's state of mind and does

4  not establish what the law is.  The court will instruct you as

5  to the law that applies to this case.

6          **MR. KLUGE:**  Your Honor, is it possible to get a hard

7  copy of that so that -- my ability to transcribe is not

8  that --

9          **THE COURT:**  Yeah, I'll give you a copy of this.

10          **MR. KLUGE:**  Thank you, Your Honor.

11          **THE COURT:**  And then the other one was your

12  stipulated instruction, No. 128.  And it was, you are about to

13  hear evidence that employees of the Internal Revenue Service

14  made statements to the defendant.  I instruct you that this

15  evidence is admitted only for the limited purpose of

16  demonstrating the defendant's state of mind, knowledge, or the

17  effect the statement had on the defendant.  Therefore, you

18  must consider it only for that limited purpose and not for

19  another.

20      Those two should be written to simply change the tense.  I

21  mean, "you have heard" as opposed to "you are about the hear."

22  All right?

23      Hera, can you make a copy of this to give to counsel?

24          **MR. KLUGE:**  Thank you, Your Honor.

25          **THE COURT:**  Okay.  All right.  So that is the general

1    instructions.

2        Now we turn to the case-specific instructions. about which

3    there are some disputes.

4                    (Off-the-record discussion.)

5        **THE COURT:**  All right.  Now, let's start with -- All

6    right.  Let's start with No. -- what you numbered as 937.  It

7    is modified by you all and found as an amended stipulated

8    proposed instruction No. 39.  And that's at Docket 120.  And

9    this is on tax evasion, the elements.

10       The revised proposed instruction is fine.  I'll give that.

11       **MR. COHAN:**  Your Honor, I just want to make sure

12   that --

13       **THE COURT:**  It's Docket No. 120, which supersedes

14   your first-filed one, which is docket No. 77.

15       **MR. COHAN:**  Thank you.  I was just informed of that

16   in my left ear.

17       **THE COURT:**  Okay.

18       **MR. COHAN:**  Sorry to disturb you.

19       **THE COURT:**  That's all right.  So that was the latest

20   stipulation that you all submitted on June 2nd.  That

21   instruction is appropriate.  And I'll give that.

22       **MR. KLUGE:**  Yep.

23       **THE COURT:**  Okay?

24       **MR. KLUGE:**  Yes, Your Honor?

25       **THE COURT:**  Okay.  All right.

1    And then the other one that you stipulated to was No. 43,

2  and that is a modification of Ninth Circuit model instruction

3  9.38 on the lesser-included offense of willful failure to pay

4  tax.  And that one's fine.  It's Docket No. 77 filed on May

5  the 11th.  Okay?

6          **MR. KLUGE:**  Yes, Your Honor.

7          **MR. COHAN:**  Yes, Your Honor.

8          **THE COURT:**  All right.  Now we get to the ones that

9  are in dispute.  We have tax evasion and tax deficiency.  Tax

10  evasion, affirmative act, and "willfully" defined.  Those were

11  three.

12    And then with regard to the defendant's separate ones,

13  defendant has proposed a number that I ruled on at the

14  pretrial conference.  I've already ruled on them at the

15  pretrial conference and denied them but you obviously have an

16  opportunity to reargue the jury instructions, the

17  case-specific jury instructions now that we've heard all of

18  the evidence.

19    All right?  So let's start first -- The government's only

20  got three, so theirs are easier.  Actually, there's four with

21  the latest one.  And the defendant, I think, had seven and

22  then submitted another one yesterday.

23    So let's start first with the shorter list, which are the

24  government's.  The government's proposed No. 40, looking at

25  Docket No. 78, and No. 40 is tax deficiency.

1          MR. KLUGE:  That's correct, Your Honor.

2          THE COURT:  All right.  Do you all wish to be heard

3     on these?

4          MR. KLUGE:  Your Honor, I think it's quite clear tax

5     deficiency is one of the elements of the offense.  And so I

6     think it's appropriate to instruct the jury on tax deficiency.

7          And because in this case, at least with respect to count

8     one, there was no -- Mr. Grant did not file a tax return, and

9     the IRS had not reached an assessment.  But the law is that

10    tax deficiency arises as an operation of law if at the time

11    that the tax return is due and the government can prove a tax

12    deficiency.

13         So I think it's appropriate to -- for the judge to

14    instruct the jury on this particular instruction No. 40 from

15    the government.

16         THE COURT:  Well, the way that it's written, it says,

17    "the first element that the government must prove."

18         Is that the first element of tax evasion?

19         MR. KLUGE:  Yes, Your Honor.

20         THE COURT:  Is the first element that there must be a

21    tax deficiency?  Or a tax owing?

22         MR. KLUGE:  It is a tax due and owing.

23         THE COURT:  Okay.  That is the first element.  Okay.

24    All right.  Mr. Cohan?

25         MR. COHAN:  Yes, Your Honor.  I think that this

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1 proposed instruction could be redacted and be fine if on that

2 third paragraph, the words "a tax due and owing" and you stop

3 right there and eliminate the next three lines until you get

4 past the word "the deficiency," so then it would read "a tax

5 due and owing arises by operation of law on the date the

6 return was due."  And that's all that needs to be said on that

7 subject.

8      The fact that there are other ways of proving it is

9 irrelevant and confusing.

10          **THE COURT:**  Response?

11          **MR. KLUGE:**  I don't think it's confusing, Your Honor.

12 I think it's more accurate, but --

13                    (Off-the-record discussion.)

14          **MR. KLUGE:**  I think it would be -- I would agree with

15 Mr. Cohan.  It would be fine to remove those two other options

16 since the third option is the option that's at issue in this

17 case.

18          **THE COURT:**  Okay.  So it shall be redacted, and it

19 shall read "a tax due and owing" -- I'm sorry.  What did you

20 say, Counsel?

21          **MR. COHAN:**  "Arise by operation of law on the date

22 the return was due."

23          **THE COURT:**  A tax and due and owing arises by

24 operation of law.  Okay.  So we'll mark out everything up to

25 there.

1       All right.  That's approved.

2       And you all need to provide me with blind copy of that one

3   as well.

4       The next one is No. 41, and that is tax evasion

5   affirmative act, and I note that the defendant -- defense has

6   submitted the same instruction with a different modification.

7       This is a Third Circuit model instruction.  And as best as

8   I can tell the modification appears underneath the box, first

9   sentence.  Each of you has proposed a different sentence.

10      Okay?  Do you want to be heard?

11          **MR. KLUGE:**  I don't think anything's changed during

12  the course of the trial, Your Honor, that would indicate that

13  any further need other than -- any further need to change what

14  the court has already approved previously, which is what the

15  government proposed in Document No. 78 --

16          **THE COURT:**  Response?

17          **MR. KLUGE:**  -- instruction No. 41.

18          **THE COURT:**  Response?

19          **MR. COHAN:**  Yes, Your Honor.

20      We provided language that I think more accurately reflects

21  not only in the law but what the evidence is in this case.

22  And the modifications are in what we proposed and filed as

23  Document No. 80, page 11 of 13.

24      Does the court have that?

25          **THE COURT:**  Your instruction?

1      MR. COHAN:  Yes.

2          THE COURT:  Yeah, that's what I'm looking at.

3      MR. COHAN:  Right.

4          THE COURT:  There's one sentence that's different in

5  each of your two.

6      MR. COHAN:  Right.  It's right below that box.

7          THE COURT:  Yeah, that's what I just said.  The

8  government says, "even otherwise lawful or innocent conduct

9  may constitute an affirmative act if you find that defendant

10  Richard Thomas Grant acted with intent to conceal income or

11  mislead the government."

12      The defendant says, "otherwise lawful or innocent conduct

13  does not constitute an affirmative act unless you find that

14  the defendant Richard Grant acted with intent to violate the

15  law as he understood it."

16      My question is which one comports with what the actual

17  language of the Third Circuit model instruction says?

18          MR. KLUGE:  Your Honor, I believe the government's

19  proposed instruction comports more with the Third Circuit's

20  model --

21          THE COURT:  Does it have that "even" in it?

22          MR. KLUGE:  I believe it does.

23          THE COURT:  Let's see if I can find that.

24              (Pause in the proceedings.)

25          THE COURT:  The -- I have a copy from the Third

1    Circuit's.  Yes, it has "even otherwise lawful or innocent

2    conduct."  Okay.  All right.  Anything else?

3         **MR. KLUGE:**  Not from the government, Your Honor.

4         **THE COURT:**  All right.  I'm going to give the

5    unmodified Third Circuit version.

6         **MR. COHAN:**  My objection is that it's argumentative

7    and slanted toward suggesting to the jury that they should

8    look around for something and really is inconsistent with the

9    burden of proof the government has and defendant's presumption

10   of innocence, Your Honor.

11        And I think the modifications are a more accurate and

12   precise statement of what the law really is.  I think that's

13   what the Third Circuit should have said.  But I'm just a

14   lawyer.

15        **THE COURT:**  Right.

16        **MR. KLUGE:**  Your Honor, I would just note that in our

17   citation for that particular instruction, we did note it was

18   modified, but that was to indicate that we had inserted the

19   facts, the affirmative acts that were alleged in the

20   indictment.

21        **THE COURT:**  No, I understand that.  I understand

22   that.  And both of you have the same affirmative facts

23   alleged.

24        As I said, I'll give the unmodified Third Circuit version

25   and that's reflected in Docket 78.

1            MR. KLUGE:  Thank you, Your Honor.

2            THE COURT:  Okay.  And then the last one was No. 42,

3    willfully defined.  Is this is an unmodified Ninth Circuit

4    model instruction?

5            MR. KLUGE:  Yes, it is, Your Honor.

6            THE COURT:  All right.  Do you wish to be heard any

7    further on it?

8            MR. KLUGE:  No, Your Honor.

9            THE COURT:  Mr. Cohan?

10            MR. COHAN:  Let's see.  Is it court looking at the

11    Ninth Circuit's 9.42?

12            THE COURT:  Yes, Document No. 78, page 6.

13            MR. COHAN:  We proposed instructions No. 3 and 4

14    because it's important the jury be instructed that the

15    defendant is presumed not to know the law.  And that's

16    particularly pertinent here because of the general assumption

17    that everybody knows there's a law that requires you to file

18    an income tax return, and that is totally inappropriate in

19    this case because this jury has to be made to understand very

20    clearly that this so-called common knowledge is not imputed to

21    this defendant.

22            THE COURT:  Okay.  All right.  Anything else?

23            MR. KLUGE:  Not from the government, Your Honor.

24            THE COURT:  All right.  Since I sit in the Ninth

25    Circuit, I follow the rules of the Ninth Circuit.  Ninth

 1    Circuit unmodified 9.42 will be given for willfully in lieu of

 2    defendant's 3 and 4.

 3         All right.  That's it for the government.  Let's turn to

 4    the defendant's.

 5              **MR. KLUGE:**  Your Honor, there was one other one from

 6    the government that we recently filed.

 7              **THE COURT:**  Oh, the repeat one, yes.  Let's see if I

 8    can find that.

 9              **MR. COHAN:**  This is Document 136?

10              **MR. KLUGE:**  Yes.

11              **THE COURT:**  Okay.  I have that.

12         All right.  This is not one that we've had any argument

13    on, so do you wish --

14              **MR. KLUGE:**  That's correct, Your Honor.

15              **THE COURT:**  To explain.

16              **MR. KLUGE:**  Yes, Your Honor.  I think it's important

17    given the voluminous material -- incorrect legal material

18    that's been presented at this particular trial to instruct the

19    jury on the law requiring the filing and paying of taxes and

20    on the definition of "voluntary" as it relates to the filing

21    and paying of taxes.

22         And I think case law supports it, and the government has

23    cited to the various provisions of Title 26 that set out those

24    requirements.

25         And the court has instructed the jury throughout the trial

1   that it is the source of the law and that it will provide the

2   law to the jurors.  And I think absent this instruction, the

3   jurors may be confused based on the evidence that's been

4   presented at trial.

5            **THE COURT:**  Okay.  I agree in principle.  But this

6   instruction is unwieldy and -- and unworkable.  There's a -- I

7   mean, clearly the jury has to be instructed on what the legal

8   duty is, not because of all of the reliance materials but

9   because Mr. Cohan asked his expert to opine on whether or not

10  the defendant's mental state affected his ability to

11  understand his legal duty.

12       At some point, the jury has to be told what the legal duty

13  is irrespective of what the reliance materials show.  So there

14  clearly has to be a statement of the law.

15       I do not like giving jury instructions based upon snippets

16  from case law.  I told you all that previously.  This

17  instruction seems to me to be a mish-mash of case law,

18  statutory law, regulatory law.

19       So I want a clean statement of what the statute -- United

20  States Code requires.  That's what I want.  I don't want bits

21  and pieces from a case.

22       The second paragraph seems perfectly fine, but I don't

23  know that that's really an issue.

24            **MR. KLUGE:**  Well, the second paragraph, Your Honor,

25  lays out what the -- the amounts are that one needs to earn in

1   order to have a filing requirement.

2           THE COURT:  Okay.  And --

3           MR. KLUGE:  And it -- it's important to -- the filing

4   requirement arises based on an amount of gross income that

5   individuals receive.

6           THE COURT:  Okay.  Doesn't 26 U.S.C. Section 6012 say

7   that every individual having for the taxable year gross income

8   which -- I'm sorry.

9       It says returns with respect to income taxes under

10  subtitle A shall be made by every individual having for the

11  taxable year gross income which equals or exceeds the

12  exemption amount.

13      Is that not a statement of law as to who's required to

14  file a return?

15          MR. KLUGE:  Yes, Your Honor.

16      I think what this paragraph does is -- is inform the jury

17  as well as to what those exemption amounts are so that there's

18  not a dispute as to -- you know, the jury may not know what

19  the exemption amount was in a certain year, and it changes

20  from year to year.

21          THE COURT:  Okay.

22          MR. KLUGE:  And it changes based upon the marital

23  status, so that's why --

24          THE COURT:  I think you all actually need to meet and

25  confer and talk just a little bit between yourselves.  I am in

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    agreement in principle that the jury must be told what the

2    legal duty at issue here is in addition to the elements of

3    offense.  And it should be told in a straightforward and

4    simple fashion.

5        This, I think, is just all over the place.  There's just

6    too much -- there are too many components to this.

7        **MR. COHAN:**  The first two paragraphs are fine.  The

8    rest of it is totally inappropriate and unnecessary because

9    there aren't any extensions.  And the fourth paragraph is just

10   catachresis.

11       **THE COURT:**  Is just what?

12       **MR. COHAN:**  Catachrises.

13       **THE COURT:**  What does that mean?

14       **MR. COHAN:**  Semantic pollution, misuse of English

15   language, gobbledy-gook.

16       **THE COURT:**  I get the drift now.

17       **MR. COHAN:**  Thank you.

18       **THE COURT:**  Okay.  I tend to agree that I don't see

19   the relevance of paragraph 3, and paragraphs (sic) 4 -- this

20   is the problem I have with the whole voluntariness issue.  In

21   the case that you all rely upon, voluntariness was a defense

22   presented by the defendant.  In this case, it is not.

23       The defendant -- The defense in this case is not that

24   income taxes are voluntary and he didn't pay.  The defense is

25   that he was led to believe that he didn't have to pay and in

1    good faith relied upon the people who told him he didn't have

2    to pay.

3            **MR. KLUGE:**  But I think, Your Honor, part of that

4    argument as to why he didn't pay was because he was told these

5    are voluntary and you don't have to.

6            **THE COURT:**  Right.

7            **MR. KLUGE:**  And there's been material that's been

8    presented through the video and other material that gives the

9    impression to the jury that the law may be that the taxes --

10   that filing taxes is a voluntary act.

11           **THE COURT:**  Well, it's -- could certainly for anyone

12   who wishes to believe that give that impression, but that's

13   not what the defense is arguing.

14       Am I incorrect about that?

15           **MR. COHAN:**  Not at all, Your Honor.

16           **THE COURT:**  Right.  It seems so to me that a -- an

17   affirmative state of what the law requires is inherently a

18   better instruction than a statement as to what the law does

19   not require, what the law is not.

20           **MR. KLUGE:**  Well, Your Honor, I think the third

21   paragraph explains simply that "voluntary" means, that you are

22   required and are responsible for paying taxes.  And I feel

23   that -- I just feel that there's some sort of -- there'll be

24   some sort of confusion with the jury given that they've seen

25   some of the reliance material that Mr. Grant claims to have

1  relied on that says the reason why I did not file taxes is

2  because these individuals told me it was voluntary.

3      And I think if we don't instruct the jury that, in fact,

4  the filing and paying of taxes is not a voluntary choice.

5          **THE COURT:**  You don't think telling them that one who

6  earns a certain income threshold is required file a tax return

7  is inherently -- essentially the same thing but a more

8  positive statement?

9          **MR. KLUGE:**  I think it is part of the -- I think it

10 is part of the law.  And yes, I think saying that it's

11 required to be done helps indicate that it's voluntary, but

12 I -- still there's confusion or risk of confusion given the

13 fact that the word "voluntary" and that Mr. Grant relied

14 supposedly on material that says the filing of taxes is

15 voluntary.

16         **THE COURT:**  Well, clearly the Ninth Circuit has said

17 that taxes are not voluntary.

18     I mean, I understand that that's -- that's the state.  I'm

19 just not sure that it's necessary in a case in which we tell

20 them what the legal duty is.

21     Mr. Cohan?

22         **MR. COHAN:**  "Voluntary" does not mean whatever the

23 government says it means.  It's an English word.  It has

24 meaning.  And that meaning is directly contradictory to the

25 law but the government --

1    **THE COURT:**  Is that what you're arguing, is that

2    he -- that paying taxes is -- is --

3    **MR. COHAN:**  Of course not.

4    **THE COURT:**  -- totally voluntary?

5    **MR. COHAN:**  No.  I just heard counsel say voluntary

6    means blah, blah, blah, that they're required to file.

7    That gobbledy-gook is gobbledy-gook.  "Voluntary" does not

8    mean anything other than voluntary.  So the government's

9    having used "voluntary compliance" in some of its materials

10   and other things is, as I said, semantic pollution.  They

11   don't get to redefine the English words.

12   **THE COURT:**  You know what I think I'll do.  I think

13   I'll wait and hear what your closing arguments are.  I

14   instruct after closing arguments.  And if the defense argues

15   that payment of taxes is voluntary, then I will instruct that

16   the Ninth Circuit has found that payment of taxes is not

17   voluntary.

18   If indeed there is no such argument, then I'm not going to

19   give it.

20   **MR. COHAN:**  There will be no such argument from me,

21   Your Honor.

22   **THE COURT:**  Okay.

23   **MR. COHAN:**  And I object to the government attempting

24   to argue that voluntariness means anything other than what it

25   means.  There are three statutes that have to be read together

1  in order to actually define the filing requirement and --

2  **THE COURT:** You've prevailed, Mr. Cohan. I --

3  **MR. COHAN:** Oh, that means I'm supposed to stop.

4  Thank you.

5  **THE COURT:** Not giving it. Okay.

6  **MR. KLUGE:** Your Honor, then can we address the third

7  paragraph that has to do with the requirement to pay because I

8  think this is a another aspect of the law with respect to

9  taxes that it is important to instruct the jury.

10  The second paragraph relates to what the filing

11  requirement is. But there is also a requirement to pay.

12  **THE COURT:** Yes.

13  **MR. KLUGE:** And I think the third paragraph is clear

14  enough that explains what that requirement is.

15  **THE COURT:** What I want -- I mean, we don't need the

16  extension information. Persons who are required to file a

17  federal income tax return for particular year because they

18  received gross income above the minimum filing requirement are

19  required to do so on or before April 15th of the following

20  year.

21  Payment of any individual income tax -- see, I just don't

22  think this says it very clearly. I mean, you want to say

23  there's a duty to pay. There's a duty to file a return.

24  What's the statutory language for those two things? And

25  the income threshold. I want an instruction that says that.

1          **MR. KLUGE:**  Very well, Your Honor.

2          **THE COURT:**  Based upon statutory language.  That's

3     what I want.

4          The voluntariness will not be given absent an argument

5     from the defense that that's what they're claiming.

6          And the first two paragraphs are fine.

7                    (Off-the-record discussion.)

8          **THE COURT:**  All right.  They're still -- They're

9     going to able to accommodate -- They already given -- got him

10    an appointment.  I asked for them to try to get something even

11    earlier than what they found for him.  They will, and they

12    will waive the cancellation, so no problem.

13         Okay.  Now, going back to the duty, the legal duty

14    instruction, have I made myself clear as to what I think it

15    should be limited to?

16         **MR. KLUGE:**  If I can reiterate, Your Honor, to make

17    sure that I'm clear, the first and second paragraphs we're

18    okay with.

19         The third paragraph you want a clearer statement of the --

20    of the filing requirement and the paying requirement.

21         **THE COURT:**  Yes.

22         **MR. KLUGE:**  And the fourth paragraph we'll eliminate

23    from the blind instruction we submit to the court, assuming

24    that an argument's not going to be made at closing about the

25    voluntariness of the tax code -- tax code.

1     **THE COURT:**  Yes.

2     **MR. KLUGE:**  And then we'll leave it at that.

3     **THE COURT:**  Yes.

4     **MR. KLUGE:**  Very well.

5     **THE COURT:**  All right.  Mr. Cohan, do you understand?

6     **MR. COHAN:**  Mostly.  I mean, I'd like to see in it

7  front of me.

8     **THE COURT:**  Yeah, they will prepare it over the

9  weekend and make sure that counsel gets a copy.

10     **MR. COHAN:**  We'll -- we'll work it out or at least

11  we'll agree that they're disagreeing about it if they put

12  "voluntary" in it.  I just don't want to see that word in here

13  in connection with anything.

14     **THE COURT:**  I just ordered them not to.  I will give

15  the instruction if indeed the argument suggests that I should.

16  Okay?

17     All right.  Let's move -- Okay.  So we finished

18  government.  Let's turn to the defense.

19     And let's start first with the original ones which I'd

20  already ruled upon but you can obviously state your objection

21  for the record.  There were nine of them originally.  I ruled

22  previously that No. 1 was covered by 9.42, the willfulness

23  instruction.

24     **MR. COHAN:**  Well --

25     **THE COURT:**  And today, I've just ruled on 3 and 4.

1  So if there's anything in addition you wish to say about the

2  others besides 3 and 4, now's the time.

3      **MR. COHAN:**  Okay.  Well, you ruled on No. 1 so I

4  guess you don't want to hear any more about that because you

5  believe that it's subsumed under 9.42.

6      I respectfully disagree because I think the jury needs to

7  be instructed that the defendant is not presumed to know the

8  law.  And I believe if the jury isn't told that, they're

9  likely to assume that, like everybody else, he must know.

10      That's not covered by 9.42, Your Honor.

11      **THE COURT:**  Okay.  Any response?

12      **MR. KLUGE:**  Nothing further from the government, Your

13  Honor.

14      **THE COURT:**  All right.  Moving on to No. 2.

15      **MR. COHAN:**  This is elaboration and really based on

16  *Cheek*, and it's not inconsistent with 9.42, but I think it

17  explains more about what the government has to prove, and it's

18  important that the jury be instructed that they have to find

19  that the defendant who was presumed not to know what the law

20  was learned what the law was.

21      And the mere fact that he abandoned his prior assumption

22  is not a sufficient basis to infer that he knew.  There's no

23  evidence that he knew other than that he, like most folks,

24  assumed there was a law.

25      **THE COURT:**  Is knowingly a element of this offense?

1          **MR. KLUGE:**  No, it is not, Your Honor.

2          **THE COURT:**  Okay.  That's what I have, that it's not

3     the mens rea that's required for this offense.

4          **MR. KLUGE:**  That's correct.  Willfulness is the mens

5     rea of this offense, and so the government's position -- in

6     our -- we filed an opposition to the defendant's proposed

7     instructions, opposed this instruction for that very reason.

8     Instructing the jury on two different mental states would

9     confuse the issue.  And the appropriate mental state that the

10    government's evidence must show is willfully, not knowingly.

11         **THE COURT:**  Okay.  All right.

12       No, that one won't be given.

13       I've ruled on 3 and 4.

14       Looking at No. 5, impeachment by a witness -- witness --

15    by earlier contradictory statement.  What was the evidence of

16    that?

17         **MR. COHAN:**  Your Honor precluded me from actually

18    developing the evidence that Randall Grant admitted to the

19    agents that he took Prozac for ten years.

20       He also in the same paragraph of his memorandum of

21    interview said that his -- even though he had said that his

22    brother was -- flew into a rage, thought the world was

23    disintegrating, thinks he's special -- I think there were nine

24    different statements, each of which singly -- and all of them

25    collectively a fortiori indicated that there were definitely

1     mental health issues in their family.

2         But he said, no, we don't have any mental health issues in

3     our family.  Nobody's been institutionalized, even though they

4     took Prozac for ten years.  The court also didn't let me

5     develop --

6             THE COURT:  Well, the fact that he took Prozac is not

7     inconsistent with no one being institutionalized.

8             MR. COHAN:  No, no.  But it is inconsistent with

9     contending that they've never had any mental health issues in

10    their family.  If you don't have mental health issues, you're

11    not allowed to take Prozac.  It's a scheduled drug that can

12    only be prescribed by an M.D. who determines that there is a

13    mental illness.

14            THE COURT:  Well, I know that that's not true.  But

15    in any event --

16            MR. COHAN:  What's not true?

17            THE COURT:  I know that it's not true that only

18    people with mental illness take Prozac.

19            MR. COHAN:  Well, they're not supposed to be taking

20    it if they don't have a mental illness, Your Honor.

21            THE COURT:  Well, in any event -- in any event, we

22    have the witness's testimony.  Tell me what in the record now

23    supports the giving of this testimony -- of this instruction.

24                    (Pause in the proceedings.)

25            MR. COHAN:  Just scrolling through my mind and trying

1  to recall what the witness -- just which witnesses have

2  testified.  Just need another moment, Your Honor.

3                  (Pause in the proceedings.)

4          MR. COHAN:  Oh, Agent Fong and her testimony that her

5  recollection was refreshed.  When Mr. Mottahedeh was on the

6  witness stand and he looked at the documents in front of him,

7  he was not allowed to use them really to assist him in

8  testifying, whereas Agent Fong was allowed to use them

9  repeatedly while saying simultaneously that her --

10  recollection was refreshed.  And finally the court even noted

11  that she clearly not had her recollection refreshed.  She was

12  simply reading from the documents.

13      And it had some -- something she characterized as global

14  amnesia for four hours, but she clearly didn't recall any of

15  it.

16          THE COURT:  Okay.

17      So why is this instruction necessary in light of the 3.9

18  instruction that I've already given in the case and will give

19  again?

20          MR. COHAN:  I don't have 3.9 in front of me.

21          THE COURT:  That's the credibility instruction

22  promulgated by the Ninth Circuit.

23          MR. COHAN:  Well, I've given you my best shot, Your

24  Honor, so --

25          THE COURT:  Okay.  I think that the list in 3.9 is

1  sufficient to cover --

2       **MR. COHAN:**  Very well.

3       **THE COURT:**  -- to cover this.

4    No. 6, IRS agents not deserving of more weight.

5       **MR. COHAN:**  Yes.

6       **THE COURT:**  And that's based upon a case, and the

7  case that you cite is a District Court case?  You don't cite a

8  circuit case.  You don't cite a model instruction.  I should

9  give this because another judge in New York decided to give

10  this instruction?

11      **MR. COHAN:**  The jury question -- The responses to the

12  jury questionnaires showed a remarkable predisposition to

13  believe the testimony of law enforcement officers above and

14  beyond ordinary folk.

15    The one juror who testified otherwise was first challenged

16  by the government for cause and then removed peremptorily.

17  His name was Koplow.  And I think unfortunately, there is the

18  totally understandable desire to trust law enforcement people

19  more for the simple reason that if we can't trust law

20  enforcement people more than other people, we need to be very

21  concerned about the quality of our law enforcement because

22  they are given a public trust, and they have a great deal of

23  power, and they should be more credible than other people.

24  But they aren't.

25    And I think that needs to be noted here.  It's a fact of

 1    life that people don't want to realize because it's unnerving.

 2         THE COURT:  Okay.  Response?

 3         MR. KLUGE:  Your Honor, it's not -- it's not a

 4    pattern instruction from the Ninth Circuit.  And I think the

 5    Ninth Circuit pattern instruction regarding witness

 6    credibility is more than sufficient and fair to both parties.

 7         THE COURT:  Yes.  And if it were based on even some

 8    Ninth Circuit law, I would have a difficult time seeing how

 9    the credibility instruction that is typically given in these

10    cases wouldn't apply here.

11         You can certainly make whatever argument you wish about

12    the lack of credibility of these witnesses.  But an

13    instruction based upon instruction that another district court

14    gave in New York is not persuasive authority in my view, so no

15    I will not give that.

16         No. 7, let's see, which is I instruct you that it is legal

17    to use a warehouse bank, prepaid debit cards, cashier's

18    checks, and mostly money orders to make payments of any kind.

19    Citizens have a right to financial privacy.

20         This is argument.  I'm not going to give this.

21         MR. COHAN:  It's law, Your Honor.

22         THE COURT:  There's no -- There's no law that

23    requires the court to instruct that these acts were legal.  No

24    one has even asserted that they were illegal.

25         I mean, the government's position is not that these acts

1 were illegal.  It's just that these acts are sufficient to

2 give rise of an inference of his intent, period.

3     There's no reason for an instruction to this effect.  No

4 one's argued otherwise.  No, I won't give that.

5     No. 8, also based upon a case.  This is at least a Ninth

6 Circuit case.  It is not unlawful to intentionally make the

7 IRS's job more difficult.  And that's dicta in a Ninth Circuit

8 case.

9         **MR. COHAN:**  Dicta?

10         **THE COURT:**  I don't understand why it is that a jury

11 instruction should be given to this effect.

12         **MR. COHAN:**  Because it's far too easy for the jury,

13 all of whom are more or less intimidated by the IRS and by our

14 government, to think that if you make the government's job

15 more difficult, you must be doing something illegal and it's

16 simply not true.

17         **THE COURT:**  It's really sort of a gross

18 generalization, isn't it, that the jury, all of which are

19 intimidated by the IRS and/or the government --

20         **MR. COHAN:**  You're right.  I'm sure some of them

21 aren't nearly as intimidated as others.

22         **THE COURT:**  Yeah.  Are you intimidated by the

23 government?

24     I mean, that's just a gross generalization, and there's no

25 reason to give a jury instruction because of that kind of

1  gross generalization.

2        MR. COHAN:  Well --

3        THE COURT:  I agree that it's not unlawful to

4  intentionally make the IRS's job more difficult.  But why is

5  that -- why does that rise to the level of a jury instruction

6  as opposed to mere argument?

7     I mean, you've -- you argued that in our opening

8  statement.  But you want me to sort of adopt that argument by

9  instructing the jury that that's what the law is?

10        MR. COHAN:  Yes, because that is what the law is.

11        THE COURT:  Hmm.

12     Okay.

13        MR. KLUGE:  Your Honor, if I may be --

14        THE COURT:  Any response?

15        MR. KLUGE:  Just briefly, the *Caldwell* case that

16  Mr. Cohan cites to is not a case involving a Title 26 offense

17  in which the government needs to prove willfulness, and so the

18  case law from --

19        THE COURT:  What is it?  What is the case about?

20        MR. KLUGE:  I believe it's a 371 -- 18 U.S.C. 371

21  conspiracy.  And so it was a case that required a knowledge

22  element, not a willfulness element.

23        MR. COHAN:  That's a false statement, Your Honor.

24  That is a absolutely false statement of the law.  The charge

25  was 18 U.S.C. 371, conspiracy to impair, impede, obstruct, and

1  defeat a lawful function of the Internal Revenue Service.  And

2  the law on 18 U.S.C. 371 is also found in the *Dahlstrom* case,

3  713 F.2d. page 1427, 1983 case.

4      And it says that to commit the substantive offense

5  requires the same mental state as the -- excuse me -- the --

6  the substantive offense and the conspiracy both require proof

7  of willfulness.  That's what the *Caldwell* case stands for, and

8  that's what the *Dahlstrom* case stands for.

9      And both cases required reversals of convictions because

10  of erroneous instructions.

11      **THE COURT:**  Okay.  All right.  Then I'm on notice.

12  I'm not going to give an instruction based solely upon the

13  language in this case.

14      No. 9, we've already -- I've already ruled on.  The model

15  instruction will be given.

16      Now, you submitted two new ones.

17      **MR. COHAN:**  Yes, Your Honor.

18      **THE COURT:**  This is Docket 139.  The first one, I

19  instruct you that since 2007, the IRS has authority to treat

20  any frivolous claims as if it were never submitted and proceed

21  without delay to collect any taxes and interest in penalties.

22      **MR. COHAN:**  There's a typographical error, Your

23  Honor.  There's an "S" on the word "claim" that should not be

24  there.

25      **THE COURT:**  Okay.  All right.  Do you wish to be

```
1    heard?
2              MR. COHAN:  Yes.  That's --
3              THE COURT:  Also --
4              MR. COHAN:  -- the law.
5              THE COURT:  -- based upon case law.
6              MR. COHAN:  Well, no, it's based on 26 United States
7    Code Section 6330 subparagraph G.
8              THE COURT:  Okay.  All right.
9              MR. COHAN:  As applied in those two cases.
10             THE COURT:  Okay.  And what does the code section say
11   specifically?
12             MR. COHAN:  It's really complicated.
13             THE COURT:  Does it say this?  It seemed -- I mean, I
14   looked at this, and it seemed very -- this is a very
15   simplistic way of saying what the code section and those cases
16   say.
17             MR. COHAN:  Well, I will refer --
18             THE COURT:  So tell me what the code section says.
19             MR. COHAN:  As is sometimes the case, one code
20   section incorporates another.  So that's the case here.
21      And I will invite the court's attention, if I may, to
22   6330(g), which incorporates 6702 -- bear with me a second, and
23   I'll find it.
24             THE COURT:  Does 6330(g) apply to a frivolous claim
25   or a frivolous request for a hearing?
```

1    **MR. COHAN:** I don't think those things are mutually

2    exclusive, Your Honor.

3          **THE COURT:** Well, tell me what it applies to.

4          **MR. COHAN:** Just a second. I'm trying to find this

5    6330(g).

6               (Pause in the proceedings.)

7          **MR. COHAN:** Got it. Okay.

8          **THE COURT:** Oh, I have it here, too.

9          **MR. COHAN:** Okay.

10         **THE COURT:** Yes, here it is. I have it.

11         **MR. COHAN:** Yes. It's 6702(b)(2) capital (A). You

12   have to refer to that in order to understand what is

13   contemplated by frivolous requests for hearing, et cetera.

14   That's what 6330's heading is.

15       So typically notwithstanding any other provision of this

16   section, if the secretary determines that any portion of a

17   request for a hearing under this section or section 6320 meets

18   the requirements of clause 1 or 2 of section 6702(b)(2)(A),

19   then the secretary may treat such portion as if it were never

20   submitted and such portion shall not be subject to any further

21   administrative or judicial review.

22       So then one has to go to 6702(b)(2)(A) to see whether it

23   meets those requirements.

24         **THE COURT:** And what does that section say?

25         **MR. COHAN:** I'm looking for it, Your Honor? I did

1    summarize it for the court, though, in simple English.

2            THE COURT:  Well, obviously it wasn't simple enough,

3    Mr. Cohan.

4            MR. COHAN:  Okay.  I'll keep trying.  Civil

5    penalty -- I'm inviting the court's attention respectfully to

6    6702(b).  And it was (B), sub (2), sub sub (A).

7        And that says, specified frivolous submission, for

8    purposes of this section, A, specified frivolous submission,

9    the term specified --

10           THE COURT:  Wait.  Wait.  Speak up just a little bit

11   more.  I can't quite hear you.

12           MR. COHAN:  Specified frivolous submission means a

13   specified submission, if any portion of such submission, small

14   "i" is based on a position with which the secretary has

15   identified as frivolous under subsection C, or 2, reflects a

16   desire to delay or impede the administration of federal tax

17   laws.

18       And it is that last one that responds directly to what the

19   government has repeatedly stated in -- in terms of accusing

20   Mr. Grant of committing the offense, that all he did was take

21   frivolous positions before the tax court and other courts for

22   the purpose of delay.

23       And so the purpose of the instruction is that didn't delay

24   the Internal Revenue Service from collecting if it wanted to.

25           THE COURT:  Okay.

1      **MR. COHAN:**  All they had to do was go ahead and

2   collect.

3       **THE COURT:**  Okay.  I don't have the second section in

4   front of me, but assuming that it says what you said, any

5   response?

6       **MR. KLUGE:**  I don't see this instruction as being

7   relevant in any way to the facts in this case.  The -- If

8   there was any claim -- any challenge to the IRS efforts that

9   were deemed frivolous, it was before 2007.  It was the -- the

10  CDP request that the defendant filed.

11      And I don't see how this relates to any of the elements of

12  the offense in this case, so I don't really see how it's

13  applicable at all.

14      **THE COURT:**  Yeah, which element does it relate to?

15      **MR. COHAN:**  Well, what the -- what affirmative acts

16  are they alleging?  And what was the cross of him about to the

17  effect that these petitions were filed and these positions

18  were taken just for purposes of delay?

19      It was to show evidence of intent to delay, and any delay

20  on the part of the Internal Revenue Service from 2007 on was

21  self-imposed, not created by Mr. Grant.

22      **THE COURT:**  Any response?

23      **MR. KLUGE:**  I still don't see any relevance to the

24  particular elements in this offense, Your Honor.

25      **THE COURT:**  Hmm.  Hmm.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    **MR. KLUGE:**  It's vague and it's confusing.

2    **THE COURT:**  There has been -- There has been no

3    testimony about this subject.  I am a little concerned.  There

4    obviously has been testimony.  Mr. Cohan has questioned a

5    number of witnesses about the ability -- I mean, because part

6    of the problem is, right, the failure to -- to cooperate

7    essentially -- to cooperate in the attempted examination and

8    assessment of a tax.  Right?

9    **MR. KLUGE:**  Yes, Your Honor.

10   **THE COURT:**  And Mr. Cohan has asked any number of

11   witnesses whether or not they were aware of the fact that

12   Mr. Grant's draw was, you know, a mirror image of his

13   brother's draw.  They could have figured out tax through other

14   means and made the assessment even with -- notwithstanding his

15   lack of cooperation.

16       So this seems like it's somewhat relevant.  I'm just not

17   sure that -- and I appreciate that you tried to simplify this.

18   I'm just not sure that this is an accurate way to capture the

19   interplay between those statutes.

20   **MR. COHAN:**  I'm not disagreeing with you.  That was

21   the best I could do trying to put this in English that's

22   rarely comprehensible because I don't think it is the way it's

23   written.

24   **THE COURT:**  Okay.  So why don't the two of you -- I'm

25   sort of tentatively disposed to giving some instruction on

1  that.  I'd like you to work with government counsel over the

2  weekend.

3      You both -- both you of you should work -- both sides

4  should work together on the legal duty and on this one.

5          **MR. COHAN:**  We shall, Your Honor.

6          **THE COURT:**  Okay.

7      All right.  And then the defendants' theory of the case --

8  this, once again, is based upon a number of cases that we've

9  talked about through the course of the trial, *Cohen*, *Finley*,

10  *Powell*, and *Cheek*.

11      Do you want to be heard on that one?

12          **MR. COHAN:**  Yes, I do.  I think what really takes

13  this out of the stock instructions is the law that's been made

14  in this circuit since *Finley* and *Cohen*.  Those are the cases

15  that really allow for the testimony that was elicited from

16  Dr. Woods.

17      And so they -- the case law broadens what is appropriate

18  for the jury to consider in that we have opinion evidence,

19  expert opinion evidence that really needs to be considered as

20  evidence of lack of willfulness that is beyond merely a

21  good-faith belief but evidence that is not readily

22  understandable to people who don't have the expertise of a

23  psychologist or a psychiatrist.

24      And that's why without some sort of guidance as to what

25  that evidence has to do with willfulness, I don't think jury's

1   adequately instructed, and that's why I proposed this

2   instruction.

3       I didn't really come up with a theory of the case

4   instruction until I had had a chance to think about Dr. Woods'

5   testimony in real detail and I looked at these cases and

6   thought, well, there's something more that needs to be said

7   that incorporates that.  And I wanted to do it as succinctly

8   as I could.

9       And I think there's good law on theory of the case

10  instruction in the Ninth Circuit.  The cases are -- I think

11  the most recent one is *Kayser*, K-a-y-s-e-r.  It's found at 488

12  F.3d 1070 at page 1073.  It's a 2007 case citing an earlier

13  Ninth Circuit case on -- I'll quote from it.

14      Quote, our cases hold that a defendant is entitled to have

15  the judge instruct the jury on his theory of defense provided

16  that it is supported by law and has some foundation in the

17  evidence, end quote.

18      I feel like now in the aftermath of judge -- excuse me.

19  Now I'm doing it -- Dr. Woods' testimony, that we're entitled

20  to this theory of the case instruction or something that

21  resembles it pretty closely.

22          **THE COURT:**  Yeah, the -- the problem that I have with

23  it is the last sentence, particularly the "a subjective

24  belief."

25      It's -- It's not just that he believed it so, therefore,

1    he's not guilty.  It's that it has to arise to a sufficient

2    level of good faith.  It has to arise to a good-faith belief.

3    It's not just a subjective belief that he's not guilty.

4            MR. COHAN:  Not so.

5            THE COURT:  It has to be a good-faith belief.  And

6    the definition of "good faith" has been defined in many

7    places.

8            MR. COHAN:  That language that I put in there was

9    based on *Cheek v. United States*, Your Honor.  That's a

10   Supreme Court decision.  And I think that's almost verbatim

11   from *Cheek*, if not actually verbatim.

12           THE COURT:  Okay.  I'm not inclined to give this with

13   that last sentence.

14           MR. COHAN:  I do believe subjective belief that he

15   was not violating the law is a complete defense of the charges

16   in this case.  And that's why the -- our -- you know, good

17   faith is something that you attribute to people without

18   consideration of whether they are suffering from some sort of

19   mental condition.

20       And so I just think it's necessary to explain this.  And I

21   added in there that -- and this is right out of *Cheek*, the

22   unreasonableness the defendant's claimed beliefs can be

23   considered by the jury in determining whether it's really held

24   in good faith.

25       But a subjective belief, no matter how unreasonable, is a

1 complete defense. I think good faith is just sort of

2 confusing it. What is the -- How do you reconcile good faith

3 with, well, he totally believes it? It's unreasonable to

4 other people, and he suffers from a mental condition.

5 **THE COURT:** But that's the defense, is good faith.

6 It's not just that he didn't believe it. It's not just a

7 subjective belief. It's a good-faith --

8 **MR. COHAN:** What is good faith -- If you really

9 subjectively believe it, how can you qualify it -- well, he

10 really believes it's subjective, but he doesn't really

11 subjectively believe it in good faith? I don't understand

12 that.

13 **THE COURT:** Well, what is the instruction. You took

14 I think from the -- because you argued this at the pretrial

15 conference, and the model instructions from -- the federal

16 jury practice treatise defines it.

17 And it actually provides a good-faith defense for

18 Internal Revenue Code criminal provisions, and it defines it.

19 It says the good faith of the defendant is a complete

20 defense to the tax charge because good faith is simply

21 inconsistent with willfully attempting to evade or defeat a

22 tax.

23 And then it says, while the term "good faith" has no

24 precise definition, it means, among other things, an honest

25 belief, a lack of malice, and the intent to perform all lawful

1  obligations.

2      A person who acts on a belief or on an opinion honestly

3  held is not punishable under the statute merely because that

4  honest belief turns out to be incorrect or wrong.

5      MR. COHAN: Well, I would urge the court to give that

6  instruction.

7      THE COURT: Well, that seems to me to be a more

8  acceptable definition of "good faith" than what you've got

9  here.

10      MR. COHAN: Well, then --

11      THE COURT: It is to me, in any event.

12      MR. COHAN: I respectfully request that court give

13  that in lieu of the one that I've requested if the court's not

14  going to give the one I requested. Just redact the last

15  sentence and put "good faith" definition that Your Honor just

16  read into the record a moment ago.

17          (Pause in the proceedings.)

18      THE COURT: Well, this instruction goes on to say, if

19  a person acts without reasonable grounds for belief that his

20  conduct is lawful, it is for the jury to decide whether that

21  person has acted in good faith in order to comply with the law

22  or whether that person has willfully attempted to evade or

23  defeat the tax.

24      In determining whether or not the government has proven

25  that the defendant willfully attempted to evade or defeat a

1  tax or whether the defendant acted in good faith, the jury

2  must consider all of the evidence received in the case bearing

3  on the defendant's state of mind.

4      The burden of proving good faith does not rest with the

5  defendant because the defendant has no obligation to prove

6  anything to you.  The government has the burden of proving to

7  you beyond a reasonable doubt that the defendant acted

8  willfully.

9      In the -- If the evidence in the case leaves the jury with

10  a reasonable doubt as to whether defendant acted in good faith

11  or acted willfully, the jury must acquit the defendant.

12      That's what the entire instruction says.  And that's part

13  of the federal practice.  I believe you relied upon that

14  previously, but --

15          MR. COHAN:  I did.

16          THE COURT:  -- have subsequently changed it and

17  modified it.

18          MR. COHAN:  Well, I think I tendered it earlier, and

19  the court indicated it wouldn't give it.

20          THE COURT:  Well, because you just keep taking bits

21  and pieces out of it.  I mean, the whole thing -- if there is

22  going to be a separate definition of "good faith" or

23  "willfulness" that is not covered by the Ninth Circuit's

24  willful instruction, it has to be a complete statement.

25      It can just be bits and pieces that you pluck out of

1  different cases.

2          MR. COHAN:  Very well, Your Honor.

3          THE COURT:  All right.  Government hasn't been heard

4  on this yet.

5          MR. KLUGE:  Your Honor, we would reiterate our

6  position that we took in Document No. 97 in which we cited

7  cases from the Ninth Circuit, in which the Ninth Circuit has

8  repeatedly rejected that a separate good-faith instruction is

9  required.

10          And I don't see any reason why this case is any different

11  than those.  And *United States vs. Hickey* clearly says that,

12  holding that it -- argumentative entitlement to a separate

13  good faith instruction in addition to other instructions on

14  specific intent is foreclosed by Ninth Circuit precedents.

15          And I see no reason to -- or to vary -- to modify or

16  deviate in any way from the model instruction 9.42 provided by

17  the Ninth Circuit pattern instructions.

18          THE COURT:  Okay.  All right.  Let me take a look at

19  that case before making a decision.

20          If I am going to give anything in addition to 9.42, I

21  would give this model instruction and not the ones that you've

22  proffered.  If I'm going to give one, but I'll take a look at

23  the case to determine if it's appropriate to give both of them

24  at the same time.

25          MR. COHAN:  Thank you.

1    **MR. KLUGE:**  Can you -- Your Honor, just -- I didn't

2  quite hear --

3    **THE COURT:**  Oh, it's from the -- the O'Malley federal

4  Jury Practice and Instruction, Sixth Edition, 2015.

5    **MR. COHAN:**  Yeah, I quoted from that in one of the

6  ones we sent?

7    **THE COURT:**  Yeah, this came from your brief.  I

8  looked at that one.

9    **MR. COHAN:**  Ah, there it is.

10   **THE COURT:**  All right.  So I'm just not interested in

11  picking and choosing.  But it is a model instruction of some

12  sort so it's been tried and tested.  It's not just some

13  language in a case.

14     So I would be more inclined to use it, in addition to

15  something to 9.42.  But I'll take a look and see if it's

16  appropriate to be, because 9.42 does include that paragraph on

17  willfulness.  And I'll look and see if it makes sense to give

18  these two together, and I'll let you know on Monday morning.

19   **MR. KLUGE:**  Very well, Your Honor.

20   **MR. COHAN:**  Thank you, Your Honor.

21     Okay.  I think that that's it.

22   **MR. KLUGE:**  Yes, Your Honor.  I just want to make

23  sure we don't to have file the amended instructions.  We just

24  provide a courtesy copy based on your rulings today to the

25  court --

1          **THE COURT:**  Yeah.  Just --

2          **MR. KLUGE:**  -- or --

3          **THE COURT:**  Just a blind copy of all of the

4   instructions.

5          **MR. KLUGE:**  With the title on each instruction.

6          **THE COURT:**  With the title on each instruction.  I

7   will prepare a cover -- cover sheet so you don't need to do

8   that.  When they're given to the jury, we will give them a

9   complete set of the instructions with the cover.  And then it

10  will be scanned and filed on the docket.

11         **MR. KLUGE:**  Okay.

12         **THE COURT:**  So you'll have a complete set, the same

13  set that the jury gets.

14         **MR. KLUGE:**  Understood, Your Honor.  Thank you.

15         **THE COURT:**  All right.

16     All right.  I think that takes care of all of the

17  instructions.  You all have decided not to change the verdict

18  form in lieu of the revised jury instruction.  I believe

19  that's it.

20         **MR. KLUGE:**  That's correct, Your Honor.

21         **THE COURT:**  Okay.  Let me see if I have anything

22  else.

23                  (Pause in the proceedings.)

24         **THE COURT:**  No.  All right.  So you'll prepare them

25  all, including the limiting instructions.  You'll put all

1  titles on, and the two sides will work together on the two

2  legal instructions.

3          **MR. KLUGE:**  Yes, Your Honor.

4          **THE COURT:**  Okay.  All right.  Then we'll see you

5  Monday morning.

6          **MR. COHAN:**  Thank you, Your Honor.

7          **THE COURT:**  You're welcome.

8          (Proceedings were concluded at 3:57 P.M.)

9                        --o0o--

10              **CERTIFICATE OF REPORTER**

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13  I further certify that I am neither counsel for, related to,

14  nor employed by any of the parties to the action in which this

15  hearing was taken, and further that I am not financially nor

16  otherwise interested in the outcome of the action.

17

18          _Raynee H. Mercado_

19          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

20              Friday, February 17, 2017

21

22

23

24

25