UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA     *ORIGINAL*

Before The Honorable Phyllis J. Hamilton, Judge

| | | |
|---|---|---|
| United States of America, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 7** |
| | ) | |
| VS. | ) | NO. CR 14-00590 PJH |
| | ) | |
| RICHARD THOMAS GRANT, | ) | **Pages 1164 through 1367** |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, June 16, 2016 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:          Brian J. Stretch, Esq.
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
               BY:  COLIN C. SAMPSON,
                    Assistant United States Attorney

                        U.S. Department of Justice
                        Tax Division
                        Western Criminal Enforcement Section
                        601 D Street NW
                        WASHINGTON, D.C.  20004
               BY:  MATTHEW KLUGE, Trial Attorney

For Defendant:          WILLIAM A. COHAN, ATTORNEY AT LAW
                        P.O. Box 3448
                        Rancho Santa Fe, California  92067


Reported By:            Raynee H. Mercado
                        CSR. No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

# I N D E X

**DEFENDANTS' WITNESSES**                                    **PAGE**     **VOL.**

WOODS, JR., M.D., GEORGE

DIRECT EXAMINATION BY MR. COHAN              1167          7

CROSS-EXAMINATION BY MR. KLUGE              1222          7

REDIRECT EXAMINATION BY MR. COHAN           1264          7

RECROSS-EXAMINATION BY MR. KLUGE            1285          7


MOTTAHEDEH, PEYMON

DIRECT EXAMINATION BY MR. COHAN              1290          7


# E X H I B I T S

| **DEFENDANT'S EXHIBITS** | **W/DRAWN** | **IDEN** | **EVID** | **VOL.** |
| --- | --- | --- | --- | --- |
| 514 | | | 1298 | 7 |
| 515 | | | 1307 | 7 |
| 516 | | | 1309 | 7 |
| 517 | | | 1310 | 7 |
| 602 | | | 1337 | 7 |
| 606 | | | 1342 | 7 |
| 608 | | | 1351 | 7 |

--o0o--

| | |
|---|---|
| 1 | Thursday, June 16, 2016                    8:43 a.m. |

2                   P R O C E E D I N G S

3      (The following proceedings were heard in the presence of

4  the jury:)

5           THE CLERK:  Please be seated and come to order.

6           THE COURT:  All right.  Good morning, counsel.  Good

7  morning, ladies and gentlemen of the jury.

8      All right.  Mr. Cohan, call your next witness.

9           MR. COHAN:  Thank you, your Honor.

10     The Defense calls Dr. George W. Woods to the witness

11  stand.

12          THE CLERK:  Dr. Woods, please step up here and raise

13  your right hand.

14                   GEORGE W. WOODS, JR., M.D.

15  called as a witness for the DEFENDANT, having been duly sworn,

16  testified as follows:

17          THE CLERK:  Please be seated.

18          THE WITNESS:  Thank you.

19          THE CLERK:  Please state your full name and spell

20  your last name for the record and speak clearly into the mic.

21          THE WITNESS:  Thank you.  Good morning.

22          THE COURT:  Good morning.

23          THE WITNESS:  Good morning.

24     My name -- I apologize -- is George W. Woods, Junior.

25  W-o-o-d-s.  Actually the "W" -- I should probably say that --

1    George Washington Woods, Junior, last name W-o-o-d-s.

2                    **DIRECT EXAMINATION**

3    **BY MR. COHAN:**

4    **Q.**  Good morning, doctor.

5                    (Simultaneous colloquy.)

6          **THE WITNESS:**  Can I just take a moment to --

7                    (Pause in the proceedings.)

8          **THE WITNESS:**  Okay.

9    **BY MR. COHAN:**

10   **A.**  Good morning, Mr. Cohan.

11   **Q.**  Can you tell the ladies and gentlemen of the jury what

12   your educational background is.

13   **A.**  Sure.  I went to the University of Utah Medical School --

14   Actually before that, I went to Westminster College in Salt

15   Lake City, Utah.

16        I then went to the University of Utah Medical Center.  I

17   graduated in 1977.  I then did a straight medical internship

18   at Highland Hospital here in Oakland.  I then did a

19   psychiatric residency at Pacific Medical Center in

20   San Francisco.  I was chief resident my last year.

21        I then did a fellowship with the National Institute of

22   Mental Health and American Psychiatric Association in

23   geriatric psychopharmacology, which is the study of

24   medications and the interactions of medications within an

25   elderly population.  And that was the extent of my formal

1 education.

2     I've continued my continuing education credits, et cetera.

3 **Q.** And do you live in the Bay Area, Doctor?

4 **A.** I live right down the street.

5 **Q.** Okay. And for how long have you lived in the Bay Area?

6 **A.** My first time in the Bay Area was 1969 through 1972. I

7 worked for IBM during that time. And then I came back to the

8 Bay Area in 1977. I been here ever since.

9 **Q.** Okay. Now, do you -- are you licensed to practice

10 medicine in the State of California?

11 **A.** Yes. Yes, I am.

12 **Q.** And when did you obtain your license to practice medicine

13 in California?

14 **A.** I believe it was 1977.

15 **Q.** Okay. If your C.V. says 1979, is it wrong?

16 **A.** No. That would have been after my internship; that's

17 correct.

18 **Q.** Okay. And then are you certified by the American Board of

19 Psychiatry and Neurology?

20 **A.** That's correct. In psychiatry.

21 **Q.** Okay.

22 **A.** Okay. The American Board of Psychiatry and Neurology

23 certifies both psychiatrists and neurologists, so if you're

24 sitting for your psychiatry boards, your test is 70 percent

25 psychiatry, 30 percent neurology. If you're sitting for your

1  neurology boards, it's 70 percent neurology, 30 percent

2  psychiatry.

3  **Q.**  Okay.  And then there's an indication that you're a fellow

4  of the American Psychiatric Association.  What -- What is

5  that?

6  **A.**  The fellow- -- fellowship is a distinction that is given

7  to psychiatrists.  There are two.  There's a fellowship, and

8  there's a distinguished fellowship.  I'm a fellow.  I been a

9  fellow for about eight years.

10  **Q.**  Okay.  And reviewing your license and certifications, it

11  indicates that from 2009 to 2013, you were secretary general

12  of the International Academy of Law and Mental Health.

13     What is that, sir?

14  **A.**  The International Academy of Law and Mental Health is

15  based at the University of Montreal.  It's an international

16  organization that focuses on issues of both law and mental

17  health and ethics.  I'm the current president of that

18  organization.

19  **Q.**  Now, you have a lengthy list of experience called

20  "clinical experience and consultation."  Can you briefly

21  review and summarize that for the ladies and gentlemen of the

22  jury?

23  **A.**  Sure.  The -- The focus of my clinical practice is what's

24  called consultation liaison psychiatry or neuropsychiatry.

25  And consequently, I focus on psychiatric disorders that

1    manifest -- with medical problems.

2        If someone has a medical problem like diabetes, for

3    example, there are a very few people that know that diabetes

4    has significant psychiatric problems that go along with it.

5        Or things like hypothyroidism.  Hyperthyroidism looks much

6    like bipolar disease.  Hypothyroidism looks much like

7    depression.

8        So what I really specialize in is looking at medical

9    diseases that manifest with psychiatric disorders or looking

10    at psychiatric illnesses that have some medical component.

11        As such -- Should I give some of my experience in that

12    area?

13    **Q.**  Please, if you would.  I want you to pick and choose

14    because the list is so long, I don't want to go through all of

15    it.

16    **A.**  Okay.  During my residency, I took electives in

17    neurology -- extra electives in neurology, and focused

18    primarily on neurology and psychopharmacology, although I -- I

19    still do psychotherapy.

20        The reason why I focused on an elderly population

21    initially was because folks that are my age now, the way we

22    metabolize medicines, the way that we change in terms of our

23    ability to -- to -- our brain to function normally is much,

24    much like the brain of a child.  And so as children grow,

25    their brains develop, and then -- and as we age, our brains

1    change in the same kind of a backward configuration.

2         So in studying geriatrics, it really gave me an

3    opportunity to look at the life span of how the brain works.

4         I worked as a family physician for three years during my

5    residency with the Clinica De La Raza in Blythe, California.

6    And I worked as an emergency room physician both at Highland

7    and Contra Costa County and at San Francisco General in

8    addition to my psychiatric work.

9         When I came out and started working in my psychiatric

10   practice, I maintained that medical focus and have continued

11   to do that up until today.

12        I've stayed up to date on certain aspects of internal

13   medicine as they relate to psychiatric illness, but my focus

14   has really gone more toward the neurological component of

15   psychiatric illness.

16        So today, I treat people that primarily have

17   neuro-developmental disorders, disorders that were created

18   typically in either childhood or before -- while the child is

19   growing, so that specialty really looks at fetal alcohol,

20   Fragile X, Down Syndrome, and other types of disorders that

21   occur within -- often during gestation while the -- the child

22   is growing.

23   **Q.**  You just testified about treating -- I thought you said

24   neuro-developmental disorders; is that right?

25   **A.**  That's correct.

1  **Q.**  Have you identified a -- a genetic component whereby

2  people who are related genetically share certain mental

3  conditions or disorders because of the structure of their

4  brain just based on the DNA?

5  **A.**  What -- It really depends upon the disorder.  Most

6  psychiatric disorders are transmitted in what's called a

7  heterogenous transmission.  And what that means is that

8  they're on a lot of different genes.

9      So the transmission of most psychiatric disorders, mood

10  disorders, like bipolar disorder or depression, even

11  schizophrenia, from a genetic point of view, they're really on

12  a number of different genes, and they're transmitted in the

13  same way that one transmit -- families transmit diabetes.

14      Let me give you an example.  If you are -- If you are born

15  into a family that has diabetes, you might get juvenile onset

16  diabetes, which is very, very early.  You might get Type II

17  diabetes later in life.  You may not get diabetes at all.

18      And this is the range of what we call genetic penetrance,

19  how much of that genetic pool did you get.  Typically children

20  that get a disease have gotten the greatest load.  They've

21  gotten the greatest genetic pool.  If you get it later in

22  life, the chances are you have less of that genetic pool.

23      Psychiatric disorders are the same.  So you may -- a

24  person that has a family history of a particular psychiatric

25  disease may only get certain symptoms, they may not get any of

1    it.

2        For example, in mood disorders, bipolar disorder or

3    depression, if a family member has a mood disorder, then

4    there's about a 8 percent chance -- higher chance that someone

5    else in that family will have some symptoms.  They may not get

6    the entire mood disorder but they'll have some symptoms.  They

7    may not have the entire spectrum.  I mean, the entire -- but

8    they may have some symptoms.  So that's really how it's

9    transmitted, is what we called a heterogenous transmission.

10   **Q.**  Well, I want to go back to more of your clinical

11   experience and consultations.  You have a section identified

12   as "International Clinical Experience and Consultations."

13       Could you briefly summarize that for the jury?

14   **A.**  Sure.

15       My first experience internationally was 1992 in Senegal.

16   Since that time, I've worked as a second responder and a third

17   responder.  I worked in Kenya in 1998.  I've worked -- I'm

18   currently working in Malawi.  I've done training in Japan and

19   Italy and Uganda.  I taught for six months at Makerere

20   University.  I've done work in Zanzibar.  And most of this

21   work has been -- particularly in -- here and Africa -- most of

22   this work has been differentiating psychiatric disorder from

23   neurological disorder.

24       In Zanzibar, the issue was what we called cerebral

25   malaria.  Cerebral malaria or malaria of the brain presents

1    much like schizophrenia.  And so if a child that is four or

2    five years old gets cerebral malaria, they may look to be okay

3    for a few years.  But by the time, say, they're 13 or 14 or

4    15, which is what we called the prodromal period,

5    p-r-o-d-r-o-m-a-l -- the prodromal period and they may start

6    to develop symptoms of mental illness, we have to

7    differentiate whether that is a symptom of cerebral malaria,

8    which it could well be, or whether it's a symptom of

9    schizophrenia.

10       So that's what most of my work internationally has been,

11   is to differentiate between psychiatric disorders and medical

12   disorders if -- if necessary.

13   **Q.**  Okay.  If I can invite your attention, then, to your

14   Faculty and Professional Appointments, are you currently

15   teaching at the University of California Berkeley School of

16   Law?

17   **A.**  I am teaching at the University of California Berkeley in

18   the law school.  I'm also teaching at Morehouse University,

19   Department of Psychiatry.  I'm currently on sabbatical until

20   2017 with both of those because of my presidency.

21   **Q.**  The presidency of the International Academy of Law and

22   Mental Health?

23   **A.**  That's correct.

24   **Q.**  Okay.

25       Have you given clinical lectures -- Let me just -- I've

1    got a list of a lot of clinical lectures.  Have you given

2    clinical lectures in areas that bear on what we're going to

3    get to in a little bit about Mr. Grant?

4    **A.**  Yes.

5    **Q.**  And --

6    **A.**  I've given lectures on mood disorders, on mood disorders

7    or disorders where there's a disruption of how -- of feeling

8    that leads to a disruption of thinking, bipolar disorder,

9    depression, and I've given lectures on those.  I've also given

10   lectures on neurological disorders that present with

11   psychiatric symptoms.

12   **Q.**  And have you authored any clinical publications, Doctor?

13   **A.**  Yes.

14   **Q.**  And what sort of clinical publications have you authored?

15   **A.**  I published an article, I believe in 2012 on neurobehavior

16   assessment, how one goes about assessing these types of cases

17   and these types of circumstances.

18       I've written on fetal alcohol.  I've written on

19   neuroimaging.  We just this -- late last year or early this

20   year along with Erin Bigler at BYU and David Friedman at UCLA,

21   we published a paper on neuroimaging in the courts.

22       Just a couple of days ago, I had two chapters published on

23   a book that should be coming out on Amazon pretty quickly on

24   financial fraud and the cognitive aspects of financial fraud.

25   I think that was last -- what's today, Thursday.  I think that

1    came out on Monday or Tuesday.

2    Q.  And you authored chapters on personal and situational

3    contributors to fraud victimization?

4    A.  That's correct.

5    Q.  Is that right?

6    A.  That's correct.

7    Q.  And did you develop a four-factor model to determine, I

8    guess, predisposition to gullibility for --

9          MR. KLUGE:  Objection, Your Honor.  He's leading the

10   witness at this point.

11         THE COURT:  Sustained.

12   BY MR. COHAN:

13   Q.  Do you recall the title of the book?

14   A.  I don't, but I've got it written down.

15   Q.  Okay.

16   A.  (Reviewing documents.)

17       If I updated my vita.  Let me see here.

18       (Reviewing document.)

19       Financial crimes, Psychological, Technological, and

20   Ethical Issues, Springer Publishing.

21   Q.  Okay.  Do you know Rick Grant?

22   A.  I've met Mr. Grant, yes.

23   Q.  And how did you come to know Mr. Grant?

24   A.  You asked me to evaluate Mr. Grant.

25   Q.  And when did that process begin, to the best of your

1    recollection?

2    **A.**  I think that process began --

3    **Q.**  You can go ahead and refresh your recollection or use your

4    reports.

5    **A.**  Thank you.

6          **MR. KLUGE:**  Your Honor, I'm going to object.  If he

7    wants to ask Dr. Woods a question, if Dr. Woods --

8          **THE COURT:**  Yes.

9          **MR. KLUGE:**  -- can't recall, he can refresh his

10   recollection.  But Mr. Cohan can't direct himself to go ahead

11   and read his report to refresh his recollection.

12         **THE COURT:**  Yes.  Mr. Cohan, that's correct.

13         **MR. COHAN:**  Just going to prolong things, but I'll

14   abide by the court's ruling, of course.

15         **THE WITNESS:**  I interviewed Mr. Grant on May 31st,

16   June 23rd, and August 16th.

17   **BY MR. COHAN:**

18   **Q.**  Of what year?

19   **A.**  Of 2015.

20   **Q.**  Okay?

21   **A.**  And I also interviewed his wife Caroline on August 16th of

22   2015.

23   **Q.**  Are you unable to recall those dates without looking at

24   your report, Doctor?

25   **A.**  Probably.

**Q.** Okay.

Now, when I requested that you perform a psychiatric and psychological evaluation -- or I guess a neuropsychiatric evaluation, did I indicate that I had a couple of questions that I wanted you to address to see whether you could provide us with an opinion to a reasonable degree of neuropsychiatric certainty?

**A.** Yes.

**Q.** And what were those questions that I asked you to try and answer so you could give an opinion to this jury?

**A.** There were two questions. The first question was whether Mr. Grant suffered from a mental disease, defect, or condition that affected his ability to understand his legal duty to file individual income tax returns and to pay income tax.

The second question was does this mental disease defect or condition increase Mr. Grant's gullibility concerning promoters of schemes to avoid -- to legally avoid income tax.

**Q.** And "legally" was in quotes?

**A.** That's correct.

**Q.** Okay.

So when you received that request, what did you begin to do and what did you do to perform the task?

**A.** Well, I, first of all, received some materials from you that included some records of communications between Mr. Grant and the Internal Revenue Service. There were interviews by

1    the Internal Revenue Service by various people, his brother,

2    his accountant, a bookkeeper, several of his employees.

3         There were materials that related to different

4    organizations that Mr. Grant belonged to that -- that were

5    part of his understanding of the -- his approach to the IRS

6    issue.

7    **Q.**  Do you believe that's complete or should you look at

8    something to try and refresh your recollection?

9    **A.**  I think that's close to complete.

10   **Q.**  Okay.

11   **A.**  And then I -- obviously I interviewed him as well.

12   **Q.**  Okay.  And did you interview his wife?

13   **A.**  I did interview his wife.

14   **Q.**  Okay.  Did you perform tests and have psychologists

15   perform tests on Mr. Grant?

16   **A.**  I had Dr. Stacy Wood, W-o-o-d, administer

17   neuropsychological tests.

18   **Q.**  And can you tell us what you -- what you learned about

19   Mr. Grant's present circumstances that led me to request that

20   you perform your evaluation?

21   **A.**  Mr. Grant had been indicted for not -- for tax evasion,

22   for not paying his taxes.  And -- And through the -- through

23   the materials, I've learned of his relationship with a number

24   of organizations that appear to promote the legality of not

25   paying his taxes.

1    And I also learned quite a bit about Mr. Grant and

2    Mr. Grant's -- in my opinion, Mr. Grant's mental disorder.

3    **Q.**  Okay.

4    Well, can you tell the ladies and gentlemen of the jury

5    how you went about doing the research or investigation that

6    enabled you to express an opinion that Mr. Grant does indeed

7    have a -- a mental illness?

8    **A.**  Sure.

9    I interviewed Mr. Grant on -- on three different

10   occasions.  I also had, as I mentioned, Dr. Wood, do

11   neuropsychological testing -- neuropsychological testing is

12   different than what we normally think of in terms of

13   personality testing.

14   Personality testing is like an MM -- a Minnesota

15   Multiphasic Personality Inventory where -- kind of tries to

16   look at your personality.

17   And neuropsychological testing is -- is a -- a test of how

18   your brain functions.  It can only test certain parts of your

19   brain.  Can't test all of your brain, but it really is a test

20   of how certain aspects of your brain function.

21   And I -- I wanted to get this testing because, first of

22   all, I wanted another clinician to look at Mr. Grant and to

23   see if he saw -- she saw the types of symptoms that I saw but

24   also to determine what severity were those symptoms because of

25   the differential diagnosis that I was entertaining when I saw

1  Mr. Grant.

2      Mr. Grant presented to me with a number of symptoms of a

3  mood disorder.  He presented with pressured speech.  He

4  presented with grandiosity.  He had an unusual set of beliefs.

5  Not only about the Internal Revenue Service but also about

6  other things that were going on in the world, about certain

7  electromagnetic fields that were impacting the world, about

8  certain dietary problems that the world was facing, certainly

9  the issue about the Internal Revenue Service and the

10  requirement that he pay taxes.

11      Mr. Grant also described a family history of significant

12  migraine headaches in his mother, his brother, and in himself

13  and his headaches had been there all his life.  He described

14  his brother as being -- having a history of manic depression,

15  manic depression is term that has been replaced by bipolar

16  disorder.

17      He described -- Actually when I asked him about his sleep,

18  he said that sleep was a fantasy to him; that is, he rarely

19  slept for more than an hour or two hours a day but that he

20  didn't need much sleep, that he was able to do pretty well

21  with very little sleep.

22      Mr. Grant uses no drugs, drinks no alcohol, has never used

23  drugs, has never been a drinker.

24      So as Mr. Grant described these behaviors, particularly as

25  it related to his family, a family history of migraines, we

1    know now that about 30 percent of people that have significant

2    mood disorder, particularly bipolar disorder, have a history

3    of migraine disease.

4        As we -- As he talked about his brother having a history

5    of what -- of manic depression, I was able to review and

6    interview with his brother that was completed by the

7    Internal Revenue Service and that interview noted -- his

8    brother noted that he had -- that Randall Grant --

9            **MR. KLUGE:**  Objection, your Honor.  Calls for

10   hearsay.

11           **THE COURT:**  Yes, it does seem like this --

12           **MR. COHAN:**  Well --

13           **THE COURT:**  -- narrative that you're allowing him to

14   go on has included a number of hearsay statements that

15   wouldn't come in under the exception that would allow

16   Mr. Grant's statements to come in.

17       So do you have another exception that might apply?

18           **MR. COHAN:**  Yes.  The expert's are routinely allowed

19   to rely on hearsay, and the doctor is simply explaining the

20   basis for his evaluating a condition that Randall Grant was

21   afflicted with, and we have the statement which I provided the

22   doctor, to assist in his diagnosis and understanding family

23   history.

24           **THE COURT:**  Sure.  He can rely on hearsay in forming

25   his opinion and coming up with his report.  But what permits

1    the admissibility?  What particular exception would permit the

2    admissibility of any hearsay statement to come in through this

3    witness?

4             MR. COHAN:  Well, it's just the foundation for his

5    conclusion.  Whether it's true or not is for the jury to

6    evaluate.

7             THE COURT:  All right.  So you're not offering it for

8    the truth of the matter?

9             MR. COHAN:  No, it's based upon an assumption that

10   the statement was correct, and that's the basis for his

11   conclusion with respect to the Prozac.  But we had the -- we

12   had that evidence from the government, and so it is offered

13   for the truth insofar as -- as it's a foundation for

14   Dr. Woods' conclusions in part about Randall, also statements

15   made to him by Rick Grant and the other statements that he

16   testified about.

17        Since -- Unless he was present in court had listened to

18   the statements themselves, he wouldn't have a basis except for

19   hearsay.  All the tests are hearsay.  So it's routinely

20   permitted that experts are allowed to relied on hearsay.

21            THE COURT:  Of course, it is.  And he certainly may

22   testify as to the statements made by Mr. Grant to him.

23   What -- because there is an exception to the hearsay rule for

24   that.

25        What would permit him to testify in court about statements

1    made by other people to other people?  Not even to him?  I

2    mean, it's double hearsay in that sense.

3           **MR. COHAN:**  Your Honor, I guess it's just offered on

4    the basis that it has indicia of reliability because we have

5    the statement that was made by Randall Grant in the memorandum

6    of interview from Agent Moran where the government prosecutors

7    were present.  So there's really no dispute that the man

8    made --

9           **THE COURT:**  That's not -- That's not in evidence.

10          **MR. COHAN:**  There was testimony about it.

11          **THE COURT:**  I think that you've gone a little bit

12   further than I'm going to be willing to permit you to go on

13   this, so I'm not going to allow the double hearsay about --

14          **MR. COHAN:**  Very well.

15          **THE COURT:**  -- brother told someone else.

16          **MR. COHAN:**  Very well.

17   **Q.**  I'm going to ask you to assume this fact and ask you a

18   hypothetical, then:  Assume that a person is taking Prozac for

19   ten years and has been at least diagnosed or believes he's

20   diagnosed as manic depressive.

21       What can you tell us about what condition that person is

22   likely to be suffering from and what bearing does it have on a

23   brother?

24          **MR. KLUGE:**  I'm going to object, Your Honor.  That's

25   argumentative and not a proper hypothetical.  I mean, counsel

1    is just attempting to put in his arguments into a hypothetical

2    question.

3              **THE COURT:**  We -- We all know what he's doing, but

4    it's a hypothetical question.  This person -- Well, you

5    haven't offered him as an expert.  I assume at some point you

6    are going to offer him as a expert.

7              **MR. COHAN:**  I forgot.  I got so absorbed.  Let me ask

8    right now.

9         I move to admit Dr. Woods as an expert to provide expert

10   testimony as a neuropsychiatrist in this case, Your Honor.

11             **THE COURT:**  Is there an objection other than what you

12   stated in your pretrial motions?

13             **MR. KLUGE:**  That's the only objection the government

14   still maintains, Your Honor.

15             **THE COURT:**  All right.  Overruled.  He is qualified

16   to testify.

17             **MR. COHAN:**  My apologies, Your Honor.  I forgot that

18   step.

19   **Q.**  So let me go back.  Now that you have been qualified as an

20   expert, you are allowed to state the basis for opinions that

21   you have about relevant matters within your field of

22   expertise.

23        So I want to ask you about the situation involving the use

24   of Prozac for a ten-year period.  What is Prozac, first of

25   all?

1    **A.**   Prozac is an antidepressant.  It's a selective serotonin

2    reuptake inhibitor, which is just a type of antidepressant.

3    **Q.**   And what does -- what does it mean to say selective

4    serotonin reuptake inhibitor in terms of brain function?

5        Can you explain that to lay people?

6    **A.**   Yes.  May I -- Your Honor, may I step down for a minute

7    and use the -- use the white board?

8            **THE COURT:**  Yes.

9            **THE WITNESS:**  Thank you.

10           **MR. COHAN:**  And may I approach to adjust the

11   microphone for him, Your Honor?

12           **THE COURT:**  Sure.

13           **MR. COHAN:**  Thank you.

14   **BY MR. COHAN:**

15   **Q.**   As we discussed, Doctor, you're going to have to

16   project --

17   **A.**   Project.

18   **Q.**   -- your voice so the court reporter can hear you.  And I'm

19   trying to adjust so the court can see and the jury can see.

20       My apologies for wandering the courtroom, Your Honor.

21                   (Simultaneous colloquy.)

22           **THE WITNESS:**  Is that loud enough?

23       Is that loud enough?

24       Okay.  All right.  So when we talk about antidepressants,

25   and we particularly talk about reuptake inhibitors, it kind of

1    makes sense.  What the antidepressants are doing are blocking

2    something so that something else could be made larger.

3        And so (indicating) if you think of -- and I apologize.  I

4    got an "A" in doctor writing, so my writing is terrible.

5    And -- But I'll try to do as -- this as quickly as I can

6    (drawing).

7        These are synapses --

8                    (Off-the-record discussion.)

9            THE WITNESS:  These are synapses.

10   BY MR. COHAN:

11   Q.  The record should reflect that the doctor is at the white

12   board, and he has drawn a diagram that he's explaining.

13       Please proceed, Doctor.

14   A.  And those are the connections between your nerves.

15                    (Off-the-record discussion.)

16           THE WITNESS:  I can see this isn't going to work.

17   I'm sorry.

18           MR. KLUGE:  Your Honor, we're going to object at this

19   point in time about the testimony regarding depression.

20   There's no testimony or issue with respect to the defendant

21   suffering from depression, so I don't really see how this is

22   relevant to the matters in this case.

23           THE COURT:  Yeah, I'm not sure either.  We started

24   with a hypothetical, and then you sort of dropped that, and --

25   but I'm not even sure what the relationship is.

1    There's not been any evidence about ten years of Prozac

2    use.  I did not permit the testimony with regard to Randall

3    Grant, so I'm not exactly sure what the hypothetical is based

4    upon or what -- what you're doing by pursuing this line.

5    So you need to establish the relevance to Mr. Grant.

6              **MR. COHAN:**  Very well.

7    **Q.**  Let's go back, Dr. Woods, to discussing Richard Grant.

8    **A.**  Sure.

9    **Q.**  Okay.  So in evaluating Mr. Grant, was it important for

10   you to try and determine as much as you could about his family

11   history?

12   **A.**  Yes.

13   **Q.**  And what did you determine about Mr. Grant's family

14   history that was relevant to the condition that you diagnosed

15   him with?

16   **A.**  Mr. Grant described to me a family history of migraine

17   headaches.  He also described to me a history of -- in his

18   brother of manic depressive disorder, which is a disorder that

19   has both depression and mania.  It has two poles.  That's why

20   now it's called bipolar disorder.  There's a depressive pole,

21   but there's also the manic pole, which is the agitated

22   elevated irritable pole.

23   **Q.**  Now, you -- in your report when you describe the history

24   of present circumstances, you evaluated some writings that

25   were signed by Mr. Grant.

1           Do you recall that?

2      **A.**  Yes.

3      **Q.**  And what about those writings was remarkable in terms of

4      it -- any relationship it might have to the defendant's mental

5      condition that would be inconsistent with specific intent in

6      this case?

7           **MR. KLUGE:**  Objection, Your Honor.  That calls for a

8      answer that violates Rule 704.  He's asking the witness to

9      state an opinion that's the ultimate issue in the case that's

10     for the jury to decide.

11          **THE COURT:**  Yes, Mr. Cohan.

12          **MR. COHAN:**  No, I did not.

13          **THE COURT:**  We talked about this before, before

14     trial.  He may not offer an opinion on the question that the

15     jury will be required to make a determination about.

16          **MR. COHAN:**  I intended the question to be whether he

17     saw evidence inconsistent with specific intent.  And that, I

18     believe, is the whole purpose for which he's been offered as

19     an expert, Your Honor.  He's not opining on the ultimate

20     issue.

21          **THE COURT:**  All right.  Just make sure that the

22     question is not designed to elicit testimony on the ultimate

23     issue as to willfulness and that is with respect to

24     Mr. Grant's intent.  That's a jury question.

25          **MR. COHAN:**  I understand that.  This witness is being

1    offered to testify about evidence inconsistent with that,

2    which the jury will have to weigh and determine to decide

3    whether the evidence establishes that Mr. Grant did or did not

4    have that specific intent.

5        But this witness is offering evidence to show that --

6    evidence that's inconsistent with that specific intent, your

7    Honor.

8            **THE COURT:**  I'm not sure that there's a real

9    distinction.  I'll have to do that on a question-by-question

10   basis.

11       I'm not so sure that arguing that -- that offering

12   evidence that is inconsistent is not the same thing as arguing

13   simply the flip of the coin, that he didn't have the intent

14   that's required.

15           **MR. COHAN:**  We briefed this --

16           **THE COURT:**  Extensively, and I told you where the

17   line was.  The line's at Rule 704.  And you understand that

18   Rule 704 prohibits an expert from opining on the ultimate

19   issue of the mental state necessary.

20           **MR. COHAN:**  I do.  I do.

21           **THE COURT:**  Okay.

22           **MR. COHAN:**  But the whole point of his testimony is

23   to explain and describe the evidence that -- inconsistent.

24   Otherwise, it wouldn't be relevant.

25           **THE COURT:**  Ask the question, and I'll make a

1    determination on a question-by-question basis.

2          **MR. COHAN:**  Very well, Your Honor.

3    **Q.**  Did you look at documentation concerning Mr. Grant's

4    communications or documents signed by Mr. Grant that were

5    communications between him and the Internal Revenue Service?

6    **A.**  I did.

7    **Q.**  And what, if anything, did you notice about the content of

8    those communications relevant to Mr. Grant's mental illness or

9    lack thereof?

10   **A.**  The documents appear to follow a consistent pattern of

11   using the same language, of using the same phraseology, of

12   having a certain level of both irritability and grandiosity

13   that would have been consistent with Mr. Grant's -- with

14   symptoms of Mr. Grant -- Mr. Grant's disorder.

15   **Q.**  Now, you rendered an opinion on the first question, and

16   that first question was, can you determine to a reasonable

17   degree of scientific -- that is to say neuropsychiatric

18   certainty whether during the period of at least 2004 to the

19   present Richard Grant suffered or still suffers from a mental

20   disease, defect, or condition that has affected his ability to

21   understand his legal duty to file individual income tax

22   returns and to pay income taxes.

23        So all my questions hence forward are designed to elicit

24   the basis for your opinion in responding to that question.

25        Okay?

1    **A.**   Yes.

2            **MR. KLUGE:**  Objection, Your Honor.  Again, that

3    violates Rule 704.  He's asking for an opinion that is the

4    ultimate issue in this case that is for the jury to decide,

5    not for Dr. Woods to opine.

6            **THE COURT:**  Okay.  He hasn't now.  He's just

7    explained to the doctor what his questions are designed for,

8    so I still have to do it on a question-by-question basis.

9            **MR. KLUGE:**  Very well, Your Honor.

10           **MR. COHAN:**  Your Honor, please, this evidence is

11   offered really to establish whether Mr. Grant suffered from a

12   mental disease, defect, or condition that affected his

13   ability.

14       The mere fact that it affected his ability to understand

15   does not prove that he did not understand.  It merely

16   establishes that he might not have been able to understand, as

17   a normal person was, who didn't suffer from a mental disease

18   or defect.  That's the purpose for psychiatric testimony as I

19   understand it.

20       I'm doing my best to provide it.

21           **THE COURT:**  I understand.

22           **MR. COHAN:**  Okay.

23           **THE COURT:**  I'll have to listen to each question.

24           **MR. COHAN:**  Understood.

25   **Q.**  So, Dr. Woods, you -- you looked at these communications.

1  Did you eventually find out that Mr. Grant had not actually

2  drafted these communications but had merely signed these

3  documents?

4  **A.**  Yes, I did.

5  **Q.**  And how, if at all, does that affect your analysis of the

6  existence or not of a mental disease or defect that you've

7  already opined, namely --

8      Well, I should ask you.  What specifically was your

9  diagnosis of Mr. Grant?

10  **A.**  I have a differential diagnosis of Mr. Grant.

11  Differential diagnosis is bipolar disorder versus temporal

12  lobe dysfunction or temporal lobe epilepsy.

13  **Q.**  And what is the basis for your opinion that Mr. Grant is

14  bipolar and/or suffers from temporal lobe epilepsy.

15      First of all, can you tell the jury in as much detail that

16  applies to Mr. Grant, what is the bipolar disorder?  What are

17  the symptoms, and what do you believe are the causes?

18  **A.**  Bipolar disorder is a disruption of mood.  In the most

19  common way of us thinking about it, bipolar, it's a person

20  that has both depression and elevated symptoms.  We often

21  think of the elevations, the mania, as being grandiosity but

22  it also can be irritability, and it can be reflected by going

23  back and forth between the depressive symptoms and the more

24  elevated symptoms.

25      Bipolar disorder occurs along a spectrum.  There are

1  people that stay in the upper poles their entire life.  There

2  are people that stay in the depressive poles their entire

3  life.  There are people that have both poles at the same time.

4  So it's a very complex disease.

5      And bipolar disorder can also define people that can

6  function very well, very well with bipolar disorder.  There

7  are other people that it's devastating.

8      So bipolar disorder is really manifested by impaired

9  judgment.  You see people that have bipolar disorder as often

10  having real vulnerability, real impaired judgment.  They can

11  often make financial decisions or personal decisions that are

12  destructive.  And -- And have significant denial around these

13  issues.  So that's a bipolar disorder.

14      Temporal lobe disorder is very much like bipolar disorder.

15  Temporal lobe disorder is a disorder of the brain of the

16  temporal lobe, and if I could possibly -- this is -- if I

17  could possibly get a --

18          **MR. COHAN:**  Yes, we'll see if we can project the

19  computer image of the brain that you wanted us to.

20          **THE WITNESS:**  Right.

21          **MR. COHAN:**  Would you bear with us for a moment, Your

22  Honor?

23              (Pause in the proceedings.)

24  **BY MR. COHAN:**

25  **Q.**  In your statements, Doctor, about bipolar disorder and

1   temporal lobe epilepsy, were these statements about a

2   condition that you believe you identified with sufficient

3   neuropsychiatric certainty to be something with which

4   Mr. Grant is afflicted?

5   **A.**   Yes.

6   **Q.**   Okay.  Please proceed to explain, if you will.

7                    (Demonstrative published.)

8            **THE WITNESS:**  This is obviously a picture of the

9   brain.  Just so we orient ourselves, this is the frontal lobe.

10  These are the -- this is the parietal lobe.  This is the left

11  side of the brain.  This is the occipital lobe.  And this is

12  the temporal lobe.  And there's one on both sides of the body

13  (indicating).

14       The temporal lobe is the only lobe in the brain in which

15  all pathways go through, language, motor, thinking, emotion.

16  It's a fascinating and --

17       Mr. Cohan, could you please turn it and -- so I --

18                    (Demonstrative published.)

19            **THE WITNESS:**  And flip it up for me, please.

20                    (Demonstrative published.)

21  **BY MR. COHAN:**

22  **Q.**   Now, is that the front of the brain you're on?

23  **A.**   This is the front of the brain.  This part here is the

24  front of the brain.

25  **Q.**   So that's the frontal lobe?

1    **A.**   This is the bottom of the frontal lobe.   This is -- This

2    is -- if you are laying down and looking up at the brain.

3    **Q.**   Please proceed.

4    **A.**   And the purple areas -- the purple areas are the temporal

5    lobe.

6        Now, the temporal lobe, as you can see, connects with all

7    of these other areas.  It really are (sic) the highways

8    between the frontal lobe and the occipital lobes where we see.

9    It's the highway between the temporal lobe and this -- this is

10   the old brain, the part of the brain we're born with, the part

11   of the brain that allows you to weigh and deliberate, to

12   sequence one's behavior.

13       And when we think about temporal lobe dysfunction or

14   temp- -- what's also called temporal lobe epilepsy, it's most

15   common in this part of the brain, this inner -- what we called

16   the mesial or middle part of the brain.  And right in here,

17   you see symptoms that are very, very similar to bipolar

18   disorder (indicating).

19       So if someone has temporal lobe syndrome, they may have

20   magical thinking.  They may believe things that other of us --

21   well, we probably aren't sure that's true.  They may have

22   obsessive-compulsive disorder.  They may have a rigidity in

23   their thinking.  This is something that Mr. Grant described to

24   me and was described in other situations as well.

25       They may have grandiosity.  Mr. Grant described his

1 beliefs as unique to him, as beliefs that set him apart, that

2 really -- things that he knew that nobody else knew.

3 **Q.** Is that grandiosity, Doctor?

4 **A.** That is -- That is grandiosity.

5 **Q.** Okay.

6 **A.** As I noted, Mr. Grant had multiple areas of magical

7 thinking completely separate from the Internal Revenue

8 Service. He believed that there were electromagnetic forces

9 that were going to impact the -- the earth.

10 He believed that there were special things -- in diet that

11 were greater than even the kind of things that we normally --

12 so the differential was, well, is this a bipolar disorder? Or

13 is this a temporal lobe disorder?

14 The reason why the question of temporal lobe come up --

15 came up is because this is where -- this mesial area, either

16 on the right or left side is where people that have

17 migraines -- the kind of migraines he described without an

18 aura that are often ongoing, this is where they occur.

19 Also because he has obsessive qualities, and temporal lobe

20 epilepsy often reflects obsessive qualities rather than -- as

21 opposed to bipolar disorder which typically does not have

22 those obsessive qualities, it became a differential diagnosis.

23 Now, Mr. Cohan, would you just drop that down to the

24 regular viewing again.

25                    (Demonstrative published.)

1    **THE WITNESS:**  And over to the --

2        (Demonstrative published.)

3    **THE WITNESS:**  Now, the differential between bipolar

4  disorder and temporal lobe disorder is really clinical because

5  both of them are treated basically in the same way.

6    In bipolar disorder today, if you use medications, the

7  first line medications are anti-seizure medicines, Depakote,

8  Tegretol.  Lithium is not -- or Lamictal, l-i-m-i-c-t-a-l

9  (sic), all three of these are anti-seizure medicines that are

10  used both for temporal lobe disorder but are also used for

11  bipolar disorder.

12    The only other medicine that doesn't -- isn't used for

13  both is Lithium.  Lithium is really only used for bipolar

14  disorder.

15    So Mr. Grant present -- presented with pressured speech.

16  He presented with grandiosity.  He presented with unusual

17  thinking in more than one area.  He presented with ob- --

18  obsessive qualities.  He presented with impaired sleep,

19  another sign of bipolar disorder.  He presented with impaired

20  sleep.  He presented with migraine headaches.  And he

21  described a family history of migraine headaches.

22    He described a family history, at least in his brother, of

23  manic depressive disorder, which is bipolar disorder.  So

24  that's what created the symptoms.  And clearly, the fact that

25  we're here, Mr. Grant demonstrated impaired judgment, which is

1    a big sign that you often see in bipolar disorder.

2         There was one other aspects of -- of making the diagnosis

3    that is very important.

4         All psychiatric disorders occur along a spectrum.  And

5    it's just been since the advent of psychiatric medications,

6    anti-psychotics particularly, that we assume that anyone that

7    has a psychiatric disorder is on medication.  That's not true.

8    All right.

9         Actually a -- the great number of people that have

10   spectrums of psychiatric disorders are, in fact, not on

11   medication.  They may have symptoms, but they may function

12   reasonably well in other areas.

13        And so I had to look at how does Mr. Grant function within

14   his culture.  And this is where the interview with his wife

15   became very important.

16        His wife, who is like --

17        **MR. KLUGE:**  Your Honor, I'm going to object at this

18   point.  It's getting quite long.  I'm not sure I remember what

19   the question is, but I also think it's starting to elicit some

20   hearsay statements well.

21        **THE COURT:**  All right.

22        **MR. COHAN:**  Well --

23        **THE COURT:**  He's been testifying in a narrative.  You

24   do need to exercise some --

25        **MR. COHAN:**  Very well.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    (Simultaneous colloquy.)

2         MR. COHAN:  Certainly.

3    Q.  So let me ask you about some of the symptoms that you

4    talked about.  You mentioned something called pressured

5    speech.

6    A.  Yes.

7    Q.  What is pressured speech?

8    A.  Pressured speech is a speech that requires you to break

9    in.  It isn't necessarily rapid speech, although it can be.

10   It's a speech that has a certain urgency that requires you to

11   say, okay.  Okay.  Hold on a minute.  And so pressured speech

12   is a speech that continues, it continues, and continues, that

13   requires you to break in.

14        Pressured speech is specific to bipolar disorder and

15   temporal lobe disorder.  There are many other types of speech

16   and language disruptions in psychiatric disorder, but

17   pressured speech is specific to bipolar disorder.

18   Q.  Now, did you learn that Mr. Grant tended to talk to people

19   about his political beliefs and other odd beliefs even though

20   they clearly didn't want to listen to it?

21   A.  Yes.

22   Q.  And does that -- is that a symptom of pressured speech or

23   otherwise related to one or more symptoms of this disorder?

24   A.  Not necessarily.  And this is -- And this is where you

25   have to really make the differentiation because there are a

1    lot of folks that say things to you you may not want to hear,

2    and particularly if you don't necessarily agree with their

3    political stance or whatever may be.

4        However, that's why it was important to interview his

5    wife.  Mrs. Grant is a very conservative -- politically

6    conservative woman.  They been married for many, many years.

7    And when I asked her about some of the symptoms that Mr. Grant

8    manifested, she talked about how their life had become

9    increasingly isolated because he could not --

10            **MR. KLUGE:**  Your Honor, we're going to object at this

11   point in time 'cause, again, it calls for hearsay.

12            **MR. COHAN:**  That's the basis --

13            **THE COURT:**  It does.

14            **MR. COHAN:**  -- in part for his opinion.

15            **THE COURT:**  It does call for hearsay, but this

16   appears to me to not go so much as to the truth of the matter

17   but as to how and why he formed the diagnosis that he formed.

18            **MR. COHAN:**  That's the basis for all my questions,

19   Your Honor.

20            **THE COURT:**  Okay.  All right.  I'm going to permit

21   this.

22            **THE WITNESS:**  Thank you, Your Honor.

23        So -- So in talking with Ms. Grant, who, as I said, is

24   very conservative person herself, acknowledged how their life

25   had become increasingly isolated because Mr. Grant would talk

1    one or another of his unusual thinking regardless of the

2    situation.  She had had to move away from friends.  She had to

3    kind of change their life.  And this is someone that

4    completely believes his conservative beliefs.

5        So this was greater than conservatism.  This was greater

6    than a political stance.

7        She also acknowledged that he had -- he did not sleep.  He

8    was someone that was not a sleeper, that he only slept -- they

9    been married, as I said, many, many years, at least two

10   decades, maybe three.  He was not a sleeper.

11       And, again, sleep disruption, difficulty sleeping is,

12   again, a sign of bipolar disorder.  So she acknowledged the

13   pressured speech.  She acknowledged the unusual thinking.  She

14   acknowledged the obsessive-compulsive qualities.  She

15   described him as a hoarder.

16   **BY MR. COHAN:**

17   **Q.**  Did you say "a hoarder"?

18   **A.**  As a hoarder.

19   **Q.**  And what is that, Your Honor?  Excuse me.

20       What is that, Doctor?

21   **A.**  You may or may not see this show on television called

22   "Hoarding."  Hoarding is one subtype of obsessive-compulsive

23   disorder.  Obsessive-compulsive disorder is -- obsession is

24   the thought; compulsion is the action.

25       Hoarding is one type of obsessive-compulsive disorder, and

1  you see OCD -- if you don't mind me summarize (sic) -- you see

2  obsessive-compulsive disorder or OCD often in mood disorders,

3  in bipolar disorder as well.

4      You can see it separately.  It can -- It could be a

5  separate diagnosis.  About 30 percent of people that have

6  bipolar disorder, about 17 percent of people that have

7  temporal lobe disorder also have obsessive qualities.

8      So what -- what I saw in my interviews with Mr. Grant were

9  reinforced by his wife, and we did not talk about psychiatric

10  diagnoses.  She had no reason to talk about these specific

11  symptoms at the time that -- that I interviewed her.

12      And so what I saw then was what you really want to look at

13  when you're talking about a psychiatric disorder.  Many people

14  may have traits.  They may have things that they do.

15          MR. KLUGE:  I'm going to object, Your Honor.  This is

16  moving to a very lengthy narrative.

17          THE COURT:  The last question was, what is a hoarder.

18          THE WITNESS:  Okay.  I'm sorry.

19          THE COURT:  And witness is going on --

20          MR. COHAN:  I understand.  I hesitated to interrupt.

21          THE COURT:  I'm not going to permit any more

22  narratives.  Ask specific questions.

23          MR. COHAN:  Very well, Your Honor.

24  Q.  So you also mentioned, Doctor, obsessive behavior.

25      Did you learn anything about Mr. Grant's ownership of a

1  couple of airplanes?

2  **A.**  Yes.

3  **Q.**  What did you learn about Mr. Grant's ownership of

4  airplanes, if anything, that sounded in obsession of one sort

5  or another?

6  **A.**  Mr. Grant owned two airplanes.  He owned those airplanes.

7  They were hydroplanes -- actually planes that were designed to

8  go in the waters.  He had owned them along with his brother

9  for decades.  Neither one of them currently flew, although I

10  believe one flew in 2007.

11      He is storing parts, both the airplanes and the parts at a

12  cost of about $2,000 a month.  There's no indication that

13  either of these planes would ever fly again.

14  **Q.**  So the fact that he owns these two airplanes that don't

15  fly and stores airport -- airplane parts and has been involved

16  in this activity for decades, does that support in any form or

17  fashion an obsessive-compulsive-type disorder?

18          **MR. KLUGE:**  Objection, Your Honor.  It's leading.

19          **THE COURT:**  Overruled.  I'll allow it.

20          **THE WITNESS:**  Yes.

21  BY MR. COHAN:

22  **Q.**  I want to make sure that you've covered all of the

23  symptoms that you've identified supporting the diagnosis that

24  I believe you've given us.  But I want to make sure that now

25  that I've got around to qualifying you as an expert because

1    the court prompted me to, do you have an opinion to a

2    reasonable degree of scientific neuropsychiatric certainty

3    whether during the period of 2004 to the present,

4    Richard Grant suffered and still suffers from mental disease,

5    defect, or condition that affected his ability to understand

6    his legal duty to file income tax returns and to pay income

7    taxes?

8         **MR. KLUGE:**  Objection, Your Honor.  The last part of

9    Mr. Cohan's question violates Rule 704(b).  He can ask him --

10   Dr. Woods if he suffers from a mental condition.  But he

11   specifically inserts in there a phrase that his mental

12   condition specifically affected his mental state with respect

13   to the charges.  That violates Rule 704.

14        **THE COURT:**  Well, the issue is under the *Cohen* case

15   is whether or not the -- it necessarily -- whether or not his

16   testimony would necessarily compel a conclusion that the

17   mental state was -- that the defendant did not labor under

18   that mental state.  I'm not sure that that question goes quite

19   that far.

20        **MR. COHAN:**  It does not, Your Honor.

21        **THE COURT:**  Yeah, I -- I think it's okay.

22        **MR. COHAN:**  Thank you.

23   **Q.**  You may answer the question if you still recall it.

24   **A.**  I'd like it one more time if you don't mind.

25   **Q.**  Okay.  I'm asking for you to tell us whether you have an

1  opinion that you can state with a reasonable degree of

2  neuropsychiatric certainty whether during the period of 2004

3  to the present, Richard Grant suffered and still suffers from

4  a mental disease, defect, or condition that affected his

5  ability to understand his legal duty to file individual tax

6  returns and to pay income taxes?

7  **A.**  I do.  I forgot the symptom of memory, but I do.

8  **Q.**  Ah.  Memory.

9     Did you identify in the course of gathering evidence about

10  Mr. Grant any memory deficit that he may suffer from?

11  **A.**  Yes.

12  **Q.**  And is it the case that when people reach the age of 65,

13  they started losing memory function, knowing that Mr. Grant's

14  only 63?

15  **A.**  It depends upon the type of memory function.  There are

16  about -- about 17 different types of memory.  The type of

17  memory function that you lose starting about 60 is for proper

18  names.  But in terms of the kinds of memory that we're talking

19  about, no.

20     **MR. KLUGE:**  Your Honor, I'm going to object to this

21  line of questioning and that answer.

22     What's relevant in this case is what Mr. Grant's mental

23  state was from 2004 through 2009.  It was not over 65.  And so

24  testimony about memory issues that affect people once they're

25  over 65 is not relevant to the issues in this particular case.

1    **THE COURT:**  Sustained.

2    BY MR. COHAN:

3    **Q.**  Doctor, did you understand the question to be limited to

4    people over the age of 65?

5    **A.**  No.

6    **Q.**  Okay.  Well, let me ask it again without that limitation.

7       Is there a progressive loss of memory, generally speaking,

8    in the human population?

9    **A.**  Yes.

10   **Q.**  Did you determine whether Mr. Grant's memory issues were

11   such that he had problems that were different or greater than

12   what we would call a normal person's memory loss for the same

13   age?

14          **MR. KLUGE:**  Objection again on the basis of

15   relevance.  If he wants to ask about memory issues from 2005

16   through 2009, that would be relevant.  Whether or not

17   Mr. Grant suffers today at his present age memory loss is not

18   relevant to whether or not his conduct was willful.

19          **THE COURT:**  Sustained.

20   BY MR. COHAN:

21   **Q.**  Can you infer from someone's current condition what their

22   condition would have been during prior years?

23   **A.**  It depends upon the condition.  In terms of memory, I

24   could not.

25   **Q.**  In -- In Mr. Grant's case, could you determine -- I

1  believe you just testified that you were able to determine

2  with a reasonable degree of scientific certainty whether

3  Mr. Grant was suffering from mental disease, defect, or

4  condition that affected his ability to understand his legal

5  duty to file income tax returns and to pay income taxes.

6      Can you state with a reasonable degree of certainty that

7  Mr. Grant suffered from such a condition as early as 2004

8  based on evaluating him in 2015?

9  **A.**  Yes.

10 **Q.**  Were you able to determine that he was manifesting these

11 same symptoms by interviewing people and looking at the

12 material that you were provided with from 2004 and perhaps

13 even earlier?

14 **A.**  Every symptom but memory.

15 **Q.**  Okay.  So can you determine with a reasonable degree of

16 scientific certainty whether the memory deficit onset was at

17 or about 2004, 2005?  Or can you not do that?

18 **A.**  It's not clear to me.

19 **Q.**  Okay.

20     Now, the second question that you were asked to respond

21 to, again, whether you could state with a reasonable degree of

22 neuropsychiatric certainty was does this mental disease,

23 defect, or condition increase Richard Grant's gullibility

24 concerning promoters of schemes to, quote, legally, end quote,

25 avoid income taxes?

1      MR. KLUGE:  Objection again, Your Honor.  Calls for

2  an answer that violates Rule 704(b).

3      THE COURT:  I think it does as well.

4      MR. COHAN:  I'm only asking whether it increases his

5  gullibility.  It's not the ultimate issue.  Even if it does

6  increase his gullibility, it doesn't mean that he doesn't

7  possess the requisite mental state.  It merely shows that it

8  affected.  The nature and extent of that effect is for the

9  jury to determine.

10      THE COURT:  Counsel, response?

11      MR. KLUGE:  If Mr. Cohan wants to ask -- Dr. Woods

12  found that Mr. Grant suffered from symptom of gullibility,

13  period, I think that would be sufficient.  But when he throws

14  on to the end of his question if raised --

15          (Off-the-record discussion.)

16      MR. KLUGE:  -- end of his question when he tacks on a

17  clause that necessarily invades the province of the jury, that

18  renders the question violative of Rule 704(b).

19      MR. COHAN:  Your Honor, it does not.  And it would be

20  irrelevant unless it affected --

21      THE COURT:  It does.

22      MR. COHAN:  -- his ability to understand his legal

23  duty.  That's what makes this whole line of inquiry relevant.

24      THE COURT:  All right.  I'm going to instruct the

25  jury that ultimately, you will be the finders of fact as to

1  whether or not the defendant did or did not have the requisite

2  mental state, which in this case, is willfulness.

3     I'm going to allow this question though because I think

4  that to the extent that there was any affect at all by virtue

5  of the diagnosed mental condition, that that is relevant to

6  the question that you will ultimately -- you would ultimately

7  be required to find, so I will permit it.

8            **MR. COHAN:**  Thank you, Your Honor.

9  **Q.**  So the question was whether you can state with a

10  reasonable degree of neuropsychiatric certainty whether the

11  mental disease, defect, or condition that you diagnosed for

12  Richard Grant increased his gullibility concerning promoters

13  of schemes to legally avoid income taxes?

14     Did it?

15  **A.**  In my professional opinion, yes.

16  **Q.**  And can you state that with a reasonable degree of

17  neuropsychiatric certainty?

18  **A.**  Yes.

19  **Q.**  And can you state for the jury the materials that you

20  relied upon evaluating specifically what Mr. Grant did

21  vis-a-vis his taxes including his filings with the IRS, with

22  the tax court, with the Court of Appeals, his involvement with

23  various promoters and the rest of his behavior?

24            **MR. KLUGE:**  Objection.  It's argumentative.  It's

25  compound, vague.  And I'm not sure I understand the question.

1    **THE COURT:** I -- I agree.  Sustained.  Rephrase it,

2    please.

3    **MR. COHAN:** Very well.

4    **Q.** Let's take look at -- unless you -- we need to go further

5    into your preliminary report -- did you do a second report?

6    **A.** Yes.

7    **Q.** And if I may, I'd like to invite your attention to the

8    second report.  When did you do your second report?

9    **A.** I completed it May 16th of 2016.

10   **Q.** So just a month ago today; is that right?

11   **A.** That's correct.

12   **Q.** And why did you do a second report?

13   **A.** I did a second report to, number one, establish my

14   credentials to make this differential diagnosis between

15   bipolar disorder and temporal lobe disorder, and to also

16   expand my discussion of the question of gullibility.

17   **Q.** Now, if I may, I'd invite your attention to page 2 of this

18   rebuttal report.

19      Before we go into it, though, did you receive a report

20   from the government's designated psychiatric expert in this

21   case?

22   **MR. KLUGE:** Objection, Your Honor.  What's the

23   relevance?  Dr. Woods is here to testify about his medical

24   diagnosis, his opinions.  And any other report is not

25   pertinent to what his diagnosis is of Mr. Grant.

1    **THE COURT:**  Well, the question was simply did he

2    receive the report, and I don't see reason why he shouldn't

3    testify as to that.

4        He can't testify as to the contents of the report.  But he

5    can certainly answer this question.  Overruled.

6        **THE WITNESS:**  Yes, I did.

7    **BY MR. COHAN:**

8    **Q.**  And did you see that the government's expert identified

9    the same symptoms you did?

10       **MR. KLUGE:**  Objection then, Your Honor.

11       **THE COURT:**  And that objection is based upon...?

12       **MR. KLUGE:**  One, it's hearsay.  It's not something

13   that's part of his expert testimony.  He's here to render

14   opinion as to what his diagnosis is of Mr. Grant.  It's not

15   relevant.

16       **THE COURT:**  You can stop with hearsay.  It's hearsay.

17   Sustained.

18   **BY MR. COHAN:**

19   **Q.**  In forming your own opinions, Doctor, do you rely of

20   opinions on other psychological and psychiatric professionals

21   who have also evaluated the same subject?

22   **A.**  I certainly review them.  I can't say that I rely upon

23   them, but I certainly review them.

24   **Q.**  Okay.

25       Now, if I may go back to page 2 of your -- your second

1 report and invite your attention to some -- some experience

2 and training and expertise that I believe you stated was

3 particularly applicable to the situation of gullibility and

4 susceptibility to certain types of ideas.

5     Can you briefly summarize those particular aspects of your

6 training and experience which provide the foundation for your

7 expertise in this area?

8          **MR. KLUGE:**  I'm going to object, Your Honor, at this

9 point.  It's cumulative.  He's already been offered and

10 accepted by the court as an expert.

11          **THE COURT:**  Yeah, I'll allow question, but I'm not

12 sure where you're going with it.

13          **MR. COHAN:**  I'm going into the details of this

14 witness's particular training and experience with this

15 particular aspect of psychiatric illness, Your Honor.

16          **THE COURT:**  Just the gullibility issue.

17          **MR. COHAN:**  That's exactly right, Your Honor.

18          **THE COURT:**  Okay.  All right.  He can do it.

19          **THE WITNESS:**  I've written about vulnerability and

20 gullibility and intellectual disability and other psychiatric

21 disorders.

22     I think the last paper that I wrote along with Dr. Stephen

23 Greenspan was a paper that was published in Paris in 2015.

24 And I focused on issues of vulnerability and gullibility or

25 risk unawareness for probably the last ten years.

1    **BY MR. COHAN:**

2    **Q.**  Now, "risk unawareness" is a term you just used.  What, if

3    any, applicability does risk unawareness have to your

4    evaluation and opinion concerning Richard Grant?

5    **A.**  Both bipolar disorder and temporal lobe dysfunction

6    undermine the ability of a person to evaluate risk.  It

7    impairs judgment.  It often impairs insight.  In the

8    Diagnostic and Statistical Manual No. 5, which is really a

9    classification system not a comprehensive textbook of

10   psychiatry but a classification system, they talk about

11   financial indiscretions as being one of the factors that one

12   sees in bipolar disorder.

13        Those financial indiscretions or impaired judgment,

14   difficulty effectively weighing and deliberating in specific

15   areas are frequently found in mood disorders, certainly in

16   bipolar disorder.

17   **Q.**  And is -- is a colloquial term for gullibility basically a

18   sucker?  Somebody who's easily beguiled?

19   **A.**  Well, I -- I think of -- I think of it that way when I

20   don't think -- when I'm not thinking clinically.

21        If -- If it were someone that did not have a mental

22   disease or defect, the answer would be yes.

23        If it's someone that does, in fact, have a mental disease

24   or defect, the answer is no because their ability to be -- to

25   judge things effectively are impaired as opposed to the

1   average person.

2   Q.   Okay.

3       Now, you've identified a number of engagements where you

4   were performing psychiatric services beginning as early as

5   1991 that were specific to the type of expertise required to

6   do the diagnosis of temporal lobe epilepsy as a differential

7   diagnosis with bipolar disorder.

8       Do you recall those experiences being in 1991 and I guess

9   continuing all the way to the present that were particularly

10  focused on the foundation for determining and identifying

11  mental illness related to gullibility?

12          MR. KLUGE:   Objection again, Your Honor.  It's

13  cumulative.

14          THE COURT:   Yes, it is.  But I'm going to permit it.

15  BY MR. COHAN:

16  Q.   So you're not going to allow me to explore this?

17          THE COURT:   No, I said I'm going to permit it.

18          MR. COHAN:   I'm sorry.

19          THE COURT:   It is cumulative, but I am going to

20  permit it.  That's what I said.

21          MR. COHAN:   I apologize.  I didn't hear Your Honor.

22  Q.   Please, if you would, Doctor, can you briefly summarize

23  that experience that is particularly focused on diagnosing

24  neuropsychiatric disorders which contribute to gullibility?

25  A.   Yes.  In the early -- actually, in the very early 1980's,

1    I developed the first medical psychiatric unit at Pacific

2    Medical Center which had -- looked at people that had medical

3    illnesses with psychiatric disorders.

4    From 1990 -- from 1983 to 1990, I worked at Crestwood

5    Manor in Vallejo, California, with seriously ill, hospitalized

6    people, most of whom had cognitive impairments or mood

7    disorders.  Very few were schizophrenic and in that seven

8    years, we again looked at the issue of vulnerability and

9    gullibility.

10   Since about 2005, maybe 2008, I have been writing about

11   gullibility and vulnerable as a core factor in mental disease,

12   particularly in intellectual disability, mental retardation,

13   but also in other disorders as well.

14   And it really appears to be because of how the brain

15   works, the breakdown across many psychiatric disorders, but

16   specifically, as it looks at bipolar disorder and temporal

17   lobe disorder.

18   **Q.**  Doctor, is the field of neuropsychiatry still evolving, or

19   have we discovered everything?

20   **A.**  Oh, it's just starting.  Not even close.

21   **Q.**  So it's just getting started.  As a result of that, are

22   you continuing to do research and work with other people doing

23   research to update each other on your findings?

24   **A.**  Yes.

25   **Q.**  And is there -- are there courses given by various

1  universities around the world, including here in the United

2  States, to further develop your understanding and expertise

3  that are continuing medical education courses that actually

4  you're required to take for your medical certification?

5  **A.**  Yes.

6  **Q.**  And have you taken courses of that sort focused on

7  neuropsychiatric disorders including bipolar disorder and

8  temporal lobe epilepsy within the last few years?

9  **A.**  Yes, I have.

10  **Q.**  And where have you done that, sir?

11  **A.**  In 2010, I took a course with the American Psychiatric

12  Association on medical diseases that masquerade as psychiatric

13  diseases and that was put on by Dr. Jose Maldonado from

14  Stanford.

15  In 2013, I believe I took a course at Harvard on

16  neuropsychiatry which also looked at temporal lobe epilepsy.

17  And in 2012, I -- this is a regular course I take -- an

18  update on internal medicine.  That was also at Harvard.

19  **Q.**  Now -- Excuse me.  One second.

20  (Pause in the proceedings.)

21  **BY MR. COHAN:**

22  **Q.**  In your second report, you were explaining the difference

23  between ictal symptoms and peri-ictal symptoms as bearing on

24  the diagnosis for Rick Grant that you've testified about that

25  he's diagnosed as bipolar, slash, temporal lobe epilepsy.

1   What does ictal symptoms versus peri-ictal symptoms mean in
2   this case?

3   A.   Well, actually they don't mean -- I was explaining --
4   Mr. Cohan, I was explaining the fact that when I talked about
5   ictal versus peri-ictal, I was explaining the fact that what
6   we normally think of epilepsy is not what temporal lobe
7   epilepsy is.

8        Temporal lobe epilepsy is an electrical -- is bad
9   electrical wiring.  And actually any epilepsy is bad
10  electrical wiring.  Temporal lobe epilepsy does not present
11  with physical manifestations.  You don't have the typical
12  clonic/tonic movement that one has in like grand mal epilepsy.

13       Temporal lobe epilepsy presents in behavior, so a person
14  may not have what we think as a seizure their entire life.
15  What they have are migraines and odd thinking.  So when we
16  talk about temporal lobe epilepsy, don't get the idea -- and
17  that's why I was talking about ictal versus peri-ictal -- that
18  these are not -- "ictal" means at the time of the seizure;
19  "peri-ictal" means around time of the seizure.  But that's not
20  really what epilepsy is all about.

21       Epilepsy is all about bad wiring.  And bad wiring can
22  occur without any motor functions, can actually present just
23  as behaviors, just as thinking, rather than any motor
24  function.

25  Q.   When you interviewed Mr. Grant, did you notice anything

1  unusual about his attitude toward this trial and the

2  prosecution that he's facing now?

3  **A.**  Yes.

4  **Q.**  And what was that?

5  **A.**  Certainly in my first two interviews, Mr. Grant, he did

6  not appear to understand the gravity of the circumstances.

7  **Q.**  So would you expect somebody to be facing a situation such

8  as criminal prosecution for three counts of tax evasion to be

9  worried and upset as opposed to happy and relaxed?

10         **MR. KLUGE:**  Objection, Your Honor.  It's leading.

11         **THE COURT:**  Overruled.

12         **THE WITNESS:**  Well, I -- I would not describe him

13  as -- as happy and relaxed.  I would describe him as unaware

14  of the gravity of the circumstances and unaware of -- and

15  increasingly aware of the fact that the resources he'd relied

16  on were inaccurate.

17         **MR. KLUGE:**  Going to move to strike the last part --

18  the last part of his question.  His answer, Your Honor,

19  invades the province of the jury.

20         **THE COURT:**  The clause "unaware" -- "increasingly

21  unaware of the fact that the resources he relied upon were

22  inaccurate"?  That portion?

23         **MR. KLUGE:**  Yes, Your Honor.

24         **THE COURT:**  I don't see that that's much difference

25  than the first part.  Request denied.

1        Go ahead.

2                **MR. COHAN:**  Your Honor, may I have a moment?

3                **THE COURT:**  Um-hmm.

4                        (Pause in the proceedings.)

5      **BY MR. COHAN:**

6      **Q.**  Before I yield here and allow the government to

7      cross-examine you, I want to make sure that you were able to

8      express a clear answer to the two questions that I asked you

9      to address.

10       So the first question --

11               **THE COURT:**  He did.

12               **MR. KLUGE:**  Objection, Your Honor.  Asked and

13     answered.

14               **THE COURT:**  He did.  On several occasions.

15               **MR. COHAN:**  All right then.

16               **THE COURT:**  I wrote them down.  Thank you.

17               **MR. COHAN:**  Very well.  Nothing further.

18               **THE COURT:**  All right.

19       All right.  Ladies and gentlemen, you'll be excused for 15

20     minutes.  And, Dr. Woods, you can take a break as well.

21               **THE WITNESS:**  Thank you, Your Honor.

22       (The following proceedings were heard out of the presence

23     of the jury:)

24               **THE COURT:**  All right.  Counsel, before

25     cross-examination of Dr. Woods, I just want to indicate to you

1    all that the question as to whether or not -- the questions

2    posed by counsel crossed the 704 line -- I mean, that's a --

3    it's definitely a difficult determination to make, but based

4    upon *Cohen* and *Finley*, I believe that Mr. Cohan did ask proper

5    questions that did not compel an answer.

6        And the two questions to the -- the two primary issues

7    that were submitted to the witness were whether or not the

8    mental condition affected the defendant's ability to

9    understand his legal duty and whether or not by virtue of

10   the -- the gullibility that resulted from the mental

11   condition, whether or not his ability to understand his legal

12   duty was affected.  I -- I think that those are actually

13   proper.

14       I was a little concerned that it was too close to the

15   line.  But in briefly perusing the *Cohen* decision, I think

16   that the jury certainly could accept the witness's testimony

17   and still find that the mental state of willfulness is

18   present.

19       I mean, the fact that it affected it isn't the same thing

20   as saying it precludes his ability to form the state (sic), so

21   I think that Mr. Cohan was correct in the way in which he

22   ultimately framed those questions.

23       So keep that in mind when you're doing your

24   cross-examination.

25           **MR. KLUGE:**  Very well.

1    **THE COURT:**  Okay.

2        **MR. COHAN:**  Thank you, Your Honor.

3        (Recess taken at 10:11 A.M.; proceedings resumed at 10:26

4    A.M.)

5        (The following proceedings were heard in the presence of

6    the jury:)

7        **THE CLERK:**  Please be seated and come to order.

8        **THE COURT:**  All right.  Cross-examination.

9        **MR. KLUGE:**  Thank you, Your Honor.

10                   **CROSS-EXAMINATION**

11   BY MR. KLUGE:

12   **Q.**  Good morning, Dr. Woods.

13   **A.**  Good morning, Mr. Kluge.  How are you?

14   **Q.**  My name is Matthew Kluge, and I work for Department of

15   Justice, and we've never met prior to this morning; is that

16   correct?

17   **A.**  That's correct.

18   **Q.**  Okay.  But you have previously met Mr. Cohan, correct?

19   **A.**  That's correct.

20   **Q.**  How long have you known Mr. Cohan?

21   **A.**  Oh, perhaps a year?  Let's see.  When did I first --

22        (Reviewing document.)

23        My first meeting was May of 2015.

24   **Q.**  That's the first time you met Mr. Cohan the defense

25   counsel?

1   **A.** Oh, I'm sorry. I apologize. Mr. Grant. I've known

2 Mr. Cohan perhaps three years. Perhaps.

3   **Q.** And Mr. Cohan has referred other clients to you besides

4 Mr. Grant; is that correct?

5   **A.** One.

6   **Q.** So how many times have you been retained by Mr. Cohan?

7   **A.** Once beside -- This is the second time.

8   **Q.** This is the second time; is that correct?

9   **A.** Yes.

10   **Q.** And in that other occasion, you also evaluated a client of

11 Mr. Cohan's; is that correct?

12   **A.** That's correct.

13   **Q.** And you prepared some reports regarding that particular

14 client; is that correct?

15   **A.** That's correct.

16   **Q.** And you were paid for those reports, correct?

17   **A.** Yes.

18   **Q.** Okay.

19     And in addition in that other instance, you testified in a

20 proceeding regarding that other client; is that correct?

21   **A.** Yes.

22   **Q.** And you were paid to testify in that proceeding, correct?

23   **A.** Well, no, I was paid, and I testified. Yes.

24   **Q.** Well, you were paid for the hours that you spent on that

25 particular case, correct?

1   **A.**   That's correct.

2   **Q.**   And that included the testimony that you provided in that

3   case, correct?

4   **A.**   That's correct.

5   **Q.**   And in that case, did you charge $400 an hour?

6   **A.**   That's correct.

7   **Q.**   And in that case, did you recall working approximately 60

8   hours?

9   **A.**   I think at least that.

10  **Q.**   At least that?

11  **A.**   Yes.

12  **Q.**   Okay.

13       So for 60 hours at $400 an hour, that's approximately

14  $24,000; is that correct?

15  **A.**   Yes.

16  **Q.**   How many hours have you billed in this case to date?

17  **A.**   I'm not sure.  But I would say that it's probably close to

18  that.

19  **Q.**   Close to 60 hours?

20  **A.**   Yes.

21  **Q.**   And what is the rate that you're charging in this

22  particular case?

23  **A.**   $400 an hour.

24  **Q.**   So approximately at this point in time, you've charged

25  $24,000 for the work that you've done relating to Mr. Grant;

1    is that correct?

2    **A.**   I would say including today, yes.

3    **Q.**   Including today?

4    **A.**   Yes.

5    **Q.**   And so for your time here today as a witness, you'll

6    charge for that time as well; is that correct?

7    **A.**   That's correct.

8    **Q.**   Do you charge more for the time that you spend testifying

9    versus the time you spend doing other matters for Mr. Grant?

10   **A.**   No, the California Business Code does not allow for

11   that -- to charge differently -- a differential.

12   **Q.**   What percentage of your income at the moment comes from

13   your clinical practice versus the work you do consulting for

14   individuals who have been indicted?

15   **A.**   Hmm.  About 40 percent of my practice is -- my income

16   comes from my clinical practice, and about 60 percent of my

17   income comes from my forensic practice.  But it -- that does

18   not include, as you said, persons that have been indicted.

19        I have both a civil practice and a -- and a criminal

20   practice.

21   **Q.**   So 60 percent of your time now is spent in doing work that

22   relates to litigation; is that fair to say?

23   **A.**   Yes.

24   **Q.**   Okay.

25        And how much of your time are (sic) you spent having been

1    retained by defendants in criminal cases?

2           **MR. COHAN:**  Object, lack of foundation as to time.

3    You mean, for the last 30 years?

4           **THE COURT:**  Sustained.

5    **BY MR. KLUGE:**

6    **Q.**  For the last two years, what percentage of your work has

7    been dedicated to providing services for defendants in

8    criminal matters?

9    **A.**  I've never been asked to do an evaluation for the

10   government, so in these cases, my -- my work has always been

11   for the defense.

12   **Q.**  So you've never been asked to testify or render an opinion

13   by a prosecutorial office; is that correct?

14   **A.**  Not in the last 25 years or so.

15   **Q.**  So any litigation in the criminal context in which you're

16   testifying is cases in which you're representing (sic) the

17   defendant; is that correct?

18   **A.**  That's correct.

19          **MR. COHAN:**  Object.  He's not representing anyone.

20          **THE COURT:**  Sustained.  Rephrase.

21   **BY MR. KLUGE:**

22   **Q.**  So all the work that you do in a criminal context, the

23   consultation and the diagnosis and testifying, you do on

24   behalf of criminal defendants; is that correct?

25   **A.**  I --

1    **MR. COHAN:** Asked and answered.

2    **THE COURT:** Overruled.

3    **THE WITNESS:** I have so far. I testify in about 11

4    percent of the cases that I'm consulted with.

5    **BY MR. KLUGE:**

6    **Q.** Dr. Woods, is it true that you didn't meet Mr. Grant

7    until after he was indicted in this case, correct?

8    **A.** Correct.

9    **Q.** You didn't know Mr. Grant back in 2004?

10   **A.** That's correct.

11   **Q.** Or 2005?

12   **A.** That's correct.

13   **Q.** Or 2006?

14   **A.** Yes.

15   **Q.** Or 2007?

16   **A.** That's correct.

17   **Q.** Or 2008, 2009, correct?

18   **A.** That's correct.

19   **Q.** And you didn't know him in the years prior to 2004,

20   correct?

21   **A.** Yes.

22   **Q.** And, in fact, the first time you met Mr. Grant was May

23   2015; is that correct?

24   **A.** That's correct.

25   **Q.** And that would have been five years after 2009 ended; is

1   that correct?

2   **A.**   Six years.

3   **Q.**   Six years?

4   **A.**   Yeah.

5   **Q.**   Okay.  And you only met Mr. Grant for purposes of this

6   particular litigation; is that correct?

7   **A.**   Yes.

8   **Q.**   And you only evaluated Mr. Grant for purposes of this

9   litigation, correct?

10  **A.**   Yes.

11  **Q.**   And you're not treating Mr. Grant; is that correct?

12  **A.**   That's correct.

13  **Q.**   You haven't prescribed Mr. Grant any medication; is that

14  correct?

15  **A.**   That's correct.

16  **Q.**   Your differential diagnosis of Mr. Grant is temporal lobe

17  epilepsy versus bipolar disorder, correct?

18  **A.**   That's correct.

19  **Q.**   And both of these are serious mental conditions; is that

20  correct?

21  **A.**   Yes.

22  **Q.**   And temporal lobe epilepsy is a neurological disorder,

23  correct?

24  **A.**   It is.  Yes.

25  **Q.**   Whereas bipolar disorder is a psychiatric disorder,

1    correct?

2    **A.**    That's actually not correct.  At one time, we thought of

3    bipolar disorder being a purely psychiatric disorder.  We now

4    know that it is what we call a neurocognitive disorder.  It's

5    got impairments of the brain as well as psychiatric

6    presentations.

7    **Q.**    But bipolar disorder appears in the DSM-5, correct?

8    **A.**    That's correct.

9    **Q.**    Temporal lobe epilepsy does not appear in the DSM-5?

10   **A.**    That's correct.

11   **Q.**    The DSM-5 is the -- I want to get the name right -- is the

12   Diagnostic and Statistical Manual of Mental Disorders,

13   correct?

14   **A.**    That's correct.

15   **Q.**    And that is a -- a primary resource for psychiatrists in

16   diagnosing mental disorders; is that correct?

17   **A.**    It's a resource of classification, not really of

18   diagnoses.  It doesn't have many diagnoses in it, particularly

19   neurological diagnosis.

20   **Q.**    Now, you showed some pictures of the brain during your

21   direct examination.  Those weren't pictures of Mr. Grant's

22   brain, correct?

23   **A.**    That's correct.

24   **Q.**    In fact, you didn't take any pictures of Mr. Grant's

25   brain, correct?

1   **A.**   Oh, no.

2   **Q.**   You did not.

3   **A.**   No.

4   **Q.**   After meeting Mr. Grant and writing your preliminary

5   report, you didn't prescribe Mr. Cohan any anti-seizure

6   medication, did you?

7          **MR. COHAN:**   Your Honor, I object to this line of

8   questioning.  He was retained strictly for forensic purposes.

9   He's not the treating psychiatrist.  There isn't one.

10         **THE COURT:**   That's I think the point counsel is

11  making.  Objection overruled.

12         **THE WITNESS:**   There are ethical dilemmas between

13  treating someone and also evaluating them in the legal

14  setting.  So I would not, in fact, prescribe for someone that

15  I was evaluating in a legal setting.

16  **BY MR. KLUGE:**

17  **Q.**   Okay.  So you did not prescribe to Mr. Grant any

18  anti-seizure medication?

19  **A.**   And would not.

20  **Q.**   And you didn't tell Mr. Grant to stop driving a car,

21  correct?

22  **A.**   No.

23  **Q.**   Now, Dr. Woods, you studied medicine, correct?

24  **A.**   Yes.

25  **Q.**   And you described your experience and your resume during

1    direct examination.  You didn't do a residency in neurology;

2    isn't that correct?

3    **A.**  That's correct.

4    **Q.**  And you didn't do a fellowship in neurology, correct?

5    **A.**  That's correct.

6    **Q.**  And you're not a board-certified neurologist; is that

7    correct?

8    **A.**  That's correct.

9    **Q.**  And the focus of your practice is not on epilepsy; is that

10   correct?

11   **A.**  The focus of my practice is not on all types of epilepsy.

12   But certainly one of the focuses -- foci of my practice would

13   be temporal lobe epilepsy because it crosses the border

14   between psychiatry and neurology.

15   **Q.**  Didn't you testify previously that the focus of our

16   practice has been ethnopsychopharmacology?

17   **A.**  It has been, yes.

18   **Q.**  And that a focus of your practice has been

19   neurodevelopmental problems?

20   **A.**  That's correct.

21   **Q.**  Such as fetal alcohol syndrome?

22   **A.**  Yes.

23   **Q.**  Now, you prepared a report regarding Dr. (sic) Grant dated

24   September 10th, 2015; is that correct?

25   **A.**  Yes.

1    **MR. COHAN:** Mr. Grant is not a doctor.

2    **MR. KLUGE:** I'm sorry.

3    **Q.** Dr. Woods, you prepared a record regarding Mr. Grant dated

4    September 10th, 2015.

5    **A.** Yes.

6    **Q.** Correct?

7        And in your report, it's specifically a preliminary

8    report; is that correct?

9    **A.** Yes.

10   **Q.** And, in fact, on the very first page of your report, in

11   the second paragraph, the sentence begins, "in order to

12   complete the preliminary portion of my examination."

13       Do you recall that?

14   **A.** Yes.

15   **Q.** And if I ask -- and if you -- on the 17th page of your

16   preliminary report, you state, "these findings are preliminary

17   because further testing and consultation is necessary.

18   **A.** That's correct.

19   **Q.** Is that correct?

20   **A.** That's correct.

21   **Q.** And also on page 17, of your report, in the

22   second-to-the-last paragraph, you state, this examination is

23   preliminary and will be completed based upon further

24   neurological and cognitive examinations.  Is that correct?

25   **A.** That's correct.

1  **Q.** Okay. You then prepared a second report that you talked

2  about on your direct examination, and that report is dated May

3  16th, 2016, correct?

4  **A.** That's correct.

5  **Q.** And this report is in the format of a -- a letter to

6  Mr. Cohan; is that correct?

7  **A.** Yes.

8  **Q.** And this report, the -- the letterhead is the Science

9  Advisors. What's the Science Advisors?

10 **A.** Science Advisors is a corporation that -- is a corporation

11 of mine.

12 **Q.** A corporation that you own and operate?

13 **A.** Yes, with two other people.

14 **Q.** And what kind of business is the Science Advisors?

15 **A.** We consult to startup companies and other types of

16 companies that are developing primarily neurological

17 instruments, like -- we work with people developing stuff on

18 concussions or childhood assessments of brain -- brain damage.

19 **Q.** And this second report you prepared regarding Mr. Grant is

20 approximately 13 pages long; is that correct?

21 **A.** That's correct.

22 **Q.** And this second report was written some eight months after

23 you submitted your preliminary report back in September,

24 correct?

25 **A.** That's correct.

1    **Q.**   Okay.

2         And nowhere in your second report do you indicate any

3    further testing or consultation or neurological examinations

4    or cognitive examinations that you've performed regarding

5    Mr. Grant; is that correct?

6    **A.**   They -- If -- They may not have been there.  I don't know

7    if the neuropsychology testing of Dr. Wood was there or the

8    consultation with Dr. Nadkarni.

9    **Q.**   And wasn't the consultation with Dr. Wood included in the

10   information you considered in your preliminary report?

11   **A.**   I don't recall.

12   **Q.**   You don't recall if the psychological testing that you

13   outsourced to Dr. Wood was something in your possession when

14   you prepared your initial report back in September 2015?

15   **A.**   That's what I said.

16   **Q.**   Do you recall that Dr. Wood -- and this is your -- the

17   individual who did the psychological testing, correct?

18   **A.**   The neuropsychological testing.

19   **Q.**   And she is a doctor in Los Angeles, correct?

20   **A.**   Yes.  In Claremont, actually.

21   **Q.**   And she found that Dr. -- Mr. Grant had a high average IQ;

22   is that correct?

23   **A.**   Yes, which has nothing to do with brain function, of

24   course.

25   **Q.**   But he has a high average IQ, correct?

1  **A.**  Yes.

2  **Q.**  Your diagnosis is in the form of a differential diagnosis,

3  correct?

4  **A.**  That's correct.

5  **Q.**  And you testified previously under oath that a

6  differential diagnosis means what are all the possible

7  options; is that correct?

8  **A.**  A differential -- That's not quite correct.  A

9  differential diagnosis are (sic) what are the most relevant

10  options rather than all the possible options.

11  **Q.**  Nowhere in your preliminary report does it say, "Mr. Grant

12  suffers from temporal lobe epilepsy," period; is that correct?

13  **A.**  That's correct.

14  **Q.**  And nowhere in your preliminary report does it say,

15  "Mr. Grant suffers from bipolar disorder," period?

16  **A.**  That's correct.

17  **Q.**  And nowhere in your second report, eight months later,

18  does it say, "Mr. Grant suffers from temporal lobe epilepsy,"

19  period?

20  **A.**  That's correct.

21  **Q.**  And nowhere in your second report, does it say, "Mr. Grant

22  suffers from bipolar disorder," period?

23  **A.**  That's correct.  That's the differential diagnosis.

24  **Q.**  Mr. Grant didn't report to you a history of seizures,

25  correct?

1  **A.**  That's correct.

2  **Q.**  And you interviewed Mr. Grant's wife, Carol Grant,

3  correct?

4  **A.**  Yes.

5  **Q.**  And Mr. Grant's wife did not report a history of seizures

6  by Mr. Grant, correct?

7  **A.**  That's correct.

8  **Q.**  Those are the only two individuals you specifically

9  interviewed in coming up with your diagnosis regarding

10  Mr. Grant, correct?

11  **A.**  That's correct.

12  **Q.**  Okay.

13  We looked at some other documents that Mr. Cohan provided

14  to you, correct?

15  **A.**  That's correct.

16  **Q.**  And nowhere in any of the documents Mr. Cohan provided to

17  you did anyone state that they observed Mr. Grant having a

18  seizure, correct?

19  **A.**  That's correct.

20  **Q.**  You did not perform a EEG on Mr. Grant prior to preparing

21  your preliminary report; is that correct?

22  **A.**  I did not and would not.

23  **Q.**  You did not perform an MRI on Mr. Grant prior to preparing

24  your preliminary report; is that correct?

25  **A.**  I did not and would not.

1    Q.   And you did not perform an EEG or an MRI on Mr. Grant

2    after you prepared your preliminary report?

3    A.   That's correct.

4    Q.   In your September 10th, 2015 preliminary report, you list

5    a number of characteristics that have been historically

6    attributed to temporal lobe epilepsy.

7         Do you recall that?

8    A.   Yes.

9    Q.   And some of these characteristics include things such as

10   anger, and guilt, religiosity, philosophical interests,

11   dependence, among others; is that correct?

12   A.   Yes.

13   Q.   But an individual can be angry and not suffer from

14   temporal lobe epilepsy, correct?

15   A.   Sure.

16   Q.   And an individual can be religious and not suffer from

17   temporal lobe epilepsy, correct?

18   A.   Absolutely.  Yes.

19   Q.   And an individual can be interested in philosophy and not

20   suffer from temporal lobe epilepsy, correct?

21   A.   That's correct.

22   Q.   On page 6 of your report, you list a number of those

23   supposed symptoms of temporal lobe epilepsy.

24        Do you recall that?

25   A.   These are the symptoms.  These are not the supposed

1  symptoms.

2  **Q.**  Okay.  These are the symptoms of temporal lobe epilepsy?

3  **A.**  Yes.  There are more and you don't have to have all of

4  them, but these are some symptoms, yes.

5  **Q.**  Well, in your paragraph that below this table that lists

6  symptoms, you then state the temporal lobe systems such as,

7  and then you list a few of these symptoms, correct?

8  **A.**  Yes.

9  **Q.**  And then you say "such as magical thinking," and you

10  include "gullibility," correct?

11  **A.**  Yes.

12  **Q.**  But looking at the -- the chart above, which you just said

13  was the inventory of symptoms of temporal lobe epilepsy,

14  magical thinking and gullibility don't appear, do they

15  Dr. Woods?

16  **A.**  Well, actually, if you look at -- magical thinking

17  typically comes from -- and this goes back to your previous

18  question under philosophical interest, and --

19      (Reviewing document.)

20  **Q.**  My question is the words "gullibility" and "magical

21  thinking" do not appear in the table in which you inventoried

22  the symptoms of temporal lobe epilepsy, do they?

23  **A.**  If you're talking about the exact words, that's correct.

24      If you're talking about the terminology that reflects

25  those, that is reflected in that.

1  **Q.** So it's correct, the exact words do not appear in your

2  inventory of symptoms of temporal lobe epilepsy that you cite

3  in your report, correct?

4  **A.** The states do, not the exact words.

5  **Q.** Now, you're -- you testified that it's your understanding

6  that Mr. Grant experiences magical thinking, correct?

7  **A.** Yes.

8  **Q.** And these are things that he told you after he was

9  indicted in this particular case, correct?

10  **A.** Well, since I didn't talk to him until afterwards, yes.

11  **Q.** So the answer is yes, these are things he told you after

12  he was indicted?

13  **A.** I think I said yes.

14  **Q.** In your report, you stated that Mr. Grant described his

15  brother as a manic depressive.

16      Do you recall that?

17  **A.** Yes.

18  **Q.** And a few moments ago Mr. Cohan objected and said that

19  Mr. Grant, the defendant, is not a doctor; is that correct?

20  **A.** Yes.

21  **Q.** Mr. Grant is not a doctor, correct?

22  **A.** As far as I know.

23  **Q.** So he's not qualified to diagnose anyone with a

24  psychological disorder, is he?

25                    (Pause in the proceedings.)

1          **THE WITNESS:**  The specific answer to your question is

2     no, he is not qualified to make a diagnosis.

3     **BY MR. KLUGE:**

4     **Q.**  You didn't interview Mr. Grant's brother, Randall Grant,

5     did you?

6     **A.**  I did not.

7     **Q.**  And you don't have a professional opinion to a reasonable

8     degree of medical certainty as to whether or not Randall Grant

9     suffers from any mental disorder, do you?

10    **A.**  Yes.

11    **Q.**  Yes, you've been able to diagnose Randall Grant based on

12    statements from Mr. Grant?

13    **A.**  No, I been able to diagnose Mr. Grant, Randall Grant,

14    based on statements that he made about himself.

15    **Q.**  Statements that he -- Who's the "he" that he made about

16    himself?

17    **A.**  Randall Grant made about his -- his own treatment and that

18    he had manic issues.

19    **Q.**  You didn't interview Randall Grant, did you?

20    **A.**  No.

21    **Q.**  On page 8 of your report, you state that Mr. Grant, like

22    his mother and his brother, share certain characteristics.

23         Do you recall that?

24    **A.**  Yes.

25    **Q.**  Okay.

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    And you mean that to indicate that both Mr. Grant, his

2    brother Randall Grant and, his mother share some

3    characteristics; is that correct?

4  **A.**  Yes.

5  **Q.**  And one of those characteristics you described that

6    Mr. Grant the defendant possesses is overall adequate

7    functioning; is that correct?

8  **A.**  Yes.

9  **Q.**  And you also say that one of the characteristics that

10   Mr. Grant possesses is reliance upon others in spite of

11   adequate day-to-day behavior.  Is that correct?

12 **A.**  That's correct.

13 **Q.**  One of the characteristics that you believe the -- those

14   three individuals share or at least you state they share is

15   odd behaviors, correct?

16 **A.**  Yes.

17 **Q.**  But those odd behaviors that you articulate that they

18   share are odd behaviors that the defendant reported to you;

19   isn't that correct?

20 **A.**  Yes.  I -- In this report.

21 **Q.**  You didn't interview Randall Grant, correct?

22 **A.**  That's correct.

23 **Q.**  And you didn't interview Mrs. -- Mr. Grant's mother,

24   correct?

25 **A.**  That's correct.

1  **Q.**  In formulating your diagnosis regarding bipolar disorder,

2  you relied in part on the DSM-5, correct?

3  **A.**  Yes.

4  **Q.**  And, in fact, you cite and quote a section from the DSM-5

5  in your preliminary report, correct?

6  **A.**  That's correct.

7  **Q.**  And the DSM-5, articulates various criteria that a

8  physician must find in -- in a patient in order to arrive at a

9  diagnosis for bipolar disorder; is that correct?

10  **A.**  Yes.

11  **Q.**  And these four criteria are labeled A through D, correct?

12  **A.**  Yes.

13  **Q.**  And in order for a patient to meet the diagnostic criteria

14  for bipolar disorder, they have to meet each one of those four

15  criteria, correct?

16  **A.**  According to DSM-5; that's correct.

17  **Q.**  The DSM-5 states that you must have all four to meet the

18  diagnosis for bipolar disorder, correct?

19  **A.**  I don't recall whether you have to meet all four.  But you

20  could -- have -- let me see DSM-5 so that I could review that?

21       **MR. KLUGE:**  May I approach, Your Honor?

22       **THE COURT:**  Yes.

23       **MR. KLUGE:**  (Handing document.)

24    (Off-the-record discussion between Mr. Kluge and the

25  witness.)

1  BY MR. KLUGE:

2  Q.  And I'm going to ask you -- are you looking at page 123?

3  A.  Yes.

4  Q.  Of the DSM-5?

5  A.  Yes, I am.

6  Q.  And does it indicate there under the heading "Bipolar I

7  Disorder," the diagnostic criteria, and it says, "For a

8  diagnosis of Bipolar I disorder, it is necessary to meet the

9  following criteria for a manic episode."  Is that correct?

10  A.  Yes.  And I think this relates specifically to Bipolar I.

11  Q.  And then on the subsequent page, there are the -- listed

12  the four criteria for that manic episode, correct?

13  A.  That's correct.

14  Q.  And that's what you cut and pasted into your report, your

15  preliminary report, regarding Dr. -- I'm sorry -- regarding

16  Mr. Grant, correct?

17  A.  That's correct.

18        MR. KLUGE:  May I approach again, Your Honor?

19        THE COURT:  Yes.

20  BY MR. KLUGE:

21  Q.  The first criteria -- criterion A from the DSM-5 for

22  bipolar disorder is a distinct period of abnormally and

23  persistently elevated expansive or irritable mood lasting one

24  week or any duration of hospitalization if necessary.

25      Is that correct?

1    **A.**  That's correct.

2          **MR. COHAN:**  Object, misstates what's in there.  It

3    says "at least one week."

4          **THE COURT:**  You're saying he misread it?

5          **MR. COHAN:**  I am, Your Honor.

6          **THE COURT:**  Okay.

7          **MR. KLUGE:**  The witness answered that, yes --

8                    (Simultaneous colloquy.)

9          **MR. KLUGE:**  -- but I'll clarify.

10          **THE COURT:**  He did, but I do want the record to be

11    accurate.

12          **MR. KLUGE:**  Let me just reread the first criteria,

13    criterion A is "a distinct period of abnormally and

14    persistently elevated expansive or irritable mood lasting at

15    least one week and present most of the day nearly every day or

16    any duration if hospitalization is necessary."

17    **Q.**  Does that accurately summarize criterion A?

18    **A.**  That's correct.

19    **Q.**  With respect to criterion A, your report cites to a claim

20    by Mrs. Grant.  Do you recall that?

21    **A.**  Would you point me to the page, please.

22    **Q.**  I want to direct your attention to page 9, and it says --

23    your report says, "His mood has been chronically elevated and

24    expansive.  His wife describes his mood as being elevated

25    their entire marriage.  More than 30 years."

1   **A.**   Yes.

2   **Q.**   Did I read that correctly?

3   **A.**   You did.

4   **Q.**   So the distinct period of time which you claim Mr. Grant

5   has been in abnormally and persistently elevated and

6   expansive -- expansive mood has lasted 30 years.

7   **A.**   It's been her -- their entire relationship, yes.

8   **Q.**   Now, criterion A indicates the distinct period in which an

9   individual's mood is expansive or elevated implies that

10  there's a baseline period of time or a baseline mood for the

11  patient; isn't that correct?

12  **A.**   No.

13  **Q.**   Well, if you are elevated, don't you have to be elevated

14  above something?

15  **A.**   That -- That sounds good, but that's actually not

16  accurate, and -- and this is what I talked about earlier in my

17  direct.

18      Bipolar disorder doesn't necessarily have to have both

19  poles.  There are some bipolar -- persons that are bipolar

20  that are manic their entire lives, and so they will be in that

21  consistently elevated mood their entire life.

22      The more common way of thinking that people are elevated

23  and then depressed is the classic bipolar, but that's not the

24  way it always presents.

25  **Q.**   I'm not asking you if he has a depressive mode.  I'm -- My

1   question is the criterion A from the DSM-IV implies -- DSM-5

2   implies that you're in a mood that's elevated above some

3   baseline mood.

4       Is that not true?

5   **A.**   No, it doesn't.  And I think I answered that question.

6   I'm more than willing to answer it again.  It doesn't imply

7   that at all.

8   **Q.**   You don't identify any period of time in your report in

9   which Mr. Grant's mood is not elevated, correct?

10  **A.**   There doesn't seem to have been a significant period of

11  depression or what we call euthymia.  That's correct.

12  **Q.**   If a patient does not satisfy the criteria -- of criteria

13  A in diagnosing someone with bipolar disorder pursuant to the

14  DSM-5, does it make sense even to go on to the second

15  criteria?

16  **A.**   Absolutely.

17  **Q.**   So even if someone doesn't meet criteria A you would spend

18  time evaluating criterion B?

19  **A.**   Yes.

20  **Q.**   Even though you establish that you must have all four

21  criteria in order to meet the diagnosis of bipolar disorder,

22  correct?

23  **A.**   The answer is yes, because I think your reliance on the

24  DSM-5 as a -- it's a classification system.  It is not the

25  comprehensive textbook of psychiatry.  And so consequently,

1    it's important that you go to each one of those and weigh each

2    of those symptoms, which are called core symptoms.

3    **Q.**  But the DSM-5 was important enough for you to cut and

4    paste into your preliminary report, correct?

5    **A.**  Yes, but not important enough to answer that question.

6    **Q.**  So the second criteria of bipolar disorder is that during

7    the period of a mood disturbance or increased energy or

8    activity, three of the following symptoms are present to a

9    significant degree?

10             **MR. COHAN:**  Object.

11             **MR. KLUGE:**  And --

12             **MR. COHAN:**  Misread it again.

13             **THE COURT:**  Hold on.  If you're going to read from

14   the report, you have to do so accurately.

15             **MR. KLUGE:**  I'm going to summarize, Your Honor, if

16   that's okay.

17             **THE COURT:**  Okay.  You may do so.  Objection

18   overruled.

19   **BY MR. KLUGE:**

20   **Q.**  If I paraphrase, for instance, criterion B from the DSM-5,

21   that criterion is that during the period of mood disturbance

22   and increased energy or activity, three of the -- or more of

23   the following symptoms are present to a significant degree and

24   represent a noticeable change from usual behavior.

25        Did I read that -- or paraphrase that correctly?

1    **A.**   That's correct.

2    **Q.**   Okay.

3         So criterion B requires a noticeable change from usual

4    behavior; is that correct?

5    **A.**   That's correct.

6         I'm sorry.  I'm sorry.  Let me read that again.  It says,

7    during the period of mood disturbance, three or more of the

8    following symptoms have been present and have been present to

9    a significant degree.

10        Am I misreading that?

11   **Q.**   I'm going to ask you the question, sir.  If you want to

12   reread it to yourself, that's fine.

13   **A.**   I think --

14                        (Simultaneous colloquy.)

15        **THE WITNESS:**  Yes.  I'm sorry.  I think I just

16   misanswered that question.  That's why I wanted to make sure

17   that I had it clear.  I apologize.

18        What I have is during the period of mood disturbance,

19   three or more of the following symptoms have persisted and

20   have been present to a significant degree.

21        I don't hear the "usual," so I may have missed that.  I'm

22   sorry.

23        **MR. COHAN:**  The record should reflect it's not in

24   there, Your Honor.

25        **THE COURT:**  What's not in there?

1    **MR. COHAN:**  The word "usual."

2    **THE COURT:**  The word "usual"?

3    **MR. COHAN:**  The word "usual" is not present anywhere

4    in there.

5    **THE COURT:**  Okay.  Thank you.

6    If you're going to read it, you have to read it verbatim.

7    **MR. KLUGE:**

8    **Q.**  Do you have a copy, sir, of the DSM-5?

9    **A.**  I don't.

10   **Q.**  You don't.

11   **MR. KLUGE:**  May I approach, Your Honor?

12   **THE COURT:**  Yes, you may.

13   **MR. KLUGE:**  May I ask a question from up here, Your

14   Honor?

15   **THE COURT:**  All right.  Just speak into the

16   microphone, please.

17   **BY MR. KLUGE:**

18   **Q.**  I'm going to read criterion B along with you, Dr. Woods.

19   Is that okay?

20   **A.**  This is not -- this is a criterion for the manic episode.

21   This is not the criterion for which you were describing, sir.

22   This is not criteria for bipolar.  It's a different page.

23   The criteria for bipolar, it represents -- you're correct --

24   represents noticeable change in usual behavior.

25   **Q.**  So is it correct that it does include the phrase, "and

1  represents a noticeable change from usual behavior"?

2  **A.**  That's correct.

3  **Q.**  Thank you.

4      **MR. COHAN:**  The record should reflect that's not on

5  page 8 of Dr. Woods' report.

6      **THE COURT:**  I think he was referring to the DSM, not

7  his report in any event.

8      **MR. COHAN:**  Right, but the reference was that this

9  was lifted out of the DSM-5.  Clearly the word "usual" is not

10 in Dr. Woods' report.

11     **THE COURT:**  All right.

12     **MR. COHAN:**  That's my point.

13     **THE COURT:**  All right.  Why don't you rephrase the

14 question so the jury is clear about the source of the

15 definition.

16 **BY MR. KLUGE:**

17 **Q.**  Dr. Woods, the -- the phrase we just read and the book

18 that I just showed you that has the phrase "and represents a

19 noticeable change from usual behavior," that's the DSM-5; is

20 that correct?

21 **A.**  That's correct.

22 **Q.**  And that's the latest edition of the Diagnostic and

23 Statistical Manual of Mental Disorders?

24 **A.**  That's correct.

25 **Q.**  Thank you.

1       With respect to that criterion B and the symptoms that are

2   listed in the DSM-5, the first one is inflated self-esteem or

3   grandiosity, correct?

4   **A.**   Yes.

5   **Q.**   And you found that Mr. Grant has an inflated self-esteem

6   and is grandiose, correct?

7   **A.**   Yes.  Can be.

8   **Q.**   You found that Mr. Grant thinks highly of himself,

9   correct?

10  **A.**   Yes.

11  **Q.**   The second symptom is decreased need for sleep, correct?

12  **A.**   That's correct.

13  **Q.**   In your report, you indicated that -- that Mr. Grant

14  sleeps very little but that he feels rested with a reduced

15  amount of sleep, correct?

16  **A.**   That's correct.

17  **Q.**   Your report does not identify a period of time in which

18  Mr. Grant required normal or usual amount of sleep, does it?

19  **A.**   There was never a period of time in which he had normal

20  sleep.

21  **Q.**   Another one of these symptoms in criterion B that you also

22  discuss in your report is excessive involvement in pleasurable

23  activities that have a high potential for painful

24  consequences.

25      Do you recall that?

1    **A.**   Yes.

2    **Q.**   And the DSM-5 lists some specific examples of these

3    pleasurable activities with a high potential for painful

4    consequences; is that correct?

5    **A.**   That's correct.

6    **Q.**   And those examples in the DSM-5 are engaging in

7    unrestrained buying sprees, correct?

8    **A.**   That's right one.

9    **Q.**   And sexual indiscretions; is that --

10   **A.**   That's two.

11   **Q.**   And foolish business investments.

12   **A.**   That's correct.

13   **Q.**   Your report does not indicate any unrestrained buying

14   sprees by Mr. Grant, correct?

15   **A.**   I'm -- I'm not sure that I would qualify the second buying

16   of the hydroplane in that way, but I would agree with you that

17   my -- my report does not reflect that.

18   **Q.**   Your report does not contain any information of sexual

19   indiscretions by Mr. Grant, does it?

20   **A.**   No, these are examples, you know, that you're -- I'm

21   sorry.  These are examples.  That's correct.

22   **Q.**   Thank you, Doctor.

23       And you're not -- your report does not list any foolish

24   business investments by Mr. Grant, does it?

25   **A.**   Well, no, I would have to disagree with that.

1  **Q.**  Well, did you look at business records from Grant

2  Engineering & Manufacturing?

3  **A.**  Well, I don't -- Well, the answer is yes, but I don't

4  consider that to be the foolish business investments.

5  **Q.**  Now, that was a successful business, wasn't it?

6  **A.**  Relatively successful, yes.

7  **Q.**  Well, do you consider half a million dollars a year in

8  ordinary income to be relatively successful?

9  **A.**  It depends upon the business and depends upon the way in

10  which the business is growing and whether all partners agree

11  that the business is growing successfully.

12  **Q.**  Do you think that having ordinary income equal to

13  one-third of gross receipts is a successful business?

14  **A.**  It depends upon the business.  It depends upon the income.

15  It depends on whether all partners agree that the business is

16  successful.

17  **Q.**  Are you familiar with the plastic molds injection

18  industry, sir?

19  **A.**  I'm not familiar with the plastic mold injection industry,

20  but I'm familiar -- well, that maybe hearsay so -- the answer

21  is no.

22  **Q.**  No, you're not familiar with the plastic injection mold

23  industry, are you?

24  **A.**  Only to the degree that its been described by Mr. Grant

25  and the records that I've seen.

1  **Q.** You don't know what a respectable profit rate is in the

2  plastic molding injection industry, do you?

3  **A.** No. No.

4  **Q.** You're not familiar with how many employees Grant

5  Engineering has, are you?

6  **A.** I'm somewhat familiar, yes.

7  **Q.** Are you familiar with how many customers Grant Engineering

8  has?

9  **A.** I know they had one major customer that had about 87

10 percent of the business, and they had perhaps several other

11 customers.

12 **Q.** And are you aware they had $1.6 million approximately in

13 gross receipts every year from 2005 through 2009?

14 **A.** From 2005 -- I am familiar with that, yes.

15 **Q.** Yes.

16    Pleasurable activities one might think would also involve

17 excessive drinking, correct?

18       **MR. COHAN:** Object, relevance, Your Honor. There are

19 any number of pleasurable activities that are not at issue

20 here.

21       **THE COURT:** Overruled.

22       **THE WITNESS:** It possibly could, yes.

23 BY MR. KLUGE:

24 **Q.** And it's a pleasurable activity that has a high risk --

25 **A.** Excessive drinking.

1   **Q.**   -- of --

2   **A.**   Oh, I'm sorry.

3   **Q.**   -- painful consequences, correct?

4   **A.**   Excessive drinking could, yes.

5   **Q.**   Mr. Grant doesn't drink to excess, does he?

6   **A.**   No.

7   **Q.**   Something like using recreational drugs might also

8   represent something that's a high-risk or high -- I'm sorry --

9   a pleasurable activity that has a high potential for painful

10  consequences, correct?

11  **A.**   Those are other -- those are other options besides the one

12  that he did engage in; you're correct.

13  **Q.**   Well, he didn't engage in recreational drug use?

14  **A.**   No.

15  **Q.**   Didn't engage in sexual indiscretions?

16  **A.**   No.

17  **Q.**   Didn't engage in excessive drinking?

18  **A.**   No.

19  **Q.**   He doesn't go sky diving?

20  **A.**   Not that I'm aware of.

21  **Q.**   You're not aware that he -- Correct?

22  **A.**   Correct.

23  **Q.**   He doesn't race cars?

24  **A.**   No.  He has foolish business investments.

25  **Q.**   I'm going to -- the third or the criterion C for bipolar

1    disorder -- and I'm going to paraphrase again -- is that the

2    mood disturbance is sufficiently severe to cause marked

3    impairment in social or occupational functioning or to

4    necessitate hospitalization to prevent harm to self or others.

5       Is that a fair summary of criterion C?

6    **A.**   Sure.

7    **Q.**   There was no hospitalization of Mr. Grant related to his

8    so-called mental condition, correct?

9    **A.**   That's correct.

10    **Q.**   And Mr. Grant has been married for 30 years, correct?

11    **A.**   Yeah.

12    **Q.**   And there was nothing in your report to indicate that

13    Mr. Grant was unhappily married, correct?

14    **A.**   Difficultly married but not unhappily married.

15    **Q.**   Not unhappily married, correct?

16    **A.**   Difficultly married but not unhappily married.

17    **Q.**   Well, there's nothing in your report regarding Mr. Grant's

18    two daughters, correct?

19    **A.**   That's correct.

20    **Q.**   You didn't interview Mr. Grant's two daughters, did you?

21    **A.**   No.

22    **Q.**   Were you aware that Mr. Grant's two daughters have grown

23    to adulthood, have attended college and are now married

24    themselves?

25    **A.**   Yes.

1    **Q.**  And there's nothing in your report that indicates that

2    Mr. Grant was any –– in any way a bad parent to his two

3    daughters, correct?

4    **A.**  That's correct.

5    **Q.**  There's nothing in your report to indicate that Mr. Grant

6    was a bad husband to his wife, correct?

7    **A.**  Hmm, would you define "bad"?

8    **Q.**  I'm asking you the questions, Dr. Woods.

9    **A.**  I can't answer that until the word "bad" is defined.

10   **Q.**  Okay.

11       Mr. Grant has continued during all the time from 2005

12   through 2009 to own and to operate Grant Engineering, correct?

13   **A.**  Yes.

14   **Q.**  You didn't interview any of the employees at Grant

15   Engineering for information related to Mr. Grant, did you?

16   **A.**  I did not personally interview them, no.

17   **Q.**  And these would have been the people that spend

18   approximately eight hours a day with Mr. Grant, correct?

19   **A.**  Yes.

20   **Q.**  And those would have been employees that Mr. Grant oversaw

21   on a day-to-day basis, correct?

22   **A.**  Yes.

23   **Q.**  And Mr. Grant was in charge of just about all the

24   day-to-day operations of Grant Engineering & Manufacturing

25   from 2005 through 2009, correct?

1    **A.**   Yes.  With help.

2    **Q.**   I'm sorry?

3    **A.**   With help.

4    **Q.**   Well, he was the boss, right?

5    **A.**   With help.

6    **Q.**   The -- The boss has employees, correct?

7    **A.**   And -- And he relies upon those employees to get things

8    done.

9    **Q.**   But the --

10   **A.**   So he was not an independent -- it's not a singular shop.

11   There was a bookkeeper, there was an accountant, so Mr. --

12   you're absolutely correct that Mr. -- that he was the boss.  I

13   don't mean to -- I'm sure you're not implying that the boss

14   does everything themselves because that wasn't the case.

15   **Q.**   But everyone reports to Mr. Grant, correct?

16   **A.**   Yes.

17   **Q.**   Were you aware that Mr. Grant, while he didn't file and

18   pay his own taxes, was withholding taxes from his employees'

19   wages --

20   **A.**   Yes.

21   **Q.**   -- and paying them to the IRS, as he was required to do?

22   **A.**   Yes.

23   **Q.**   Going to ask you to look back at the symptoms identified

24   in criterion B for bipolar disorder.  And we talked about a

25   number of them, the grandiosity, the decreased need for sleep,

1   the third one is more talkative than usual or pressure to keep

2   talking, correct?

3   **A.**   Yes.

4   **Q.**   And then there are some other -- other symptoms here as

5   well, correct?

6   **A.**   That's correct.

7   **Q.**   Nowhere in these symptoms for bipolar disorder does the

8   word "gullible" appear, does it?

9   **A.**   That's probably true.  Yes.

10  **Q.**   Probably true.

11  **A.**   Yeah.  That's true.

12  **Q.**   Would it help if showed you the DSM-5 --

13  **A.**   No, I would agree.

14  **Q.**   -- for you to confirm?

15  **A.**   I would agree with that.  The sum of the symptoms equal

16  gullibility.

17  **Q.**   There's no question pending, Dr. Woods.

18  **A.**   I apologize.

19  **Q.**   You state in your report that magical thinking is a

20  symptom of bipolar disorder.

21  **A.**   Yes.

22  **Q.**   But in looking at the symptoms listed in criterion B for

23  bipolar disorder, magical thinking doesn't appear there,

24  correct?

25  **A.**   (Reviewing document.)

1    In criterion B, not criteria -- it is in criterion C,

2    which we were talking about.

3    **Q.** The word "magical thinking" does not appear as one of the

4    listed symptoms in criterion B?

5    **A.** Criterion B, that's correct.

6    **Q.** Thank you.

7    You focus some of your -- a fair amount of your report on

8    this issue of gullibility. Isn't that the specific question

9    that Mr. Cohan specifically directed you to look at,

10   gullibility, correct?

11   **A.** Yes.

12   **Q.** We haven't talked about criterion D in your report, or

13   criterion D within the DSM-5, but isn't it true in your report

14   you state that there is some uncertainty with respect to

15   criterion D; is that correct?

16   **A.** (Reviewing document.)

17   Can you direct me to that, please.

18   **Q.** Yes, sir. If you looked at the bottom of page 10 of your

19   report, you indicate there that there is some uncertainty

20   remaining with criterion D; is that correct?

21   **A.** (Reviewing document.)

22   Only as it relates to the differential diagnosis.

23   **Q.** So there is some uncertainty with respect to criterion D,

24   correct?

25   **A.** As it relates to the differential diagnosis.

1  **Q.**  Well, then you go on to state that -- that there is a

2  dilemma with your diagnosis and you state that additional

3  testing -- you have "my reveal," but I think you mean "may

4  reveal" that Mr. Grant experiences these symptoms due to a

5  medical condition, correct?

6  **A.**  That's correct.

7  **Q.**  But you didn't do any additional testing of doctor -- of

8  Mr. Grant, did you?

9  **A.**  After consultation, no, I did not.

10  (Pause in the proceedings.)

11  **BY MR. KLUGE:**

12  **Q.**  One of the sources of information you received to prepare

13  your report and your diagnosis was the family history that you

14  received from Mr. Grant, correct?

15  **A.**  That was one, yes.

16  **Q.**  But Mr. Grant was the individual who provided to you the

17  family medical history, correct?

18  **A.**  Not completely, but he did.

19  **Q.**  He provided -- He was the only individual that provided

20  you information regarding the family history; is that correct?

21  **A.**  He was the only person that provided me.

22  **Q.**  You didn't interview any other family members of

23  Dr. (sic) Grant --

24  **A.**  Mr. Grant.

25  **Q.**  -- Mr. Grant to confirm his family medical history,

1  correct?

2  **A.**  I did not.

3       **MR. COHAN:**  Asked and answered.

4       **THE COURT:**  Sustained.

5  **BY MR. KLUGE:**

6  **Q.**  You didn't review any medical history from Mr. Grant's

7  mother, correct?

8  **A.**  That's correct.

9  **Q.**  You didn't review any medical history of Mr. Grant's

10  brother, Randall Grant, correct?

11  **A.**  Um, I -- I reviewed Mr. -- description of his medical

12  history so --

13  **Q.**  Is Mr. Grant a doctor?

14  **A.**  Well, I think he knows what he's got.  I mean, I think he

15  knows what he has.  He described his own -- I'm talking about

16  Randall Grant, and he described his own medical history so --

17  **Q.**  Let me ask you this:  Did you review any medical records

18  prepare by a competent physician relating to Randall Grant?

19  **A.**  As opposed to Mr. Grant's description of his medical

20  problems; is that correct?

21  **Q.**  My question was, did you review any medical records

22  prepared by a compensate medical professional related to

23  Randall Grant.

24  **A.**  I did not review any medical records, only his statement.

25  **Q.**  You did not review the medical history of Mr. Grant's

1  daughters, correct?

2  **A.**   That's correct.

3  **Q.**   Your report does not indicate whether or not you refer

4  Mr. Grant for any treatment, correct?

5  **A.**   That's correct.

6  **Q.**   And Mr. Grant prior to meeting you, in preparation for

7  this litigation, has never been diagnosed as suffering from a

8  mental disorder; is that correct?

9  **A.**   That's correct.

10 **Q.**   Despite the eight-month period of time between your

11 initial preliminary report --

12        **MR. COHAN:**   Object as argumentative, beginning with

13 "despite."

14        **THE COURT:**   Let's hear the whole question first.

15 **BY MR. KLUGE:**

16 **Q.**   From September -- From when you prepared your preliminary

17 report until you prepared your second report on May 16th,

18 2016, you didn't conduct any additional testing of Mr. Grant;

19 is that correct?

20 **A.**   Consultation but no testing.

21 **Q.**   No testing.

22 **A.**   That's correct.

23 **Q.**   Mr. Grant never reported having a seizure to you, correct?

24 **A.**   That's correct.

25 **Q.**   Mr. Grant never checked himself into a mental hospital,

1   correct?

2   **A.**   That's correct.

3   **Q.**   He's never taken a day off from (sic) a mental condition,

4   has he?

5   **A.**   I can't answer that.

6   **Q.**   And from 2009 –– 2005 through 2009, Mr. Grant continued as

7   the boss and manager at Grant Engineering & Manufacturing,

8   correct?

9   **A.**   Yes.

10                  (Pause in the proceedings.)

11            **MR. KLUGE:**   May I have a moment, Your Honor?

12                  (Pause in the proceedings.)

13            **MR. KLUGE:**   Thank you, Dr. Woods.  I have no further

14   questions.

15            **THE WITNESS:**   Thank you.  I appreciate it very much.

16            **THE COURT:**   Any redirect?

17            **MR. COHAN:**   Oh, yes, Your Honor.

18                  <u>**REDIRECT EXAMINATION**</u>

19   BY MR. COHAN:

20   **Q.**   Good morning again, Dr. Woods.

21   **A.**   Good morning.  We're still morning, so we're doing okay.

22   **Q.**   There you go.

23        You were asked questions about your involvement in

24   performing forensic psychiatric service.

25        Do you recall that?

1    **A.**    Yes.

2    **Q.**    Now, you were involved in litigation, both in civil and

3    criminal cases, I believe you testified?

4    **A.**    That's correct.

5    **Q.**    And what sort of service do you provide in civil cases?

6    **A.**    In civil cases, I work with employment law cases, elderly

7    abuse cases, competency cases, competency to contract,

8    et cetera.

9    **Q.**    How many times have you testified as an expert witness in

10   neuropsychiatry or psychiatry?

11   **A.**    Probably --

12   **Q.**    Can you give us an estimate?

13   **A.**    Probably over the course of thirty years, a hundred,

14   hundred twenty-five.  I testify perhaps four or five times a

15   year.

16   **Q.**    Okay.  And what percentage would you say is your best

17   estimate of testifying in criminal cases for defense?

18   **A.**    I would say that about 30 percent of my practice is

19   criminal cases of my forensic practice.

20   **Q.**    Okay.

21   **A.**    And 70 percent is civil.

22   **Q.**    Okay.  And that -- And -- Okay.  Thank you.

23         Now, we're -- Now I heard numerous questions about

24   Mr. Grant receiving -- or excuse me -- not ever receiving any

25   psychological or psychiatric treatment.

1  **A.** Yes.

2  **Q.** Now, can you tell us amongst people who suffer from the

3  same symptoms and condition as Mr. Grant generically

4  described, approximately what percent of those people do not

5  ever seek treatment?

6  **A.** About 80 percent.

7  **Q.** Eighty percent.

8  So is part of the problem that people who are bipolar

9  and/or suffer from temporal lobe epilepsy or differential

10  diagnosis -- excuse me -- symptoms that give rise to

11  differential diagnosis that they cannot recognize that they

12  have a problem?

13  **A.** Well, there are two issues. One issue is that many times

14  the symptoms will not impair their functioning to such a

15  degree that they become obvious to -- to the general

16  population or they impair their ability to -- to harm -- to

17  not harm themselves, et cetera.

18  So there are -- These diseases occur in a spectrum, so

19  there are significant numbers of people that have symptoms of

20  bipolar disorder that never get diagnosed from a psychiatric

21  point of view until there's a circumstance like this one or

22  similar where there's some incredible problem that's occurred.

23  Secondly, because of the use of medications, we tend to

24  focus treatment only on medication today, although that's

25  changing. But there is a significant number of people on --

1  the less severe end of bipolar and other symptoms who are not

2  treated with medications.

3  **BY MR. COHAN:**

4  **Q.** Now, given Mr. Grant's condition as you've diagnosed him,

5  is Mr. Grant receiving treatment voluntarily or is it

6  mandatory?

7  **A.** Well, he's not -- he's not receiving treatment, and he

8  doesn't believe he needs treatment.

9  **Q.** So he's not required by law to seek treatment, is he?

10  **A.** That's correct.

11  **Q.** Even though in your opinion, he should seek treatment;

12  isn't that so?

13       **MR. KLUGE:** Objection, argumentative.

14       **THE COURT:** Overruled.

15       **THE WITNESS:** Yes.

16  **BY MR. COHAN:**

17  **Q.** Now, you were asked questions about the testing, and in

18  particular, you were asked about the fact that there was no

19  electroencephalogram.  That's the -- what an EEG is, right?

20  **A.** That's correct.

21  **Q.** Now, what is an electroencephalogram, Doctor?

22  **A.** And I'd like to, if I could, put the brain up one more

23  time to answer your question.

24  **Q.** Please.

25  **A.** Your Honor --

1        **MR. COHAN:** Can we do that?

2                    (Off-the-record discussion.)

3    **BY MR. COHAN:**

4    **Q.** Well, can you --

5    **A.** Yeah. Yeah, sure.

6    **Q.** In the interest of moving along and not delaying this --

7    **A.** That --

8    **Q.** I'm sure the picture's indelibly printed on everybody's

9    brain, if I may put it that way?

10   **A.** An electroencephalogram or EEG is a test for the

11   electrical brain waves. There -- Your brain works by

12   electricity, and the electrical waves can be measured to some

13   degree.

14        So an EEG -- and there are multiple types of EEG's -- are

15   the tests that test for electrical activity in your brain.

16   **Q.** Now, in order to test temporal lobe epilepsy, is this

17   intrusive and/or painful for a person to be tested, given this

18   condition?

19   **A.** Yes, because most temporal lobe epilepsy occurs in the

20   middle of the brain. So it doesn't occur on the outside of

21   the brain. And as we looked at that picture, it really occurs

22   in the middle of the brain. And so there are one of two ways

23   that you can do that.

24        The old way was to actually to have a lead go through the

25   nose into the open area and touch the temporal lobe of the

1   brain, which was extremely uncomfortable.  And the new way,

2   which is even more uncomfortable, is a -- what they call a

3   magneplanar (phonetic) where they actually to have place

4   electrodes deep into your brain in order to catch that -- that

5   middle area 'cause that's where most of temporal lobe epilepsy

6   occurs, in the middle of the brain.

7        So it's -- it was recommended to me by Dr. Nadkarni, who's

8   the head of epilepsy at NY -- New York University that that's

9   not --

10           **MR. KLUGE:**  Objection, Your Honor.  Calls for

11  hearsay.

12           **THE COURT:**  Sustained.

13  **BY MR. COHAN:**

14  **Q.**  Anyway, you made a determination based on your

15  professional expertise and experience that it was not

16  warranted in this case for Mr. Grant to have an EEG; is that

17  right?

18  **A.**  Yes, sir, and there's another reason.

19  **Q.**  Please.  What is the other reason?

20  **A.**  Temporal lobe epilepsy is a disease -- is a disorder of

21  symptom diagnosis, as in -- as most of epilepsy.  Fifty

22  percent of people that have diagnosed epilepsy have normal

23  EEG's.  Diagnosed treated epilepsy have normal EEG's.  And so

24  the symptoms were great enough that I could include that in my

25  differential diagnosis.

1 **Q.** So is it fair to say that a great deal of what, in fact,

2 is a disease of temporal lobe epilepsy cannot be identified by

3 the EEG's that we have because they're just not sensitive

4 enough and can't get the job done to definitively --

5   **MR. KLUGE:** Objection.

6 **BY MR. COHAN:**

7 **Q.** -- define it?

8   **MR. KLUGE:** It's leading.

9   **THE COURT:** Sustained.

10 **BY MR. COHAN:**

11 **Q.** Okay. Can you explain why we don't generally seek to use

12 the EEG to detect temporal lobe epilepsy, currently?

13 **A.** The EEG is the least sensitive of all invasive brain

14 equivalent.

15  As I said earlier, 50 percent of people that have

16 diagnosed, treated epilepsy have normal EEG's.

17  So it is, in fact, the least sensitive until you actually

18 can go into the brain and put the electrodes deeply enough

19 into the brain.

20 **Q.** Okay. Now, you were also asked about the fact that you

21 did not recommend or have Mr. Grant tested for an MRI. And I

22 believe that stands for Magnetic Resonance Imaging; is that

23 right?

24 **A.** That's correct.

25 **Q.** And what is Magnetic Resonance Imaging?

1  **A.**  Magnetic Resonance Imaging is a way of indirectly looking

2  at brain structure.

3       So it's –– it's a test where you indirectly look at how

4  the brain is built.  And you –– and to use –– it's sliced very

5  thinly, so it allows you to look and see if there are

6  structural abnormalities in the brain.

7       It tells you nothing about how the brain functions.  It

8  just tells you whether there's a hole in it or not.

9  **Q.**  So is it your testimony that the MRI would not be

10  sufficiently likely to detect any abnormality, that it didn't

11  make sense to employ that type of test?  Or is there some

12  other explanation?

13            **MR. KLUGE:**  Objection, leading.

14            **THE COURT:**  Overruled.  I'll allow that one.

15            **THE WITNESS:**  Thank you, Your Honor.

16       Yeah, an MRI both temporal lobe epilepsy and bipolar

17  disorders are not disorders of structural problems in the

18  brain.  They really are disorders of the primarily biochemical

19  problems in the brain or electrical problems in the brain.

20  And so, again, with consultation, a –– an MRI was not

21  recommended.

22  **BY MR. COHAN:**

23  **Q.**  You were asked a number of times by Mr. Kluge about the

24  fact that you hadn't interviewed Randy –– Randy Grant.

25       Did you receive a –– statements that Mr. Grant made to the

1   IRS agents about his condition?

2   **A.**   Yes.

3   **Q.**   Did you credit those statements as being accurate

4   representations of his experience that you relied on?

5   **A.**   Yes.

6   **Q.**   If you had asked him the questions in person about his

7   behavior that he related to agents, is it your belief he would

8   have given the same answers?

9           **MR. KLUGE:**   Objection, Your Honor.

10          **THE COURT:**   Calls for speculation.  Sustained.

11  **BY MR. COHAN:**

12  **Q.**   You assumed that Mr. Randy Grant was being truthful when

13  he spoke to the agents?

14          **MR. KLUGE:**   Objection, Your Honor, argumentative.

15          **THE COURT:**   Sustained.

16  **BY MR. COHAN:**

17  **Q.**   Now, you were asked a number of questions about the

18  specific criteria for various mental illnesses and conditions

19  in DSM-5?

20  **A.**   Yes.

21  **Q.**   Do you recall those questions?

22  **A.**   Yes.

23  **Q.**   Do all mental illnesses fit into categories that are

24  provided in the DSM-5?

25  **A.**   No.

1    **Q.** So if you limit yourself to what fits in the category, you

2    miss a lot of mental illnesses because they don't fit into

3    categories; is that a fair statement?

4        **MR. KLUGE:** Objection, leading.

5        **THE COURT:** Overruled.

6        **THE WITNESS:** You -- If I can answer that -- the

7    answer is yes with qualifications.

8    BY MR. COHAN:

9    **Q.** Please qualify it as appropriate, Doctor.

10   **A.** There are some diagnosis that we know are completely

11   accurate, like chronic trauma, Type II PTSD, that is not in

12   the DSM-5.

13       We also know that, as Mr. Kluge asked me before, someone

14   may not meet a certain criteria and yet have a psychiatric --

15   have that psychiatric disorder because they have what are

16   called core symptoms. They may have a symptom that is so

17   heavily weighted that it's outweighs all the other criteria.

18       Now, that's not relevant in this particular case because

19   Mr. Grant actually hit every pitch. He met criteria A, he met

20   criteria B, and he met criteria C, and the only question that

21   there was for criteria D was whether it was temporal lobe or

22   bipolar. So he certainly -- he certainly met all criteria in

23   this case.

24   **Q.** Now, you were asked a number of questions about criterion

25   B. Well, let me just touch on A. Were you satisfied by the

1   observations made of Mr. Grant himself and the statements made

2   about Mr. Grant's elevated mood to opine that he did indeed

3   have had a distinct period of abnormally or persistently

4   elevated or expansive or irritable mood that lasted for 30

5   years?

6   **A.**  Yes.

7   **Q.**  Is there any reason to doubt that?  Is there some basis

8   why people would misstate that if it were not so that you're

9   aware of?

10          **MR. KLUGE:**  Objection, Your Honor.  Calls for --

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  There appears to be no reason to doubt

13  that he talk -- I talked with his wife who acknowledged it.

14  Certainly, a history -- I don't know about 30 years, but

15  certainly a history of angry irritable behavior was discussed

16  by his brother in emails as well.

17  **BY MR. COHAN:**

18  **Q.**  And did you note anything about him foaming at the mouth

19  or rage that was alleged by his brother Randy?

20          **MR. KLUGE:**  Objection, Your Honor.  Calls for

21  hearsay.

22          **THE COURT:**  I'm not sure that it does.

23      What do you mean by "did you note"?

24  **BY MR. COHAN:**

25  **Q.**  Did you read all the memoranda of interview that the

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1    government provided me that I forwarded to you where the

2    interviewers were the agents sitting over here and Randall

3    Grant --

4              **MR. KLUGE:**  Objection.  It's now double hearsay.

5              **THE COURT:**  So you're referring to did he read it in

6    the statement written by Mr. Grant?

7              **MR. COHAN:**  Yes, I am, Your Honor.

8              **THE COURT:**  All right.  That calls for hearsay.

9    Sustained.

10   **BY MR. COHAN:**

11   **Q.**  May I invite your attention now to criterion B.  During

12   the period of mood disturbance, three or more of the following

13   symptoms have persisted; four if the mood is only irritable,

14   having been present to a significant degree.

15        The first one is inflated self-esteem or grandiosity.  Any

16   doubt in your mind that Mr. Grant has exhibited symptoms of

17   inflated self esteem or grandiosity?

18   **A.**  No.

19   **Q.**  The second one is decreased need for sleep.  Any doubt in

20   your mind that he exhibited the symptoms for decreased need

21   for sleep?

22             **MR. KLUGE:**  Objection, Your Honor.  Just bolstering

23   the witness, going to go through every single question.

24             **THE COURT:**  You know, you could get through it much

25   quicker if you would just let him do it.  Overruled.

1    We covered this ground before, but you're certainly free

2    to emphasize the points you wish to.

3           MR. COHAN:  I didn't cover it before, Your Honor.

4    This is redirect.  This was all stuff that was raised on

5    cross.

6           THE COURT:  Sure, but we've heard it.  But go ahead.

7    BY MR. COHAN:

8    Q.  The third criterion under criterion B is more talkative

9    than usual or pressure to keep calling -- excuse me --

10   talking.

11        Did you observe that Mr. Grant was more talkative than

12   most people or exhibited pressure to keep talking?

13   A.  He was not more talkative.  He had pressured speech.

14   Q.  And what is pressured speech?

15   A.  Pressured speech is really pathognomonic or bipolar

16   disorder.  It's a type of speech that just makes you want to

17   break in, just say "hold it."  Right.  And it can go on and go

18   on and go on.

19   Q.  The next criterion within B is flight of ideas or

20   subjective experience that thoughts are racing.  Did you

21   observe that during your interviews with Mr. Grant?

22   A.  Yes.

23   Q.  Distractibility is the next criterion.  Did you observe

24   that Mr. Grant was distractible, i.e., his attention was too

25   easily drawn to unimportant or irrelevant external stimuli?

1    **A.**  I did not see him as consistently distractible.

2    **Q.**  Okay.  Now, the questions that -- there are numerous

3    questions about access -- excessive involvement in pleasurable

4    activities that have a high potential for painful

5    consequences.  And specifically one of the examples is foolish

6    business investments.

7    **A.**  Yes.

8    **Q.**  Did you get to give your full response to what you felt

9    were Mr. Grant's foolish business investments?

10   **A.**  No.

11   **Q.**  Would you please expand.  I think you mentioned airplanes

12   and airplane parts.  Was there more?

13   **A.**  I think airplane and airplane parts.  I think investing in

14   commodities.  And frankly --

15   **Q.**  You mean, the --

16   **A.**  And the issues that we -- that are -- that he was indicted

17   for.

18   **Q.**  Well, did you feel like the investments he made in these

19   various legal tax avoidance organizations and representation

20   constituted foolish business investment?

21   **A.**  Yes.

22   **Q.**  Okay.

23       Now, you were also asked about his occupational

24   functioning.  We're down to criterion C, and you were asked

25   questions about the business and the profit.

1    Is it your position that if a business is making $500,000,

2    it's still being adequately run if it were properly run, it

3    could make three times that much because it could have been

4    grown?

5    You understand my question?  Looks like you didn't.  Let

6    me try it again.

7    You were asked questions about -- by Mr. Kluge about

8    running the -- the business.  And Mr. Grant -- I should say

9    Rick Grant, as we know, is half owner of Grant Engineering.

10   And we've all seen the statistics now of the income and profit

11   that was made.

12   Did you consider any sources that indicated that

13   Rick Grant really wasn't functioning adequately because he

14   failed to manage the business effectively and grow the

15   business?

16   **A.**  Yes.

17   **Q.**  And how were you able to make that determination?

18   **A.**  Well, the question was did I consider other sources.  And

19   the source that I considered was his brother and a series of

20   emails between he and his brother that talked about him over

21   the course --

22          **MR. KLUGE:**  Objection, again, Your Honor.  Relying --

23          **THE COURT:**  -- permit any hearsay statements on this.

24          **MR. COHAN:**  Okay.

25   **Q.**  You did learn, though, that basically the business relied

1  on one major customer; is that right?

2  **A.**  That's correct.

3  **Q.**  And so you were able to infer that it didn't grow,

4  correct?

5  **A.**  I can't say that I would infer that it didn't grow.  But I

6  would say that it did rely upon one customer and that it was

7  a -- and that Mr. Grant had bookkeepers and accountants that

8  worked with him that he wasn't -- he didn't work purely

9  independently.

10            (Pause in the proceedings.)

11  **BY MR. COHAN:**

12  **Q.**  You were asked questions about whether Rick Grant was a

13  bad husband.  Would you define "bad" in this context of a bad

14  husband because Mr. Kluge didn't give you that definition?

15  **A.**  I -- I couldn't define "bad," and that's what my

16  difficulty -- my difficulty.

17  **Q.**  Is it just too broad a term?

18  **A.**  It's too broad a term, and it doesn't necessarily define

19  the ways in which Mr. Grant impacted his marriage.

20  **Q.**  Well, are there people whom you would call would be bad

21  husbands who don't suffer from any mental disease or defect,

22  they're just married to the wrong person?

23  **A.**  Or they have their own problems.

24  **Q.**  Okay.

25            Now, you were also asked questions about Mr. Grant being

1  in charge of the business.

2  **A.**  Yes.

3  **Q.**  Did you come to any conclusions about whether Mr. Grant

4  was really in charge or whether basically the employees were

5  running things without much help from Mr. Grant during the

6  period of time we're talking about?

7          **MR. KLUGE:**  Objection, Your Honor.  He's not an

8  expert on the operations of Grant Engineering and what's a

9  proper business methodology to run this business.  He's an

10  expert on mental disorders.

11          **THE COURT:**  Overruled.

12  **BY MR. COHAN:**

13  **Q.**  Do you have the question in mind, Doctor?

14  **A.**  I -- I do have the question in mind.

15     But I'd like to hear it one more time.  I want to be

16  specific about my answer.

17  **Q.**  That means I have to remember what I asked you.

18  **A.**  Can we have it read back?

19          **MR. COHAN:**  Could we have it read back, Your Honor?

20          **THE COURT:**  All right.  Raynee --

21          **MR. COHAN:**  I'm having a short term memory lapse.  I

22  apologize.

23                  (Pause in the proceedings.)

24          **THE WITNESS:**  Here let me --

25          **THE COURT:**  Hold on.  Hold on.

1    **THE WITNESS:**  Okay.

2    **THE COURT:**  Raynee, would you read it back?

3    (Record read as follows:

4    "Q.  Did you come to any conclusions about whether

5    Mr. Grant was really in charge or whether basically the

6    employees were running things without much help from Mr. Grant

7    during the period of time we're talking about?")

8    **MR. KLUGE:**  Objection, your Honor.

9    **THE COURT:**  You already objected, and I already

10   overruled it.  It's the same question.

11   You may answer.

12   **THE WITNESS:**  Thank you, Your Honor.

13   I think it would be speculative for me to answer that

14   specific question.

15   **MR. COHAN:**  Very well.

16   **Q.**  Did you learn that Mr. Grant was responsible for making

17   decisions to pay the employees extremely well if not

18   excessively?

19   **MR. KLUGE:**  Objection, Your Honor, argumentative.

20   **THE COURT:**  Overruled.

21   **THE WITNESS:**  Yes.

22   **BY MR. COHAN:**

23   **Q.**  Would you relate that to grandiosity or some other symptom

24   that Mr. Grant exhibited?

25   **A.**  Grandiosity.

1 **Q.** Did you ever understand what Mr. Grant was talking about

2 when he referred to an electromagnetic pulse attack?

3 **A.** No.

4 **Q.** Would you say that was a strange idea?

5 **A.** It was unusual.

6        **MR. KLUGE:** Objection, Your Honor. Calls for

7 speculation and is vague.

8        **THE COURT:** Overruled.

9 **BY MR. COHAN:**

10 **Q.** I can make it more focused.

11     Was it symptomatic of the illness that you diagnosed for

12 Rick Grant?

13 **A.** Yes.

14 **Q.** And was -- did you learn that Mr. Grant was giving money

15 to employees for earthquake preparedness and other disasters?

16 **A.** Yes.

17 **Q.** Do the things that Mr. Grant referred to such as

18 earthquake preparedness and electromagnetic pulse attacks

19 constitute symptoms of paranoia?

20 **A.** Actually I separated those two out. Mr. -- I felt as

21 though there are some of the things that Mr. Grant did that

22 certainly made sense, particularly given where his shop was

23 and again where he lives in terms of the earthquake

24 preparedness.

25     On the other hand, there was no basis that I could find

1    for the electromagnetic pulses.  Some of the other, in my

2    professional opinion, delusional thinking that Mr. Grant

3    manifested, so it -- you really saw both.  You saw some things

4    that made sense and you saw other things that were more

5    ridiculously delusional.

6    Q.  Did you consider any of the statements that Mr. Grant was

7    telling people that the world was coming to an end or

8    disintegrating?

9            MR. KLUGE:  Objection, Your Honor.

10   BY MR. COHAN:

11   Q.  Did you hear such statements allegedly made by Mr. Grant,

12   or did he make such statements to you?

13           MR. KLUGE:  Objection, hearsay, Your Honor.

14           THE COURT:  We're talking about Richard Grant,

15   correct?

16           MR. COHAN:  Yes, we're talking about Richard Grant.

17           THE COURT:  Overruled.  I'll allow it.

18           THE WITNESS:  Yes, he did make those statements to

19   me.

20   BY MR. COHAN:

21   Q.  And, again, were those symptomatic of the illness with

22   which you diagnosed him?

23   A.  Again, Mr. Cohan, there is an difference between an

24   over-valued idea and a delusional idea.  And, you know, I took

25   into consideration that many people may believe that the world

```
 1   is coming to an end.  And that is not necessarily an

 2   over-valued -- I mean, not necessarily delusional idea.  It's

 3   an over-valued idea?

 4        So I separated that out from other patently bizarre ideas

 5   that Mr. Grant had, and I act -- talked to his wife about that

 6   because I -- because she is also, as I mentioned, a deeply

 7   conservative person.  And so I asked her where are you along

 8   this spectrum to make sure that --

 9            MR. KLUGE:  Objection, Your Honor.  Now calls for

10   hearsay.

11            THE COURT:  Sustained.

12            MR. COHAN:  Very well.  Just one more thing.

13   Q.  Did you do -- Have you done any work for the San Francisco

14   Police Department?

15   A.  Yes.

16   Q.  And what have you done for the San Francisco Police

17   Department?

18   A.  I do critical incident training.

19   Q.  And do you get paid $400 an hour for that?

20   A.  No.

21   Q.  Do you get paid at all?

22   A.  No.

23            MR. COHAN:  Nothing further.  Thank you.

24            THE COURT:  All right.  Any recross?

25            MR. KLUGE:  Yes, Your Honor.
```

1    (Pause in the proceedings.)

2    **RECROSS-EXAMINATION**

3    BY MR. KLUGE:

4    **Q.**  Dr. Woods, would it change your impression of Mr. Grant's

5    discussions with you regarding an electromagnetic pulse attack

6    if you were to learn that there was an article in *60 Minutes*

7    recently about that?

8    **A.**  No.

9    **Q.**  Would it change your understanding of whether or not that

10   is a delusional idea if the Central Intelligence Agency has

11   directed resources to prepare for an electromagnetic pulse

12   attack?

13         **MR. COHAN:**  Object, lack of foundation for the

14   question.

15         **THE COURT:**  Overruled.

16         **THE WITNESS:**  I have a fair amount of experience in

17   that area of electromagnetic pulse attacks, so I'm not -- I'm

18   not poo-pooing the idea.  I'm poo-pooing Mr. Grant's

19   representation of the idea.

20   BY MR. KLUGE:

21   **Q.**  So it is a legitimate concern that various people in our

22   government and in society in general have about the

23   possibility of an electromagnetic pulse attack; isn't that

24   true?

25   **A.**  There's always smoke where there's fire, Mr. Kluge.  The

1    answer --

2    **Q.**  The answer --

3    **A.**  The answer's yes.

4    **Q.**  The answer's yes, and it's not delusional to be concerned

5    about earthquakes in California; isn't that correct?

6    **A.**  That's correct.

7    **Q.**  You indicated that Mr. Grant made some bad investments in

8    precious metals.  Are you aware of the price of gold, sir?

9    **A.**  Not currently.  I typically follow it, but I've not --

10   **Q.**  You aware the price of gold has gone up significantly?

11   **A.**  Yes, but --

12           **MR. COHAN:**  Object, lack of foundation.  Between when

13   and when, Your Honor.

14           **THE COURT:**  Sustained.  Sustained.

15           **THE WITNESS:**  I don't think --

16           **THE COURT:**  Hold on.

17           **THE WITNESS:**  Okay.

18           **THE COURT:**  Sustained the objection.  Rephrase the

19   question.

20   **BY MR. KLUGE:**

21   **Q.**  Are you aware of any increase in the price of gold over

22   the last five years?

23   **A.**  Yes.

24   **Q.**  Okay.  So the price of gold has gone up over the last five

25   years, correct?

1    **A.**  Yes.

2    **Q.**  So if one invested in gold five years ago, that was not a

3    bad investment, correct?

4    **A.**  If that's what we were talking about.  Yes.  That's not

5    what I was talking about.

6    **Q.**  You indicated in your report that your findings were

7    preliminary and that further testing was required, correct?

8    **A.**  Yes.

9    **Q.**  Okay.  And you did not do any further testing of

10   Mr. Grant, correct?

11   **A.**  With consultation, that's correct.

12   **Q.**  So you did not test Mr. Grant in any other way, correct?

13   **A.**  With consultation, that's correct.

14          **THE COURT:**  I don't know what that means.  "With

15   consultation that is correct."

16          **THE WITNESS:**  Okay.

17          **THE COURT:**  Did you do further testing?

18          **THE WITNESS:**  No, Your Honor.  After -- After I

19   consulted with other doctors, I did not do any further

20   testing.

21          **THE COURT:**  Okay.

22   **BY MR. KLUGE:**

23   **Q.**  But you indicate in your report that further testing was

24   required, correct?

25   **A.**  At that time, I thought it was, yes.

1    Q.    Yes.  And you did not do any further testing, correct?

2    A.    I think I answered that.

3              THE COURT:  You did.  Your objection is sustained on

4    your --

5                        (Laughter.)

6              THE COURT:  Don't make any further ones.

7              MR. KLUGE:  May I have a moment, Your Honor?

8              THE COURT:  Yes.

9                   (Pause in the proceedings.)

10             MR. KLUGE:  Thank you, again, Dr. Woods.

11   I have no further questions, Your Honor.

12             THE COURT:  All right.  Thank you.

13   Anything else, Mr. Cohan?

14             MR. COHAN:  No, Your Honor.  Thank you very much.

15             THE COURT:  All right.  Thank you.

16   Dr. Woods may step down, and you can leave all the

17   materials there.

18             THE COURT:  All right.  Are you ready with your next

19   witness?

20             MR. COHAN:  I think so.

21   We should be.  Can we have a moment?

22                  (Off-the-record discussion.)

23             THE COURT:  All right.  I think we'll take our

24   15-minute break now, although because one of you was late this

25   morning, we are adding on the additional time at the end of

1    the day.  But we'll take the second break now.

2        (Recess taken at 11:56 A.M.; proceedings resumed at 12:13

3    P.M.)

4        (The following proceedings were heard in the presence of

5    the jury:)

6            THE CLERK:  Please be seated and come to order.

7            THE COURT:  All right.  Mr. Cohan, call your next

8    witness, please.

9            MR. COHAN:  Yes, Your Honor.  The defense calls

10   Peymon Mottahedeh.

11               (Pause in the proceedings.)

12               **PEYMON MOTTAHEDEH**,

13   called as a witness for the DEFENDANT, having been duly sworn,

14   testified as follows:

15           THE CLERK:  Please step up here and raise your right

16   hand.

17               (Pause in the proceedings.)

18           THE CLERK:  Please be seated.  If you can please

19   state your full name and spell your last name and please speak

20   clearly into the mic.

21           THE WITNESS:  Peymon Mottahedeh, P-e-y-m-o-n,

22   M-o-t-t-a-h-e-d-e-h.

23       Before we go on, I like to apologize to the court and the

24   jury that I got tooth abscess, so I might look a little bit

25   strange on my left side of my face.  So just -- I'm not trying

1    to --

2                    (Off-the-record discussion.)

3            **THE WITNESS:**  I got a tooth abscess, and I'm on

4    medication.  But it will make me probably look a little bit

5    abnormal on the front center of my face, little bit inflamed.

6            **THE COURT:**  All right.  Thank you.

7            **THE WITNESS:**  That's all.

8            **THE COURT:**  Mr. Cohan.

9        **MR. COHAN:**  Yes.

10                    (Off-the-record discussion.)

11                    <u>**DIRECT EXAMINATION**</u>

12   BY MR. COHAN:

13   **Q.**  Mr. Mottahedeh, can you tell us when and where you were

14   born, sir?

15   **A.**  Yes, I was born October 9th, 1962 in Teheran, Iran in a

16   Jewish family.

17   **Q.**  And when did you first come to the United States?

18   **A.**  1977.

19   **Q.**  So you were 14 years old?

20   **A.**  Correct.

21   **Q.**  And where did you live in the United States beginning in

22   1970- --

23   **A.**  -7.

24   **Q.**  -7.  Sorry.  Thank you.

25   **A.**  I lived in Southern California.

1 **Q.** For how long did you live in Southern California after

2 arriving in the United States?

3 **A.** Until two years ago.

4 **Q.** And where did you move after that?

5 **A.** Florida.

6 **Q.** Okay. Is that where you reside currently?

7 **A.** Yes.

8 **Q.** And are you a United States citizen?

9 **A.** Yes.

10 **Q.** When did -- when did you become a United States citizen?

11 **A.** 1989.

12 **Q.** And how did you do that? What did you have to do to gain

13 your U.S. citizenship?

14 **A.** Well, I married an American woman. And after we married,

15 we -- I applied for a green card, permanent residency. And

16 after five years of permanent residency, I was allowed to

17 apply to become a United States citizen. And I was allowed to

18 do so, and I had to go to a swearing ceremony in which I had

19 to swear that I uphold and defend the U.S. Constitution.

20        **MR. SAMPSON:** Objection, Your Honor. This is a

21 narrative.

22        **THE COURT:** Sustained. Sustained.

23 BY MR. COHAN:

24 **Q.** So you swore an oath to uphold and defend the United

25 States Constitution.

1  **A.**  Yes.  And I also had to take a basic test of my knowledge

2  of American government as well.

3  **Q.**  Okay.

4     And is English your native language, sir?

5  **A.**  No.

6  **Q.**  Where did you learn to speak English?

7  **A.**  I learned English in the school that I attended in the --

8  the -- the private Jewish school I attended in Teheran, Iran.

9  From the second grade forward, I was taught a second language

10  of English.

11  **Q.**  Did you have any experiences in Iran before you left there

12  that made you afraid of government?

13        **MR. SAMPSON:**  Objection, Your Honor. relevance.

14        **THE COURT:**  Yes.  What is the relevance?  Of any fear

15  he might have of the Iranian government?  This is the United

16  States.

17        **MR. COHAN:**  I generalize to "government," Your Honor,

18  because I think fearing one government may be fearing more

19  than just one government.

20        **THE COURT:**  Well, I'll give you some --

21        **MR. COHAN:**  My psychiatrist is gone.

22        **THE COURT:**  I'll give you some leeway to establish a

23  proper foundation.

24     All right.  Overruled.  Overruled.

25        **THE WITNESS:**  Yes.

1  **BY MR. COHAN:**

2  **Q.**  And why were you afraid of the Iranian government?

3       **MR. SAMPSON:**  Objection.  I renew my objection.

4       **THE COURT:**  I'm going give him some leeway.

5       All right.

6       **THE WITNESS:**  In Iran in 1960's, we do not have such

7  a thing as a freedom of speech.  And many of the rights that

8  in America we take it for granted -- so if you were in any way

9  vocal in your criticism of the government's policies or

10 practices, it could be very dangerous where you could be

11 imprisoned without notice and put on summary trial or no

12 trial, no jury of your fellow citizens, tortured, executed.

13 **BY MR. COHAN:**

14 **Q.**  That's sufficient.

15      So you got to the United States.  You were 14 years old.

16 Did you complete education past high school?

17 **A.**  Yes.

18 **Q.**  And did you graduate from high school in the United

19 States?

20 **A.**  Yes.

21 **Q.**  Where did you do that, sir?  And what year was it?

22 **A.**  I graduated in 1980 from Tustin High School in

23 Orange County in Southern California.

24 **Q.**  And did you continue your education to college somewhere?

25 **A.**  Yes, I did.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  **Q.**  Where was that, sir?

2  **A.**  I -- after attending community college, I got my -- my

3  degree in Cal -- California State University at Long Beach in

4  Business Administration.

5  **Q.**  And what year was that?

6  **A.**  I believe that was 1986.

7  **Q.**  And did you continue your education or become employed

8  after your graduation from Long Beach State?

9  **A.**  No more formal education after that.  So -- worked and --

10  but I continue always to self-educate myself 'cause I love to

11  read.

12  **Q.**  And what sort of things did you love to read?

13  **A.**  Well, my father had taught me about the importance of

14  education since I was a small child.  My father was political

15  in his youth.  And I heard him talk to his friends about

16  politics of East, West, America, and the Soviet Union, the

17  Arab/Israeli conflict, the Iranian politics.

18  **Q.**  Forgive me, but my question was what did you read.

19  Are you describing the subject matter that you were

20  reading a lot of?

21  **A.**  I read a lot about politics.  I read about health.  I read

22  about self-improvement.  I learn about success in life.  Any

23  area that I could do a self-improvement and -- and empowerment

24  and -- and become more knowledgeable in general.  That's why I

25  try to do that on my own.

1    **Q.**   Okay.  So were you employed after you graduated for a

2    period of time?

3    **A.**   Yes.

4    **Q.**   And what was your employment?

5    **A.**   Series of jobs I had.  I had to run -- deliver business

6    cards one time for a while.  I -- Before that, I did about six

7    months of real estate mortgages.  I marketed that.  Then about

8    seven years of financial planning with -- dealing with

9    insurance and mutual funds, IRA's.  Then I had --

10   **Q.**   What years -- What years did you do financial planning?

11   **A.**   From 1984 to about 1991.

12   **Q.**   And then from 1991 after that, what kind of employment did

13   you have?

14   **A.**   I sold medical x-ray film for about a couple -- about

15   couple years.  Also on a part-time basis, whenever -- once in

16   a while there would be Persian language interpretation

17   assignments that would come up for either legal proceedings,

18   like court proceedings or -- or depositions or somebody got

19   hurt maybe in a -- a accident, a car accident.  They would see

20   a doctor and they would need someone to interpret Persian for

21   them, so I would do that 'cause I was fluent at English and

22   Persian.

23   **Q.**   Have you ever heard of an organization called Freedom Law

24   School?

25   **A.**   Yes.

1  **Q.**  What is Freedom Law School?

2  **A.**  Freedom Law School is part of Freedom Church, which I

3  started both on January 1st, 1996.

4  **Q.**  And since 1996, have you been employed by or associated

5  with Freedom Law School?

6  **A.**  Yes.

7  **Q.**  In what capacity are you employed by or associated with

8  Freedom Law School?

9  **A.**  I'm the founder and president.

10  **Q.**  Okay.  Do you know Rick Grant?

11  **A.**  Yes.

12  **Q.**  Do you see him here in the courtroom?

13  **A.**  Yes.

14  **Q.**  Can you identify him for me?

15  **A.**  The gentleman over there with the blue tie.

16  **Q.**  Let the record reflect that this witness identified Rick

17  Grant.

18      When did you first meet Rick Grant?

19  **A.**  May 2003.

20  **Q.**  And had you ever had any encounter with Mr. Grant before

21  May 2003?

22  **A.**  I believe I had briefly met him in San Jose at an event of

23  another organization that was on the weekend of July 4th of

24  2002.

25  **Q.**  Okay.  And what was the nature of your interaction with

1   Mr. Grant in May of 2003?

2   **A.**   I was a speaker at that event.  And so as a speaker,

3   you're also provided a table for your organization for people

4   to meet you, talk with you, ask you further questions.  And so

5   he's one of the people that I had contact at that event.

6   **Q.**   And did you -- Strike that.

7        Did Mr. Grant join your organization in some form or

8   fashion?

9   **A.**   Yes.

10  **Q.**   And may you -- Do you have your exhibit book up there?

11  **A.**   Yes.

12  **Q.**   Okay.  Inviting your attention if I may to what's been

13  marked for purposes of identification as Exhibit 514.

14       Do you have that before you?

15  **A.**   Yes.

16  **Q.**   Do you recognize that document?

17  **A.**   Yes.

18  **Q.**   What is that?

19  **A.**   This is a Royal Freedom Package renewal notice that

20  Freedom Law School send to Mr. Grant.

21  **Q.**   And are you the person responsible for sending this

22  document to Mr. Grant?

23  **A.**   Yes.

24  **Q.**   Is that your signature at the bottom of the page?

25  **A.**   Yes.

1  **Q.**  And what does this document reflect with respect to the

2  relationship, if any, between Freedom Law School and Rich and

3  Carol Grant of Richmond, California?

4  **A.**  Well, it speaks of the fact that the Grants have been for

5  three years members of the Royal Freedom Package program, and

6  it tells a little bit about the purpose of the fund, the

7  program and what it provides, what kind of benefits it

8  provides the members.

9  **Q.**  And did you receive payments from Rich and Carol Grant

10 beginning in May of 2003 and continuing through March 28th of

11 2006, which is the date on Exhibit 514?

12 **A.**  Yes.

13     **MR. COHAN:**  Your Honor, I'd move admission of Exhibit

14 514 at this time so I can inquire into the contents.

15     **THE COURT:**  Any objection?

16     **MR. SAMPSON:**  No, Your Honor.

17     **THE COURT:**  All right.  Admitted.

18    (Defendant's Exhibit 514 received in evidence)

19     **MR. COHAN:**  Your Honor, may I display this to the

20 jury?

21     **THE COURT:**  Yes.

22          (Exhibit published.)

23     **MR. COHAN:**  Okay.  Let me just adjust it if I may.

24 **Q.**  You have it before you, sir?

25 **A.**  Yes.

1    **Q.**  Okay.

2        So this indicates that as of March --

3            **THE COURT:**  Hold on.  Hold on.  It's not being

4    displayed --

5            **MR. COHAN:**  Oh, I'm sorry.

6            **THE COURT:**  -- on the screen.

7                    (Off-the-record discussion.)

8            **THE COURT:**  Is the jury's monitors working?

9            **JURORS:**  Yes.

10           **THE COURT:**  Pardon me?

11           **A JUROR:**  Is there a possible way it can be zoomed

12   in?  Kind of can see in the back row.  Can it be zoomed in?

13   Can you make it bigger?

14           **MR. COHAN:**  You tell me when.

15           **MR. SAMPSON:**  Your Honor, there's some writing on the

16   version that Mr. Cohan is using that's not on government's.

17           **THE COURT:**  Or mine.

18           **MR. COHAN:**  My bad.  I put --

19           **THE COURT:**  You need a clean version.

20           **MR. COHAN:**  I put that on there.

21           **THE COURT:**  You need a clean version.

22           **MR. COHAN:**  I -- I apologize.  But the only thing --

23           **THE COURT:**  Here.  Here.  You could just switch it

24   with me.

25           **MR. COHAN:**  Okay.  Thank you, Your Honor.  Sorry.

1  (Off-the-record discussion.)

2  **BY MR. COHAN:**

3  **Q.**  So you sent this letter to Rich and Carol Grant at the

4  address indicated on there on about March the 28th, 2006; is

5  that right?

6  **A.**  Yes.

7  **Q.**  Okay.  And it states here that they have made it through

8  the third year of membership and they paid $6,000 membership

9  dues and renewal dues are $2500 a year.

10  So how much money had they paid you as of March 28th,

11  2006?

12  **A.**  That will -- 11,000.

13  **Q.**  Okay.  Inviting your attention down to roughly the middle

14  of the page, it says, "unlimited consultation by telephone

15  about your IRS or state income tax issues."

16  Do you see that?

17  **A.**  Yes.

18  **Q.**  Is that something that you provided to Rick Grant

19  beginning in sometime in 2003?

20  **A.**  Yes.

21  **Q.**  And did you have telephone conversations with Mr. Grant

22  beginning in 2003 and continuing for at least the next ten

23  years?

24  **A.**  Yes.

25  **Q.**  Do you know how many telephone conversations you haded

1   with Mr. Grant during that ten-year period approximately?

2   **A.**  Probably a few dozen.

3   **Q.**  A few dozen?

4   **A.**  Yes.

5   **Q.**  Okay.  It's -- When you say, "unlimited consultation by

6   telephone about your IRS or state income tax issues," did

7   Mr. Grant provide you with documents he received from the IRS

8   and the California Franchise Tax Board?

9   **A.**  Yes.

10  **Q.**  And did you consult with him about how to address the

11  contents of those documents that were forwarded to you that he

12  received from the IRS and the FTB?

13  **A.**  Yes.

14  **Q.**  The next thing that it states is No. 2, full

15  representation by qualified paralegals, attorneys, or other

16  professionals for any and all IRS and State income tax agency

17  administrative issues, including all -- a) all letters and

18  correspondence between you and the IRS or state income tax

19  agencies.

20      Did you provide full representation by qualified

21  paralegals, attorneys, or other professionals to Mr. Grant for

22  his IRS and state income tax agency administrative issues?

23  **A.**  Whenever needed, I provided the -- if necessary, full

24  representation.  But oftentime, representing is not necessary

25  or too expensive so an -- in those cases, which was most

1  often, I wrote the letters for him and he signed and mailed

2  them out himself.

3  **Q.**  Okay.  We will get to some of those letters in just a few

4  minutes.

5  **A.**  Um-hmm.

6  **Q.**  Did you also provide services including responding to IRS

7  or other summonses and hearings and tax court work for the IRS

8  and the FTB?

9  **A.**  Yes.

10  **Q.**  And was that throughout the entire period?

11  **A.**  Whenever needed, yes.

12  **Q.**  Okay.

13  And c), full representation for non-filing criminal tax

14  charges pretrial, trial, and appeals all the way up to the

15  U.S. Supreme Court and conditional representation for years

16  that you have filed a 1040 income tax confession form?

17  **MR. SAMPSON:**  Objection, Your Honor.  That's a

18  leading question.

19  **THE COURT:**  I don't even think it was a question.

20  Had you finished?

21  **MR. COHAN:**  Not really.  I was asking really whether

22  he had provided such representation to Mr. Grant as identified

23  in sub c just like a and b.

24  **THE COURT:**  All right.  Overruled.  He may answer.

25  **THE WITNESS:**  Could you repeat your question, please.

**BY MR. COHAN:**

**Q.** Yes. Just inviting your attention to --

**A.** Oh.

**Q.** -- to subsection C, full representation, et cetera, so I don't have to read the whole thing. The jury can see it.

**A.** Um-hmm.

**Q.** Did you provide any services to Mr. Cohan in connection with his criminal tax charges that we're here on pretrial?

**A.** Yes, I did -- I did consult with him on that area, yes.

**Q.** Okay. Have I ever paid you any money for anything, sir?

**A.** Just a $40 witness fee that's required by law to be a witness.

**Q.** Right. So you received a subpoena that we have had served on you; is that correct?

**A.** Correct.

**Q.** Okay. Other than that, have I ever provided you with any valuable consideration of any type whatsoever.

**A.** No.

**Q.** Have I ever represented you?

**A.** No.

**Q.** Have I any association whatsoever with Freedom Law School?

**A.** No.

**Q.** Are you in any way providing support to me or paying for any of Rick Grant's legal service that I been providing since I entered my appearance in this case?

1  **A.**  No.

2  **Q.**  Now, let's look at the rest of this before we move to the

3  next exhibit.  You represent to the Grants, quote, in short,

4  you have obtained a peace of mind package that allows you to

5  spend your time on the other areas of your life while we make

6  sure that you are well protected from the insidious attacks of

7  IRS or State income tax agencies so that you can enjoy your

8  life with reassurance and free of fear.

9     Did you write that?

10  **A.**  Yes.

11  **Q.**  And is that what you provided to Mr. and Mrs. Grant?

12  **A.**  To the best of my ability, yes.

13  **Q.**  Now, inviting your attention back up above that to full

14  representation for non-filing criminal charge -- excuse me --

15  criminal tax charges, pretrial, trial and appeals all the way

16  up to the U.S. Supreme Court?

17  **A.**  Uh-huh.

18  **Q.**  And conditional representation for years that you have

19  filed 1040 income tax confession form.  Is that a

20  typographical error?

21  **A.**  No, that's correct.

22  **Q.**  So the word "not" should be in there.

23  **A.**  No, no.  Actually it is correct.  It's -- covers

24  non-filing 1040 -- and under with some conditions, if the

25  person files also, so whether a person files or doesn't file

1  the person, you know, either way could be assisted and

2  represented.

3  Q.  So it is your position -- Strike that.

4      Freedom Law School considers 1040 form a confession form;

5  is that right?

6          MR. SAMPSON:  Objection, Your Honor.  "Freedom law

7  school considers"?

8              THE COURT:  Yeah.  Sustained.  Ask this witness --

9              MR. COHAN:  Okay.

10 Q.  Do you speak for Freedom Law School, sir?

11 A.  Yes.

12 Q.  So is it your position that the 1040 income tax form is a

13 confession form?

14 A.  Yes.

15          MR. SAMPSON:  Objection, Your Honor.  Calls for --

16 It's argumentative, calls for speculation.  It's -- it's an

17 argumentative question, "the confession form."

18          THE COURT:  I don't think it's either argumentative

19 or calls for speculation.  Those aren't appropriate

20 objections.

21      I'm going to allow it.  Go ahead.

22          MR. COHAN:  Thank you.

23          THE WITNESS:  Could you repeat the question, please.

24 BY MR. COHAN:

25 Q.  Yes.  Do you consider 1040 income tax returns to be

1  confession forms, as stated here on Exhibit 514?

2  **A.**  Yes.

3       **MR. SAMPSON:**  Objection based on relevance, Your

4  Honor, and it also calls for a legal conclusion.

5       **THE COURT:**  That's the problem that I'm anticipating.

6  **BY MR. COHAN:**

7  **Q.**  I'm not asking for legal conclusions, only your own

8  personal conclusions sir.

9     Do you understand that?

10       **THE COURT:**  Okay.

11       **MR. SAMPSON:**  And not relevant.

12       **THE COURT:**  I'm going to allow it given the document

13  and in the document uses the language.  I'd like to hear what

14  he has to say about it.

15     Overruled.

16                    (Pause in the proceedings.)

17       **MR. COHAN:**  Bear with me if you would, for just a

18  moment, Your Honor, ladies and gentlemen.

19                    (Pause in the proceedings.)

20  **BY MR. COHAN:**

21  **Q.**  Sir, do you have Exhibit 515 before you?

22  **A.**  Yes.

23  **Q.**  Next tab.  Do you recognize that document?

24  **A.**  Yes.

25  **Q.**  Does it reflect basically the same content as the previous

1  Exhibit 514 except the date is March the 6th of 2008?

2  **A.**   Yes.

3  **Q.**   Is that your signature at the bottom?

4  **A.**   Yes.

5  **Q.**   Did you send this letter to Rick and Carol Grant on about

6  March the 6th of 2008?

7  **A.**   Yes.

8  **Q.**   And did you continue to provide services in exchange for

9  being paid as indicated on Exhibit 515 by Mr. Grant?

10  **A.**   Yes.

11          **MR. COHAN:**   Your Honor, I move admission of Exhibit

12  515.

13          **THE COURT:**   Any objection?

14          **MR. SAMPSON:**   No, Your Honor.

15          **THE COURT:**   Admitted.

16      (Defendant's Exhibit 515 received in evidence)

17          **MR. COHAN:**   Okay.  May I publish this, Your Honor?

18          **THE COURT:**   Yes.

19          **MR. COHAN:**   Thank you.

20                  (Exhibit published.)

21  **BY MR. COHAN:**

22  **Q.**   I believe you testified in response to my question about

23  the previous Exhibit 514 that the Grants had paid you $11,000

24  as of May the 2nd of 2006.

25      So does this letter indicated that they have paid you

1  another $6,000 as of March 6th, 2008?

2  **A.**  Indicates they paid for two years of membership during

3  that time.  And the membership was 2500, and this was the

4  first year went up to 3,000, so they paid 5,000 more.

5  **Q.**  Okay.  So that means they had paid you $16,000 by this

6  time?

7  **A.**  Yes.

8  **Q.**  Okay.  And you were performing services for the Grants

9  including all those services that we just reviewed on this

10  Exhibit 515, the same as on 514, correct?

11  **A.**  Yes.

12  **Q.**  Okay.

13                    (Pause in the proceedings.)

14  **BY MR. COHAN:**

15  **Q.**  Let me invite your attention to Exhibit 516, sir.

16  **A.**  (Reviewing document.)

17  **Q.**  Do you have that before you?

18  **A.**  Yes.

19  **Q.**  Do you recognize that document?

20  **A.**  Yes.

21  **Q.**  Does it appear to be essentially the same as the two

22  previous exhibits except for the date on it and the dollar

23  amounts having changed?

24  **A.**  Yes.

25  **Q.**  And does it promise to provide the same services

1    essentially that we've discussed in the previous two exhibits?

2    **A.**  Yes.

3    **Q.**  And what's the date on this letter, sir?

4    **A.**  March 8, 2012.

5    **Q.**  And did you send this letter to Richard and Carol Grant?

6    **A.**  Yes.

7           **MR. COHAN:**  Move the admission of Exhibit 516, Your

8    Honor.

9           **THE COURT:**  Any objection?

10          **MR. SAMPSON:**  None, Your Honor.

11          **THE COURT:**  Admitted.

12      (Defendant's Exhibit 516 received in evidence)

13          **MR. COHAN:**  May I display?

14          **THE COURT:**  Yes.

15                        (Exhibit published.)

16                  (Pause in the proceedings.)

17          **MR. COHAN:**  Not sure the jurors can see it.

18                        (Exhibit published.)

19          **MR. COHAN:**  Okay.

20   **Q.**  Inviting your attention to Exhibit 517, do you recognize

21   that document?

22   **A.**  Yes.

23   **Q.**  What is that, sir?

24   **A.**  It's a statement showing that Mr. Grant had paid his

25   membership renewal of $3500 on April 18, 2010.

1  **Q.**  Okay.  So by this time, the Grants have paid you $18,500?

2  **A.**  In that neighborhood.

3  **Q.**  Okay.

4  **A.**  Yes.

5  **Q.**  Close enough?

6  **A.**  Close --

7  **Q.**  Okay.

8  Move the admission of Exhibit 517, Your Honor.

9  **THE COURT:**  Any objection?

10  **MR. SAMPSON:**  None, Your Honor.

11  **THE COURT:**  Admitted.

12  (Defendant's Exhibit 517 received in evidence)

13  **MR. COHAN:**  May I display it?

14  **THE COURT:**  Yes.

15  (Exhibit published.)

16  **MR. COHAN:**  May I display it?

17  **THE COURT:**  Yes.  Yes.  Yes.  It's already displayed.

18  **MR. COHAN:**  Oh.

19  Thank you, Your Honor.  Okay.

20  **Q.**  It's a two-page exhibit.  Let's look at the second page

21  that looks very much like the previous page.

22  (Exhibit published.)

23  **BY MR. COHAN:**

24  **Q.**  This just shows that now they paid -- now being as of

25  when, sir, did they make yet another payment?

1    **A.**   As of April 13, 2012.

2    **Q.**   So now, we're up to them having paid you, what, $22,000,

3    give or take?

4    **A.**   Approximately.

5    **Q.**   Okay.  Inviting your attention to Exhibit 518, do you

6    recognize that document?

7    **A.**   Yes.

8    **Q.**   And what is that document?

9    **A.**   It's the cover page of a course which I provide all of our

10   students like Mr. Richard Grant who are interested in learning

11   about the law, the U.S. Constitution, and their rights.

12           **MR. SAMPSON:**  Objection, Your Honor.  He's testifying

13   in a narrative about what Mr. Grant was interested in.

14           **THE COURT:**  Overruled.  He's just describing what

15   this is.

16       Go ahead.

17   **BY MR. COHAN:**

18   **Q.**   So did you provide this level one course to Mr. Grant by

19   sending it to him in the mail or some other carrier to get it

20   delivered to him at either 13 -- I guess 1306 Sanderling

21   Island, or do you know?

22   **A.**   Yes.

23   **Q.**   Okay.  Let me just double-check.  Well, the address is a

24   P.O. Box, but did Mr. Grant acknowledge that he received

25   the -- the actual package that we have a photocopy of the

1  cover page?

2  **A.**  Yes.

3  **Q.**  Okay.

4      Now, this is just for purposes of identification, Your

5  Honor.  I'm not going to try and introduce this, but I do want

6  the jury to see what it was that was actually provided to

7  Mr. Grant.

8          **MR. SAMPSON:**  I'm not sure that's proper to show the

9  jury something but not offer it into evidence.

10          **THE COURT:**  It's not.

11          **MR. COHAN:**  Fine.  I'll offer it into evidence.

12          **THE COURT:**  What's wrong with the copy that's in the

13  binder?

14          **MR. COHAN:**  Well, they're just photocopies of the

15  CD's, Your Honor.

16          **THE COURT:**  Oh, I see.

17          **MR. COHAN:**  The CD's are the actual content that was

18  sent to Mr. Grant.  We just made a picture of the cover.

19          **THE COURT:**  Okay.  And --

20          **MR. COHAN:**  That's 518.

21          **THE COURT:**  518.  I think it's perfectly fine.  Yes,

22  you can show it to the jury.

23          **MR. COHAN:**  Very well.  So I'm not going to move this

24  into evidence, but I do want to ask this witness what it

25  consists of.

1    **THE COURT:**  Okay.

2    **MR. COHAN:**  Okay.

3    **Q.**  So, Mr. Mottahedeh, I see disks with a picture of your

4    face on them.  And I see four, eight, oh, wow, they're double

5    sided.  How many of these disks did you send to Mr. Grant in

6    total?

7    **A.**  There is --

8                        (Simultaneous colloquy.)

9    **BY MR. COHAN:**

10   **Q.**  Are there 19 in total, sir?

11   **A.**  Yes.

12   **Q.**  And do they each contain different material?

13   **A.**  Yes.

14   **Q.**  And can you basically summarize what the material is

15   looking at the -- the first CD, it says, quote, a course in

16   law and procedure, level one, class one.

17            **MR. SAMPSON:**  Objection to the extent it calls for

18   hearsay, Your Honor, about what's on the CD's themselves.

19            **THE COURT:**  Overruled.

20   **BY MR. COHAN:**

21   **Q.**  Are you responsible for the content of what's on these

22   CD's, sir?

23   **A.**  Yes.

24   **Q.**  And have you ever attended law school?

25   **A.**  No.

1  **Q.** Have you consulted with any attorneys or C.P.A.'s to

2  contain any insight into the law that you were supposedly

3  teaching people who listened to these CD's?

4       **MR. SAMPSON:** Objection, Your Honor, relevance as to

5  the consultation. What matters is what Mr. Grant knew.

6       **THE COURT:** True. But this is -- I assume you're

7  setting up a basis for the package that was sent.

8       **MR. COHAN:** Yes.

9       **THE COURT:** Okay. I'm going to allow it. Go ahead.

10  **BY MR. COHAN:**

11  **Q.** Well, you made representations in the exhibits that we saw

12  that services were being provided by Freedom Law School,

13  including attorneys, qualified paralegals, and so on, correct?

14  **A.** Correct.

15  **Q.** Did you actually get information from attorneys, C.P.A.'s

16  and qualified paralegals?

17  **A.** Yes.

18  **Q.** Can you identify by name of attorneys who provided you

19  information, some of which you say is on these CD's?

20       **MR. SAMPSON:** Objection, Your Honor, relevance,

21  bolstering.

22       **THE COURT:** Well, as to relevance, sustained. The

23  names of attorneys who provided information is totally

24  irrelevant.

25       **MR. COHAN:** Very well.

1  **Q.**  Where did you get the material that you have included on

2  these CD's?

3      I see the same description, a course in law and procedures

4  and class one, class two, class three, class four.  How many

5  class were there in law and procedure that you were providing

6  to Mr. Grant and presumably other people?

7  **A.**  There's actually nine classes.  And there is a -- just

8  one-page sheet on back of the cover of the courses.  The front

9  that you showed me in the first -- on the first page.

10     But the back page has a short description of each of those

11  nine classes.  Eight of them are on audio.  Approximately two

12  hours and forty minutes each.  One of them is a video about an

13  hour and a half.  And then there's approximately 200 pages of

14  paperwork that's on the -- one of these CD's that a person can

15  print out from their own personal computer.

16  **Q.**  So do you have any knowledge one way or another whether

17  Mr. Grant ever listened to or watched any of these CD's?

18  **A.**  Nope, 'cause I don't know if he -- how much of it he

19  listened at this time.  That's up to the person to do it.

20  **Q.**  Now, were there different types of membership in Freedom

21  Law School other than what was referred to on the letters as

22  the Freedom -- excuse me -- Royal Freedom Package, was it?

23  **A.**  Yes.

24  **Q.**  And what was the Royal Freedom Package as opposed to some

25  other package?

**A.**   It's the most comprehensive program because, for example, this course by itself is an entire course, over 20 hours long about the law and your rights.  So someone wants to just get started with that, they going to get a great amount of information that they were not taught in high school or university about the law and their rights.

So there were other courses that I've put together myself with -- myself or with assistance of others, which I -- as I learned more law, I put those courses and audio available for others as well.

So there's different courses that over the years, I developed and made available.

**Q.**   Did -- Now, when we went through some of those exhibits, you described in them the services that were provided to Mr. and Mrs. Grant involving your providing written material for Mr. Grant simply to sign and submit to the IRS, the FTB, the tax court, and so on; is that right?

**A.**   Yes.

**Q.**   Could people buy the material and pay less money and not pay for you providing those services?

**A.**   Yes.  They could just simply just get the courses to educate themselves, if you get this or other courses alone without any assistance or representation or consultation provided.

**Q.**   Okay.  Inviting your attention to Exhibit 522, do you

1  recognize that?

2  **A.**  Yes.

3  **Q.**  What is that?

4  **A.**  This is a book written by one of my students.

5  **Q.**  And what's the name of this student?

6  **A.**  Joseph R. Bannister.

7  **Q.**  And who is Joseph R. Bannister, sir?

8  **A.**  He was a gun-carrying special agent with the IRS's

9  criminal investigation division.

10  **Q.**  And where was he an IRS agent, if you know?

11  **A.**  In San Jose, California.

12  **Q.**  And when was he an IRS agent in San Jose, California?

13  **A.**  I believe from 1995 to 1999.

14  **Q.**  Okay.  And do you know whether Mr. Bannister was also a

15  Certified Public Accountant?

16  **A.**  Yes, he was.

17        **MR. SAMPSON:**  Your Honor, I'm not sure of the

18  relevance of all of this discussion of someone else,

19  Mr. Bannister.

20        **THE COURT:**  Well, we'll see where it's going.

21  Overruled.

22  **BY MR. COHAN:**

23  **Q.**  And to your knowledge, did Mr. Bannister create what has

24  been marked for purposes of identification as Exhibit 522?

25  **A.**  Yes, he wrote this book.

1  **Q.** And what is this -- Well, first of all, did you send a

2  copy of this book to Mr. Grant as part of his Royal Freedom

3  Package?

4  **A.** Yes.

5  **Q.** And did you also send him video of Mr. Bannister

6  describing the contents of this book?

7  **A.** Yes.

8  **Q.** And did you send him other videos in -- I'll just stick

9  with that one. Did you send him other videos?

10 **A.** Yes.

11 **Q.** What other videos did you send to Mr. Grant?

12 **A.** Besides --

13 **Q.** Besides the -- Excuse me.

14     Besides the one we just referred to in which

15 Mr. Bannister, basically tells the story of --

16         **MR. SAMPSON:** Objection --

17 **BY MR. COHAN:**

18 **Q.** -- 522.

19         **MR. SAMPSON:** -- misstating testimony.

20         **THE COURT:** Yeah, you can't tell us what's in the

21 book, counsel. Objection's sustained.

22 **BY MR. COHAN:**

23 **Q.** Mr. Mottahedeh, what are the contents of the book, Exhibit

24 522?

25 **A.** The content of the book, which I edited, is

1   Mr. Bannister's research on the subject of the legality of the

2   income tax.

3   Q.  Okay.  And you distributed that to Mr. Grant as part of

4   his Royal Freedom Package; is that right?

5   A.  Yes.

6   Q.  When was this book written, if you know?

7   A.  It was -- started in 1998 and ended very early, 1999.

8   Q.  When you say "ended," do you mean it was completed?

9   A.  Completed, yes.

10  Q.  Now, it says it's a preliminary report.  Do you see that?

11  A.  Yes.

12  Q.  Was it ever modified such that it became anything other

13  than a preliminary report?

14  A.  No.

15  Q.  Okay.

16         MR. COHAN:  Your Honor, I move the admission of

17  Exhibit 522.

18         MR. SAMPSON:  Your Honor, this exhibit is not

19  relevant at this time.  And there's no foundation of whether

20  the defendant relied on it.

21         THE COURT:  Yeah, it would have to come in through

22  the defendant's testimony, not through the witness.

23         MR. COHAN:  I agree.  I withdraw it.

24         THE COURT:  Okay.

25         MR. COHAN:  Trying to do too much too quick.

1    **Q.**   Sir, do you have Exhibit 106 before you?

2    **A.**   (Reviewing document.)

3         Yes.

4    **Q.**   Do you recognize Exhibit 106?

5    **A.**   Yes.

6    **Q.**   What is Exhibit 106?

7    **A.**   It's a "Request for a Collection Due Process Hearing,"

8    which basically what that is, when the IRS wants to enforce

9    collection by force before --

10        **MR. SAMPSON:**  Your Honor, I -- I object.  He's

11   describing what IRS does.  He's not describing the document.

12        **THE COURT:**  Sustained.  Moreover, you described the

13   Exhibit as G -- as 106 when in facts, this is G106.  We

14   already have a 106.

15        **MR. COHAN:**  Oh, this one's in evidence.

16        **THE COURT:**  106?

17        **MR. COHAN:**  Yes, it is.

18        **THE COURT:**  Why is it marked differently then?

19        **MR. COHAN:**  It's marked 106.  We just forgot to put

20   the "G" on it, Your Honor.

21        **THE COURT:**  What's -- The original one that was

22   already admitted was simply 106.

23        **MR. COHAN:**  Right.  And it's in evidence.

24        **THE COURT:**  This one is marked as "G106."

25        **MR. COHAN:**  Oh, well mine's marked as just 106, Your

1    Honor.

2           **THE COURT:**  Okay.

3           **MR. COHAN:**  I'm sorry.

4           **THE COURT:**  Okay.

5           **MR. COHAN:**  I think we've stuck "G" only there so

6    that we're reminding ourselves that it's a Government's

7    Exhibit.

8           **THE COURT:**  All right.  So that we just strike the

9    "G's" on these?

10          **MR. COHAN:**  Please feel free.  They're not informing

11   anybody of anything that we don't already know.

12          **THE COURT:**  Okay.

13          **MR. COHAN:**  So this is in evidence.  So if I may, I'd

14   like to display it to the jury.

15                (Exhibit published.)

16   **BY MR. COHAN:**

17   **Q.**  So, Mr. Mottahedeh, when did you first see the original of

18   which this 106 is a copy, if you know?

19   **A.**  (Reviewing document.)

20      I saw this document -- Let's see.  He was signed -- Let me

21   see.

22      (Reviewing document.)

23      About September 2005.

24   **Q.**  And do you know who wrote the statement, quote, I am

25   requesting for a collection due process hearing in an appeals

1   office closest to my place of residence.  This is also to

2   inform you that I will be audio recording this hearing.  One

3   of the issues we will address is if the IRS follows proper

4   procedure.  If the IRS has considered any of my prior issues

5   that I've raised in the past to be frivolous, I hereby

6   renounce them.

7       Do you know who wrote those words?

8   **A.**  Yes, I did.

9   **Q.**  Okay.  And did you send this to Mr. Grant for him to sign

10  and send to the IRS?

11  **A.**  Yes.

12  **Q.**  Okay.

13      Inviting your attention to Exhibit 108, do you recognize

14  Exhibit 108?

15  **A.**  Yes.

16      **MR. COHAN:**  I believe this one is also in evidence,

17  Your Honor.  And if there's a "G" in front of the "108," I

18  apologize.

19      **THE COURT:**  We'll ignore it.

20      **MR. COHAN:**  I'm sorry?

21      **THE COURT:**  We will ignore the "G."

22      **MR. COHAN:**  Thank you.

23          (Exhibit published.)

24  BY MR. COHAN:

25  **Q.**  Now, sir, I want to ask you if you recognize this exhibit

1    that's been marked 108?

2    **MR. SAMPSON:** Your Honor, again, there's highlighting

3    on his version.

4    **THE COURT:** All right. Yes, counsel. You have to

5    show clean copies to the jury.

6    **MR. COHAN:** I apologize.

7    **THE COURT:** Do you want my copy?

8    **MR. COHAN:** I'll be happy to switch with you, Judge.

9    Excuse me.

10    (Pause in the proceedings.)

11    **BY MR. COHAN:**

12    **Q.** Sir, do you see that this is a four-page letter?

13    **A.** Yes.

14    **Q.** Is that what's before you?

15    **A.** Yes.

16    **Q.** And do you know who actually wrote this letter?

17    **A.** I wrote it.

18    **Q.** Okay. And did you write it sometime in early November of

19    2005?

20    **A.** Yes.

21    **Q.** Was it written in response to a letter that you received

22    from Mr. Grant who had received it, as far as you know, from

23    someone named Ms. Cahill at the Internal Revenue Service?

24    **A.** Yes.

25    **Q.** And so you were responding on behalf of Mr. Grant for him

1  to adopt and sign and send this to the IRS; is that right?

2  **A.**  Yes.

3       **MR. SAMPSON:**  Objection, Your Honor.  It's

4  argumentative.

5       **THE COURT:**  No. it's not.  It's leading, but it's not

6  argumentative.  Overruled.

7  **BY MR. COHAN:**

8  **Q.**  And can you summarize the contents of this Exhibit 108

9  without going through all four pages since it's in evidence

10  and the jury can read it if they want to?

11 **A.**  Well, let me refresh myself, please --

12 **Q.**  Please --

13 **A.**  -- for a minute.

14 **Q.**  -- take your time and review it, and then let us know when

15 you're ready to, if you can, summarize your letter.

16      Basically, what was the purpose of the letter, is the

17 question?

18 **A.**  The purpose of the letter is to challenge legally,

19 properly, challenge the tax amount that IRS claims that

20 Mr. Grant owes.

21 **Q.**  And this is for the years 2001 and 2002?

22 **A.**  Yes.

23 **Q.**  Okay.

24      I want to just invite your attention the last page.  Do

25 you see where Mr. -- well, it appears that someone has signed

1    above "Richard Grant" and dated it.  Correct?

2    **A.**  Yes.

3    **Q.**  I want you to take look at how this letter ends.  The last

4    two sentences are, quote, there is an unwritten law that

5    allows at least 30 days between correspondences.  Even the

6    courts take into consideration any possible delays or

7    unforeseen incidents which may affect the flow of

8    correspondence.

9         **MR. SAMPSON:**  Your Honor, I object to the extent it's

10    admitted for the truth.

11         **THE COURT:**  The document's already in evidence.

12    Counsel's just reading a document that's in evidence.

13    **BY MR. COHAN:**

14    **Q.**  Do you see that language?

15    **A.**  Yes.

16    **Q.**  And you wrote that language, correct?

17    **A.**  Yes.

18    **Q.**  Okay.  Now, I -- did you -- want to invite your attention

19    to Government -- Excuse me.  Got to get that "G" out of

20    there -- exhibit 111, sir.

21    **A.**  (Reviewing document.)

22         Yes.  111.

23              (Simultaneous colloquy.)

24         **THE WITNESS:**  Or 110?

25

1  BY MR. COHAN:

2  **Q.**  No, no.  111.  We'll go back to 110.

3  **A.**  Okay.  Yes.

4  **Q.**  I'm going to ask you to perform a comparison in a moment.

5       **THE COURT:**  Is this one already in?

6       **MR. COHAN:**  I believe 111 is in, yes.

7       **THE COURT:**  All right.  All right.

8  BY MR. COHAN:

9  **Q.**  So I'm inviting your attention to the third page of this

10  exhibit.  Do you see that?  Do you see the third page?

11  **A.**  (Reviewing document.)

12       Hmm, one, two -- yes.

13  **Q.**  And that page has a heading "Attachment Letter 3193 Notice

14  of Determination" at the top?

15  **A.**  Yes.

16  **Q.**  Does this look like a letter from the IRS of a type you

17  have previously seen?

18  **A.**  Yes.

19  **Q.**  And inviting your attention to the last line, it says,

20  "Appeals received a letter from the taxpayer which stated the

21  following."

22       And did you send -- strike that.

23       Did Mr. Grant send Exhibit 108 to Appeals to the best of

24  your knowledge?

25       **MR. SAMPSON:**  Objection, lacks personal knowledge.

1    **THE COURT:**  Well, he's asking him if he has

2    knowledge.  He may answer if he has personal knowledge.

3    **THE WITNESS:**  Yes, he did.

4    **BY MR. COHAN:**

5    **Q.**  Okay.  It was addressed to --

6    **THE COURT:**  Well, excuse me.  Now you have to

7    establish how he knows that.

8    **MR. COHAN:**  Okay.

9    **Q.**  If you look at the first page of Exhibit 108, to whom is

10   it addressed?

11   **A.**  (Reviewing document.)

12      Exhibit 108 is addressed to the Internal Service (sic),

13   attention Colleen Cahill in San Jose.

14   **Q.**  Right.  But just above -- "Attention Colleen Cahill," does

15   it say, "San Jose Appeals"?

16   **A.**  Yes.

17   **Q.**  Okay.  So it was addressed to Appeals.  Is it fair to say,

18   to the best of your knowledge and belief, Mr. Grant sent it

19   there at your direction?

20   **A.**  Yes, and he sent me a signed copy of that for my records.

21   **Q.**  Okay.  Now, inviting your attention to the third page of

22   Exhibit 111 where it says "Appeals received a letter from the

23   taxpayer which stated the following."

24      Look at the next page, page 4 of Exhibit 111.  Do you see

25   that?

1    **A.**  Yes.

2    **Q.**  Have you made a comparison between what appears on page 4

3    through page 7 to see whether it's a verbatim copy,

4    essentially, of Exhibit 108, the letter that we just saw

5    that's been admitted as 108?

6    **A.**  I'm sorry.  Could you go over that little bit more slowly

7    so I can do that proper -- properly?

8    **Q.**  Yes.  I thought you had done this previously, but I'm

9    going to ask you.  Can you compare Exhibit 111 beginning at

10   page 4 with the entirety of Exhibit 108, which is a letter you

11   said you prepared and that Rick Grant sent to Appeals.

12   **A.**  Yes.

13   **Q.**  Okay.  Can you do that?  Can you compare this four-page

14   letter to see that it's essentially a verbatim copy of the

15   letter that you prepared and that Mr. Grant sent to IRS

16   Appeals on or about November the 9th, 2005?

17   **A.**  Yes.

18   **Q.**  Inviting your attention to the seventh page of Exhibit

19   111, do you see the third paragraph on that page that is the

20   last paragraph of Exhibit 108 duplicated?

21   **A.**  Yes.

22   **Q.**  The letter that you prepared for Mr. Grant ends with the

23   sentence, quote, even the courts take into consideration any

24   possible delays or unforeseen incidents which may affect the

25   flow of correspondence, correct?

1    **A.**   That's right.

2    **Q.**   If you look at Exhibit 111, do you see that someone from

3    the IRS has added the words, quote, if the IRS chooses to

4    continue to disregard their own rules and procedures, then I

5    will be forced to seek litigations, end quote?

6           **MR. SAMPSON:**   Your Honor, counsel's reading, and the

7    document does speak for itself.  It's in evidence.

8           **THE COURT:**   Sustained.

9    **BY MR. COHAN:**

10   **Q.**   Sir, your letter doesn't contain such a statement as is

11   attributed to your letter right here on this page, does it?

12   **A.**   No, my letter does not say that.

13   **Q.**   And do you know how or why the IRS added these words,

14   quote, if IRS chooses to continue to disregard their own rules

15   and procedures, then I will be forced to seek litigations?

16   **A.**   I had no idea why they would make it up.

17   **Q.**   But you didn't put it in your letter, did you?

18   **A.**   No, my letter does not say that.

19   **Q.**   Nor does the letter that Mr. Grant signed that you

20   provided, correct?

21   **A.**   Yes, that's right.  The letter doesn't have that language.

22   **Q.**   Thank you.

23          Now we can go back to Exhibit 110.  Inviting your

24   attention to Exhibit 110, do you recognize it?

25   **A.**   Yes.

1  **Q.**  It purports to be a letter from Richard Grant dated March

2  15, 2006, right?

3  **A.**  Yes.

4  **Q.**  Did you write that letter, and did you provide it to

5  Mr. Grant for him to submit to the IRS?

6  **A.**  Yes.

7  **Q.**  Okay.  Thank you.

8     Inviting your attention Exhibit 112, do you see that?

9  **A.**  Yes.

10  **Q.**  And what is Exhibit 112?

11  **A.**  It's a -- a petition to the United States Tax Court.

12  **Q.**  Okay.

13     Bear with me, Your Honor, just a moment if you would.

14  Unfortunately, my copies of things have highlighting on them,

15  so I don't want to put them on the ELMO.  I don't really mind,

16  but court has ruled that's inappropriate --

17         **THE COURT:**  Well, it's not the highlighting so much

18  as the annotations in the margins.  Here's 112, if you wish, a

19  clean copy.

20         **MR. COHAN:**  Thank you.

21             (Pause in the proceedings.)

22         **MR. COHAN:**  Thank you.

23             (Pause in the proceedings.)

24         **MR. COHAN:**  Okay.  Now may I publish, Your Honor?

25         **THE COURT:**  Yes.

1          **MR. COHAN:**  Thank you.

2                      (Exhibit published.)

3    **BY MR. COHAN:**

4    **Q.**   Mr. Mottahedeh, do you recognize this letter?

5    **A.**   Yes.

6    **Q.**   Did you write this letter?

7    **A.**   Yes.

8    **Q.**   What was your purpose in writing this letter?

9    **A.**   When the IRS ruled against Mr. Grant at the collection due

10   process hearing, this letter was to appeal the ruling of the

11   IRS to the United States Tax Courts.

12   **Q.**   And were you providing this letter to Mr. Grant because

13   you thought this was going to protect his rights?

14   **A.**   Yes.

15   **Q.**   Did you tell Mr. Grant that's what you were doing for him?

16   **A.**   Yes.

17   **Q.**   Okay.

18        Did you pursue this appeal to the tax court on Mr. Grant's

19   behalf by drafting things for him?

20   **A.**   Yes.

21   **Q.**   Let me show you what I believe has been admitted as

22   Exhibit 116.

23        Yes.  It's admitted.

24        Do you have 116 before you, Mr. Mottahedeh?

25   **A.**   (Reviewing document.)

1    Yes.

2                    (Exhibit published.)

3    BY MR. COHAN:

4    **Q.**  Do you recognize Exhibit 116?

5    **A.**  Yes.

6    **Q.**  Okay.  I want to show the jury what this is.

7        Hmm?  Doesn't have exhibit sticker on it.  I represent

8    that this is Exhibit 116, but it doesn't seem to have an

9    exhibit sticker on it.

10       Well, it shows that the in lower right-hand corner, it is

11   Exhibit 116, but we don't have an exhibit sticker on it.

12              **THE COURT:**  Okay.  It's not.  It's okay.

13   BY MR. COHAN:

14   **Q.**  Okay.  You so said you recognize this document.  How do

15   you recognize it, sir?

16   **A.**  I wrote it.

17   **Q.**  And what is the purpose of writing this document?

18   **A.**  It's to -- Well, it's a motion for leave or permission to

19   file a motion to vacate the -- or put aside the dismissal of

20   his case that the tax court had done, so basically to

21   reinstate his case with the United States Tax Court.

22   **Q.**  Was it your understanding that Mr. Grant had never

23   received a hearing constituting a collection due process

24   hearing?

25              **MR. SAMPSON:**  Objection, Your Honor, relevance as to

 1    the witness's understanding.

 2            **THE COURT:**  Sustained.

 3    **BY MR. COHAN:**

 4    **Q.**  Did you tell Mr. Grant that you were doing this to protect

 5    his rights, vis-a-vis the IRS?

 6    **A.**  Yes.

 7    **Q.**  And so you were appealing what the IRS had denied to the

 8    U.S. Tax Court; is that right?

 9    **A.**  Yes.

10    **Q.**  And that's what this motion for leave to file motion to

11    vacate order of dismissal for lack of jurisdiction is, as you

12    understand it?

13    **A.**  Yes, it's part of that process.

14    **Q.**  Okay.

15            **MR. COHAN:**  I don't have this on my list.  Bear with

16    me just a moment, Your Honor.  I'm looking at my exhibit list,

17    and I don't seem to have it on my list, but I have an Exhibit

18    117 that I believe was admitted.

19            **THE COURT:**  Was 117 admitted?

20            **THE CLERK:**  Yeah.

21            **THE COURT:**  Okay.

22                    (Pause in the proceedings.)

23            **THE COURT:**  Do you not have a copy of it?

24            **MR. COHAN:**  No, I do have a copy of it.  It just

25    wasn't on my exhibit list, so I didn't know it was admitted

1   but now I've heard that it is, and I do have it.

2      It also is lacking an exhibit sticker, but in the lower

3   right-hand corner, it shows that it's Exhibit 117.

4           **THE COURT:** Okay. We can take care of it later.

5           **MR. COHAN:** Okay. Thank you.

6      May I display it?

7           **THE COURT:** Um-hmm.

8                    (Exhibit published.)

9           **MR. COHAN:** Thank you.

10  **Q.** Mr. Mottahedeh, do you recognize this document that is

11  Exhibit 117?

12  **A.** Yes.

13  **Q.** It is -- looks like two pages -- no, it is three pages.

14  Excuse me.

15  **A.** Yes.

16                    (Exhibit published.)

17  **BY MR. COHAN:**

18  **Q.** Did you fill out the places on this document that call for

19  entries by someone who is trying to file an amended petition?

20  **A.** Yes.

21  **Q.** And what were you seeking to do when you prepared the

22  amended petition for Mr. Grant?

23  **A.** This is part of challenging the IRS having ruled against

24  Mr. Grant, appealing you (sic) to the tax court and amending

25  the petition.

1  **Q.**  And did you provide it to Mr. Grant for him to sign and

2  send to the tax court?

3  **A.**  Yes.

4  **Q.**  As far as you know, did he do so?

5  **A.**  Yes.

6  **Q.**  Okay.

7      Inviting your attention to what I believe is the next

8  exhibit in your book, which is Exhibit 602.

9  **A.**  (Reviewing document.)

10          **THE COURT:**  Is that in evidence?

11          **MR. COHAN:**  No, it's not, Your Honor.  I have to lay

12  foundation -- this witness.

13          **THE COURT:**  Okay.

14  **BY MR. COHAN:**

15  **Q.**  Do you have it before you, sir?

16  **A.**  Yes.

17  **Q.**  602?

18  **A.**  Yes.

19  **Q.**  Do you recognize Exhibit 602?

20  **A.**  Yes.

21  **Q.**  And this -- Let's see.

22      Appears to be a two-page document?

23  **A.**  Yes.

24  **Q.**  How is it that you are able to recognize this document?

25  **A.**  I wrote it for Mr. Grant.

1   Q.  And what was the purpose of writing this letter for

2   Mr. Grant?  What were you hoping to accomplish?

3   A.  Hmm --

4   Q.  Well, first of all, you apologize for not attending a

5   meeting that was scheduled by Mr. McPherson on May 24th of

6   2007, right?

7        MR. SAMPSON:  Objection, Your Honor.  Counsel's

8   testifying, leading questions.

9        THE COURT:  Yeah, let him answer the question first.

10       MR. COHAN:  Sorry.

11       THE WITNESS:  (Reviewing document.)

12   Could you repeat question, please?

13  BY MR. COHAN:

14  Q.  Yes.  What were you trying to accomplish by drafting this

15  letter for Mr. Grant to sign and send to Internal Revenue

16  Service Office of Division Counsel, attention Jeremy

17  McPherson?

18  A.  Well, the IRS lawyer, Mr. McPherson, had written a letter,

19  as it says on May 16, 2007, to Mr. Grant.  And so this is the

20  response and the communications with the attorney on --

21       I don't know how much more detail you want me to tell you

22  besides what's in the letter already.

23  Q.  No, that's okay.  Before you say anymore about it, I want

24  to move its admission.

25       THE COURT:  Any objection?

1        **MR. SAMPSON:**  No, Your Honor.

2        **THE COURT:**  Admitted.

3     (Defendant's Exhibit 602 received in evidence)

4        **MR. COHAN:**  May I display?

5        **THE COURT:**  Yes.

6        **MR. COHAN:**  Thank you.

7   **Q.**  Okay.  Mr. Mottahedeh --

8                      (Exhibit published.)

9   **BY MR. COHAN:**

10  **Q.**  You sent this -- Strike that.

11       Well, you sent this letter to Mr. Grant for him to sign

12  and send to Mr. McPherson at the address on it, correct?

13  **A.**  Yes.

14  **Q.**  And what did you hope to accomplish by -- or what did you

15  hope that Mr. Grant was going to accomplish by sending this

16  letter to Mr. McPherson at the Internal Revenue Service Office

17  of Division Counsel?

18  **A.**  This was part of the process of him challenging the taxes

19  that the IRS claimed that Mr. Grant owed.

20  **Q.**  Okay.

21       And so your understanding was Mr. Grant had to send some

22  letter of this type to maintain his position that he had no

23  liability for income taxes?  This --

24  **A.**  Yes.

25           **MR. SAMPSON:**  Objection, relevance.

1    THE COURT:  Yeah, I'm going to permit this one.

2    THE WITNESS:  Yes.

3  BY MR. COHAN:

4  Q.  Thank you.

5    Inviting your attention to what's been marked for purposes

6  of identification as Exhibit 604.

7    Do you recognize Exhibit 604?

8  A.  Yes.

9  Q.  And how do you recognize it?

10  A.  This is the IRS's Motion for Summary Judgment against

11  Mr. Grant where the IRS asked the tax court to quickly and

12  summarily just rule against Mr. Grant without any kind of a

13  hearing whatsoever.

14    MR. SAMPSON:  Objection, Your Honor.  It's a

15  narrative.  It's --

16    THE COURT:  Yes.

17    MR. SAMPSON:  -- speculative, hearsay.

18    THE COURT:  Calls for a legal conclusion about what

19  the IRS was attempting to do this.

20    MR. COHAN:  Well, I'm just asking --

21    (Simultaneous colloquy.)

22    MR. COHAN:  -- his understanding, Your Honor.

23    THE COURT:  I'm sustaining the objection.

24    MR. COHAN:  Okay.

25  Q.  So you received this document after it was sent to you by

1  Mr. Grant; is that right?

2  **A.**  Yes.

3  **Q.**  And did you do anything in response to this document based

4  on your understanding of how you might assist Mr. Grant in

5  protecting his rights?

6  **A.**  Yes.

7  **Q.**  Okay.

8  **MR. COHAN:**  Your Honor, I think it's foundation for

9  what he did.  Just for the --

10  **THE COURT:**  He can describe what he did, but this is

11  the government's motion.  It's --

12  **MR. COHAN:**  Right.  It is the government's motion.

13  **THE COURT:**  No.

14  **MR. COHAN:**  -- filed a response to it, but --

15  **THE COURT:**  He can testify about how he responded.

16  **MR. COHAN:**  Okay.  So you're denying my motion to

17  admit this letter?

18  **THE COURT:**  Yes.

19  **MR. COHAN:**  Or this motion.  Excuse me.  Okay.

20  Then let's move on.  And I would also move Exhibit 605,

21  but I'm assuming that Mr. McPherson's declaration in support

22  of the motion for summary judgment would be subject to the

23  same ruling.

24  **THE COURT:**  Yes.  Do you have an objection to it?

25  **MR. SAMPSON:**  I do, Your Honor.

1    **THE COURT:** Okay. All right. I'm sustaining the

2    objection.

3    **BY MR. COHAN:**

4    **Q.** Okay. You responded -- in some form or fashion, you

5    drafted up something to oppose this motion for summary

6    judgment for Mr. Grant to file in the tax court, correct?

7    **A.** Yes.

8    **Q.** Inviting your attention to Exhibit 606. Do you see that?

9    **A.** Yes.

10   **Q.** Do you recognize this document?

11   **A.** Yes.

12   **Q.** What is this document?

13   **A.** This is the order of the United States Tax Court that

14   denied government's motion for summary judgment, ruling

15   against the government.

16   **Q.** Okay.

17       And was that in part based upon the opposition that you

18   provided for Mr. Grant to file opposing the motion for summary

19   judgment?

20   **A.** Yes.

21           **MR. COHAN:** I move its admission, Your Honor.

22           **THE COURT:** Any objection?

23           **MR. SAMPSON:** I don't think there's a foundation with

24   this witness. I don't have a problem with its authenticity.

25           **THE COURT:** All right. No foundation for this

1   witness.  Yeah.

2          **MR. SAMPSON:**  He did not write it.  He --

3          **THE COURT:**  You didn't -- Yeah, you haven't

4   established a foundation for his even receipt of it.  I mean,

5   it's a public document, though.  It's a publicly filed

6   document.

7          **MR. COHAN:**  I'll lay foundation.

8          **THE COURT:**  Okay.  If you would.

9          **MR. COHAN:**  Okay.

10  **Q.**  Do you recall when you first received the original of

11  which this Exhibit 606 is a copy?

12  **A.**  Yes.

13  **Q.**  Ands it forward to you by Mr. Grant?

14  **A.**  Yes.

15  **Q.**  And did you read it?

16  **A.**  Yes.

17  **Q.**  And did it indicate to you that what you'd provided to

18  Mr. Grant had successfully opposed to commissioner of Internal

19  Revenue's motion for summary judgment?

20  **A.**  Yes.

21          **MR. COHAN:**  Move its admission.

22          **THE COURT:**  Okay.  I'll will admit 606.

23          **MR. COHAN:**  May I display?

24          **THE COURT:**  Yes.

25

1    (Defendant's Exhibit 606 received in evidence)

2                        (Exhibit published.)

3  **BY MR. COHAN:**

4  **Q.**  Mr. Mottahedeh, I'm inviting your attention to the last

5  three lines of what's on page 1.

6       Do you see that?

7  **A.**  Yes.

8  **Q.**  Do you know what it means when the order says, quote, in

9  this case, there is a genuine issue of material fact as to

10 whether petitioner can rebut the presumption of official

11 regularity and delivery?

12          **MR. SAMPSON:**  Objection, Your Honor.  Counsel's

13 testifying, and the document should speak for itself.

14          **THE COURT:**  Yeah, the document speaks for itself.  He

15 can't give a legal opinion as to what a legal document means.

16          **MR. COHAN:**  Okay.

17 **Q.**  Did you take any action based on your understanding of

18 what this order means, sir?

19 **A.**  No.

20 **Q.**  Okay.  And is that because you believe that you needn't

21 take any?

22          **MR. SAMPSON:**  Objection, relevance.

23          **THE COURT:**  It's leading.  You can ask him why he did

24 not take any action.  But you can't tell him why you think he

25 did not take any action.

1    MR. COHAN:  Stand corrected, Your Honor.

2    THE COURT:  Okay.

3  BY MR. COHAN:

4  Q.  Why didn't you take any action in response to receiving

5  this order from Mr. Grant saying that the motion for summary

6  judgment by the commissioner was denied?

7  A.  Because Mr. Grant won this part of the battle.  There was

8  nothing at this stage to do.  This part of the battle was won

9  by Mr. Grant.

10                  (Pause in the proceedings.)

11  BY MR. COHAN:

12  Q.  Inviting your attention Exhibit 121 -- I'm flipping

13  through several exhibits.

14  A.  (Reviewing document.)

15     I'm sorry.  121?

16  Q.  Yes, sir.  Let me know when you have it before you.

17  A.  (Reviewing document.)

18  Q.  Got it?

19  A.  Um, 121?  I don't see it.

20    THE COURT:  It has a "G" in front of it.

21    THE WITNESS:  (Reviewing document.)

22  BY MR. COHAN:

23  Q.  Pretend the "G" is not there, just 121.

24  A.  Oh, yes.

25  Q.  Okay.  Do you recognize this document?

1    **A.**   Yes.

2    **Q.**   And what is this document?

3    **A.**   This is a -- a -- this is an -- on appeal from the Ninth

4    Circuit Federal Court of Appeal, in this case of Mr. Grant.

5    This is the court of appeal that handled the appeal of

6    Mr. Tack -- of the tax court decision that was ruled against

7    Mr. Grant.  This is the decision of the court of appeal.

8    **Q.**   Okay.  Did you receive this from Mr. Grant at some point

9    shortly after July the 6th of 2009 when it was filed?

10   **A.**   Yes.

11   **Q.**   Did you read the order?

12   **A.**   Yes.

13   **Q.**   Inviting your attention to the second page of this order.

14        Again, Your Honor, I have marked --

15             **MR. SAMPSON:**  All the copies are marked, Your Honor.

16             **THE COURT:**  All right.  Well, we have to clean it up.

17             **MR. SAMPSON:**  Government's 121, we could pull it up,

18   but I think this one's inappropriate with marked --

19             **THE COURT:**  Yeah, mine is, too.

20             **MR. COHAN:**  Very well.

21             **THE COURT:**  There's a clean one in the courtroom.

22   Please produce it for me.

23                  (Pause in the proceedings.)

24             **MR. COHAN:**  Okay.  Can we turn the page?

25                     (Exhibit published.)

1    **MR. COHAN:**  It's a two-page document.

2    **Q.**  Okay.  Mr. Mottahedeh, I want to invite your attention to

3    the third paragraph on this page.  Do you see the third

4    paragraph?

5    **A.**  Yes.

6    **Q.**  Can you read that?  Says Grant forfeits review of District

7    Court's orders?

8            **MR. SAMPSON:**  Your honor, I -- I object again.  The

9    document does speak for itself.  He's just asking the witness

10   to read a Ninth Circuit order.

11           **THE COURT:**  Yes, it does.

12           **MR. COHAN:**  I'm just laying foundation.

13           **MR. SAMPSON:**  It's in, Your Honor.

14           **THE COURT:**  It's an exhibit that's in.  This witness

15   doesn't need to read it.  The jury can read it.

16           **MR. COHAN:**  Very well, Your Honor.

17   **Q.**  Do you understand that there were no proceedings in the

18   District Court in this case?

19   **A.**  Yes.

20   **Q.**  Do you understand why the Court of Appeals thinks,

21   according to this order, that there were District Court orders

22   in this case when there were no District Court orders?

23           **MR. SAMPSON:**  Objection, relevance.

24           **THE COURT:**  He can't testify as to why the Court of

25   Appeals does anything that it does.  He's not a lawyer, and

1    even if he was, that would be inappropriate.

2    BY MR. COHAN:

3    **Q.** Did you discuss this order with Mr. Grant after it was

4    received?

5    **A.** Yes.

6    **Q.** Did you attempt to explain to him what this language

7    "Grant forfeits review of District Court's orders" means?

8    **A.** Yes, I did.

9    **Q.** Were you able to understand what it meant?

10   **A.** Yes.

11   **Q.** What did it mean to you --

12            **THE COURT:** Counsel --

13   BY MR. COHAN:

14   **Q.** -- when it referred to --

15            **THE COURT:** His opinion as to what a court meant in

16   his order is not relevant here.

17            **MR. COHAN:** Only insofar as --

18            **THE COURT:** Only what he had in response to it.

19   BY MR. COHAN:

20   **Q.** What did you tell Mr. Grant about the Court of Appeals

21   saying that Grant forfeits review --

22            **THE COURT:** No. Not what he said. What he did --

23            **MR. COHAN:** I'm talking about --

24            **THE COURT:** -- in response to this order.

25            **MR. COHAN:** Okay.

1  **Q.**  Did you have a conversation with -- with Mr. Grant in

2  which you discussed this portion of this Ninth Circuit order

3  to which I've just invited your attention?

4  **A.**  Yes.

5  **Q.**  And what did you tell him?

6          **MR. SAMPSON:**  Your -- Hearsay, Your Honor.

7          **THE COURT:**  Sustained.

8          **MR. COHAN:**  It's not offered for the truth.  It's

9  offered for the effect on Mr. Grant, Your Honor.

10         **THE COURT:**  Sustained.

11         **MR. COHAN:**  Your Honor, I'd request that you take

12  judicial notice of the fact that since Mr. Grant persuaded --

13  excuse me -- prevailed on the motion for summary judgment,

14  that this Ninth Circuit order makes absolutely no sense to say

15  that Mr. Grant forfeited --

16         **THE COURT:**  You want me to take judicial notice that

17  a Ninth Circuit order makes no sense?

18         **MR. COHAN:**  I do, Your Honor.

19         **THE COURT:**  Well, no.

20         **MR. COHAN:**  Since it does not.

21         **THE COURT:**  That's not going to happen, counsel.  The

22  Ninth Circuit is the circuit over this entire jurisdiction.

23  It's not for the trial court to question the legitimacy of an

24  order issued by a higher court.  No.  I will not do that.

25         **MR. COHAN:**  Even if it's obviously nonsensical?

1    **MR. SAMPSON:**  Your Honor, counsel's testifying.

2    **THE COURT:**  No, I will not do that.

3    **MR. SAMPSON:**  Argumentative.

4    **THE COURT:**  And it's entirely inappropriate.  No.

5    BY MR. COHAN:

6    **Q.**  Sir, were there any district court orders entered on -- in

7    connection with Mr. Grant?

8    **A.**  Not at this time.

9    **Q.**  Okay.

10       So there was no proceeding involving a district court that

11   is being addressed by the circuit, as you understand it?

12   **A.**  That's right.  There was no district court order of any

13   kind that we were challenging at this time.

14   **Q.**  Now, is the tax court the same as the district court,

15   Mr. Mottahedeh?

16   **A.**  No, it is not.

17           **MR. COHAN:**  Okay.

18   **Q.**  Now --

19           **THE COURT:**  Now, counsel, he's not a lawyer.  You

20   have no foundation for these opinions that you're bringing in

21   through him.  None.

22           **MR. COHAN:**  Fine.  I'll lay foundation.

23   **Q.**  Do you know the difference between United States District

24   Court and the United States Tax Court, Mr. Mottahedeh?

25   **A.**  Yes.

1    **Q.**   What is the difference?

2             **THE COURT:**   No.   The next question is how does he

3    know the difference.

4    **BY MR. COHAN:**

5    **Q.**   How do you --

6             **THE COURT:**   What qualifications does he have to be

7    able to tell the difference between two federal courts?

8             **MR. COHAN:**   He can read English, Your Honor.

9             **THE COURT:**   Counsel, ask the question that I am

10   permitting you to ask and don't argue back with me on it.

11            **MR. COHAN:**   I apologize, Your Honor.

12   **Q.**   How do you know that there's a difference between the

13   United States Tax Court and a United States District Court?

14   **A.**   Because I read the laws.   I read the court cases that

15   describe these differences.   It's in English.   I read English

16   well.   And it's very clear that they're not in same.

17   **Q.**   Do you get juries in U.S. Tax Court?

18            **MR. SAMPSON:**   Objection, Your Honor.   He's -- Again,

19   he's not an attorney.

20            **MR. COHAN:**   Take judicial notice of it.

21            **THE COURT:**   This is something he could find if he

22   went to the website.   Overruled.

23   **BY MR. COHAN:**

24   **Q.**   So you --

25   **A.**   You get no jury trial in tax court.

1 **Q.** Are judges of the tax court the same as U.S. District

2 judge, like Her Honor in this courtroom?

3          **MR. SAMPSON:** Relevance, Your Honor.

4          **THE COURT:** Sustained.

5                    (Pause in the proceedings.)

6 **BY MR. COHAN:**

7 **Q.** Inviting your attention, if I may, sir, to Exhibit 608.

8 Do you see that?

9 **A.** (Reviewing document.)

10      608?

11 **Q.** Yes, sir, 608.

12 **A.** (Reviewing document.)

13      I'm having trouble finding it.

14          **MR. COHAN:** May I approach, Your Honor?

15          **THE COURT:** Yes.

16 (Off-the-record discussion between the witness and Mr. Cohan.)

17          **MR. COHAN:** All right. I'm going to give you my

18 copy.

19      May I have just a moment, Your Honor?

20          **THE COURT:** All right.

21                    (Pause in the proceedings.)

22          **MR. COHAN:** May I approach, Your Honor?

23          **THE COURT:** Yes.

24          **MR. COHAN:** Let him use my copy.

25 **Q.** Sir, do you recognize Exhibit 608?

1    **A.**   Yes.

2    **Q.**   What is Exhibit 608?

3    **A.**   It's a statement I provided for Mr. Grant to send to tax

4    court instead of being -- appearing before the court to make

5    his position known in writing.

6    **Q.**   So you drafted up the entirety of what constitutes Exhibit

7    608 for Mr. Grant to file with the tax court; is that right?

8    **A.**   Yes.

9    **Q.**   And to the best of your knowledge and belief, did

10   Mr. Grant sign it and file it with the tax court?

11   **A.**   Yes.

12          **MR. COHAN:**  Move its admission at this time, Your

13   Honor.

14          **THE COURT:**  Any objection?

15          **MR. SAMPSON:**  No, Your Honor.

16          **THE COURT:**  Admitted.

17      (Defendant's Exhibit 608 received in evidence)

18          **MR. COHAN:**  May I approach, Your Honor?

19      And I want to display it to the jury.

20              (Exhibit published.)

21              (Pause in the proceedings.)

22   **BY MR. COHAN:**

23   **Q.**   Do you recall what was the essence of this petitioner's

24   statement that you drafted for Mr. Grant to file with the tax

25   court?

1    **A.**  Yes.

2    **Q.**  Can you tell the ladies and gentlemen of the jury what it

3    was that you drafted up here?

4    **A.**  Essentially that the IRS appeals officer has wrongfully

5    denied a hearing, a face-to-face hearing to Mr. Grant which he

6    was entitled under law.  And also reminding the court that

7    Ninth Circuit Court of Appeal, which in this case would be

8    above -- I mean -- I'm sorry -- the Eighth Circuit Court of

9    Appeal, the one of the courts of appeal, had ruled that an

10   appeal --

11            **MR. SAMPSON:**  Your Honor, I object.  He's talking

12   about another court case.

13            **THE COURT:**  Yes.  I -- I don't know what the

14   relevance is of another court case.

15            **MR. COHAN:**  I'll --

16            **THE COURT:**  He can summarize what this response is.

17   BY MR. COHAN:

18   **Q.**  Okay.  Did you cite the case of *Robinette vs. The*

19   *Commissioner* in the Eighth Circuit in this petitioner's

20   statement, the first page of it?

21   **A.**  Yes, I did.

22   **Q.**  And why did you do that, sir?  What was the reference to

23   *Robinette v. Commissioner* supposed to do for Mr. Grant?

24            **MR. SAMPSON:**  Your Honor, this is irrelevant.  I

25   object.

1    **THE COURT:**  I'd like to hear the answer to this

2    before I sustain the objection.

3    **THE WITNESS:**  Because in *Robinette*, the Court of

4    Appeal has said that there is not supposed to be a -- a trial

5    in this collection due process hearing appeals, as was done in

6    this case.

7    **THE COURT:**  All right.

8    **MR. SAMPSON:**  Your Honor, the answer -- I'm sorry.

9    The answer was not responsive to the question.

10    **THE COURT:**  It isn't, and I'm going to close down

11    this line of questioning.

12    **MR. COHAN:**  Okay.

13    **THE COURT:**  Objection's sustained.

14    Jury is ordered to disregard the last answer.

15    (Pause in the proceedings.)

16    **BY MR. COHAN:**

17    **Q.**  Do you have Exhibit 128?

18    **A.**  Yes.

19    **Q.**  Forgive the "G".  In front of it?

20    Do you recognize Exhibit 128, sir?

21    **A.**  Yes.

22    **Q.**  What is Exhibit 128?

23    **A.**  It's the letter I wrote for Mr. Grant in response to the

24    IRS summons issued against Mr. Grant.

25    **Q.**  And do you recall who Ms. Young-Lau is who's the addressee

1    on this letter?

2    **A.**    The IRS Revenue Agent who had summoned Mr. Grant.

3    **Q.**    And what was your purpose in drafting this letter and

4    providing it to Mr. Grant?

5        How was this going to help Mr. Grant, as you understood

6    it?

7    **A.**    To --

8        (Reviewing document.)

9            **MR. SAMPSON:**    Your Honor, I -- I'm not sure if

10   there's a refreshing going on or if he's --

11           **THE WITNESS:**    I was refreshing myself.

12           **THE COURT:**    Excuse me.

13           **THE WITNESS:**    Yes.  I'm sorry.

14           **THE COURT:**    He's addressing the court, not you.

15           **THE WITNESS:**    I apologize.

16           **THE COURT:**    What's your objection?

17           **MR. SAMPSON:**    It appears that he was reading the

18   document to refresh his recollection before he answered.  And

19   so I think that we would have to establish that he lacked a

20   recollection of what the letter was about first.

21           **THE COURT:**    Okay.  That's proper procedure.  Yes.

22       Ask him if he recalls.  If he doesn't, he can look at it.

23   BY MR. COHAN:

24   **Q.**    Sir, do you recall that you were the person who actually

25   wrote this letter?

1  **A.**  Yes.

2  **Q.**  Do you not recall exactly what you wrote approximately

3  seven years ago?

4  **A.**  No, I do not recall exactly what I wrote without

5  refreshing myself.

6  **Q.**  Okay.  Would you take a moment to refresh your

7  recollection, and then I'll just ask you a couple of questions

8  and we can get out of here for the day.

9  **A.**  Sure.

10  (Reviewing document.)

11  Okay.

12  **Q.**  Do you now recall the purpose that you wrote this letter

13  for -- to send to Ms. Young-Lau -- or strike that -- for

14  Mr. Grant to sign and send to Ms. Young-Lau?

15  **A.**  Yes, the purpose was to let Ms. Young-Lau know that the

16  IRS summons by itself does not have any power, that they

17  would -- needs to be a court order before Mr. Grant could be

18  forced to give information about himself to the IRS in

19  response to IRS summons.

20  **Q.**  Okay.

21  And to the best of your knowledge and belief, you provided

22  this letter to Mr. Grant, and he signed it on the third page

23  of Exhibit 168?

24  **A.**  Yes.

25  **Q.**  Okay.

1    May I display, Your Honor?  This one's in evidence.

2         THE COURT:  Yes.

3              (Exhibit published.)

4         MR. SAMPSON:  Your Honor, at this time -- and I know

5    this document is in evidence -- it discusses the law, and I

6    think it would be appropriate to give a limiting instruction

7    to the jury about whether they should take this legal argument

8    for the truth of the matter stated or for some other purpose.

9         THE COURT:  Okay.

10   All right.  Ladies and gentlemen, I instruct you that the

11   legal material that is admitted here at trial or discussed by

12   this or any other witness is relevant only on the question of

13   the defendant's state of mind.

14   It does not establish what the law is.  The court will

15   instruct you as to what law actually applies to this case.

16        MR. COHAN:  Okay.  Thank you.

17   Again, this will be in evidence so the jurors can look at

18   it as much as they like.  We won't take your time to read it

19   now.

20   Q.  Inviting your attention to what's been marked and admitted

21   as Exhibit 129, do you have that before you, sir?

22   A.  (Reviewing document.)

23   Yes.

24   Q.  Do you recognize what's been marked for purpose of

25   identification and admitted as Exhibit 129?

1  **A.**  Yes.

2  **Q.**  And how did you receive it?

3  **A.**  Mr. Grant had provided me a copy of this letter.

4  **Q.**  Okay.  Inviting your attention to the third page of this

5  letter, it says, "description of documents requested."

6  Do you see that?

7  **A.**  Yes.

8  **Q.**  And inviting your attention to paragraph No. 2, says --

9  Again, my copy is marked.

10  Do you have an unmarked one, Your Honor?

11         **MR. SAMPSON:**  Do you want us to show it?

12         **MR. COHAN:**  Sure.  Thank you, Larry -- Mr. Garland.

13  Excuse me.

14         **MR. SAMPSON:**  Mr. Cohan, I'm sorry.

15         **MR. COHAN:**  Did you call me something else?

16                 (Off-the-record discussion.)

17                     (Exhibit published.)

18  **BY MR. COHAN:**

19  **Q.**  So may I invite your attention to the paragraph No. 2 that

20  says, we have no filings of your 2005 and subsequent

21  individual income tax returns.

22  Do you see that?

23  **A.**  (Reviewing document.)

24  Say it again, please?  Where?  Oh, paragraph No. 2, yes,

25  uh-huh.

1  **Q.**  Okay.  Inviting your attention to the language, please be

2  aware that Internal Revenue Code Section 6001 and 6011 require

3  that each person who owes (sic) -- who owes income -- who owes

4  income files a return.

5      Do you see that?

6  **A.**  Yes.

7  **Q.**  Did you discuss this with Mr. Grant?

8  **A.**  Yes.

9  **Q.**  Did you make any statements to him to the effect that

10  Section 6001 and 6011 did or did not apply to him?

11      **MR. SAMPSON:**  Objection, Your Honor, its leading.

12  It -- It's --

13      **THE COURT:**  It's hearsay.

14      **MR. SAMPSON:**  It's double-hearsay.

15      **THE COURT:**  Sustained.

16      **MR. COHAN:**  I'm asking him --

17      **THE COURT:**  Sustained.

18      **MR. COHAN:**  -- if he made statements.  It's not

19  hearsay to ask him if he made a statement.

20      **THE COURT:**  You're asking about an out-of-court

21  statement that he made?  Why isn't that hearsay?

22      **MR. COHAN:**  Because he's a witness of the statement,

23  and I'm not offering it for the truth, Your Honor.

24      **THE COURT:**  What are you offering it for?

25      **MR. COHAN:**  For its effect on Mr. Grant.

1  **THE COURT:**  The effect on Mr. Grant?

2  **MR. COHAN:**  Yes.

3  **THE COURT:**  I don't understand what you mean.

4  **MR. COHAN:**  The effect on Mr. Grant of what

5  Mr. Mottahedeh may have told him about whether 6001 and 6011

6  actually applied to Mr. Grant.

7  **THE COURT:**  And I'm not sure what you mean "the

8  effect on Mr. Grant."  In fact, I'd like to have a full

9  discussion with you about this line of questioning, so I think

10  we will allow the jury to be excused, and then we can talk in

11  their absence and we'll start again tomorrow.

12  **MR. COHAN:**  Thank you.

13  **THE COURT:**  Okay.

14  All right, ladies and gentlemen of the jury, thank you for

15  your patience.  Keep in mind the instruction that I've given

16  you every day.  Do not discuss the case with anyone, and do

17  not allow anyone to discuss the case with you.  Do not do any

18  independent research and keep an open mind until all the

19  evidence is in.

20  We'll see you tomorrow morning at 8:30.

21  (The following proceedings were heard out of the presence

22  of the jury:)

23  **THE COURT:**  Mr. Mottahedeh, you may step down.  Thank

24  you.

25  **MR. SAMPSON:**  Your Honor, before this witness leaves,

1  I would just ask the court to remind the witness -- to remind

2  parties not to discuss his testimony because he's still on the

3  stand with him.

4          **THE COURT:**  Yes.  Mr. Mottahedeh?

5          **THE WITNESS:**  Yes, Your Honor.

6          **THE COURT:**  You may not discuss your testimony --

7  since you've already started testifying, you may not discuss

8  your testimony with any of the participants in this trial.

9          **THE WITNESS:**  Okay.

10          **THE COURT:**  You understand?

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  And you may not approach any of the

13  jurors in this case.  Do you understand?

14          **THE WITNESS:**  Yes.

15          **THE COURT:**  All right.  Thank you.

16      All right.

17      Couple of things.  With regard to your request for

18  judicial notice of the error of the Court of Appeals, I mean,

19  I'm totally floored by such a request.  It's obviously

20  appropriate for the court to perhaps take judicial notice of

21  the existence of a publicly filed document, but it certainly

22  isn't appropriate to take judicial notice that another court,

23  particularly one that reviews this court's work, has committed

24  an error.

25      Indeed, under Rule 201, the court may only judicially

1  notice facts that are generally known within the trial court's

2  territorial jurisdiction, not something that's suitable --

3  that's --

4           **MR. COHAN:**  Or not reasonably --

5           **THE COURT:**  -- subject to dispute or question.

6      I mean, I can't even believe that you would make such a

7  request of this court.  But with that said, let's move on.

8      I'd like to hear about the -- where we're going with this

9  line of questioning.  And just tell me what your plan is with

10  regard to the -- I believe the last question had to do with an

11  out-of-court statement made by the witness but you say you're

12  offering it to prove the effect.  What -- what do you mean the

13  effect on Mr. Grant?

14           **MR. COHAN:**  The issue --

15           **MR. SAMPSON:**  Your Honor, Mr. Mottahedeh is still in

16  the courtroom.

17           **THE COURT:**  Oh.

18           **THE WITNESS:**  Shall I leave?

19           **THE COURT:**  Yes, you should.  All witness who will

20  testify in the trial must be excluded when trial's in session

21  and they're not on the stand.

22           **THE WITNESS:**  Am I excused for the day?

23           **THE COURT:**  Pardon me?

24           **THE WITNESS:**  Am I excused for the day?

25           **THE COURT:**  You're excused until tomorrow morning at

1    8:30.

2         Are there any other witnesses in the court?

3         **MR. SAMPSON:**  I don't believe so, Your Honor, not

4    that have been identified by the defense.

5         **THE COURT:**  Okay.

6         **MR. COHAN:**  The only other witness we have is in the

7    courtroom.  His name is Richard Grant.

8         **THE COURT:**  Well, he's a party, and he can stay.

9         All right.  So tell me what you're doing.

10        **MR. COHAN:**  I'm laying the foundation for Mr. Grant

11   to testify that he was told things by Mr. Mottahedeh and

12   believed them.  And Mr. Mottahedeh -- Mottahedeh was here so

13   he could say yes, I told Mr. Grant X, Y, Z.  You aren't

14   required to file a tax return because these things don't apply

15   to you.

16        Now, if Mr. Grant testifies to that, the -- the government

17   can cross-examine him, say, well, Mr. Mottahedeh never told

18   you that.  So I've got him here to say, yeah, I did tell him

19   that.  Now, what effect it had on Mr. Grant and his intent in

20   terms of reliance material is for the jury to determine.

21        But how else would I show that Mr. Mottahedeh made a

22   statement to Mr. Grant about whether he was or was not

23   required to file income tax return, except through his

24   testimony and Mr. Grant's testimony?  There is no other way.

25        **THE COURT:**  Hmm.  Okay.

1    Response.

2         MR. SAMPSON:  Your Honor, this witness cannot testify

3    as to the effect on Mr. Grant.  Only Mr. Grant can do that.  I

4    don't see a foundational issue that Mr. Mottahedeh's testimony

5    resolves.  It's still hearsay.

6         THE COURT:  Well, counsel has just said he's not

7    offering it to show that the -- he's not going to ask the

8    witness how did it affect Mr. Grant.  That's correct, right?

9                   (Simultaneous colloquy.)

10        THE COURT:  Just that the statement was made --

11                  (Off-the-record discussion.)

12        THE COURT:  Just that the statement was made, which

13   will give some support to Mr. Grant's claim as to what he

14   believed.  Is that -- Do I have that right?

15        MR. COHAN:  You do, Your Honor.  It's not offered for

16   the truth.  It's offered that it was made, and then Mr. Grant

17   will have to testify what, if any, effect it had on his

18   beliefs concerning whether he did or did not have a legal duty

19   to file income tax returns and pay taxes.

20        THE COURT:  Okay.

21      Response?

22        MR. SAMPSON:  As long as the jury's appropriately

23   instructed, Your Honor, I -- I suppose that that's not

24   inappropriate.

25        THE COURT:  Did we have some -- we had some

1  discussion about the use of hearsay to show the effect on the

2  listener and that, for the most part, had to do with

3  statements that the IRS made to Mr. Grant.

4  Wouldn't that same apply -- and the limiting instruction I

5  think that we talked about, would apply under this scenario as

6  well?

7  **MR. COHAN:**  Exactamon (phonetic).

8  **THE COURT:**  Is that the position you're taking.

9  **MR. COHAN:**  Exactly.

10  **THE COURT:**  Okay.

11  **MR. SAMPSON:**  I'm not sure, Your Honor.

12  It's the statement of a -- essentially IRS, a party to the

13  opposing party.  This is not an analogous situation.  I'm not

14  sure how to parse it other than that.

15  **THE COURT:**  Well, what difference does it make that

16  the IRS is the opposing party to the effect on the listener?

17  **MR. SAMPSON:**  I guess the effect on the listener

18  would be non-hearsay.

19  **THE COURT:**  I think that that's kind of what that

20  limiting instruction went to.  You all prepared one, I

21  thought.

22  **MR. COHAN:**  We did.

23  **THE COURT:**  And it says, you are about to hear

24  evidence that employees of the IRS made statements to the

25  defendant.  I instruct you that this evidence is admitted only

1  for the limited purpose of demonstrating the defendant's state

2  of mind, knowledge, or the effect the statement had on the

3  defendant.  Therefore, you must consider it only for that

4  limited purpose and not for any other.

5      I'm not so sure I see why it makes a -- I know this was

6  written with something else in mind, but why wouldn't this

7  apply here?

8          **MR. SAMPSON:**  I'm -- I think that it could be crafted

9  in a way where it would.

10         **THE COURT:**  Okay.  All right.  Then I'll allow it.

11     If -- Why don't I just change it and just take out the

12  part about the employees of the revenue service.

13         **MR. COHAN:**  Perfect, Your Honor.

14         **THE COURT:**  That would work?

15         **MR. COHAN:**  That's the whole point of the inquiry.

16         **THE COURT:**  All right.  Then that's what we'll do.

17     Is there anything else that we need to address, and is

18  tomorrow going to be our last day --

19         **MR. COHAN:**  I believe so.

20         **THE COURT:**  -- of evidence?

21         **MR. COHAN:**  Yes.  I believe so, because this is my

22  second-last witness.  After Mr. Mottahedeh's testimony is

23  concluded, my last witness is Mr. Grant.  And that's going to

24  take a while.

25         **THE COURT:**  Okay.

```
 1            MR. COHAN:  He's got some explaining to do.

 2            THE COURT:  So probably between your direct and

 3   cross, it will take all day.

 4            MR. COHAN:  I would assume so because we have

 5   considerable video that we would like to play and documents

 6   that I can only introduce through Mr. Grant that he read it,

 7   relied upon it, and it's all relevant to his intent, Your

 8   Honor.

 9            THE COURT:  Right.  Okay.  So -- All right.

10       I'm sorry.  I'm just -- My blood sugar's dropping.  I need

11   a break.  But we'll plan on just a regular day, and as we

12   talked about, on Tuesday, we'll do the -- any rebuttal witness

13   and/or --

14            THE CLERK:  Monday?

15            THE COURT:  Tuesday?

16                 (Simultaneous colloquy.)

17            THE COURT:  Monday.  Monday.  Monday.  Tomorrow's

18   Friday.

19            MR. COHAN:  Right.

20            THE COURT:  We'll have -- We'll conclude with the

21   witness that's currently on the stand.  Have Mr. Grant

22   testify.  And hopefully we'll get through Mr. Grant's

23   testimony and cross by the end of the day tomorrow.

24       And then whatever evidence is left, we will hear on Monday

25   morning and have closing arguments and instructions
```

1  immediately thereafter.  It will be a full day.  I can tell

2  the jury tomorrow that Monday will be a full day.

3          **MR. COHAN:**  Tomorrow, Your Honor, my understanding

4  was from previous statements by the court that we would have

5  our instruction conference tomorrow afternoon?

6          **THE COURT:**  Tomorrow afternoon.

7          **MR. COHAN:**  Okay.

8          **MR. SAMPSON:**  Yes, Your Honor.  I think that's

9  appropriate.  I think we're expecting -- if we put on a

10  rebuttal case, we don't think it will be very long.  And we

11  would do that on Monday morning.

12          **THE COURT:**  Okay.  All right.  All right.  So it

13  sounds like we're ready to go.

14          **MR. SAMPSON:**  Yes, Your Honor.

15          **THE COURT:**  All right.  So what we'll do tomorrow,

16  though, assuming we have as full a day as we did today, we'll

17  have a lunch break and then come back and talk about

18  instructions, 'cause I don't think we can go straight through.

19          **MR. SAMPSON:**  Thank you, Your Honor.

20          **MR. COHAN:**  Speaking of blood sugar, I really like

21  that idea.  Thank you.

22              (Proceedings were concluded at 1:50 P.M.)

23                          --o0o--

24

25

```
1

2                    CERTIFICATE OF REPORTER

3

4              I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6     I further certify that I am neither counsel for, related to,

7     nor employed by any of the parties to the action in which this

8     hearing was taken, and further that I am not financially nor

9     otherwise interested in the outcome of the action.

10

11     _____

12            Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                   Friday, February 17, 2017

14

15

16

17

18

19

20

21

22

23

24

25
```